

08 CIV 10420

James A. Janowitz
Donald S. Zakarin
Jacob B. Radcliff
PRYOR CASHMAN LLP
410 Park Avenue
New York, New York 10022
(212) 421-4100
jjanowitz@pryorcashman.com
dzakarin@pryorcashman.com
jradcliff@pryorcashman.com

Attorneys for Plaintiffs Allianz Risk Transfer,
Marathon Structured Finance Fund, LP,
NewStar Financial, Inc. and Munich Re Capital Markets New York, Inc.

RECEIVED
DEC 2 2008
U.S.D.C. S.D. N.Y.
CASHIERS

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------- x

ALLIANZ RISK TRANSFER,                         :
MARATHON STRUCTURED FINANCE FUND, LP,          :        **COMPLAINT**
NEWSTAR FINANCIAL, INC., and                   :
MUNICH RE CAPITAL MARKETS NEW YORK, INC.,      :

        Plaintiffs,                                  :

        -v-                                          :

PARAMOUNT PICTURES CORPORATION,                :

        Defendant.                                   :

-------------------------------------------------------------------- x

      Plaintiffs Allianz Risk Transfer ("Allianz"), Marathon Structured Finance Fund,

LP ("Marathon"), NewStar Financial, Inc. ("NewStar") and Munich Re Capital Markets

New York, Inc. ("MRCM") (collectively, "Plaintiffs"), by their attorneys Pryor Cashman

LLP, as and for their Complaint against defendant Paramount Pictures Corporation

("Paramount"), allege as follows:

## NATURE OF DISPUTE

1.      This is an action brought by Plaintiffs pursuant to Section 10(b) of the

Securities Exchange Act of 1934 and Rule 10b-5 promulgated thereunder, 15 U.S.C.

78(j)(b) and 17 C.F.R. 2401.10b-5, and for fraudulent inducement and unjust enrichment

at common law in the State of New York, seeking damages, rescission and/or restitution

based on Paramount's knowing misrepresentations and omissions of information material

to Plaintiffs' decision to invest in securities issued by Melrose Investors LLC for the

benefit of Paramount.

2.      Plaintiffs are financial institutions which make investments in a variety of

industries.  All of Plaintiffs invested in debt instruments, Class B Notes (the

"Securities"), and Marathon and Allianz also invested in membership interests of Melrose

as set forth in paragraphs 10 and 11 below (the "Equity" and, together with the Notes, the

"Securities"), in an investment vehicle sponsored by Paramount to finance the production

of a slate of films to be produced, released and distributed by Paramount between April

of 2004 and March of 2006 (the "Melrose Slate").  The Securities were issued by an

entity named Melrose Investors LLC ("Melrose") which served as a conduit for the

investment proceeds to Paramount.  In purchasing the Securities, Plaintiffs read and

relied on the accuracy and completeness of the statements contained in a private

placement memorandum dated July 22, 2004 (the "PPM"), statements which Paramount

alone knew were incomplete and otherwise false and misleading.  Merrill Lynch & Co.

("Merrill") acted as the placement agent for the Securities of Melrose.

3.      Paramount induced Plaintiffs to purchase the Securities through

disclosures in the PPM stating that Paramount regularly employed specific risk mitigation

techniques when producing and distributing films, and that these risk mitigation techniques would operate for the benefit of the investors in Melrose (the "Melrose Investors").

4.      Because Paramount elected to market the Securities by touting its risk mitigation techniques and providing detailed information regarding such techniques, Paramount had a duty to disclose all information relevant and necessary to render the statements in the PPM regarding its risk mitigation activities in producing and distributing films not misleading.

5.      Paramount failed to disclose that by the time of Plaintiffs' purchase of the Securities, contrary to the specific and repeated representations in the PPM concerning its risk mitigation activities, Paramount had materially altered its production and distribution plans with regard to the films in the Melrose Slate to dramatically reduce the use of the risk mitigation techniques described in the PPM.  By failing to explain that its discussion of its risk mitigation activities was no longer accurate, Paramount not only misrepresented the actual financial risks associated with the investment but also omitted material facts necessary to make statements made in the PPM not misleading.

6.      The financial performance of the Melrose Slate was poor and, as a result, Plaintiffs expect to lose their entire investment of $40.1 million.  Had Paramount used the risk mitigation techniques to co-finance the Melrose Slate in keeping with the representations in the PPM, not only would Plaintiffs not have lost their investment, but, upon information and belief, Plaintiffs would also have earned their expected rate of return on the Notes and would have recovered their investment in the Equity.

