UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 3/31/10
```

-------------------------------------------x
:
ALLIANZ RISK TRANSFER, MARATHON            :
STRUCTURED FINANCE FUND, LP,               :        08 Civ. 10420 (TPG)
NEWSTAR FINANCIAL INC., and                :
MUNICH RE CAPITAL MARKETS NEW              :
YORK, INC.,                                 :        **OPINION**
:
                        Plaintiffs,         :
:
            – against –                     :
:
PARAMOUNT PICTURES CORPORATION,            :

                        Defendant.

-------------------------------------------x

        This is an action for securities fraud pursuant to Section 10(b) of

the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and SEC Rule

10b-5 thereunder, 17 C.F.R. § 240.10b-5, and also asserting common

law claims of fraudulent inducement and unjust enrichment. Plaintiffs

seek damages, rescission and/or restitution, interest, punitive damages,

attorneys' fees, and costs based on defendant's knowing

misrepresentations and omissions of information material to plaintiffs'

decision to invest in securities.

        Defendant moves pursuant to Fed. R. Civ. P. 12(b)(6) to dismiss

the complaint for failure to state a claim. The motion is granted.

## Background

The following facts are taken from the amended complaint and, for the purposes of this motion, are assumed to be true.

### I. The Parties

Paramount is a Delaware corporation wholly owned by Viacom, Inc. with a principal place of business located in Hollywood, California. Paramount is in the business of producing, financing, and distributing motion pictures.

NewStar is a Delaware corporation with a principal place of business located in Boston, Massachusetts. NewStar purchased $10,000,000 original principal amount of Melrose Class B Notes on July 29, 2004.

Marathon is a Delaware limited partnership with a principal place of business located in New York, New York. Marathon purchased $7,000,000 original principal amount of Melrose Class B Notes and $3,000,000 of membership interests in Melrose (representing approximately 10.5% of the issued and outstanding membership interests of Melrose) on July 29, 2004.

MRCM, formerly Munich American Capital Markets, Inc., is a Delaware corporation wholly owned by Munich Reinsurance Company AG (through Munich American Holding Corporation) with a principal place of business located in New York, New York. On July 30, 2004, MRCM entered into a total return swap transaction with Merrill Lynch

- 2 -

Mortgage Capital, Inc. with respect to $10,000,000 original principal amount of Class B Notes purchased by Merrill Lynch Mortgage Capital, Inc. on July 29, 2004, wherein MRCM acquired the material economic benefit and risk of the Notes. On March 21, 2007, MRCM acquired the underlying bond from Merrill Lynch Mortgage Capital, Inc. for the face amount of $10,000,000. By virtue of the total return swap transaction with Merrill Lynch Mortgage Capital, Inc., MRCM has been the beneficial owner of the Notes since July 30, 2004.

Allianz is an insurance company organized under the laws of Switzerland with a principal place of business in Zurich, Switzerland. On or about October 14, 2004, Allianz entered into a total return swap transaction with Hypo Public Finance Bank (formerly known as Hypo Real Estate Bank International) ("EuroHypo") with respect to $7,125,000 original principal amount Class B Notes and $3,000,000 of membership interests in Melrose (representing approximately 10.5% of the issued and outstanding membership interests of Melrose), in each case purchased by EuroHypo on October 13, 2004, wherein Allianz acquired the material economic benefit and risk on the Securities. On June 30, 2006, Allianz acquired the underlying Class B Notes from EuroHypo for the face amount of $7,125,000 and the underlying membership interests of Melrose for $3,000,000. By virtue of the total return swap transaction with EuroHypo, Allianz has been the beneficial owner of the Securities since July 30, 2004.

- 3 -

II. <u>The Facts</u>

Plaintiffs are financial institutions which make investments in a variety of industries. All of plaintiffs invested in debt instruments, Class B Notes (the "Securities"), and Marathon and Allianz also invested in membership interests of Melrose (the "Equity"), in an investment vehicle sponsored by Paramount to finance the production of a slate of films to be produced, released and distributed by Paramount between April of 2004 and March of 2006 (the "Melrose Slate"). The Securities were issued by an entity named Melrose Investors LLC ("Melrose"), which served as a conduit for the investment proceeds to Paramount.

