James A. Janowitz
Donald S. Zakarin
Jacob B. Radcliff
PRYOR CASHMAN LLP
7 Times Square
New York, New York 10036
(212) 421-4100
jjanowitz@pryorcashman.com
dzakarin@pryorcashman.com
jradcliff@pryorcashman.com

Attorneys for Plaintiffs Allianz Risk Transfer,
Marathon Structured Finance Fund, LP,
NewStar Financial, Inc. and Munich re Capital Markets New York, Inc.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------------ x
    :
ALLIANZ RISK TRANSFER,     :
MARATHON STRUCTURED FINANCE FUND, LP,     :
NEWSTAR FINANCIAL, INC., and     :    No. 08 CV 10420 (TPG)
MUNICH RE CAPITAL MARKETS NEW YORK, INC.,     :
    :
    Plaintiffs,     :
    :
    -v-     :
    :
PARAMOUNT PICTURES CORPORATION,     :
    :
    Defendant.     :
    :
------------------------------------------------------------------------ x

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO
DEFENDANT'S RENEWED MOTION TO DISMISS THE SECOND AMENDED
COMPLAINT IN LIGHT OF THE UNITED STATES SUPREME COURT'S DECISION
IN *JANUS CAPITAL GROUP, INC. v FIRST DERIVATIVE TRADERS***

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................................ ii

STATEMENT OF FACTS ........................................................................................................ 3

    I.      Paramount Had Ultimate Authority Over the PPM
          Including Its Content And Whether and How to
          Communicate the Statements Contained Therein ........................................................ 7

    II     Statements in the PPM are Attributable to Paramount ................................................ 10

    III.    Paramount is Seeking to Relitigate an Issue Already Decided .................................... 12

    IV.    Plaintiffs' Common Law Claims Should Survive ....................................................... 13

CONCLUSION ........................................................................................................................ 13

# TABLE OF AUTHORITIES

## CASES

*FRA S.p.A. v. Surg-O-Flex of America, Inc.,*
    415 F. Supp. 421 (S.D.N.Y. 1976) ...................................................................12

*Halperin v. eBanker USA.com, Inc.,*
    295 F.3d 352 (2d Cir. 2002)...........................................................................11

*Janus Capital Group, Inc. v. First Derivative Traders,*
    564 U.S. ___ (2011)............................................................................... passim

*Pac. Investment Management Co. LLC v. Mayer Brown LLP,*
    603 F.3d 144 (2d Cir. 2010)..............................................................................1

*AMA v. United Healthcare   Corp.,*
    588 F. Supp. 2d 432 (S.D.N.Y. 2008)..............................................................12

*Wiggins v. Janus Capital Group, Inc. (In re Mutual Funds Investment Litigation),*
    566 F.3d 111 (4th Cir. 2009) .............................................................................8

## STATUTES

15 U.S.C. § 78u-4(b)(3)(B)..................................................................................2

## MISCELLANEOUS

http://www.sec.gov/spotlight/proxyprocess/bio/jccoffee.pdf.........................................2

www.gssnyc.com. ...............................................................................................6

Paramount's[1] third motion to dismiss in this action, ostensibly based on the Supreme Court's decision in *Janus Capital Group, Inc. v. First Derivative Traders*, 564 U.S. ___ (2011)[2] ("*Janus*"), simply revisits Paramount's defense that the Plaintiffs should have sued Melrose, the special purpose vehicle Paramount created to raise over $300 million to finance its films, instead of Paramount, and that the disclaimers Paramount inserted into the PPM are sufficient to avoid liability.

*Janus* in no way supports dismissal of the Second Amended Complaint (the "Complaint"), and Paramount's motion is an impermissible attempt to re-litigate an issue that this Court has already decided in Plaintiffs' favor. *Janus* held that one who could be considered the "creator" of a prospectus by providing input for it is not a "maker" of false statements as is required under Rule 10b-5, unless the statements are "attributed" to that party, and that unless a person has "ultimate authority" over the statement, including its content and whether and how to communicate it, it is not the maker of the statement. In so deciding, the Supreme Court substantially adopted the "attributed statement" rule in the Second Circuit,[3] which had rejected the "creator" standard also advanced by Plaintiffs in *Janus*, and found liability pursuant to Rule 10b-5 for those to whom fraudulent statements are attributed.

