

James A. Janowitz
Donald S. Zakarin
Jacob B. Radcliff
PRYOR CASHMAN LLP
7 Times Square
New York, New York 10036
(212) 421-4100
jjanowitz@pryorcashman.com
dzakarin@pryorcashman.com
jradcliff@pryorcashman.com

Attorneys for Plaintiffs Allianz Risk Transfer AG,
Marathon Structured Finance Fund, LP,
NewStar Financial, Inc. and Munich Re Capital Markets New York, Inc.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------ x
                                       :

ALLIANZ RISK TRANSFER AG,              :      1:08-cv-10420 (TPG)
MARATHON STRUCTURED FINANCE FUND, LP,   :
NEWSTAR FINANCIAL, INC., and          :
MUNICH RE CAPITAL MARKETS NEW YORK, INC.,   :
                                         :

           Plaintiffs,                        :      **THIRD**
                                         :      **AMENDED**
           -v-                             :      **COMPLAINT**
                                         :

PARAMOUNT PICTURES CORPORATION,       :
                                         :
           Defendant.                       :
                                         :
------------------------------------------------------------------ x

       Plaintiffs Allianz Risk Transfer AG, formerly known as Allianz Risk Transfer

("Allianz"), Marathon Structured Finance Fund, LP ("Marathon"), NewStar Financial,

Inc. ("NewStar") and Munich Re Capital Markets New York, Inc. ("MRCM")

(collectively, "Plaintiffs"), by their attorneys Pryor Cashman LLP, as and for their Third

Amended Complaint against defendant Paramount Pictures Corporation ("Paramount"),

allege as follows:

## NATURE OF DISPUTE

1.      This is an action brought by Plaintiffs pursuant to Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 promulgated thereunder, 15 U.S.C. 78(j)(b) and 17 C.F.R. 2401.10b-5, and for fraudulent inducement and unjust enrichment at common law in the State of New York, seeking damages, rescission and/or restitution based on Paramount's knowing misrepresentations and omissions of information material to Plaintiffs' decision to invest in securities issued by Melrose Investors LLC for the benefit of Paramount.

2.      Plaintiffs are financial institutions which make investments in a variety of industries. All of Plaintiffs invested in debt instruments, Class B Notes (the "Securities"), and Marathon and Allianz also invested in membership interests of Melrose as set forth in paragraphs 10 and 12 below (the "Equity" and, together with the Notes, the "Securities"), in an investment vehicle sponsored by Paramount to finance the production of a slate of films to be produced, released and distributed by Paramount between April of 2004 and March of 2006 (the "Melrose Slate"). The Securities were issued by an entity named Melrose Investors LLC ("Melrose") which served as a conduit for the investment proceeds to Paramount and which was created at the direction of Paramount. In purchasing the Securities, Plaintiffs read and relied on the accuracy and completeness of the statements contained in a private placement memorandum dated July 22, 2004 (the "PPM"), statements as to which Paramount was the source and which Paramount knew were incomplete and otherwise false and misleading. Merrill Lynch & Co. ("Merrill") acted as the placement agent for the Securities of Melrose.

3.      Paramount induced Plaintiffs to purchase the Securities through disclosures in the PPM stating that Paramount regularly employed specific risk mitigation techniques when producing and distributing films, and that these risk mitigation techniques would operate for the benefit of the investors in Melrose (the "Melrose Investors").

4.      Because Paramount elected to market the Securities by emphasizing its risk mitigation techniques and providing detailed information regarding such techniques, Paramount had a duty to disclose all information relevant and necessary to render the statements in the PPM regarding its risk mitigation strategy with regard to producing and distributing films not misleading.

5.      Paramount failed to disclose that by the time of Plaintiffs' purchase of the Securities, contrary to the specific and repeated representations in the PPM concerning its risk mitigation strategy, Paramount had materially altered its production and distribution plans with regard to the films in the Melrose Slate to dramatically reduce the use of a key risk mitigation technique described in the PPM.  By failing to explain that its discussion of its risk mitigation strategy was no longer accurate, Paramount not only misrepresented the actual financial risks associated with the investment but also omitted material facts necessary to make statements made in the PPM not misleading.

6.      The financial performance of the Melrose Slate was poor and, as a result, Plaintiffs will lose their entire investment of approximately $40.1 million.  Had Paramount employed risk mitigation strategies to co-finance the Melrose Slate in a manner consistent with the representations in the PPM, Plaintiffs' loss would have been limited to approximately $9.8 million, and they would have recovered approximately

$30.3 million of their investment.  Accordingly, as a result of Paramount's fraud, Plaintiffs have been damaged in the amount of approximately $30.3 million.

7.      Plaintiffs seek damages pursuant to sections 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. 78j(b) and the rules and regulations promulgated thereunder by the Securities and Exchange Commission, including Rule 10b-5, 17 C.F.R. 240.10b-5, rescission pursuant to common law fraud and recovery of the entirety of their investment pursuant to a common law claim of unjust enrichment, together with interest, punitive damages, costs and Plaintiffs' attorneys' fees.

**PARTIES**

8.      Paramount is a Delaware corporation wholly owned by Viacom, Inc. with a principal place of business located at 5555 Melrose Avenue, Hollywood, California 90038-3197.  Paramount is in the business of producing, financing and distributing motion pictures.

9.      NewStar is a Delaware corporation with a principal place of business located at 500 Boylston Street, Boston, Massachusetts 02116.  NewStar purchased $10,000,000 original principal amount of Class B Notes on July 29, 2004.

10.      Marathon is a Delaware limited partnership with a principal place of business located at 461 Fifth Avenue, New York, New York 10017.  Marathon purchased $7,000,000 original principal amount of Class B Notes and $3,000,000 of membership interests in Melrose (representing approximately 10.5% of the issued and outstanding membership interests of Melrose) on July 29, 2004.