7.      Plaintiffs seek damages pursuant to sections 10(b) of the Securities

Exchange Act of 1934, 15 U.S.C. 78j(b) and the rules and regulations promulgated

thereunder by the Securities and Exchange Commission, including Rule 10b-5, 17 C.F.R.

240.10b-5, rescission pursuant to common law fraud and recovery of the entirety of their

investment pursuant to a common law claim of unjust enrichment, together with interest,

punitive damages, costs and Plaintiffs' attorneys' fees.

## PARTIES

8.      Paramount is a Delaware corporation wholly owned by Viacom, Inc. with

a principal place of business located at 5555 Melrose Avenue, Hollywood, California

90038-3197.  Paramount is in the business of producing, financing and distributing

motion pictures.

9.      NewStar is a Delaware corporation with a principal place of business

located at 500 Boylston Street, Boston, Massachusetts 02116.  NewStar purchased

$10,000,000 original principal amount of Class B Notes on July 29, 2004.

10.      Marathon is a Delaware limited partnership with a principal place of

business located at 461 Fifth Avenue, New York, New York 10017.  Marathon purchased

$7,000,000 original principal amount of Class B Notes and $3,000,000 of membership

interests in Melrose (representing approximately 10.5% of the issued and outstanding

membership interests of Melrose) on July 29, 2004.

11.      MRCM, formerly Munich American Capital Markets, Inc., is a Delaware

corporation wholly owned by Munich Reinsurance Company AG (through Munich

American Holding Corporation) with a principal place of business located at 540

Madison Avenue, 5th Floor, New York, New York 10022.  On July 30, 2004, MRCM

entered into a total return swap transaction with Merrill Lynch Mortgage Capital, Inc. with respect to $10,000,000 original principal amount of Class B Notes purchased by Merrill Lynch Mortgage Capital, Inc. on July 29, 2004, wherein MRCM acquired the material economic benefit and risk of the Notes. On March 21, 2007, MRCM acquired the underlying bond from Merrill Lynch Mortgage Capital, Inc. for the face amount of $10,000,000. By virtue of the total return swap transaction with Merrill Lynch Mortgage Capital, Inc., MRCM has been the beneficial owner of the Notes since July 30, 2004.

12. Allianz is an insurance company organized under the laws of Switzerland with a principal place of business located at Lavaterstrasse 67, CH-8002, Zürich, Switzerland. On or about October 14, 2004, Allianz entered into a total return swap transaction with Hypo Public Finance Bank (formerly known as Hypo Real Estate Bank International) ("EuroHypo") with respect to $7,125,000 original principal amount Class B Notes and $3,000,000 of membership interests in Melrose (representing approximately 10.5% of the issued and outstanding membership interests of Melrose), in each case purchased by EuroHypo on October 13, 2004, wherein Allianz acquired the material economic benefit and risk on the Securities. On June 30, 2006, Allianz acquired the underlying Class B Notes from EuroHypo for the face amount of $7,125,000 and the underlying membership interests of Melrose for $3,000,000. By virtue of the total return swap transaction with EuroHypo, Allianz has been the beneficial owner of the Securities since July 30, 2004.

## JURISDICTION AND VENUE

13. This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Securities Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1331

and § 1367.  As this action is between citizens of different states and/or foreign states and the amount in controversy exceeds $75,000 exclusive of interest and costs, this Court also has original jurisdiction pursuant to 28 U.S.C. § 1332.

14.     Venue is proper in this District pursuant to Section 27 of the Securities Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1391(b).  Many of the acts constituting the violations of law alleged herein, including the preparation and dissemination of the PPM, occurred in substantial part in this Judicial District.

## FACTUAL ALLEGATIONS

**I.**          **The Structure of the Melrose Transaction**

**A.**          **Terms of the Transaction**

15.     The Melrose transaction (the "Melrose Transaction") is a structured finance transaction sponsored by Paramount pursuant to which the Melrose Investors provided Paramount approximately $231.3 million for purposes of enabling Paramount to finance the production and distribution of motion pictures.  Because Paramount both produces films and distributes them, by reducing Paramount's own financial investment in the production any single film, the Melrose Transaction enabled Paramount to produce a slate of films for distribution while reducing Paramount's own financial risk in connection with the production of films.

16.     The Melrose Transaction included three types of securities.  The senior creditors, holders of the Class A Notes, provided $157.5 million.  The junior creditors, holders of the Class B Notes, provided $45.3 million.  The equity investors provided $28.5 million.  The Melrose Transaction closed on July 29, 2004 and was amended to

permit additional purchases of Class A and Class B Notes and equity on or about October 13, 2004.