In purchasing the Securities, plaintiffs read and relied on the accuracy and completeness of the statements contained in a private placement memorandum dated July 22, 2004 (the "PPM"), statements that plaintiffs allege Paramount knew were incomplete and otherwise false and misleading.

A. <u>The Structure of the Melrose Transaction</u>

The Melrose Transaction is a structured finance transaction sponsored by Paramount pursuant to which the Melrose Investors provided Paramount approximately $231.3 million for purposes of enabling Paramount to finance the production and distribution of motion pictures.

The Melrose Transaction included three types of investors. The senior creditors, holders of the Class A Notes, provided $157.5 million.

The junior creditors, holders of the Class B Notes, provided $45.3 million. The equity investors provided $28.5 million. The Melrose Transaction closed on July 29, 2004 and was amended to permit additional purchases of Class A and Class B Notes and equity on or about October 13, 2004.

The Melrose Slate did not cover all of the films that Paramount intended to produce or distribute between 2004 and 2006, but rather a discrete set of films that met the criteria for "Covered Pictures" set forth in the PPM. These criteria included, *inter alia*, films that received an MPAA rating no more restrictive than "R", were filmed predominantly in English, and for which Paramount's net production investment exceeded $5 million.

Melrose, as a conduit or instrumentality sponsored by Paramount, used the funds raised in the Melrose Transaction to purchase from Paramount revenue participation interests ("RPI") in each film in the Melrose Slate pursuant to the terms of the Revenue Participation Agreement between Paramount and Melrose dated July 29, 2004 (the "RPA"). Melrose operated as a conduit for investor funds to Paramount and to distribute the RPI income from the Melrose Slate to the noteholders and Melrose members.

As intended by the parties to the Melrose Transaction, Melrose's sole asset, aside from a small reserve for administrative purposes, is now the RPI for all of the films in the Melrose Slate.

The RPA provides that the receipts available for RPI are net of a distribution fee to Paramount, an administrative fee, print, advertising and distribution costs, third-party participations and taxes for each production period. After these net receipts are calculated, the Melrose Investors' RPI income is based on the Melrose Investors' pro rata contribution to the net cost of producing the films in the Melrose Slate.

Payments of the RPI are made to Melrose and distributed pursuant to a "waterfall" to investors in order of seniority. RPI is generally first distributed to pay the holders of senior Class A Notes, then to holders of the subordinated Class B Notes, and finally to holders of the Equity of Melrose.

### B. Paramount's Alleged Fraud

#### 1. Misrepresentations and Omissions Regarding Changes in Paramount's International Distribution Strategy

From 1998 to 2003, Paramount distributed a significant percentage of its films internationally through the use of international territorial sales, also known as international "pre-sales," whereby third-party distribution companies purchased the right to distribute a film in specific foreign countries and territories in exchange for a fixed sum, or minimum guarantee. The minimum guarantees were used by Paramount to partially pay for or defray the production cost of the film. Thereafter the third-party distribution companies had no obligation to share revenues or profits with Paramount, irrespective of how well or

poorly a particular film performed in a foreign market unless and until the minimum guarantee and the distribution fees and expenses of the territorial distributor were recouped.  When Paramount pre-sold the rights to a film in a particular foreign country or territory, this also eliminated the need for Paramount to expend any money on prints of the film for exhibition and advertising expenses in that foreign country or territory since that expense was the responsibility of the territorial distributor.

The net effect for Paramount of utilizing international pre-sales was to decrease the gain that could be earned in foreign countries by a highly performing film while minimizing the risk posed by poorly performing films.  The benefit to Paramount of pre-selling distribution rights for foreign territories was that it transferred the risk that a film would perform poorly to third-party distribution companies.

The PPM states that Paramount "opportunistically enter[s] into output agreements and territory sales with third parties."  However, the next paragraph cautions that "[t]here can be no assurance that Paramount will implement the same techniques . . . as it has in the past."