Paramount argues that *Janus* conveniently vindicates its position that regardless of Paramount's control over the statements made in the Private Placement Memorandum ("PPM") and the attribution of those statements to Paramount, it is protected from liability by the interposition of an administrative shell entity which, at all critical times, it controlled. To support this conclusion, Paramount claims that "only" the "party that issued the pertinent

---

[1] All capitalized terms not specifically defined herein shall have the same meaning as set forth in Plaintiffs' Second Amended Complaint.

[2] All citations herein to the *Janus* decision are to the slip opinion, which is annexed to the Declaration of Alan J. Arffa in support of Paramount's motion as Exhibit A.

[3] *Pac. Inv. Mgm.t Co. LLC v. Mayer Brown LLP*, 603 F.3d 144 (2d Cir. 2010).

disclosure document" can be liable under Rule 10b-5, misreading *Janus* to eliminate the "attribution" and "ultimate authority" analysis that the Supreme Court now requires. (Def. Mem. p. 2.)   When the *Janus* analysis is applied to this case, however, under the surrounding circumstances of the Melrose Transaction, the conclusion that Paramount was the "maker" of the statements in the PPM is unavoidable.[4]

Moreover, as noted in a recent article by distinguished securities law scholar John C. Coffey, Jr.[5] analyzing the *Janus* decision, the Supreme Court's standard differs "only marginally" from the "attributed statement rule in the Second Circuit."[6]   Professor Coffey concluded that the Supreme Court's decision is "actually more liberal than the existing Second Circuit 'attributed statement' rule because it expressly allows for attribution that is 'implicit from surrounding circumstances.'"[7]  Thus, ironically, Janus actually supports Plaintiffs' theory of the case, which is that the surrounding circumstances demonstrate that the PPM was attributed to Paramount.

For these reasons, Plaintiffs respectfully submit that Paramount's motion should be denied.

---

[4] Paramount's motion delayed discovery in this case, which will almost certainly support Plaintiffs' well-pleaded allegation of control.  Paramount filed its papers on July 5, 2011, one day before Paramount's discovery responses were due, invoking the Private Securities Litigation Reform Act's ("PSLRA") automatic stay of discovery at the last possible moment. *See* 15 U.S.C. § 78u-4(b)(3)(B).

[5] Professor Coffey is the Adolf A. Berle Professor of Law at Columbia Law School, the co-author of several leading treatises, including *Cases and Materials on Securities Regulation* (9th Ed. 2003), a member of the Legal Advisory Boards of the New York Stock Exchange and the NASD and the Economic Advisory Board to NASDAQ. He is the most cited law professor in law reviews in the combined corporate, commercial and business law fields. http://www.sec.gov/spotlight/proxyprocess/bio/jccoffee.pdf

[6] Coffey, Jr., John C., "U.S. Supreme Court and Securities Litigation," N.Y.L.J. July 21, 2011.  A copy of Professor Coffey's article is annexed to the Janowitz Declaration as Exhibit A.

[7] *Id.*

2

## STATEMENT OF FACTS[8]

As set forth in *Janus*, a person may be found to be a "maker" of a fraudulent statement under Rule 10b-5 if the person controls the content of the statement and how and when to disseminate it. A person may also be a maker if the statement is "attributed" to the person explicitly or implicitly from surrounding circumstances. The facts of this case clearly establish that Paramount is the "maker" under this standard.

First, Paramount spoke to the Investors through the PPM. The language of the factual statements contained in the PPM is direct and contains no qualifying language to suggest that the statements are made by any other speaker. Paramount is identified in the PPM over 350 times.