11.      MRCM, formerly Munich American Capital Markets, Inc., is a Delaware corporation wholly owned by Munich Reinsurance Company AG (through Munich

American Holding Corporation) with a principal place of business located at 540 Madison Avenue, 5th Floor, New York, New York 10022.  On July 30, 2004, MRCM entered into a total return swap transaction with Merrill Lynch Mortgage Capital, Inc. with respect to $10,000,000 original principal amount of Class B Notes purchased by Merrill Lynch Mortgage Capital, Inc. on July 29, 2004, wherein MRCM acquired the material economic benefit and risk of the Notes.  On March 21, 2007, MRCM acquired the underlying bond from Merrill Lynch Mortgage Capital, Inc. for the face amount of $10,000,000.  By virtue of the total return swap transaction with Merrill Lynch Mortgage Capital, Inc., MRCM has been the beneficial owner of the Notes since July 30, 2004.

       12.     Allianz is an insurance company organized under the laws of Switzerland with a principal place of business located at Lavaterstrasse 67, CH-8002, Zürich, Switzerland.  On or about October 13, 2004, Allianz entered into a total return swap transaction with Hypo Public Finance Bank (formerly known as Hypo Real Estate Bank International) ("EuroHypo") with respect to $7,125,000 original principal amount Class B Notes and $3,000,000 of membership interests in Melrose (representing approximately 10.5% of the issued and outstanding membership interests of Melrose), in each case purchased by EuroHypo on October 13, 2004, wherein Allianz acquired the material economic benefit and risk on the Securities.  On June 30, 2006, Allianz acquired the underlying Class B Notes from EuroHypo for the face amount of $7,125,000 and the underlying membership interests of Melrose for $3,000,000.  By virtue of the total return swap transaction with EuroHypo, Allianz has been the beneficial owner of the Securities since October 13, 2004.

## JURISDICTION AND VENUE

13.     This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Securities Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1331 and § 1367.  As this action is between citizens of different states and/or foreign states and the amount in controversy exceeds $75,000 exclusive of interest and costs, this Court also has original jurisdiction pursuant to 28 U.S.C. § 1332.

14.     Venue is proper in this District pursuant to Section 27 of the Securities Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1391(b).  Many of the acts constituting the violations of law alleged herein, including the preparation and dissemination of the PPM, occurred in substantial part in this Judicial District.

## FACTUAL ALLEGATIONS

**I.      The Structure of the Melrose Transaction**

**A.      Terms of the Transaction**

15.     The Melrose transaction (the "Melrose Transaction") is a structured finance transaction sponsored by Paramount pursuant to which the Melrose Investors provided Paramount approximately $231.3 million for purposes of enabling Paramount to finance the production and distribution of motion pictures.  Because Paramount both produces films and distributes them, by reducing Paramount's own financial investment in the production of any single film, the Melrose Transaction enabled Paramount to produce a slate of films for distribution while reducing Paramount's own financial risk in connection with the production and distribution of films.

16.     The Melrose Transaction included three types of investors.  The senior creditors, holders of the Class A Notes, provided $157.5 million.  The junior creditors,

holders of the Class B Notes, provided $45.3 million. The equity investors provided $28.5 million. The Melrose Transaction closed on July 29, 2004 and was amended to permit additional purchases of Class A and Class B Notes and equity on or about October 13, 2004.

17.     The Melrose Slate did not cover all of the films that Paramount intended to produce or distribute between 2004 and 2006, but rather a discrete set of films that met the criteria for "Covered Pictures" set forth in the PPM. These criteria included, *inter alia*, films that received an MPAA rating no more restrictive than "R", were filmed predominantly in English, and for which Paramount's net production investment exceeded $5 million.

18.     Melrose, as a conduit or instrumentality sponsored and employed by Paramount, used the funds raised in the Melrose Transaction to purchase from Paramount revenue participation interests ("RPI") in each film in the Melrose Slate pursuant to the terms of the Revenue Participation Agreement between Paramount and Melrose dated July 29, 2004 (the "RPA"). Melrose operated as a conduit for investor funds to Paramount and to distribute the RPI income from the Melrose Slate to the noteholders and Melrose members.

19.     As intended by the parties to the Melrose Transaction, Melrose's sole asset, aside from a small reserve for administrative purposes, is now the RPI for all of the films in the Melrose Slate.

20.     The RPI income is distributed to Melrose pursuant to the terms of the RPA and further distributed among the Melrose noteholders and members pursuant to the terms of an indenture dated as of July 29, 2004.

21.     The RPA provides that the receipts available for RPI are net of a distribution fee to Paramount, an administrative fee, print, advertising and distribution costs, third-party participations and taxes for each production period. After these net receipts are calculated, the Melrose Investors' RPI income is based on the Melrose Investors' pro rata contribution to the net cost of producing the films in the Melrose Slate.

22.     Payments of the RPI are made to Melrose and distributed pursuant to a "waterfall" to investors in order of seniority.  RPI is generally first distributed to pay the holders of senior Class A Notes, then to holders of the subordinated Class B Notes, and finally to holders of the Equity of Melrose.

**B.      Slate-Based Institutional Investment in Film Production**

23.     When institutional investors such as Plaintiffs finance the production of motion pictures, the process is a highly analytic one based upon objective criteria and facts as well as the structure of the financing.

24.     Typically, as in the Melrose Transaction, institutional investors invest in a large slate of films rather than individual films to benefit from diversification, just as conservative individual investors invest in diversified funds rather than individual stocks and bonds.  Slates of films offered for institutional investment participation are typically produced by the major film studios which have the capacity to produce and distribute a large number of films in a relatively short period of time.

25.     One of the key elements in evaluating an investment in a slate of films is the business model of the sponsor (the "Business Model").  The Business Model includes, among other things, the budget range of films, the means of distribution and the

fiscal discipline of management and risk mitigation techniques employed by management to avoid undue loss.

26.     For example, a given film project could be produced with big stars resulting in a costly production or with relatively unknown actors for a small budget. The studio may choose to share the risk of loss with partners or to go it alone. It may choose to spend more or less aggressively in promoting a film.

27.     Critically, because the process of producing films is complex and necessarily involves a large number of negotiated transactions regarding the details of film production, distribution and financing, most, if not all, of the decisions regarding film production and distribution are made months or even years before a film is released initially for exhibition in theaters. Accordingly, a studio's Business Model provides information not only as to how a studio produces, distributes and finances films generally, but also how a studio has already determined to produce, distribute and finance films set for theatrical release in the near future.

## II.     **Paramount's Fraud**

### A.     **Paramount's Statements as to Risk Mitigation**

28.     Paramount was the source of all of the financial information disclosed to the Melrose Investors during the due diligence process, and wrote portions of the PPM directly. Paramount also drafted the language of the General Disclaimer in the PPM, which states, falsely and fraudulently, that Paramount did not prepare the PPM and does not "assume" responsibility for it.