17.    The Melrose Slate did not cover all of the films that Paramount intended to produce or distribute between 2004 and 2006, but rather a discrete set of films that met the criteria for "Covered Pictures" set forth in the PPM.  These criteria included, *inter alia*, films that received an MPAA rating no more restrictive than "R", were filmed predominantly in English, and for which Paramount's net production investment exceeded $5 million.

18.    Melrose, as a conduit or instrumentality sponsored by Paramount, used the funds raised in the Melrose Transaction to purchase from Paramount revenue participation interests ("RPI") in each film in the Melrose Slate pursuant to the terms of the Revenue Participation Agreement dated July 29, 2004 (the "RPA").  Melrose operated as a conduit for investor funds to Paramount and to distribute the RPI income from the Melrose Slate to the noteholders and Melrose members.

19.    As intended by the parties to the Melrose Transaction, Melrose's sole asset, aside from a small reserve for administrative purposes, is now the RPI for all of the films in the Melrose Slate.

20.    The RPI income is distributed to Melrose pursuant to the terms of the RPA and further distributed among the Melrose noteholders and members pursuant to the terms of an indenture dated as of July 29, 2004.

21.    The RPA provides that the receipts available for RPI are net of a distribution fee to Paramount, an administrative fee, print, advertising and distribution costs, third-party participations and taxes for each production period.  After these net

receipts are calculated, the Melrose Investors' RPI income is based on the Melrose

Investors' pro rata contribution to the net cost of producing the films in the Melrose Slate.

22.     Payments of the RPI are made to Melrose and distributed pursuant to a

"waterfall" to investors in order of seniority.  RPI is generally first distributed to pay the

holders of senior Class A Notes, then to holders of the subordinated Class B Notes, and

finally to holders of the Equity of Melrose.

**B.          Slate-Based Institutional Investment in Film Production**

23.     When institutional investors such as Plaintiffs finance the production of

motion pictures, the process is a highly analytic one based upon objective criteria and

facts as well as the structure of the financing.

24.     Typically, as in the Melrose Transaction, institutional investors invest in a

large slate of films rather than individual films to benefit from diversification, just as

conservative individual investors invest in diversified funds rather than individual stocks

and bonds.  Slates of films offered for institutional investment participation are typically

produced by the major film studios which have the capacity to produce and distribute a

large number of films in a relatively short period of time.

25.     One of the key elements in evaluating an investment in a slate of films is

the business model of the sponsor (the "Business Model").  The Business Model

includes, among other things, the budget range of films, the means of distribution and the

fiscal discipline of management and risk mitigation techniques employed by management

to avoid undue loss.

26.     For example, a given film project could be produced with big stars

resulting in a costly production or with relatively unknown actors for a small budget.  The

studio may choose to share the risk of loss with partners or to go it alone.  It may choose to spend more or less aggressively in promoting a film.

27.     Critically, because the process of producing films is lengthy and necessarily involves a large number of negotiated transactions regarding the details of film production and distribution, most, if not all, of the decisions regarding film production and distribution are made months or even years before a film is released in theaters.  Accordingly, a studio's Business Model provides information not only as to how a studio produces and distributes films generally, but also how a studio has already determined to produce and distribute films set for theatrical release in the near future.

## II.            Paramount's Fraud

## A.            Paramount's Statements as to Risk Mitigation

28.     The PPM describes Paramount's Business Model.  In a section devoted to "Paramount Pictures Business Overview," the PPM states that "[h]istorically, Paramount has managed its business guided by the following principal strategic objectives" including an "[e]mphasis on a **culture of fiscal caution** through continuous budgetary scrutiny and opportunistic **risk-sharing financing**."  (PPM p. 38.)

29.     The PPM further provides as follows:

> **In seeking to limit Paramount's financial exposure**, Paramount has pursued a strategy of entering into **agreements to share the financing of certain films with other parties**.  The parties to these arrangements include studio and non-studio entities, both domestic and foreign.  In some of these arrangements, other parties control certain distribution and/or other ownership rights.

(PPM p. 6.)

30.     The PPM further states:

Like other major studios, **Paramount aims to achieve consistent slate profitability** by managing capital commitments for each film project, **opportunistically entering into output agreements and territory sales** with third parties, and **emphasizing cost mitigation programs such as . . . co-financings . . . . The purpose of these risk-management techniques is to reduce a film's net production cost, thereby diversifying slate performance risk and creating a lower cost basis for Paramount.**

(PPM p. 31.)