The PPM also states that Paramount "selectively pursues and enters into co-production agreements . . . pursuant to which the third party agrees to share in the cost of production of one of Paramount's

- 7 -

films in exchange for obtaining certain distribution rights . . . . These types of arrangements are entered into on a selective basis."

The PPM also states that, in seeking to limit Paramount's financial exposure, "Paramount has pursued a strategy of entering into agreements to share the financing of certain films with other parties. . . . In some of these arrangements, other parties control distribution and/or other ownership rights."

According to the amended complaint, prior to plaintiffs' purchase of the Securities, Paramount's management decided to change its strategy of mitigating the risk of loss through the regular use of such international pre-sales and implemented a new strategy of increasing its handling of foreign distribution through United International Pictures ("UIP"), a company owned by Paramount's parent company, Viacom.

The substantial reduction of foreign pre-sales increased the risk of loss to Paramount (and the Melrose Investors) for poorly performing films by eliminating the minimum guarantee (which was not performance related) while, at the same time, increasing the amounts Paramount needed to spend on prints and advertising, which itself created further risk of loss for the Melrose Investors.

Over twenty-five percent of the gross production cost of films comparable to those in the Melrose Slate and released by Paramount between 1998 and 2003 was financed using international pre-sales, but

- 8 -

less than 12.5% of the gross production cost of the films in the Melrose

Slate was financed using international pre-sales.

Therefore, according to plaintiffs, the representations in the PPM

regarding Paramount's "opportunistic" engagement in international pre-

sales as a means of reducing cost and minimizing risk of loss was

knowingly and materially misleading.

Further, the section of the PPM entitled "Risk Factors" contains the

following statement:

> Increase of Production and Acquisition Costs
>
> The costs of producing, marketing and distributing motion
> pictures have increased dramatically in the past decade. . . .
> If Gross Receipts do not increase at the same rate as the
> increase in costs, there will be a negative impact on . . .
> profitability . . . .

(PPM p. 34.)

Plaintiffs argue that, although the PPM stated that costs of

producing, marketing and distributing motion pictures had increased in

the last decade, it failed to disclose that Paramount had already decided

to abandon its reliance on international pre-sales in favor of distributing

films through UIP, thereby creating a certainty that foreign distribution

costs would increase.

### 2. Misrepresentations and Omissions Regarding Insurance Wrapped Co-Financing

To finance certain films between 1998 and 2001, Paramount

issued, in five specific transactions utilizing special purpose vehicles,

securities that were insured for the purchasers' benefit by major

- 9 -

insurance companies.  Pursuant to the insurance policies, the
purchasers of the securities (lenders) were guaranteed the return of both
principal and interest even if the films financed in the transaction
performed poorly.   Because the notes were insured, the lenders were
willing to agree to relatively low rates of interest on the loans.  These
transactions, known as "insurance wrapped" transactions, effectively
transferred all of the risk of a poorly performing slate of films to the
insurers in exchange for a premium.

By late 2002, however, insurance wrapped transactions had
become completely unavailable to Paramount and other studios because
the insurers that had underwritten the transactions were no longer
willing to participate in them as a result of the poor performance of the
films and the losses sustained by insurers on claims.

According to plaintiffs, insurance wrapped financing was the "co-
financing" that Paramount refers to in the PPM as a cost-mitigation/
risk-management technique, and it was used in more than 25% of the
films released between 1998 and 2003 that would have met the criteria
for "Covered Films" under the RPA.

Paramount failed to disclose that insurance wrapped transactions
would not be used in the Melrose Slate and thus created, according to
plaintiffs, the false impression that in the event that the Melrose Slate
performed poorly, some of the risk of loss would be borne by other
parties.

### 3. Misrepresentations and Omissions Regarding Risk Mitigation

In a section devoted to "Paramount Pictures Business Overview,"
the PPM states that "[h]istorically, Paramount has managed its business
guided by the following principal strategic objectives," which included an
"[e]mphasis on a culture of fiscal caution through continuous budgetary
scrutiny and opportunistic risk-sharing financing."  (PPM p. 38.)