Second, the PPM and the other transaction documents contain information about Paramount's business practices, including risk mitigation and Paramount's upcoming slate, as well as past performance which, as specifically alleged, could only have come from Paramount and were provided to Plaintiffs by Paramount on a confidential basis. (Complaint ¶¶ 28-32, 44-47.)

Third, Paramount is specifically alleged to be the author of the misrepresentations, not merely in substance but in their precise formulation. (Complaint ¶¶ 30.) For example, as is revealed in the Indemnification Agreement between Paramount and Merrill Lynch, Paramount insisted that the following language be included, verbatim, in the PPM:

> In seeking to limit Paramount's financial exposure, Paramount has pursued a strategy of entering into agreements to share the financing of certain films with other parties. The parties to these arrangements include studio and non-studio entities, both domestic and foreign. In some of these arrangements, other parties control certain distribution and/or other ownership rights.

---

[8] Obviously, Plaintiffs drafted the Complaint prior to the issuance of the *Janus* decision, and as such certain facts relevant to the new standard may not have been specifically alleged in the Complaint. To the extent that these facts are contained in the transactional documents, they have been cited herein. In the event that Paramount's motion is granted, however, Plaintiffs respectfully submit they should be given the opportunity to replead.

(Indemnification Agreement, Schedule 1-1.)[9]

Fourth, Paramount explicitly controlled the content of the key documents containing the misrepresentations and omissions, both as to <u>form</u> and <u>substance</u> as well as whether and how such statements should be communicated to investors.  Paramount conditioned its entrance into the Melrose Transaction with Melrose – executing the Revenue Participation Agreement – upon, *inter alia*, the following:

> 12.2  Paramount shall have caused Viacom to deliver to Participant the Guarantee Agreement [providing a Viacom guarantee of all of Paramount's obligations] in the forms annexed hereto as exhibit C;[10]
>
> 12.3  Participant [including Plaintiffs] shall have entered into the Indenture, Subscription Agreements and Limited Liability Company Agreement **in forms and substance acceptable to Paramount**;

(Janowitz Decl. Ex. F, Revenue Participation Agreement, p. 17, ¶ 12 (emphasis added).  The RPA was executed on July 29, 2004, the same day the Melrose Transaction closed.  Thus, until the moment of closing, Paramount expressly conditioned its participation in the Melrose Transaction upon retaining total control over every aspect of the Melrose Transaction, including the content of the PPM, which was integrated into the Subscription Agreement, as follows:

> This Subscription Agreement, including each of the Attachments . . . appendices and exhibits hereto . . . the Investor Information Form and any other documents being delivered herewith . . . , are being entered into by the undersigned (the "Investor") on the terms and conditions **set forth herein and in the final Confidential Private Placement Memorandum** . . . , the Amended and Restated Limited Liability Company Agreement of the Issuer . . . and that certain Indenture dated as of July 29, 2004 . . . .

Subscription Agreement, preamble p. 1.

---

[9] A copy of the Indemnification Agreement is annexed to the Janowitz Declaration as Exhibit D.

[10] A copy of the Viacom Guarantee is annexed to the Janowitz Declaration as Exhibit E.

Fifth, the Indenture provides that Plaintiffs are responsible to fund a portion of the investment commitment and must provide security for such obligation directly to Paramount. (Janowitz Decl. Ex. H, Indenture, § 2.1(d) at p. 8.)

Sixth, in addition to the surrounding circumstances which attribute the content and control of the PPM to Paramount, the Subscription Agreement explicitly attributes the information contained in the PPM to Paramount and acknowledges that the Investor (including Plaintiffs) "shall" use such information in purchasing the securities.  The Subscription Agreement provides in part:

> All information furnished by the Issuer in connection with this Subscription Agreement, which may include certain information made available to the Issuer by Paramount, whether furnished before or after the date hereof, and regardless of the manner in which it is furnished, is referred to in this Subscription Agreement as "Proprietary Information."
>
> \*       \*       \*
>
> The Investor shall use the Proprietary Information solely for the purpose of evaluating the Securities  and not for any other purpose, and shall keep such Proprietary Information strictly confidential, provided, however, that Proprietary Information may be disclosed to such of the Investor's Representatives as need to know such information for the purpose of assisting the Investor in evaluating the terms of the Securities.