29.     The PPM describes Paramount's Business Model. In a section devoted to "Paramount Pictures Business Overview," the PPM states that "[h]istorically, Paramount

has managed its business guided by the following principal strategic objectives"

including an "[e]mphasis on a **culture of fiscal caution** through continuous budgetary

scrutiny and opportunistic **risk-sharing financing**." (PPM p. 39.)

30.    In a provision drafted *in haec verba* by Paramount itself, the PPM further

provides as follows:

> **In seeking to limit Paramount's financial exposure,** Paramount has
> pursued a strategy of entering into **agreements to share the financing of
> certain films with other parties.**   The parties to these arrangements
> include studio and non-studio entities, both domestic and foreign.  In some
> of these arrangements, other parties control certain distribution and/or
> other ownership rights.

(PPM p. 6.)

31.    The PPM further states, **as a current and prospective matter**:

> Like other major studios, **Paramount aims to achieve consistent slate
> profitability** by **managing** capital commitments for each film project,
> **opportunistically entering into output agreements and territory sales**
> with third parties, and **emphasizing cost mitigation programs such as . .
> . co-financings . . . .    The purpose of these risk-management
> techniques is to reduce a film's net production cost, thereby
> diversifying slate performance risk and creating a lower cost basis for
> Paramount.**

(PPM p. 31.)

32.    The PPM further states, again as a current and prospective matter:

> Paramount **selectively pursues and enters** into co-production agreements,
> studio "shared pot" deals, split rights deals and similar arrangements under
> which, depending on the situation, either Paramount enters into an
> arrangement with a third party pursuant to which the third party agrees to
> share in the cost of production of one of Paramount's films in exchange
> for obtaining certain distribution rights from Paramount or vice versa.
> Paramount also occasionally asks investors to invest directly in one or
> more films for a share of those films' net proceeds without any transfer of
> distribution rights to the investor.   Such agreements provide that the
> investor receives a share of the defined net proceeds of the film which,
> depending on the deal, can be from worldwide distribution, certain

territories or other markets.  **These agreements limit Paramount's risk relating to the motion picture's performance.**

(PPM pp. 39.)

33.    As set forth above, the PPM repeatedly and emphatically represented, not merely that Paramount had historically prudently engaged in a broad array of risk mitigation strategies, including co-financing, selling off distribution rights for guaranteed payments and making international territorial sales, all designed to limit Paramount's financial risk, but that it did so currently and prospectively, thus limiting the potential risk of the Melrose Investors.  Thus, Paramount stated that its Business Model,  on a historical, current and prospective basis, included the objective of limiting its exposure to risk in an effort to achieve "consistent profitability" in its film slates.

34.    A critical technique identified by Paramount in the PPM to minimize risk and achieve consistent profitability is the use of international territorial sales.  Paramount stated that it would prospectively manage the capital requirements for each film project by "opportunistically entering into output agreements and territory sales with third parties . . . ." (PPM p. 31.)

35.    The PPM stated that the Melrose Investors would benefit from Paramount's "culture of fiscal caution" because the Melrose Investors' interests were aligned with those of Paramount under the RPA.

36.    Paramount's election to market the Securities by emphasizing its risk reducing strategies as disclosed in the PPM imposed a duty on Paramount to fully disclose all material information that related to its risk mitigation strategies, including all information inconsistent with the statements in the PPM that would have revealed that Paramount actually had not employed and, contrary to its emphasis in the PPM on the

prospective continued use of risk mitigation strategies, Paramount did not intend to employ the critical risk mitigation strategy it described in connection with the Melrose Slate, thereby materially increasing the risk of loss for the Melrose Investors.

**B.      Paramount's Misrepresentations and Omissions as to Risk Mitigation**

37.      Paramount falsely stated to the Melrose Investors that it was employing certain risk mitigation techniques at the time the Melrose Transaction closed, when in fact Paramount had made and implemented decisions regarding financing and distribution with respect to a majority of the films in the Melrose Slate which did not employ these techniques or only employed them to a *de minimus* degree.

38.      Unknown to and undisclosed by Paramount to the Melrose Investors, prior to the sale of the Securities to the Melrose Investors, and contrary to its extensive disclosure of its historical, current and prospective use of risk mitigation techniques in the PPM, Paramount decided to finance, produce and distribute the Melrose Slate in a manner that imposed a materially higher level of risk than that contained in the Business Model disclosed in the PPM.

39.      In electing to invest in the Melrose Slate, the risk mitigation strategies identified by Paramount in the PPM were material to the investment decision of the Melrose Investors who relied on the statements contained in the PPM as to risk mitigation.  The Melrose Investors were unaware, due to the false representations contained in the PPM and due to Paramount's failure to disclose the change in the Business Model, that the risk mitigation techniques identified in the PPM were substantially not being employed and would not in the future be employed by Paramount with respect to the Melrose Slate.

40.     As a result of Paramount's failure to disclose in the PPM that certain risk

mitigation techniques were now disfavored and were only going to be used sparingly, if

at all, to finance the Melrose Slate, its disclosures in the PPM and its emphasis on the

protections afforded by such risk mitigation techniques to be employed prospectively

were materially false and misleading.

C.      **Misrepresentations and Omissions Regarding Changes
        in Paramount's International Distribution Strategy**

41.     From 1998 to 2003, Paramount distributed a significant percentage of its

films internationally through the use of international territorial sales, also known as

international "pre-sales," whereby third-party distribution companies purchased the right

to distribute a film in specific foreign countries and territories in exchange for a fixed

sum, or minimum guarantee.  The minimum guarantees were used by Paramount to

partially pay for or defray the production cost of the film.  Thereafter the third-party

distribution companies had no obligation to share revenues or profits with Paramount,

irrespective of how well or how poorly a particular film performed in a foreign market

unless and until the minimum guarantee and the distribution fees and expenses of the

territorial distributor were recouped.  When Paramount pre-sold the rights to a film in a

particular foreign country or territory, this eliminated the need for Paramount to expend

any money on prints of the film for exhibition and advertising expenses in that foreign

country or territory since that expense was the responsibility of the territorial distributor.