31.     The PPM further states:

Paramount selectively pursues and enters into co-production agreements, studio "shared pot" deals, split rights deals and similar arrangements under which, depending on the situation, either Paramount enters into an arrangement with a third party pursuant to which the third party agrees to share in the cost of production of one of Paramount's films in exchange for obtaining certain distribution rights from Paramount or vice versa. Paramount also occasionally asks investors to invest directly in one or more films for a share of those films' net proceeds without any transfer of distribution rights to the investor.  Such agreements provide that the investor receives a share of the defined net proceeds of the film which, depending on the deal, can be from worldwide distribution, certain territories or other markets.  **These agreements limit Paramount's risk relating to the motion picture's performance.**

(PPM pp. 38-39.)

32.     The PPM further states:

**Alignment of Interests**

Since Paramount will share the success of each Covered Picture in which the Issuer acquires an RPI, Paramount will have incentives to extensively market and promote each such Covered Picture.

(PPM p. 31.)

33.     As set forth above, the PPM repeatedly and emphatically represented that

Paramount prudently engaged in a broad array of risk mitigation strategies, including co-

financing, selling off distribution rights for guaranteed payments and making

international territorial sales, all designed to limit Paramount's and hence the Melrose

Investors' financial risk.   Thus, Paramount stated that its Business Model, both on an

historical and current basis, included the objective of limiting its exposure to risk in an

effort to achieve "consistent profitability" in its film slates.

34.      Among the techniques identified by Paramount in the PPM to minimize

risk and achieve consistent profitability are co-financings and international territorial

sales.  Paramount further stated that it "opportunistically" used these risk-mitigating

techniques.

35.      The PPM stated that the Melrose Investors would benefit from

Paramount's "culture of fiscal caution" because the Melrose Investors' interests were

aligned with those of Paramount under the RPA.

36.      Paramount's election to market the Securities by emphasizing its risk

reducing strategies as disclosed in the PPM imposed a duty on Paramount to fully

disclose all material information that related to its risk mitigation activities, including all

information inconsistent with the statements in the PPM that would have revealed that

Paramount actually had not employed and did not intend to employ certain risk

mitigation activities in connection with the Melrose Slate, thereby materially increasing

the risk of loss for the Melrose Investors.

**B.**          **Paramount's Omissions as to Risk Mitigation**

37.      Paramount knew at the time of the sale of the Securities to the Melrose

Investors that certain of the risk mitigation and co-financing strategies identified in the

PPM as Paramount's Business Model would not be employed in the future or would be

significantly curtailed.  Paramount did not disclose this information to Plaintiffs.

38.     Unknown to and undisclosed by Paramount to the Melrose Investors, prior
to the sale of the Securities to the Melrose Investors, in direct contravention of its
extensive disclosure of its risk mitigation techniques in the PPM, Paramount decided to
finance, produce and distribute the Melrose Slate in a manner that imposed a materially
higher level of risk than that contained in the Business Model disclosed in the PPM.

39.     In electing to invest in the Melrose Slate, the risk mitigation strategies
identified by Paramount in the PPM were material to the investment decision of the
Melrose Investors who relied on the statements contained in the PPM as to risk
mitigation.  The Melrose Investors were unaware, due to the concealment of and failure
of Paramount to disclose the change in the Business Model, that the risk mitigation
techniques identified in the PPM would either not be employed by Paramount or
employed to a dramatically diminished extent with respect to the Melrose Slate.

40.     As a result of Paramount's failure to disclose in the PPM that its risk
mitigation techniques were going to be used sparingly to finance to the Melrose Slate, its
disclosures in the PPM were materially false and misleading.

**C.          Omissions Regarding Changes in
             Paramount's International Distribution Strategy**

41.     From 1998 to 2003, Paramount distributed a significant percentage of its
films internationally through the use of international territorial sales, also known as
international "pre-sales," whereby third-party distribution companies purchased the right
to distribute a film in specific foreign countries and territories in exchange for a fixed
sum, or minimum guarantee.  The minimum guarantees were used by Paramount to
partially pay for or defray the production cost of the film.  Thereafter the third-party
distribution companies had no obligation to share revenues or profits with Paramount,

irrespective of how well or poorly a particular film performed in a foreign market unless and until the minimum guarantee and the distribution fees and expenses of the territorial distributor were recouped. When Paramount pre-sold the rights to a film in a particular foreign country or territory, this eliminated the need for Paramount to expend any money on prints of the film for exhibition and advertising expenses in that foreign country or territory since that expense was the responsibility of the territorial distributor.

42.    The net effect for Paramount of utilizing international pre-sales was to decrease the gain that could be earned in foreign countries by a highly performing film while minimizing the risk posed by poorly performing films. The benefit to Paramount of pre-selling distribution rights for foreign territories was that it transferred the risk that a film would perform poorly to third-party distribution companies.