The PPM further provides as follows:

> In seeking to limit Paramount's financial exposure,
> Paramount has pursued a strategy of entering into
> agreements to share the financing of certain films with other
> parties.  The parties to these arrangements include studio
> and non-studio entities, both domestic and foreign.  In some
> of these arrangements, other parties control certain
> distribution and/or other ownership rights.

(PPM p. 6.)

The PPM further states:

> Like other major studios, Paramount aims to achieve
> consistent slate profitability by managing capital
> commitments for each film project, opportunistically entering
> into output agreements and territory sales with third parties,
> and emphasizing cost mitigation programs such as . . . co-
> financings . . . .  The purpose of these risk-management
> techniques is to reduce a film's net production cost, thereby
> diversifying slate performance risk and creating a lower cost
> basis for Paramount.

(PPM p. 31.)

The PPM further states:

> Paramount selectively pursues and enters into co-production
> agreements, studio "shared pot" deals, split rights deals and
> similar arrangements under which, depending on the
> situation, either Paramount enters into an arrangement with
> a third party pursuant to which the third party agrees to
> share in the cost of production of one of Paramount's films in

- 11 -

> exchange for obtaining certain distribution rights from Paramount or vice versa. Paramount also occasionally asks investors to invest directly in one or more films for a share of those films' net proceeds without any transfer of distribution rights to the investor. Such agreements provide that the investor receives a share of the defined net proceeds of the film which, depending on the deal, can be from worldwide distribution, certain territories or other markets. These agreements limit Paramount's risk relating to the motion picture's performance.

(PPM p. 39.)

Plaintiffs argue that Paramount's election to market the Securities by emphasizing its risk-reducing strategies imposed a duty on Paramount to fully disclose all material information that related to those strategies. According to plaintiffs, Paramount falsely stated to the Melrose Investors that it was employing certain risk mitigation techniques at the time the Melrose Transaction closed when in fact Paramount had made and implemented decisions regarding financing and distribution with respect to a majority of the films in the Melrose Slate which did not employ these techniques or only employed them to a *de minimis* degree. Paramount's disclosures in the PPM were therefore materially false and misleading.

### Jurisdiction and Venue

This court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Securities Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1331 and § 1367. As this action is between citizens of different states and/or foreign states and the amount in controversy

exceeds $75,000 exclusive of interest and costs, this court also has original jurisdiction pursuant to 28 U.S.C. § 1332.

Venue is proper in this district pursuant to Section 27 of the Securities Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1391(b). Many of the acts constituting the violations of law alleged herein, including the preparation and dissemination of the PPM, occurred in substantial part in this judicial district.

## Legal Standard

To survive a motion to dismiss under Rule 12(b)(6), a complaint must plead sufficient facts to state a claim for relief that is plausible on its face. Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007); Ashcroft v. Iqbal, 129 S.Ct. 1937, 1949-50 (2009).

In deciding such a motion, a court must accept as true the facts alleged in the complaint, drawing all reasonable inferences in the plaintiff's favor, and may consider documents attached to the complaint, incorporated by reference into the complaint, or known to and relied on by the plaintiff in bringing the suit. ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 98 (2d Cir. 2007).

## Discussion

I. Federal Securities Fraud

To state a claim for relief in a Section 10(b) private action a plaintiff must adequately allege that the defendant made misstatements or omissions of material fact, with scienter, in connection with the purchase

- 13 -

or sale of securities, upon which plaintiffs relied, and that plaintiffs'

reliance was the proximate cause of the injury. See Stoneridge Inv.