(Janowitz Decl. Ex. G, Subscription Agreement, ¶¶ 9(a) and (b)(emphasis in original).

Seventh, Melrose Investors, LLC , the issuer of the securities sold to Plaintiffs, was designed and constructed as a purely administrative entity to function without discretion as to any material issue affecting its governance.  The managers of Melrose are two companies named GSS Holdings, Inc. and Global Securitization Services LLC (collectively, "GSS").  As is set forth on the GSS Website:

> Global Securitization Services LLC specializes in the ownership and administration of special purpose vehicles ("SPVs") established in connection with structured finance transactions …

5

(*See* www.gssnyc.com.)

The nature and role of SPVs or SPEs (Special Purpose Entities) as they are sometimes

known is well understood in structured finance transactions.  One practitioners' journal described

these entities and their roles as follows:

> Basically, an off-balance-sheet entity is created by a party (the transferor or the
> sponsor) by transferring assets to another party (the SPE) to carry out a specific
> purpose, activity, or series of transactions. Such entities have no purpose other
> than the transactions for which they are created.  The legal form for these entities
> may be a limited partnership, a limited liability company, a trust, or a corporation.
> Regardless of their legal form, off-balance-sheet entities share the following
> characteristics:
> - <u>They are often thinly capitalized.</u>
> - <u>They typically have no independent management or employees.</u>
> - Their administrative functions are often performed by a trustee
>   who receives and distributes cash in accordance with the terms of
>   contract and who serves as an intermediary between the SPE and
>   the parties that created it.
> - If the SPE holds assets, one of these parties usually services then
>   under a servicing agreement.

The CPA Journal, <u>Accounting for Special Purpose Entities Revised: FASB Interpretation</u>

<u>46(R)</u> by Jalal Soroosh and Jack T. Ciesielski (emphasis added).[11]  Another article

discussing the funding and control of such entities noted as follows:

> Special purpose entities are <u>shell</u> firms created by a sponsor, but funded by
> independent equity investors and debt financing.

Journal of Economic Perspectives –Volume 17, Number 2-Spring 2003-pages 3-26, <u>The</u>

<u>Fall of Enron</u> by Paul M. Healy and Krishna G. Palepu (emphasis added).[12]

The Melrose Transaction's use of an SPV – Melrose Investors, LLC – conformed

to the normal use of such vehicles.  Melrose Investors, LLC was formed on May 7, 2006

---

[11] Cielielski, Jack T. and Soroosh, Jalal, "Accounting for Special Purpose Entities Revised: FASB Interpretation 46(R)," The CPA Journal.  A copy of this article is annexed to the Janowitz Declaration as Exhibit C.

[12] Healy, Paul M. and Palepu, Krishna G., "The Fall of Enron," Journal of Economic Perspectives –Volume 17, Number 2 -pages 3-26 (Spring 2003).  A copy of this article is annexed to the Janowitz Declaration as Exhibit B.

by GSS Holdings, Inc. which capitalized it with a token "capital contribution." (LLC

Agreement, ¶ 9 ("Capital Contributions"), p. 2.)[13]  At the closing on July 29, 2004,

Melrose executed the key transaction documents, the RPA and the Indenture, which

limited the operation of Melrose (managed by GSS) to that of an administrative entity.

In other words, Melrose functioned only to collect the Investor funds and to

distribute money to the Investors as required under the RPA.  The Amended[14] LLC

Agreement provided that the "Purposes of the Issuer" were limited to the following:

> i) entering into, delivering and performing the Revenue Participation Agreement,
> investing assets of the Issuer in Revenue Participation Interests in accordance
> with the Revenue Participation Agreement, (ii) making, holding and disposing of
> investments, (iii) issuing Notes pursuant to the Indenture and any activities
> incidental thereto and (iv) engaging in all activities and transactions on behalf of
> the Issuer as the Manager may deem reasonably necessary, advisable, convenient
> or incidental in connection therewith or in furtherance thereof.