42.     The net effect for Paramount of utilizing international pre-sales was to

decrease the gain that could be earned in foreign countries by a highly performing film

while minimizing the risk posed by poorly performing films.  The benefit to Paramount

of pre-selling distribution rights for foreign territories is that it transfers the risk that a

film might perform poorly to third-party distribution companies.  International pre-sales thus were a key component of Paramount's goal of achieving "**consistent** slate profitability" as stated in the PPM.

43.      Not employing international pre-sales would increase the profits of Paramount as producer and distributor with respect to highly successful films.  However, at the same time, because downside risk was no longer shifted to a third party, it would greatly increase the risk of loss for the Melrose Investors in the event films were unsuccessful.

44.      Prior to Plaintiffs' purchase of the Securities, Paramount's management decided to change its strategy of mitigating the risk of loss through the regular and heavy use of international pre-sales and had implemented a new strategy of increasing its handling of most of its foreign distribution through United International Pictures ("UIP"), a company co-owned by Paramount's parent company, Viacom, and an affiliate of Universal Studios, Inc.  The PPM states that Paramount "generally" distributes its motion pictures outside the U.S. and Canada through UIP.  Given the discussion of international pre-sales in the PPM, Plaintiffs reasonably understood this statement to mean that in those circumstances where Paramount chose to self-distribute as opposed to pre-selling international rights, it did so through its affiliate UIP, just as the other major studios, when they self-distribute, generally do so  through foreign distribution affiliates but also pre-sell through third-party distributors in foreign territories.  Plaintiffs did not understand, nor could they reasonably have been expected to understand, that the reference to UIP was intended to contradict information provided to them by Paramount

emphasizing its current and prospective use of international pre-sales as a risk mitigation technique.

45.    Upon information and belief, Paramount's distribution through UIP provides no risk mitigation for Paramount and does not provide for minimum guarantees, unlike international pre-sales.  The substantial reduction of foreign pre-sales increased the risk of loss to Paramount (and the Melrose Investors) for poorly performing films by eliminating the minimum guarantee (which was not performance related) while, at the same time, significantly increasing the amounts Paramount needed to spend on prints and advertising, which itself created further risk of loss for the Melrose Investors.

46.    The PPM stated that Paramount engaged in international territorial sales on an "opportunistic" basis as a "risk management technique[]" used to "reduce a film's net production cost . . . ."  Plaintiffs reasonably understood these statements to mean that Paramount had a predisposition to make international and territorial pre-sales limited only by the reasonable availability of the opportunities to make such pre-sales.  Similarly, Plaintiffs understood Paramount's statement that it pursued and entered into territorial pre-sales "selectively" meant that Paramount would search for opportunities to engage in pre-sales and then select the most advantageous of such opportunities, not that Paramount had already made a fundamental decision to not pursue pre-sale opportunities.  As set forth below, contrary to Paramount's statements in the PPM, it failed to take advantage of opportunities to reduce the aggregate net production cost of the films in the Melrose Slate through international and territorial pre-sales with particularly disastrous results with respect to a number of films.  As a result of its decision, nowhere identified in the PPM, to materially reduce its international pre-sales while increasing its self-distribution

through UIP, Paramount was not engaging in such sales on an "opportunistic" basis when the PPM was issued.  Paramount did the opposite.  It engaged in a business plan pursuant to which there was a prejudice *against* engaging in international territorial pre-sales, and a bias *in favor of* self-distribution.

47.     Accordingly, the representations in the PPM regarding Paramount's practice (Business Model) regarding its current and prospective opportunistic engagement in making international pre-sales as a means of reducing cost and minimizing risk of loss were knowingly and materially misleading.  Moreover, the PPM failed to include information necessary to make the description of Paramount's Business Model not misleading because Paramount failed to inform the Melrose Investors of the changes in its Business Model which Paramount had already implemented with respect to the current and future financing of the Melrose Slate.

48.     Upon information and belief, Paramount's decision to self-distribute in international markets through UIP also was motivated by the fact that UIP, for the benefit of Paramount and/or its parent Viacom, collected a distribution fee on such gross receipts which it did not share with the Melrose Investors.  Thus, Paramount relied on the Melrose Investors to cushion its risk in the new strategy knowing that Paramount and/or its parent Viacom would reap the rewards of any increased distribution income without sharing it with the Melrose Investors.

49.     Because the Melrose Investors' RPI is calculated as a percentage of the net of gross receipts from all sales less the costs of prints and advertising and the distribution fees, Paramount's change in strategy significantly increased the risk of loss to the Melrose Investors in the event that the films in the Melrose Slate performed poorly.

50.    Paramount failed to disclose to the Melrose Investors in the PPM that Paramount's change in strategy undermined its stated objective of achieving "consistent" slate profitability.  Prior to the dates Plaintiffs purchased the Securities, Paramount had, undisclosed to the Melrose Investors, made and implemented a policy to disfavor international pre-sales to co-finance the Melrose Slate for risk mitigation purposes and to embrace a high-risk strategy of self-distribution.

51.    Paramount failed to disclose to the Melrose Investors in the PPM that prior to the dates Plaintiffs purchased the Securities, Paramount had made and implemented decisions to increase the amounts Paramount would be required to spend on prints and advertising for foreign distribution of the films in the Melrose Slate.  Unbeknownst and undisclosed to the Plaintiffs, Paramount's spending on foreign prints and advertising, as a percentage of the total revenues of each film, significantly increased in the period immediately preceding the period of time during which the films in the Melrose Slate were released and remained at historically high levels with respect to the films in the Melrose Slate.  Paramount deliberately concealed this material information from the Melrose Investors with full knowledge that one of the key factors affecting the receipts available for distribution as RPI were print and advertising costs, which were recoupable prior to any distribution to the Melrose Investors, and which were increasing as a result of Paramount's new and undisclosed high risk strategy.