43.    Not employing international pre-sales would increase the profits of Paramount as producer and distributor with respect to highly successful films. However, at the same time, because downside risk was no longer shifted to a third party, it would greatly increase the risk of loss for the Melrose Investors in the event films were unsuccessful.

44.    Prior to Plaintiffs' purchase of the Securities, Paramount's management decided to change its strategy of mitigating the risk of loss through the regular and heavy use of international pre-sales in favor of increasing its handling most of its foreign distribution through United International Pictures ("UIP"), a company owned by Paramount's parent company, Viacom. Upon information and belief, unlike international pre-sales, Paramount's distribution through UIP provides no risk mitigation for Paramount and does not provide for minimum guarantees. The substantial reduction of

foreign pre-sales increased the risk of loss to Paramount (and the Melrose Investors) for poorly performing films by eliminating the minimum guarantee (which was not performance related) while, at the same time, significantly increasing the amounts Paramount needed to spend on prints and advertising, which itself created further risk of loss for the Melrose Investors.

45.     The PPM stated that Paramount engaged in international territorial sales on an "opportunistic" basis, suggesting that when they were reasonably available, Paramount would engage, or at least consider, such sales.  However, as a result of its decision, nowhere identified in the PPM, to reduce its international pre-sales while increasing its self-distribution through UIP, Paramount was not engaging in such sales on an "opportunistic" basis when the PPM was issued.

46.     Accordingly, the representations in the PPM regarding Paramount's practice (Business Model) regarding its opportunistic engagement in making international pre-sales as a means of reducing cost and minimizing risk of loss was knowingly and materially misleading because Paramount failed to inform the Melrose Investors of changes in its Business Model.

47.     Upon information and belief, Paramount's decision to self-distribute in international markets through UIP also was motivated by the fact that UIP, for the benefit of Paramount and/or its parent Viacom, collected a distribution fee on such gross receipts which it did not share with the Melrose Investors.  Thus, Paramount relied on the Melrose Investors to cushion its risk in the new strategy, knowing that Paramount and/or its parent Viacom would reap the rewards of any increased distribution income without sharing it with the Melrose Investors.

48.     Because the Melrose Investors' RPI is calculated as a percentage of the net of gross receipts from all sales less the costs of prints and advertising and the distribution fees, Paramount's change in strategy significantly increased the risk of loss to the Melrose Investors in the event that the films in the Melrose Slate performed poorly.

49.     Paramount failed to disclose to the Melrose Investors in the PPM that it had determined, prior the dates Plaintiffs purchased the Securities, that Paramount intended to use little or no international pre-sales to co-finance the Melrose Slate.

50.     Paramount failed to disclose to the Melrose Investors in the PPM that it had determined, prior to the dates Plaintiffs purchased the Securities, to increase the amounts Paramount intended to and would be required to spend on prints and advertising for foreign distribution of the films in the Melrose Slate.

51.     Unbeknownst and undisclosed to the Plaintiffs, Paramount's spending on foreign prints and advertising, as a percentage of the total revenues of each film, significantly increased in the period immediately preceding the period of time during which the films in the Melrose Slate were released and remained at historically high levels with respect to the films in the Melrose Slate.  Paramount deliberately concealed this material information from the Melrose Investors with full knowledge that the one of the key factors affecting the receipts available for distribution as RPI were print and advertising costs which were increasing as a result of Paramount's new and undisclosed strategy.

52.     Over twenty-five percent of the gross production cost of films comparable to those in the Melrose Slate released between 1998 and 2003 were financed using international pre-sales.  Paramount failed to disclose that by the time Plaintiffs purchased

the Securities, Paramount had already determined that international pre-sales would not be used in a manner consistent with historical practice. Upon information and belief, less than 12.5% of the gross production cost of the films in the Melrose Slate was financed using international pre-sales.

53.    Paramount knew in 2004 that the films in the Melrose Slate that had already been released or would be released shortly after Plaintiffs purchased the Securities would not be financed by international pre-sales in a manner consistent with Paramount's Business Model as described in the PPM. Paramount did not disclose this material information.

54.    The financial information disclosed to Plaintiffs first in March of 2007 (the "Ultimates") revealed that at the time of the closing on July 29, 2004, Paramount had decided to significantly curtail the use of international pre-sales to co-finance the Melrose Slate, in a manner that was completely inconsistent with the historical practices described in the PPM.