Partners, LLC v. Scientific-Atlanta, 552 U.S. 148, 157 (2008). A claim for

relief under Section 10(b) and Rule 10b-5 is subject to the heightened

pleading requirements of Fed. R. Civ. P. 9(b) and the Private Securities

Litigation Reform Act ("PSLRA"). ATSI Commc'ns v. Shaar Fund, 493

F.3d at 99. Under the PSLRA, a complaint must "specify each statement

alleged to have been misleading, the reason or reasons why the

statement is misleading, and, if an allegation regarding the statement or

omission is made on information and belief, the complaint shall state

with particularity all facts on which that belief is formed." 15 U.S.C. §

78u-4(b)(1).

### A. Attribution to Paramount

Paramount first contends that it was uninvolved in providing any

of the information contained in the PPM, which is in their opinion a

document wholly attributable to Melrose. The PPM does clearly state

that it was not prepared by Paramount and that none of the statements

therein can be attributed to Paramount. Further, the Subscription

Agreement states that Paramount did not prepare any of the offering

documents and assumes no liability for the adequacy or accuracy of any

information therein. While the disclaimer language in these documents

is significant, it is not the end of the story.

Paramount argues as if this were a case of secondary liability, quoting extensively from <u>Wright v. Ernst & Young, LLP</u>, 152 F.3d 169 (2d Cir. 1998) (a securities class action against corporation's outside auditor), and <u>Lattanzio v. Deloitte & Touche LLP</u>, 476 F.3d 147 (2d Cir. 2007) (a securities class action against corporation's outside accountant). However, plaintiffs do not allege that Paramount is a secondary actor in this matter, but the primary actor, who created Melrose as a vehicle to shield itself from liability. Accepting as true the facts alleged in the complaint, as we must, any case law regarding secondary actors is inapposite.

Where a straw man is used as a "mere conduit" and a defendant is "the original and knowing source of a misrepresentation," and where the defendant "knew or should have known that the misrepresentation would be communicated to investors," such misrepresentations are attributable to the defendant on a motion to dismiss. <u>In re LaBranche Sec. Litig.</u>, 405 F. Supp. 2d 333, 351 (S.D.N.Y. 2005). Here, the complaint alleges that Melrose is a mere conduit sponsored by Paramount, who is the original and knowing source of misrepresentations regarding the risk-mitigation techniques to be used in connection with the Melrose Slate. This is sufficient at the motion to dismiss stage.

B. Alleged Material Omissions or Affirmative Misrepresentations

1. Changes in International Distribution Strategy

Plaintiffs allege that the PPM was misleading because it failed to disclose that Paramount had changed its distribution strategy, electing to handle international distribution of the Melrose Slate principally through UIP rather than through international pre-sales.

It is true that the "Risk Factors" section of the PPM did not disclose that Paramount had apparently decreased its reliance on international pre-sales, and would therefore need to pay for prints of the film and advertising expenses in foreign countries for those films it chose to distribute through UIP.

However, international pre-sales are not featured extensively in the PPM. They are apparently referred to only three times, and always in conjunction with other risk-management techniques. Further, in all three instances their use is qualified in some way, either implicitly (e.g., describing the use of international pre-sales as "opportunistic" or "selective") or explicitly (cautioning that there is no assurance that Paramount will implement the same techniques as it has in the past).

At the heart of plaintiffs' allegations with respect to Paramount's international distribution strategy is that the PPM failed to disclose that UIP would be the principal distribution vehicle for the Melrose Slate films. However, the PPM arguably disclosed precisely this fact, stating, "Paramount generally distributes its motion pictures for theatrical

release outside the U.S. and Canada through United International

Pictures ("UIP") . . . . Pursuant to an agreement, UIP will continue to

distribute [Paramount's] films through 2006 [the final distribution year of

the Melrose Slate films]." Plaintiffs argue that this statement must be

interpreted to mean that when Paramount itself distributes

internationally, it generally does so through UIP, but that the statement

is unrelated to international pre-sales, which by definition utilize third-

party distributors. Even accepting this interpretation, there is no doubt

that plaintiffs were at the very least on notice that UIP was likely to be

heavily involved in the foreign distribution of the Melrose Slate films.