(Amended LLC Agreement, ¶ 2.4(a) ("Purposes of the Issuer"), pp. 9-10.)  Thus under GSS's

management, Melrose, one of thousands of entities in the GSS administrative mill, functioned on

autopilot without authority to act on any significant issues affecting the governance of Melrose.

This is precisely the way GSS was intended to act, assuring Paramount and the Investors that the

administrative intermediary would do nothing to interfere with the financial arrangement they

had made.

### ARGUMENT

I.      **Paramount Had Ultimate Authority Over the PPM Including Its Content
        And Whether and How to Communicate the Statements Contained Therein**

*Janus* clarifies that for the purposes of Rule 10b-5, "the maker of a statement is the

person or entity with ultimate authority over the statement, including its content and whether and

---

[13] *See* Limited Liability Company Agreement of Melrose Investors LLC, dated as of May 7, 2004 ("LLC Agreement").  A copy of the LLC Agreement (without exhibits) is annexed to the Janowitz Declaration as Exhibit I.
[14] A copy of the Amended Limited Liability Company Agreement for Melrose Investors LLC (without exhibits) is annexed to the Janowitz Declaration as Exhibit J.

how to communicate it." *Janus* at 6.  The Supreme Court continued, "[w]ithout control, a person

or entity can merely suggest what to say, not 'make' a statement in its own right."  Instead of

following this guidance, Paramount urges an interpretation of *Janus* whereby the form of the

Melrose Transaction – the creation and use of an administrative special purpose vehicle to issue

securities to raise capital for Paramount – precludes any finding of liability whatsoever against

Paramount.  As will be shown below, Paramount's analysis is superficial and ignores the

Supreme Court's focus on the party who has "ultimate authority over the statement" made in a

securities offering.

In *Janus*, the Court reviewed a decision of the Fourth Circuit which permitted 10b-5

claims to go forward against Janus Capital Management ("JCM"), based upon allegedly false and

misleading prospectuses issued by a mutual fund Janus Investment Fund ("JIF").  *See Wiggins v.*

*Janus Capital Group, Inc. (In re Mut. Funds Inv. Litig.)*, 566 F.3d 111 (4th Cir. 2009).  JCM

served as an investment advisor to JIF and was allegedly significantly involved in preparing the

prospectuses.  *Id.* at 121.  Plaintiffs argued that because of this involvement and the close

relationship between a mutual fund and its investment advisors, JCM was in a position to

exercise significant influence over JIF, subjecting JCM to liability under Rule 10b-5.  *Id.*  The

Fourth Circuit held that plaintiffs had sufficiently alleged that through this role, JCM had "made"

the statements formally issued by JIF by "participating in the writing and dissemination of the

prospectuses."  *Id.* at 121.

Nevertheless, upon review, the Supreme Court reversed, holding that JCM's participation

in the drafting process was insufficient to render it a "maker" of the statements in the

prospectuses:

> [f]or purposes of Rule 10b-5, the maker of the statement is the person or entity with
> <u>ultimate authority over the statement</u> including <u>its content and whether and how to</u>

communicate it. Without control, a person or entity can merely know what to say and not "make" a statement in its own right.