**D.    Paramount's Omissions Regarding International Pre-Sales Were Material**

52.    The undisclosed changes in the Business Plan were substantial and increased the risk that Melrose would default on the Notes.  Approximately 24.1% of the gross production cost of films comparable to those in the Melrose Slate and released by

Paramount between 1998 and 2003 was financed using international pre-sales. Paramount failed to disclose that by the time Plaintiffs purchased the Securities, Paramount had already determined that international pre-sales would not be used in a manner consistent with historical practice. Upon information and belief, approximately 4.3% of the gross production cost of the films in the Melrose Slate was financed using international pre-sales. Thus the choice of Paramount's undisclosed high risk strategy resulted in an over eighty percent (80%) decrease in Paramount's use of the key risk mitigation strategy of international territorial pre-sales or, stated otherwise, Paramount's use of international pre-sales prior to the Melrose Slate was more than **500% greater than that used with respect to the Melrose Slate,** a dramatic change in Paramount's risk mitigation strategies that was nowhere disclosed in the PPM.

53.    Although Paramount continued to employ some risk mitigation techniques (not including insurance wrapped deals which it had used in the past), the impact of the more than 80% reduction in the use of the key international pre-sale technique had a devastating effect on the financial results of the Melrose Slate. This single factor resulted in over 75% of Plaintiffs' loss. In other words, had the past practice with regard to international pre-sales been applied to the Melrose Slate, Plaintiffs' loss would have been approximately $9.8 million instead of $40.1 million.

54.    The overall impact of Paramount's undisclosed changes to the Business Model on the financial performance of the Melrose Slate is quantified above. The impact the high risk strategy had on Plaintiffs' investment is further illustrated by examining the financing and profitability of individual films in the Melrose Slate.

55.    For example, "The Manchurian Candidate," a remake of a famous thriller, starred Denzel Washington and cost over $93 million, making it by far the largest Paramount investment in any film in the Melrose Slate.  In pursuit of its high risk strategy, Paramount decided not to engage in any international pre-sales to help finance the production cost of this film despite Mr. Washington's unquestionable marketability as an actor worldwide.  Upon information and belief, Paramount never considered the possibility of engaging in pre-sales to co-finance "The Manchurian Candidate."  Had Paramount been pursuing international pre-sales on an "opportunistic" basis, it could have easily engaged in such pre-sales with regard to this film.  When the film performed poorly, the loss of over $38 million was unmitigated, contributing to the Melrose Investors' loss of their entire investment.

56.    "Elizabethtown" is another example of the failure of Paramount's high risk strategy which resulted in a largely unmitigated loss.  "Elizabethtown" cost over $60 million.  Paramount engaged in international pre-sales of less than six percent of the gross production cost of this film, which was less than one-quarter of the past average of 24.1%.  The loss sustained, net of the insignificant pre-sales, was over $48 million.  Like "The Manchurian Candidate," "Elizabethtown" starred a raft of accomplished and highly marketable actors, including Alec Baldwin, Orlando Bloom, Susan Sarandon, Jessica Biel and Kirsten Dunst, and the opportunities to engage in international pre-sales to co-finance the film were unquestionably available.

**E.    Paramount Was the "Maker" of the PPM**

57.    Paramount "made" all of the statements in the PPM and omitted the material statements regarding its change in Business Model.  Paramount had the authority

over the content of the PPM and whether and how that content was communicated to the Melrose Investors.

58.     Melrose is a special purpose entity which was specifically created to effectuate a transaction to provide Paramount, the sponsor, author, creator and beneficiary of the transaction, with financing for a slate of films.  (PPM p. 2.)  Special purpose entities like Melrose are thinly capitalized and have no independent management or employees.  They are shell companies created by the sponsor, but funded by independent equity investors and debt financing.  Their administrative functions are performed by a trustee or other service provider.  Special purpose entities like Melrose are designed to be incapable of engaging in any other business aside from their designed purpose, and by design their management has no independent discretion regarding any substantive business decision.

59.     Melrose served the function of entering into the transaction documents for the Melrose Transaction.  Thereafter its function was primarily to transmit money from the Investors to Paramount to fund the Melrose Slate and to transmit the RPI from Paramount to the Investors as was required by the RPA.

60.     Melrose was managed by two entities created by Global Securitization Services ("GSS"), a corporation in the business of creating and providing service companies to administer special purpose entities.

61.     GSS provided to Melrose two management entities, the Manager, Global Securitization Services, LLC, and the Independent Manager, GSS Holdings II, Inc.  The same individual, Bernard Angelo, executed documents for the Manager and the ironically denominated "Independent" Manager.

62.     Neither the Manager nor the Independent Manager had any control over the contents of the PPM. nor any discretion as to what content or whether that content was communicated to the Melrose Investors.

63.     Neither the Manager nor the Independent Manager had any control over the operations for which the Melrose Transaction was constructed, except to slavishly follow the instructions set forth in the transaction documents while performing purely ministerial, administrative tasks.

64.     Neither the Manager nor the Independent Manager, nor any other Melrose officer, member or employee wrote or contributed substantively to the content of the PPM.

65.     All of the information about Paramount contained in the PPM was authored by Paramount.

66.     Paramount controlled the content of the PPM and the Melrose Transaction by conditioning its execution of the RPA with Melrose on, *inter alia*, the following:

> 12.2  Paramount shall have caused Viacom to deliver to Participant the Guarantee Agreement [providing a Viacom guarantee of all of Paramount's obligations] in the forms annexed hereto as exhibit C;
>
> 12.3  Participant shall have entered into the Indenture, Subscription Agreements and Limited Liability Company Agreement **in forms and substance acceptable to Paramount.**

(RPA p. 17, ¶12 (emphasis added).)

67.     Paramount exercised control over all of the documents in the Melrose Transaction, including the PPM, the RPA, the Subscription Agreement, the Indenture and the Amended and Restated Limited Liability Company Agreement for Melrose LLC ("Amended LLC Agreement") until a simultaneous closing on July 29, 2004.  Thus, until

the moment of closing, Paramount had ultimate authority over the content, in form and in substance, of all of the statements made and not made to the Melrose Investors in the Melrose Transaction documents, and whether and how those statements were communicated.

68.     Paramount structured Melrose so as to limit its ability to function to only executing the tasks called for by the RPA.  The Amended LLC Agreement, which was expressly in a "form and substance acceptable to Paramount" pursuant to the RPA, describes the "Purposes of the Issuer" as follows:

> (a)  The Issuer is formed for the object and purpose of, and the nature of the business to be conducted and promoted by the Issuer shall be limited to, (i) entering into, delivering and performing the Revenue Participation Agreement, investing assets of the Issuer in Revenue Participation Interest in accordance with the Revenue Participation Agreement, (ii) making, holding and disposing of investments, (iii) issuing Notes pursuant to the Indenture and any activities incidental thereto and (iv) engaging in all activities and transactions on behalf of the Issuer as the Manager may deem reasonably necessary, advisable, convenient or incidental in connection therewith or in furtherance thereof.