55.    Specifically, the Ultimates reveal that three films that were included in the Melrose Slate were released on or before July 30, 2004, and that Paramount engaged in *de minimis* international pre-sales with respect to these films. These films included "The Stepford Wives" and "Mean Girls," both of which were released prior to the closing of the Melrose Transaction, and "The Manchurian Candidate," which was released the day after the Melrose Transaction closed.

56.    Despite the fact that these films did not employ the risk mitigation techniques as identified in the PPM and despite the fact that Paramount already knew that it had not employed such techniques with respect to such films, nowhere in the PPM did

Paramount disclose such information, instead making its repeated and materially misleading representations regarding its employment of risk mitigation techniques that it in fact knew it was not employing.

57.     Based upon the Ultimates, Paramount engaged in virtually no international pre-sales with regard to "The Manchurian Candidate." International pre-sales for "Mean Girls" and "The Stepford Wives" were the equivalent of less than 6% of the gross production budgets for those films.

58.     The Ultimates also revealed that for the 19 films released between July 30, 2004 and November 23, 2005, the level of international pre-sales employed in the Melrose Slate was significantly less than 50% of the amount of Paramount's historical precedent.

59.     International territorial sales decisions are generally made prior to the date a film begins production, and the production of films with the characteristics of the Covered Pictures – large budget, studio-produced films – usually begins more than eighteen months prior to the release date. Therefore, upon information and belief, by June of 2004 Paramount had already made the co-financing decisions with regard to the first 22 of the films in the Melrose Slate. Unbeknownst to Plaintiffs and undisclosed by Paramount, those decisions resulted in less than 11% of the gross production cost of these films being co-financed by international pre-sales.

60.     The Ultimates also reflect that the Melrose Slate films released in the six months immediately following the closing on July 29, 2004, i.e., films that were at or near completion, employed international pre-sales significantly below Paramount's

historical precedent and utilized international pre-sales to finance less than 12.1% of gross production cost.

61.     As a result of Paramount's decision to limit international pre-sales to a low level in the Melrose Slate, Plaintiffs' risk of loss was significantly greater than it would have been if Paramount had followed the Business Model described in the PPM.

62.     As of the closing date, only Paramount knew of its decision to severely curtail its use of risk-mitigating international pre-sales in financing the Melrose Slate. Paramount deliberately concealed this material information from the Melrose Investors.

**D.     Paramount Failed to Disclose That Insurance Wrapped Co-Financing Would Not Be Used for the Melrose Slate**

63.     Paramount also failed to disclose in the PPM that one of the primary techniques Paramount used to "limit Paramount's risk relating to [a] motion picture's performance" involved a co-financing structure that Paramount knew would not be used to co-finance the Melrose Slate

64.     Specifically, to finance certain films in the 1998 to 2001 time period, Paramount issued, in five specific transactions utilizing special purpose vehicles, securities that were insured for the purchasers' benefit by major insurance companies. Pursuant to the insurance policies, the purchasers of the securities (lenders) were guaranteed the return of both principal and interest even if the films financed in the transaction performed poorly.   Because the notes were insured, the lenders were willing to agree to relatively low rates of interest on the loans.  These transactions, known as "insurance wrapped" transactions, effectively transferred all of the risk of a poorly performing slate of films to the insurers in exchange for a premium.

65.     By late 2002, however, insurance wrapped transactions had become completely unavailable to Paramount and other studios because the insurers that had underwritten the transactions were no longer willing to participate in them as a result of the poor performance of the films and the losses sustained by insurers on claims.

66.     In fact, by 2002, at least four lawsuits had been brought in New York and the United Kingdom by noteholders in Paramount insurance wrapped transactions against their insurers for their failure to honor the noteholders' policies.  Paramount representatives were deposed in connection with at least one of these suits.

67.     Due to the circumstances surrounding the insurance wrapped transactions (including, but not limited to, the litigation), at the time Plaintiffs purchased the Securities, Paramount knew that insurance wrapped transactions would not be available to finance the films in the Melrose Slate.

68.     Insurance wrapped financing was the "co-financing" that Paramount used to mitigate risk for more than 25% of the films released between 1998 and 2003 that would have met the criteria for "Covered Films" under the RPA.

69.     The PPM makes no reference to any reduction in the forms or amount of co-financing that would be available for use with regard to the Melrose Slate.

70.     Paramount failed to disclose that insurance wrapped transactions, one of its principal forms of risk mitigation, would not be used in the Melrose Slate.  This created the false impression that in the event that the Melrose Slate performed poorly, some of the risk of loss would be borne by other parties.

71.     Plaintiffs relied on the statements regarding risk reducing co-financing in the PPM and were unaware of Paramount's omission of facts regarding the insurance-wrapped transactions.