Finally, the actual decline in Paramount's use of international pre-

sales was insufficient to find in any of Paramount's statements a material

misstatement or the omission of a material fact, as required to state a

claim under the federal securities laws. According to the amended

complaint, 25% of the cost of films comparable to the Melrose Slate films

and released by Paramount between 1998 and 2003 was financed by

international pre-sales, as opposed to 12.5% of the cost of the Melrose

Slate films. This does amount to a reduction. However, it is difficult to

say that Paramount was no longer engaging in the practice on an

"opportunistic" or "selective" basis, which is all the PPM claims.

### 2. Insurance-Wrapped Transactions

Plaintiffs contend that certain sections of the PPM were misleading

absent a disclosure that insurance wrapped transactions would not be

- 17 -

available to finance the Melrose Slate. Plaintiffs, however, cannot identify any reference to insurance wrapped transactions in those sections or anywhere else in the PPM, and in fact there is none. Further, plaintiffs nowhere allege that Paramount ever promised to employ insurance wrapped transactions in connection with the Melrose Slate.

Finally, plaintiffs concede that the unavailability of insurance wrapped transactions to finance motion picture production was public knowledge by no later than 2002, two years before plaintiffs' investment in Melrose. Thus, even if plaintiffs could demonstrate a conflict between the unavailability of such transactions and the disclosures contained in the PPM, they still could not prove a Section 10(b) violation on this basis. See In re WorldCom, Inc. Sec. Litig., 346 F. Supp. 2d 628, 687 (S.D.N.Y. 2004) (noting that "there is no duty to disclose information to one who reasonably should already be aware of it") (citation omitted).

### 3. Curtailing of Risk Mitigation

Plaintiffs allege that certain statements in the PPM regarding Paramount's risk-mitigation strategies were misleading because Paramount had already decided not to employ these strategies with respect to the Melrose Slate. The statements at issue refer to Paramount's "culture of fiscal caution," "opportunistic risk-sharing financing," and efforts to "limit Paramount's financial exposure." The complaint also cites a comment from the PPM that Paramount "aims to achieve consistent film slate profitability" by means of various co-

financing arrangements intended to "limit Paramount's risk relating to a motion picture's performance." The complaint argues that Paramount's decision to market the Melrose securities in this way imposed a duty on Paramount to disclose any information inconsistent with this business model.

Paramount counters that certain disclaimers contained in the PPM and the Subscription Agreement preclude plaintiffs' reliance on other statements within these documents. However, the rule in this circuit is that unless cautionary language in a securities offering expressly warns of or directly relates to the risk that brought about a plaintiff's loss, it is ineffective to bar a claim. Halperin v. eBanker USA.com, Inc., 295 F.3d 352, 359 (2d Cir. 2002). Under the Halperin test, the statements relied on by Paramount are insufficient disclaimers to bar plaintiffs' Section 10(b) claim.

Nonetheless, the PPM statements quoted by plaintiffs in the amended complaint are too general to be actionable under Section 10(b) and Rule 10b-5. By telling investors that Paramount "aims to achieve consistent film slate profitability," "opportunistically enter[s] into output agreements and territory sales," "emphasiz[es] cost mitigation programs," and employs "a culture of fiscal caution," the PPM did not represent that Paramount would enter into any particular type of transaction with respect to the Melrose Slate of pictures or would otherwise work to mitigate plaintiffs' risk. Such statements are much closer to the type of

"puffery" that the Second Circuit has consistently held to be non-actionable. See Lasker v. N.Y. State Elec. & Gas Corp., 85 F.3d 55, 59 (2d Cir. 1996) (representation that company would "not compromise its financial integrity," had a "commitment to create earnings opportunities," and that its "business strategies [would] lead to continued prosperity" constituted non-actionable puffery); In re JP Morgan Chase Sec. Litig., 363 F. Supp. 2d 595, 633 (S.D.N.Y. 2005) ("The particular misstatements that plaintiffs allege—generalizations regarding integrity, fiscal discipline and risk management—amount to no more than puffery.").