*Janus*, 564 U.S. ___, Slip op. at 6 (emphasis added). The Supreme Court found that despite the contributions of JCM to the prospectuses, they remained ultimately in the control of JIF, the entity who filed them. *Id.* at 10-11. While acknowledging the typically "close relationship" between the mutual fund JIF and its advisor, JCM, the Court found it dispositive of the issue of control that JIF was managed by a predominantly independent board which overlapped, but incompletely, with the board of JCM. *Id.* Thus, the Court credited the argument that the two entities were truly separately governed. *Id.*

Here, unlike *Janus,* Paramount controlled the making and dissemination of the false statements in the PPM completely, and, unlike *Janus,* the nominal issuer of the PPM was created to function without independent management or judgment. Again, Paramount maintained the ultimate authority to approve the entire Melrose Transaction -- including the language of the PPM -- as a condition of its participation, and Melrose operated without any discretion to do anything other than what Paramount prescribed in the Amended LLC Agreement. Unlike the independent board of the JIF mutual fund in Janus, Melrose has only a managing member with limited authority whose duties are purely administrative.

Paramount's contribution to the PPM also cannot be analogized to the relationship between a speaker and a speech writer, an analogy relied upon by the Court in *Janus. Id.* at 9-10. According to this analogy, the speech writer does not control the ultimate wording or communication of the statements; that is the function of the person delivering the speech for whom the words have been suggested. In *Janus* the separation of JIF, the fund issuing the prospectus, and JCM, the manager, was sufficient to justify the conclusion that it was JIF who ultimately controlled the statements that were filed. However, in Melrose, the key documents

9

containing the representations and omissions were specifically controlled both as to form and

substance through the Revenue Participation Agreement. It was the Revenue Participation

Agreement which facilitated Plaintiffs' investment in the Paramount films and which governed

the payment for their participation interests. The Revenue Participation Agreement was

executed by Paramount on July 29, 2004, the same day that the Melrose Transaction closed.

Thus, Paramount maintained complete control over all of the transaction documents, including

the PPM, until the very minute that the deal closed.

As set forth above, Melrose Investors, LLC had no purpose or function until the deal

closed other than to execute the transaction documents and to act as an administrator for

Plaintiff's investment. After the transaction closed in July 2006, Melrose Investors, LLC

functioned strictly in accordance with the documents which had been created by Paramount to

closely control the activities of Melrose Investors, LLC and to limit its discretion to purely

administrative and ministerial matters. To have permitted otherwise would have undermined the

very purpose for which the SPV had been created and make the Melrose Transaction unfeasible.

Thus, the Melrose Transaction is not the kind of transaction addressed by the Supreme

Court in *Janus*. As set forth by the Court, the essential question in deciding whether a person is

a "maker" is the issue of control, not formality.

## II.   The Statements in the PPM are Attributable to Paramount

*Janus* held that "in the ordinary case, attribution within a statement or implicit from

surrounding circumstances is strong evidence that a statement [is] made by, and only by, the

party to whom it is attributed." *Id.* at 6. The evidence is overwhelming that the statements in the

PPM are attributable to Paramount under the circumstances, and Paramount's only defense to

these facts is that their legal disclaimers preclude any reliance on this attribution. *Janus*,

10

however, did not change the law with respect to disclaimers, and as this Court has already found on two occasions, the disclaimers in the PPM are far too general to be effective here. Unless disclaimers in a securities offering expressly warn of or directly relate to the risk that brought about a plaintiff's loss, they are ineffective to bar a claim *See, e.g., Halperin v. eBanker USA.com, Inc.*, 295 F.3d 352, 359 (2d Cir. 2002).

The *Janus* decision is noteworthy because it does not require that attribution be explicit: it may also be implicit from surrounding circumstances. *Janus* at 6. It is hard to imagine circumstances in which attribution to Paramount could have been more evident. Attribution is evident in this case for a number of reasons.

First, as set forth above, Paramount's control of the key transaction documents until the moment the deal closed demonstrates that it was Paramount, not Melrose, who was in control of the precise language of the offering documents – and the Investors in the Melrose Transaction were all aware that this was the case. The transaction documents could just as easily have stated that the RPA and the PPM were subject to the approval of Melrose, but that is not what they provide, nor could they. Melrose could not approve the documents because there was no one with any authority to do so at Melrose, and every party to the Melrose Transaction knew that Melrose was merely a vehicle created by Paramount to administer the Securities and the RPI. Thus, by requiring complete approval by Paramount, the transaction documents accurately attribute control over the transaction, and specifically the statements contained therein, to Paramount.