(Amended LLC Agreement, pp. 9-10, § 2.4(a)).

69.     In furtherance of this general limitation on the purpose of Melrose to the mere administration of the terms of the Melrose Transaction, the powers of the designated "Manager" and "Independent Manager" were similarly curtailed by the Amended LLC Agreement.  Section 5.2 of the Amended LLC Agreement expressly limits the Manager's power to the "Purposes of the Issuer" set forth in section 2.4, and Section 5.8(b) specifically states that "[a]ll right, power and authority of the Independent Manager shall be limited to the extent necessary to exercise those rights and perform those duties specifically set forth in this Agreement and, except as otherwise expressly set

forth herein, the Independent Manager shall have no authority to bind the Issuer." (*Id.*
pp. 21, 27.)

70.     In addition, where the RPA gave Melrose certain affirmative rights, the
Manager and Independent Manager were relegated to execute the orders of the investors.
Melrose's right to audit the results of films, for example, could only be exercised after an
audit committee comprised exclusively of Melrose Investors demanded that this take
place. (*Id.* p. 26, Section 5.7.)  Similarly, the put option in the RPA, which permitted the
re-sale of all of the Securities to Paramount at a specified price in a specified time frame,
was only exercisable by Melrose if the majority of each class of security holders provided
written notice to the Manager of their desire to exercise the put.  (Indenture, pp. 46-47, §
9.1.)

71.     In sum, Melrose retained no authority to determine what disclosures were
made or not made to the Melrose Investors, as the documents governing the transaction
limited Melrose's role to executing the terms of the RPA and executing various tasks as
directed by the Melrose Investors.  Melrose was an entity which lacked any independence
and discretion whatsoever, and served merely an administrative role in the Melrose
Transaction.  All of the substantive disclosures supposedly issued "from Melrose" were
in fact made by Paramount.  The information contained in the PPM, which mentions
Paramount more than 350 times, was information which could have only come from, and
did in fact come from, Paramount.

72.     The Subscription Agreement explicitly attributes information contained in
the PPM to Paramount as follows:

>   All information furnished by the Issuer in connection with this
>   Subscription Agreement, which may include certain information made

> available to the Issuer by Paramount, whether furnished before or after the
> date hereof, and regardless of the manner in which it is furnished, is
> referred to in this Subscription Agreement as "Proprietary Information."

(Subscription Agreement, p. 13, §9(a).)

73.     Pursuant to the Subscription Agreement, the Melrose Investors were

informed that the information in the PPM was attributed to Paramount and that the

Melrose Investors had a direct obligation to Paramount to keep such proprietary

information confidential.

74.     From all of the facts and circumstances set forth above and below, the

statements contained in the PPM were both explicitly and implicitly attributed to

Paramount.

**F.    Paramount's Drastic Reduction in Risk Mitigation Techniques Was
       Omitted from Due Diligence Materials Provided to Plaintiffs**

75.     Paramount provided Plaintiffs with a 65-film "Historical Data Set" which

included the performance results of 65 pictures released by Paramount from calendar year

1998 through 2003 that would have qualified under the criteria governing inclusion in the

Melrose Slate.

76.     Paramount modeled the projected performance of randomly generated

slates of films using the Historical Data Set to simulate possible returns on the Notes sold

to Plaintiffs.  The model was used to create 10,000 hypothetical slates.  The results of the

modeling, which were provided to Plaintiffs and upon which they relied in making their

investment, disclosed that even in the worst case scenario, Plaintiffs were very unlikely to

lose money.

77.     Upon information and belief, despite the fact that Paramount had already

determined to sharply reduce its use of international pre-sales by over 80%, every one of

the 10,000 scenarios calculated using the Historical Data Set contained the assumption that approximately 24% of the production cost of the films in the Melrose Slate would be covered by international pre-sales, concealing the critical fact that its actual use of international pre-sales as a risk mitigation strategy was going to be less than one fifth of the percentage of such pre-sales in the Historical Data Set.

78.     On May 13, 2004, Paramount confirmed the fact that the model for the projected Melrose Slate contained the territorial pre-sales in an amount previously employed by transmitting a schedule of the co-financings relating to the Historical Data Set to Moody's, which was rating the Melrose securities.[1]

79.     Although Paramount, in May 2004, had already made the co-financing decisions with regard to the Melrose Slate, it failed to reflect those decisions in the modeling of the Melrose Slate or to inform either Moody's or Plaintiffs that the schedule describing the co-financing techniques for the 65-film Historical Data Set was irrelevant to the Melrose Slate.  Indeed, Paramount, through Merrill, informed Moody's that it should use the information in the schedule to project the results of the Melrose Slate.

80.     As a result of Paramount's failure to state in the due diligence materials and modeling that the Melrose Slate would not employ international pre-sales in the manner used in the 65 Film Historical Data Set, all of the 10,000 scenarios created by Paramount and provided to Plaintiffs were knowingly and intentionally false and misleading.

---

[1] The title of the schedule was "1998-2003 Co-Financings (65 Movies From Historical Data Set Ranked in Order of Descending Gross Revenues)."

81.     The focus of the due diligence materials on the use of international pre-sales as a means of co-financing demonstrates the materiality of the omissions regarding this significant risk mitigation technique.

**G.      Paramount Acted with Scienter**

82.     Like other financing decisions, the decision to engage in international territorial sales decisions is generally made long before the date a film begins production. The production of films with the characteristics of the Covered Pictures – large budget, studio-produced films – usually begins more than eighteen months prior to the release date.  By June of 2004 Paramount had already made all of the co-financing decisions with regard to the first 22 of the films in the Melrose Slate.  Unbeknownst to Plaintiffs and undisclosed by Paramount, those decisions ultimately resulted in approximately 4.3% of the gross production cost of the Melrose Slate being co-financed by international pre-sales as compared to approximately 24.1% for Paramount's historical precedent, a massive and undisclosed variation that Paramount also purposefully concealed from Moody's.