72.     Had Paramount used insurance wrapped transactions to co-finance films in the Melrose Slate, these co-financing strategies would have transferred to third parties the risk that Paramount intentionally misled the Melrose Investors, who were unaware of these differences from the Melrose Slate, into bearing themselves.

73.     If insurance wrapped transactions had been employed to co-finance the Melrose Slate, it would have limited or eliminated Plaintiffs' losses on their investment.

## II.          Risk Factors

## A.          Paramount Statements

74.     The section of the PPM entitled "Risk Factors" contained the following statement:

**Increase of Production and Acquisition Costs**

The costs of producing, marketing and distributing motion pictures have increased dramatically in the past decade. . . .  If Gross Receipts do not increase at the same rate as the increase in costs, there will be a negative impact on . . . profitability . . . .

(PPM p. 34.)

75.     The PPM further provides as follows:

Although the interests of the Issuer and Paramount are somewhat aligned, as between Paramount and the Issuer, Paramount will control all decisions (i.e., business, creative or otherwise) relating to the development and production of each Covered Picture as well as the decisions whether to pursue and consummate any co-financing transaction, and the Issuer has no consultation or approval rights with respect thereto.  Paramount will have complete authority to license, market and exploit the Covered Pictures and all rights therein, or to refrain from so doing, in accordance with such sales methods, policies and terms as it may, in its reasonable

business judgment determine. Paramount may modify, amend, cancel, adjust and alter all agreements, exhibition licenses, rental terms, sales methods and policies relating to the distribution, exhibition and exploitation of the Covered Pictures and any other of its rights as it may deem advisable. . . . Recent press has reported a desire by Viacom and Paramount management to pursue a more aggressive approach, both fiscally and artistically, to such development and production of motion pictures than it has in the past.

(PPM pp. 35-36.)

**B.            Paramount's Omissions**

76.    Although the PPM stated that costs of producing, marketing and distributing motion pictures had increased in the last decade, it failed to disclose that Paramount's Business Model had already changed in a manner that assured that releasing costs would be dramatically higher for the Melrose Slate.

77.    The PPM failed to disclose that Paramount had already decided to abandon its reliance on international pre-sales in favor of distributing films through UIP.

78.    Paramount's decision to distribute its films through UIP created a certainty that foreign releasing costs would increase significantly and thereby threaten the profitability of the Melrose Slate and remove a critical risk mitigation technique.

79.    Plaintiffs relied on the Business Model employed by Paramount as described in the PPM and were not alerted to the risk of loss resulting from Paramount's changes in Business Model which were not disclosed in the "Risk Factors" described in the PPM.

80.    The PPM disclosed that "recent press has reported" that Paramount had decided to pursue a "more aggressive approach . . . to the development and production of motion pictures than it had in the past." By so stating, Paramount created the impression that it was disclosing to the Melrose Investors the most up-to-date information which

might affect their investment decision.  The PPM omitted any disclosure that an equally

important, if not more important decision, had also been made, namely, to severely

curtail the use of international pre-sales and to spend aggressively on international

releasing costs.

81.     Plaintiffs seek to recover the loss caused by Paramount's

misrepresentations and omissions pursuant to Rule 10b-5 under section 10(b) of the

Securities Exchange Act of 1934.  Plaintiffs alternatively seek to rescind the transaction

based on Paramount's fraudulent inducement of Plaintiffs' investment in the Securities to

recover their $40.1 million investment from Paramount pursuant to a claim for unjust

enrichment.

## FIRST CLAIM FOR RELIEF
### (Violation of § 10(b) of the Securities Exchange Act and Rule 10b-5 thereunder)

82.     Plaintiffs repeat and reallege the allegations set forth in paragraphs 1

through 80 as if fully set forth herein.

83.     Paramount, by the use of the means and instrumentalities of interstate

commerce and/or of the mails, engaged in an intentional course of conduct to omit

material information regarding the manner in which the films in the Melrose Slate would

be financed.

84.     Paramount's disclosures in the PPM informed the Melrose Investors that

Paramount was operated pursuant to a Business Model that incorporated "a culture of

fiscal caution" that sought "consistent slate profitability" through the use of various "risk

management techniques" designed to "limit Paramount's risk" relating to the

performance of films.

85.    Paramount's disclosures in the PPM also informed the Melrose Investors that Paramount's risk-avoiding Business Model would inure to the benefit of the Melrose Investors.