## II. Common Law Fraud

To state a claim for common law fraud in New York, a plaintiff must show a material representation or omission of fact, made with knowledge of its falsity, with scienter or an intent to defraud, upon which the plaintiff reasonably relied, and that such reliance caused damage to the plaintiff. Dover Ltd. v. A.B. Watley, Inc., 423 F. Supp. 2d 303, 327 (S.D.N.Y. 2006). The elements of common law fraud are, therefore, "essentially the same" as those required to state a claim under Section 10(b) and Rule 10b-5. Id. As to pleading requirements, although a common law fraud claim is subject to Fed. R. Civ. P. 9(b) rather than the PSLRA, there is no significant distinction between the two as practiced in the Second Circuit. In fact, the PSLRA pleading requirements were based on the 9(b) pleading standard practiced in this Circuit. See H.R. Rep. No. 105-803, at 15 (1998) (Conf. Rep.) ("[I]t was the intent of

Congress, as was expressly stated during the legislative debate . . . that the [PSLRA] establish a heightened uniform Federal standard on pleading requirements based upon the pleading standard applied by the Second Circuit Court of Appeals.").

Plaintiffs allege that Paramount made fraudulent misrepresentations and omitted material facts regarding the co-financing of the Melrose Slate films. Plaintiffs further allege that these misrepresentations and omissions were intended to and did induce plaintiffs to invest in the Securities, and that had Paramount made full disclosure regarding the risk profile of the Melrose Transaction, the Melrose Investors would not have purchased the Securities. Plaintiffs allege that Paramount thereby fraudulently induced them to purchase the Securities.

As noted above, the elements and pleading standards for Section 10(b) claims are essentially the same as those for common law fraud in New York. Since plaintiffs' Section 10(b) claims do not survive this motion, it stands to reason that plaintiffs' common law fraud claims, based on the same alleged facts, must be dismissed as well.

III. Unjust Enrichment

To state a claim for unjust enrichment under New York law, a plaintiff must allege that the defendant benefited at the plaintiff's expense, and that the circumstances are such that equity and good conscience require the defendant to make restitution. Mazzaro de Abreu

- 21 -

v. Bank of America Corp., 525 F. Supp. 2d 381, 397 (S.D.N.Y. 2007);
Korff v. Corbett, 794 N.Y.S.2d 374, 377 (1st Dep't 2005).

Plaintiffs allege that Paramount obtained the benefit of plaintiffs'
$40.1 million investment by fraudulently inducing plaintiffs to purchase
the Securities based on misleading and deliberately concealed
information.  Paramount was thereby unjustly enriched by its fraudulent
activity and plaintiffs are entitled to restitution.

Paramount argues that because plaintiffs' unjust enrichment claim
is predicated on their fraud claims, and the fraud claims fail, the unjust
enrichment claim must fail as well.  However, the pleading standards for
unjust enrichment are distinct from those for a violation of Section 10(b)
or for common law fraud, and Paramount's argument that the dismissal
of plaintiffs' fraud claims requires dismissal of the unjust enrichment
claim is not correct.

Nonetheless, since we have found no fraud, either under the
federal securities laws or the common law of the State of New York, it is
difficult to imagine, and plaintiffs do not explain, how the elements of an
unjust enrichment claim could be met in this case.  Plaintiffs note that
New York courts do occasionally sustain unjust enrichment claims even
where fraud claims are dismissed.  But in such cases, some underlying
fraud must be present.  See, e.g., Thomas H. Lee Equity Fund V, L.P. v.
Mayer Brown, Rowe & Maw LLP, 2009 WL 762512 (S.D.N.Y. March 23,
2009) (dismissing Section 10(b) and common law fraud claims against

secondary actors, but finding unjust enrichment adequately pleaded

based on their alleged concealment of primary actor's fraud). Here,

because all underlying fraud claims are to be dismissed, the claim for

unjust enrichment must also be dismissed.

Conclusion

For the reasons stated above, defendant's motion to dismiss is

granted with leave to replead within 60 days.

SO ORDERED.

Dated: New York, New York
       March 31, 2010

Thomas P. Griesa
U.S.D.J.