Second, the transaction documents, and particularly the Subscription Agreement and the Indenture, attribute the relevant statements to Paramount by creating a direct nexus between the Investors and Paramount. Specifically, the Subscription Agreement states that information has

11

been provided to the Investor through the issuer by Paramount and requires that the Investor agrees to hold such information confidential.  Moreover, the Indenture sets forth a direct obligation between the investors and Paramount requiring the investors to fund a portion of their investment and to secure that investment in favor of Paramount.

Third, and of equal importance to the other factors, the transaction from top to bottom is purely about Paramount.  The PPM discloses information that could only come from Paramount concerning Paramount's business practices, its assets, its motion pictures, its performance, etc. Unlike *Janus*, where investors purchased shares in a mutual fund which then invested in array of publicly traded securities, all of Plaintiff's investment was committed, by design, to one asset, namely, an interest in the revenue of future Paramount films.  The hundreds of mentions of Paramount in the PPM are a ringing attribution of the document to Paramount.

## III.  Paramount is Seeking to Relitigate an Issue Already Decided

As the standard for "attribution" has not been limited in the Second Circuit following *Janus*, especially with respect to how the law should be applied to the facts of this case, Defendant's motion also should be denied because Defendant impermissibly seeks to re-litigate the issue of whether Paramount "made" the material misrepresentations related to the Melrose transaction -- which has already been considered and decided by this Court.  Federal Rule of Civil Procedure 12(g) precludes consideration of such a successive motion to dismiss which relies on previously litigated arguments.  *See FRA S.p.A. v. Surg-O-Flex of Am. Inc.*, 415 F. Supp. 421, 428 (S.D.N.Y. 1976); *see also AMA v. United Healthcare Corp.*, 588 F. Supp. 2d 432, 439 (S.D.N.Y. 2008) ("Based upon the statute's plain language, [Federal Rule of Civil Procedure] Rule 12(g) seeks to prevent successive motions that are similar in nature").  While Defendant is correct that Rule 12 does allow for successive motions for failure to state a claim, a

successive motion will not be considered where it is based on the same pleadings and arguments

as its predecessors.  Defendant's motion should be rejected out-of-hand as repetitive and a waste

of judicial resources.

**IV.     Plaintiffs' Common Law Claims Should Survive**

Irrespective of whether Plaintiffs' federal securities claim survives, Plaintiffs have pled

sufficient facts to state causes of action for common law fraud and unjust enrichment based upon

Paramount's fraudulent omissions and misstatements in the PPM under New York Law.  While

appellate courts prior to *Janus* held that the pleading standard under New York law for fraud and

under Rule 10b-5 were similar, nowhere in New York's jurisprudence is there a discussion of the

*Janus'* "attribution" and "ultimate authority" standard.  As such, in the unlikely event that

Plaintiffs' Rule 10b-5 claim is dismissed – and it should not be – this Court should decline to

exercise jurisdiction over Plaintiffs' common law claims, and permit Plaintiffs to pursue them in

state court.

**CONCLUSION**

For the reasons set forth above, upon the exhibits annexed to the Janowitz Declaration,

and upon all prior pleadings herein, Plaintiffs respectfully request that Paramount's third motion

to dismiss the Second Amended Complaint be denied.

13

Dated: New York, New York
       August 19, 2010

PRYOR CASHMAN LLP

By: _____
    James A. Janowitz
    Donald S. Zakarin
    Jacob B. Radcliff
7 Times Square
New York, New York 10022
(212) 421-4100
jjanowitz@pryorcashman.com
dzakarin@pryorcashman.com
jradcliff@pryorcashman.com

Attorneys for Plaintiffs Allianz Risk Transfer AG,
Marathon Structured Finance Fund, LP,
NewStar Financial, Inc. and Munich Re Capital
Markets New York, Inc.

14