83.     The financial information on the performance of the Melrose Slate disclosed to Plaintiffs first in March of 2007 (the "Ultimates") revealed that at the time of the closing on July 29, 2004, Paramount had already decided to all but eliminate the use of international pre-sales to co-finance the Melrose Slate, in a manner that materially deviated from the practices described in the PPM.

84.     Despite the fact that the Melrose Slate did not employ the risk mitigation techniques identified in the PPM and despite the fact that Paramount already knew that it had not employed and would not be employing such techniques with respect to such

films, nowhere in the PPM did Paramount disclose that this was the case. Instead, the PPM makes repeated and materially misleading representations regarding Paramount's current and prospective employment of risk mitigation techniques with regard to the Melrose Slate that Paramount knew as a matter of fact that it was not employing and which Paramount could have, should have and, indeed, was required to have clearly and unambiguously disclosed.

85. But Paramount refused to disclose this material information because it knew that disclosure would have rendered inapplicable all of its prior historical results reflected in the Historical Data Set and would not have induced investors to invest in the Melrose Slate. As such, Paramount decided to conceal this massive and material change in its business plan and instead disseminated a knowingly false and misleading Historical Data Set to mislead and defraud both Moody's and the Melrose Investors.

86. As a result of Paramount's decision against using international pre-sales in the Melrose Slate, Plaintiffs' risk of loss was significantly greater than it would have been if Paramount had followed the Business Model described in the PPM.

87. As of the closing date, Paramount knew, but the Melrose Investors did not know, that Paramount had made and implemented decisions to all but eliminate its use of risk-mitigating international pre-sales in financing the Melrose Slate. Accordingly, Paramount's statements in the PPM regarding this important feature of its risk mitigation strategy were materially false and misleading.

### III.   Risk Factors

### A.   Paramount's Statements

88.   The section of the PPM entitled "Risk Factors" contained the following

statement:

**Increase of Production and Acquisition Costs**

The costs of producing, marketing and distributing motion pictures have
increased dramatically in the past decade. . . .  If Gross Receipts do not
increase at the same rate as the increase in costs, there will be a negative
impact on . . . profitability . . . .

(PPM p. 34.)

89.   The PPM further provides as follows:

Although the interests of the Issuer and Paramount are somewhat aligned,
as between Paramount and the Issuer, Paramount will control all decisions
(i.e., business, creative or otherwise) relating to the development and
production of each Covered Picture as well as the decisions whether to
pursue and consummate any co-financing transaction, and the Issuer has
no consultation or approval rights with respect thereto.  Paramount will
have complete authority to license, market and exploit the Covered
Pictures and all rights therein, or to refrain from so doing, in accordance
with such sales methods, policies and terms as it may, in its reasonable
business judgment determine.  Paramount may modify, amend, cancel,
adjust and alter all agreements, exhibition licenses, rental terms, sales
methods and policies relating to the distribution, exhibition and
exploitation of the Covered Pictures and any other of its rights as it may
deem advisable. . . .  Recent press has reported a desire by Viacom and
Paramount management to pursue a more aggressive approach, both
fiscally and artistically, to such development and production of motion
pictures than it has in the past.

(PPM pp. 35-36.)

### B.   Paramount's Omissions

90.   Although the PPM stated that costs of producing, marketing and

distributing motion pictures had increased in the last decade, it failed to disclose that

Paramount's Business Model had already changed in a manner that assured that releasing

costs would be dramatically higher for the Melrose Slate than with respect to the Historical Data Set.

91.     The PPM failed to disclose that Paramount had already decided to abandon its reliance on international pre-sales in favor of distributing films through UIP, reducing such pre-sales to only approximately 18% of its historical utilization.

92.     Paramount's decision to distribute its films through UIP created a certainty that foreign releasing costs would increase significantly and thereby threaten the profitability of the Melrose Slate and remove a critical risk mitigation technique.

93.     Plaintiffs relied on the Business Model employed by Paramount as described in the PPM and were not alerted to the risk of loss resulting from Paramount's changes in Business Model which were not disclosed in the "Risk Factors" described in the PPM.

94.     The PPM disclosed that "recent press has reported" that Paramount had decided to pursue a "more aggressive approach . . . to the development and production of motion pictures than it had in the past." By so stating, Paramount created the impression that it was disclosing to the Melrose Investors the most up-to-date information which might affect their investment decision.  The PPM omitted any disclosure that an equally important, if not more important decision, had also been made with respect to the manner which Paramount was going to distribute, and hence finance, the films in the Melrose Slate, namely, to all but eliminate the use of international pre-sales and to spend aggressively on international releasing costs.

95.     Plaintiffs seek to recover the loss caused by Paramount's misrepresentations and omissions pursuant to Rule 10b-5 under section 10(b) of the

Securities Exchange Act of 1934.  Plaintiffs alternatively seek to rescind the transaction based on Paramount's fraudulent inducement of Plaintiffs' investment in the Securities, and to recover their $40.1 million investment from Paramount pursuant to a claim for unjust enrichment.

## FIRST CLAIM FOR RELIEF
### (Violation of § 10(b) of the Securities Exchange Act and Rule 10b-5 thereunder)

96.     Plaintiffs repeat and reallege the allegations set forth in paragraphs 1 through 95 as if fully set forth herein.

97.     In connection with the Melrose Transaction, Paramount: (a) employed devices, schemes and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud upon the Melrose Investors in violation of §10(b) of the Exchange Act and Rule 10b-5 thereunder.

98.     Paramount, by the use of the means and instrumentalities of interstate commerce and/or of the mails, engaged in an intentional course of conduct to make false statements of material facts and to omit information regarding the manner in which the films in the Melrose Slate would be financed that was necessary in order to make the statements made not misleading.

99.     Paramount's statements in the PPM informed the Melrose Investors that Paramount was operated pursuant to a Business Model that incorporated "a culture of fiscal caution" that sought "consistent slate profitability" through the use of various "risk

management techniques" designed to "limit Paramount's risk" relating to the performance of films.

100.    Paramount's statements in the PPM also informed the Melrose Investors that Paramount's risk-avoiding Business Model would inure to the benefit of the Melrose Investors.