86.    Paramount was aware that Plaintiffs were relying on the disclosures in the PPM regarding risk mitigation.

87.    Paramount had a duty to disclose all material information necessary to make the PPM not misleading.

88.    At the time Plaintiffs purchased the Securities, Paramount knew that the films in the Melrose Slate would not be co-financed at all by insurance wrapped transactions, where insurance wrapped transactions historically had been one of Paramount's principal risk mitigating co-financing strategies.

89.    As of the dates when Plaintiffs purchased the Securities, Paramount failed to disclose that Paramount had decided to significantly curtail the use of international pre-sales to co-finance the films in the Melrose Slate, and Plaintiffs had no way to discover that this decision had been made.

90.    Plaintiffs relied on Paramount's misrepresentations and omissions of material fact when purchasing the Securities, and specifically upon Paramount's representations that co-financing would limit the risk to Plaintiffs on their investment in the Melrose Slate.

91.    Had the risk limiting strategies been in place, Plaintiffs would not have lost their entire investment, and had Plaintiffs known that such risk limiting strategies were not in place, Plaintiffs would not have invested any part of their $40.1 million investment.

92.     By virtue of the foregoing, Paramount violated § 10(b) of the Securities Exchange Act of 1934, and Rule 10b-5 promulgated thereunder.

93.     Plaintiffs have been damaged by Paramount's omissions and misrepresentations in an amount to be determined at trial.

## SECOND CLAIM FOR RELIEF
### (Fraud)

94.     Plaintiffs repeat and reallege the allegations set forth in paragraphs 1 through 80 as if fully set forth herein.

95.     In order to induce Plaintiffs to purchase the Securities, Paramount made fraudulent misrepresentations and omitted material facts regarding the co-financing of the films in the Melrose Slate.

96.     Paramount's misrepresentations and omissions were intended to and did induce Plaintiffs to invest in the Securities.

97.     Plaintiffs relied upon on the disclosures in the PPM when investing in the Securities.

98.     Plaintiffs had no knowledge that Paramount had omitted material information concerning the unavailability of insurance wrapped co-financing and Paramount's decision to eliminate and/or significantly reduce the use of international pre-sales.

99.     Had Paramount made full disclosure regarding the risk profile of the Melrose Transaction, the Melrose Investors would not have purchased the Securities.

100.    By virtue of the foregoing, Paramount fraudulently induced Plaintiffs to purchase the Securities.

101.    Plaintiffs are entitled to rescission of their purchase of the Securities.

102.    Paramount's fraud was purposeful, malicious and knowingly intended by Paramount to wrongfully secure money for its own benefit to the detriment of Plaintiffs and that conduct cannot be tolerated or deterred simply be depriving Paramount of the fruits of its conduct.  Therefore, an award of punitive damages is necessary.

### THIRD CLAIM FOR RELIEF
#### (Unjust Enrichment)

103.    Plaintiffs repeat and reallege the allegations set forth in paragraphs 1 through 80 as if fully set forth herein.

104.    Plaintiffs invested $40.1 million in the Securities based on the disclosures made by Paramount.

105.    Paramount received the entire benefit of Plaintiffs' $40.1 million investment.

106.    Paramount obtained the benefit of Plaintiffs' $40.1 million investment by fraudulently inducing Plaintiffs to purchase the Securities based on misleading information disclosed in the PPM, and Paramount deliberately concealed information from Plaintiffs regarding the co-financing of the Melrose Slate.

107.    Under the circumstances, it would be unjust for Paramount to retain the benefit of Plaintiffs' $40.1 million investment, and Plaintiffs are entitled to restitution.

## PRAYER FOR RELIEF:

WHEREAS, Plaintiffs demand judgment as follows:

(a)  On the First Claim for relief, damages sustained as a result of Defendant's wrongdoing; and

(b)  On the Second Claim for relief, rescission of Plaintiffs' purchase of the Securities; and

(c)  On the Third Claim for relief, restitution of Plaintiffs' purchase price of the Securities; and

(d)  Interest and punitive damages; and

(e)  Plaintiffs' attorneys' fees and costs incurred in this action; and

(f)  such other and further relief as the Court deems just and proper.

Dated:  New York, New York
          December 2, 2008

PRYOR CASHMAN LLP

By: _____
          James A. Janowitz
          Donald S. Zakarin
          Jacob B. Radcliff
          410 Park Avenue
          New York, New York 10022
          (212) 421-4100
          jjanowitz@pryorcashman.com
          dzakarin@pryorcashman.com
          jradcliff@pryorcashman.com

          Attorneys for Plaintiffs Allianz Risk
          Transfer, Marathon Structured Finance
          Fund, LP, NewStar Financial, Inc. and
          Munich Re Capital Markets New York, Inc.