101.    Paramount was aware that Plaintiffs were relying on the statements in the PPM regarding risk mitigation.

102.    Paramount had a duty to disclose all material information necessary to make the PPM not misleading.

103.    As of the dates when Plaintiffs purchased the Securities, Paramount failed to disclose that Paramount had decided to all but eliminate the use of international pre-sales to co-finance the films in the Melrose Slate, reducing such sales to approximately 18% of the pre-existing level of such pre-sales, and had implemented this decision with regard to the majority of the films in the Melrose Slate.  Plaintiffs had no way to discover that this decision had been made and implemented.

104.    Plaintiffs relied on Paramount's misrepresentations and omissions of material fact when purchasing the Securities, and specifically upon Paramount's representations that Paramount's current and prospective use of risk mitigation strategies, including co-financing through international pre-sales, would limit the risk to Plaintiffs on their investment in the Melrose Slate.

105.    Had the risk limiting strategies been in place, Plaintiffs' loss would have been limited to approximately $9.8 million, and they would have recovered approximately $30.3 million of their investment of $40.1 million.

106.    By virtue of the foregoing, Paramount violated § 10(b) of the Securities Exchange Act of 1934, and Rule 10b-5 promulgated thereunder.

107.    Plaintiffs have been damaged by Paramount's omissions and misrepresentations in an amount to be determined at trial.

## SECOND CLAIM FOR RELIEF
### (Fraud)

108.    Plaintiffs repeat and reallege the allegations set forth in paragraphs 1 through 95 as if fully set forth herein.

109.    In order to induce Plaintiffs to purchase the Securities, Paramount made fraudulent misrepresentations and omitted material facts regarding the co-financing of the films in the Melrose Slate.

110.    Paramount's misrepresentations and omissions were intended to and did induce Plaintiffs to invest in the Securities.

111.    Plaintiffs relied upon on the disclosures in the PPM when investing in the Securities.

112.    Plaintiffs had no knowledge that Paramount had omitted material information concerning Paramount's decision to eliminate and/or significantly reduce the use of international pre-sales.

113.    Had Paramount made full disclosure regarding the risk profile of the Melrose Transaction, the Melrose Investors would not have purchased the Securities.

114.    By virtue of the foregoing, Paramount fraudulently induced Plaintiffs to purchase the Securities.

115.    Plaintiffs are entitled to rescission of their purchase of the Securities.

116.    Paramount's fraud was purposeful, malicious and knowingly intended by Paramount to wrongfully secure money for its own benefit to the detriment of Plaintiffs and that conduct cannot be tolerated or deterred simply be depriving Paramount of the fruits of its conduct.  Therefore, an award of punitive damages is warranted.

### THIRD CLAIM FOR RELIEF
### (Unjust Enrichment)

117.    Plaintiffs repeat and reallege the allegations set forth in paragraphs 1 through 95 as if fully set forth herein.

118.    Plaintiffs invested $40.1 million in the Securities based on the disclosures made by Paramount.

119.    Paramount received the entire benefit of Plaintiffs' $40.1 million investment.

120.    Paramount obtained the benefit of Plaintiffs' $40.1 million investment by fraudulently inducing Plaintiffs to purchase the Securities based on misleading information disclosed in the PPM, and Paramount deliberately concealed information from Plaintiffs regarding the co-financing of the Melrose Slate.

121.    Under the circumstances, it would be unjust for Paramount to retain the benefit of Plaintiffs' $40.1 million investment, and Plaintiffs are entitled to restitution.

### PRAYER FOR RELIEF:

WHEREAS, Plaintiffs demand judgment as follows:

(a)  On the First Claim for relief, damages sustained as a result of Defendant's wrongdoing; and

(b)  On the Second Claim for relief, rescission of Plaintiffs' purchase of the Securities; and

(c)  On the Third Claim for relief, restitution of Plaintiffs' purchase price of the

Securities; and

(d)  Interest and punitive damages; and

(e)  Plaintiffs' attorneys' fees and costs incurred in this action; and

(f)  such other and further relief as the Court deems just and proper.

Dated: New York, New York
       February 15, 2012

PRYOR CASHMAN LLP

By:  _____
     James A. Janowitz
     Donald S. Zakarin
     Jacob B. Radcliff
7 Times Square
New York, New York 10036
(212) 421-4100
jjanowitz@pryorcashman.com
dzakarin@pryorcashman.com
jradcliff@pryorcashman.com

Attorneys for Plaintiffs Allianz Risk
Transfer AG, Marathon Structured Finance
Fund, LP, NewStar Financial, Inc. and
Munich Re Capital Markets New York, Inc.

1141819

James A. Janowitz
Donald S. Zakarin
Jacob B. Radcliff
PRYOR CASHMAN LLP
7 Times Square
New York, New York 10036
(212) 421-4100
jjanowitz@pryorcashman.com
dzakarin@pryorcashman.com
jradcliff@pryorcashman.com

Attorneys for Plaintiffs Allianz Risk Transfer,
Marathon Structured Finance Fund, LP,
NewStar Financial, Inc. and Munich Re Capital Markets New York, Inc.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------- x

|  |  |  |
|---|---|---|
| ALLIANZ RISK TRANSFER,<br>MARATHON STRUCTURED FINANCE FUND, LP,<br>NEWSTAR FINANCIAL, INC., and<br>MUNICH RE CAPITAL MARKETS NEW YORK, INC.,<br><br>                    Plaintiffs,<br><br>          -v-<br><br>PARAMOUNT PICTURES CORPORATION,<br><br>                    Defendant. | :<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>: | 1:08-cv-10420 (TPG)<br><br><br>**CERTIFICATE OF<br>SERVICE** |

-------------------------------------------------------------------- x

        I, Bryan T. Mohler, an attorney admitted to the Bar of the State of New York and the Bar of this Court, certify that on February 15, 2012, I caused a true and correct copy of the Third Amended Complaint in this action to be served upon the following, counsel for defendant Paramount Pictures Corporation, via Federal Express and ECF:

Leslie G. Fagen
Andrew J. Ehrlich
Paul, Weiss, Rifkind, Wharton & Garrison LLP
1285 Avenue of the Americas
New York, NY 10019

I declare under penalty of perjury that all of the statements made in this Certificate of Service are true and correct.

Dated: New York, New York
February 15, 2012

BRYAN T. MOHLER