UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ALLIANZ RISK TRANSFER AG, MARATHON STRUCTURED FINANCE FUND, LP, NEWSTAR FINANCIAL, INC., and MUNICH RE CAPITAL MARKETS NEW YORK, INC.,<br><br>                          Plaintiffs,<br><br>                    v.<br><br>PARAMOUNT PICTURES CORPORATION,<br><br>                          Defendant. | No. 1:08-CV-10420 (TPG) |

**MEMORANDUM OF LAW IN SUPPORT OF
<u>DEFENDANT'S MOTION FOR SUMMARY JUDGMENT</u>**

PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP
1285 Avenue of the Americas
New York, New York 10019-6064
Tel:  (212) 373-3000

– and –

KENDALL BRILL & KLIEGER LLP
10100 Santa Monica Boulevard, Suite 1725
Los Angeles, CA 90067
Tel:  (310) 556-2700

*Attorneys for Defendant
Paramount Pictures Corporation*

## **Table of Contents**

**Page(s)**

Table of Authorities ................................................................................................. iv

Preliminary Statement ............................................................................................... 1

Statement of Facts ..................................................................................................... 3

      A.      Melrose Investors LLC ................................................................................. 3

      B.      The Melrose PPM and Subscription Materials ......................................... 4

      C.      The Subscription Agreement and Its Release Language ......................... 7

      D.      Merrill Lynch Dealt with the Investors; Paramount Played a Minor Role ............ 8

            1.      Merrill Lynch .......................................................................................8

            2.      Paramount ...........................................................................................10

      E.      Plaintiffs Are All Highly Sophisticated, Institutional Investors; All Understood Paramount Was Providing No Guarantees as to Co-Financing; and All Were Aware of the Lower Level of Co-Financing for the Melrose Slate ................................................................ 11

            1.      Marathon ..............................................................................................11

            2.      NewStar..................................................................................................14

            3.      Allianz ...................................................................................................16

             4.      Munich Re..............................................................................................19

Procedural History ................................................................................................. 21

Applicable Legal Standards ................................................................................... 22

Argument ................................................................................................................. 23

I.      SUMMARY JUDGMENT IS WARRANTED BECAUSE PLAINTIFFS CANNOT PREVAIL ON THEIR CLAIMS AGAINST PARAMOUNT ..................... 24

      A.      Marathon and NewStar Directly Waived and Released All Claims Against Paramount with Respect to the Matters at Issue ................................... 24

**Page(s)**

    B.     Allianz and Munich Re Also Cannot Assert Any Claims Against Paramount ................................................................................. 25

II.    SUMMARY JUDGMENT IS WARRANTED ON PLAINTIFFS' FEDERAL SECURITIES FRAUD CLAIMS ................................................ 26

    A.     Plaintiffs Cannot Prove that Paramount Made a Material Misrepresentation ................................................................................. 26

    B.     Plaintiffs Also Cannot Prove Actual or Reasonable Reliance .............................. 29

         1.     Plaintiffs Did Not *Actually* Rely on Any Purported Misrepresentations by Paramount ................................................ 29

                (a)    Marathon ................................................................ 30

                (b)    NewStar ................................................................ 30

                (c)    Allianz ................................................................ 30

                (d)    Munich Re ................................................................ 31

                (e)    All of the Plaintiffs ................................................ 31

         2.     Plaintiffs Are Sophisticated Investors Who Could Not Reasonably Have Relied on Any Alleged Misrepresentations ................................ 32

    C.     Paramount Is Not the "Maker" of Any Alleged Misrepresentation or Omission ................................................................................. 34

    D.     In Any Event, Plaintiffs' Belated Theory of Liability as to Tax Credits Fails ................................................................................. 36

         1.     Plaintiffs Waived Any Fraud Claim Predicated on Disclosures Concerning Efforts to Obtain Tax Credits ................................ 36

         2.     Plaintiffs Cannot Raise A Material Question of Disputed Fact Concerning Their Newly Minted Alleged Fraud ................................ 38

                (a)    Plaintiffs Cannot Prove Paramount Made a Material Misrepresentation ................................................ 38

                (b)    Plaintiffs Also Cannot Prove Actual or Reasonable Reliance ................................................ 39

**Page(s)**

III.    SUMMARY JUDGMENT IS WARRANTED ON PLAINTIFFS' COMMON
        LAW FRAUD CLAIMS.................................................................................. 40

        A.    Plaintiffs Cannot Prove Common Law Fraud........................................ 40

        B.    Plaintiffs' Common Law Fraud Claims Also Cannot Be Based On Any
              Supposed Omission................................................................................. 41

        C.    Plaintiffs' Common Law Fraud Claim Fails Because Plaintiffs Are Not
              Entitled to Rescission............................................................................. 43

IV.    SUMMARY JUDGMENT IS WARRANTED ON PLAINTIFFS' UNJUST
        ENRICHMENT CLAIMS............................................................................ 45

Conclusion ............................................................................................................. 45

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Abbey* v. *3F Therapeutics, Inc.*,
    2011 WL 651416 (S.D.N.Y. Feb. 22, 2011) *aff'd sub nom. Abbey* v. *Skokos*,
    509 F. App'x 92 (2d Cir. 2013) ...................................................................34, 40

*Abrahami* v. *UPC Constr. Co., Inc.*,
    638 N.Y.S.2d 11 (1st Dep't 1996) ..........................................................41

*Albion Alliance Mezzanine Fund, L.P.* v. *State St. Bank & Trust Co.*,
    797 N.Y.S.2d 699 (1st Dep't 2003) ..........................................................42

*Allianz Risk Transfer* v. *Paramount Pictures Corp.*,
    2010 WL 1253957 (S.D.N.Y. Mar. 31, 2010) .....................................21, 23, 37, 45

*In re Bear Stearns Cos., Inc. Sec., Derivative, & ERISA Litig.*,
    2014 WL 463582 (S.D.N.Y. Feb. 5, 2014) ..........................................................25

*Beth Israel Med. Ctr.* v. *Horizon Blue Cross & Blue Shield of N.J., Inc.*,
    448 F.3d 573 (2d Cir. 2006).........................................................................23

*Brown* v. *E.F. Hutton Grp., Inc.*,
    991 F.2d 1020 (2d Cir. 1993)...................................................................25

*Career Initiatives Corp.* v. *Palmer*,
    893 F. Supp. 295 (S.D.N.Y. 1995) .........................................................45

*Century Pac., Inc.* v. *Hilton Hotels Corp.*,
    528 F. Supp. 2d 206 (S.D.N.Y. 2007), *aff'd*, 354 F. App'x 496 (2d Cir. 2009)...............23, 40

*CSX Corp.* v. *Children's Inv. Fund Mgmt. (UK) LLP*,
    562 F. Supp. 2d 511 (S.D.N.Y. 2008), *aff'd on other grounds*, 292 F. App'x
    133 (2d Cir. 2008), *and aff'd in part, vacated in part, and remanded on other*
    *grounds*, 654 F.3d 276 (2d Cir. 2011) ....................................................26

*Dembeck* v. *220 Central Park S. LLC*,
    823 N.Y.S.2d 45 (1st Dep't 2006) ..........................................................42

*Diker* v. *Cathray Constr. Corp.*,
    552 N.Y.S.2d 37 (2d Dep't 1990).............................................................45

*Emergent Capital Inv. Mgmt., LLC* v. *Stonepath Grp., Inc.*,
    343 F.3d 189 (2d Cir. 2003)..........................................................29, 32, 33

**Page(s)**

*Eurycleia Partners, LP* v. *Seward & Kissel, LLP,*
12 N.Y.3d 553 (2009) .................................................................................23

*Fernbach, LLC* v. *Capital & Guarantee Inc.,*
2009 WL 2474691 (S.D.N.Y. Aug. 12, 2009) .......................................23

*Footbridge Ltd. Trust* v. *Countrywide Fin. Corp.,*
770 F. Supp. 2d 618 (S.D.N.Y. 2011)....................................................22

*Genager* v. *Genager,*
966 N.Y.S.2d 346 (Sup. Ct. N.Y. Cnty. 2013) .....................................44

*Harsco Corp.* v. *Segui,*
91 F.3d 337 (2d Cir. 1996)......................................................................25

*In re I.B.M. Corp. Sec. Litig.,*
163 F.3d 102 (2d Cir. 1998).................................................22, 36, 37, 38

*In re I.B.M. Corp. Sec. Litig.,*
954 F. Supp. 81 (S.D.N.Y. 1997), *aff'd*, 163 F.3d 102 (2d Cir. 1998) ............................36, 37

*In re Initial Pub. Offering Sec. Litig.,*
241 F. Supp. 2d 281 (S.D.N.Y. 2003).....................................................36

*Janus Capital Grp., Inc.* v. *First Derivative Traders,*
131 S. Ct. 2296 (2011) ..................................................................... *passim*

*Krasner* v. *Rahfco Funds LP,*
2012 WL 4069300 (S.D.N.Y. Aug. 9, 2012) .........................................35

*Kulak* v. *City of New York,*
88 F.3d 63 (2d Cir. 1996).........................................................................22

*Lazard Freres & Co.* v. *Protective Life Ins. Co.,*
108 F.3d 1531 (2d Cir. 1997)............................................................29, 41

*In re Lehman Bros. Sec. & ERISA Litig.,*
2013 WL 5730020 (S.D.N.Y. Oct. 22, 2013) .......................................28

*Lichtyger* v. *Franchard,*
18 N.Y.2d 528 (1966) ..............................................................................44

*Milestone Shipping, S.A.* v. *Estech Trading LLC,*
811 F. Supp. 2d 915 (S.D.N.Y. 2011)....................................................22

*Municipality of Bremanger* v. *Citigroup Global Mkts., Inc.,*
2013 WL 1294615 (S.D.N.Y. Mar. 28, 2013) .................................30, 31

**Page(s)**

*New Shows, S.A. de C.V.* v. *Don King Prods., Inc.*,
    210 F.3d 355 (2d Cir. 2000)...........................................................................44

*Richmond Lace Works, Inc.* v. *Epstein*,
    31 F.R.D. 150 (S.D.N.Y. 1962) ....................................................................43

*Rodas* v. *Manitaras*,
    552 N.Y.S.2d 618 (1st Dep't 1990) .............................................................29

*Rosewood Apartments Corp.* v. *Perpignano*,
    200 F. Supp. 2d 269 (S.D.N.Y 2002)..........................................................44

*Ross* v. *Louise Wise Servs., Inc.*,
    8 N.Y.3d 478 (2007) ....................................................................................23

*Rudman* v. *Cowles Commc'ns, Inc.*,
    30 N.Y.2d 1 (1972) ......................................................................................44

*Societe Nationale D'Exploitation Industrielle Des Tabacs Et Allumettes* v.
    *Salomon Bros. Int'l, Ltd.*,
    702 N.Y.S.2d 258 (1st Dep't 2000) .............................................................42

*Sokolow, Dunaud, Mercadier & Carreras LLP* v. *Lacher*,
    747 N.Y.S.2d 441 (1st Dep't 2002) .............................................................44

*Standish-Parkin* v. *Lorillard Tobacco Co.*,
    786 N.Y.S.2d 13 (1st Dep't 2004) ...............................................................42

*Steed Fin. LDC* v. *Nomura Sec. Int'l, Inc.*,
    2004 WL 2072536 (S.D.N.Y. Sept. 14, 2004).........................................22, 33, 40

*Tudor* v. *Riposanu*,
    461 N.Y.S.2d 6 (1st Dep't 1983) .................................................................43

*In re Vivendi Universal, S.A. Sec. Litig.*,
    765 F. Supp. 2d 512 (S.D.N.Y. 2011)..........................................................40

*Walker* v. *Sheldon*,
    10 N.Y.2d 401 (1961) ..................................................................................45

*Wilson* v. *Comtech Telecomm. Corp.*,
    648 F.2d 88 (2d Cir. 1981)....................................................................30, 31, 39

**Statutes**

Securities Exchange Act of 1934, Section 10(b), 15 U.S.C. § 78j(b) ................................. *passim*

**Page(s)**

**Other Authorities**

Fed. R. Civ. P. 9(b) ..................................................................................................36

Fed. R. Civ. P. 12(b)(7) ...........................................................................................43

Fed. R. Civ. P. 19(b) ...............................................................................................43

Fed. R. Civ. P. 56(a) ...............................................................................................22

Local Rule 56.1 ..........................................................................................................3

Defendant Paramount Pictures Corporation ("Paramount") respectfully submits this memorandum of law in support of its motion for summary judgment dismissing all of plaintiffs' alleged claims asserted against it in this action.

## Preliminary Statement

Discovery has confirmed that plaintiffs' claims in this action suffer from a variety of infirmities that now warrant the dismissal of those claims in full.

Plaintiffs in this action are all highly sophisticated, institutional investors who, along with other investors who have rightly chosen not to join this action, purchased debt and equity issued by a special-purpose vehicle called Melrose Investors LLC ("Melrose"). Melrose, in turn, invested its funds in a slate of over two dozen films (the "Melrose Slate") that were produced and distributed by Paramount over a two-year period. Although some of the films in the Melrose Slate performed well, the Melrose Slate as a whole did not perform as hoped, resulting in losses to both Paramount and the Melrose investors.

Dissatisfied with this economic result, some four years after their investments, plaintiffs filed this action, alleging that Melrose's Private Placement Memorandum (the "PPM") misrepresented Paramount's prospective use, in distributing the Melrose Slate, of certain co-financing techniques—specifically, "pre-sales" of films in foreign territories—as a means of reducing costs and minimizing the risk of loss on the films in the Slate. Based on these allegations, plaintiffs assert claims against Paramount for federal securities fraud, common law fraud and unjust enrichment.

After a full and fair opportunity for discovery, the undisputed facts show that plaintiffs' claims cannot be sustained. In particular, the undisputed facts establish that:

- In the Melrose offering documents, plaintiffs released and waived all claims against Paramount (which did not issue the PPM or the securities in dispute)

1

with respect to the specific issue raised in this action:  namely, the manner by which Paramount distributed the Melrose Slate;

- None of the plaintiffs actually or reasonably relied on any representation about Paramount's co-financing techniques, as to international pre-sales or otherwise.  Rather, all of the plaintiffs have now conceded that they understood that there was no guarantee or assurance that Paramount would use the same co-financing techniques for films in the Melrose Slate as it had in the past or would use those techniques to any particular extent;

- Further, prior to their investment decisions, plaintiffs received and reviewed information about the *actual* levels of co-financing, including international pre-sales, for films in the Melrose Slate, which showed that such levels were running lower than historical levels; and

- In any event, Paramount itself did not *make* any misleading statements in the PPM or otherwise.  The PPM was issued by Melrose, a separate and legally distinct entity not controlled by Paramount.

Put another way, there is no genuine dispute of material fact that (1) plaintiffs waived and released all of the claims they now purport to assert against Paramount, (2) Paramount never in fact made any false statement, (3) even if Paramount had made a false statement (which it did not), plaintiffs did not actually or reasonably rely on any such alleged misrepresentation, and (4) as a matter of law, Paramount is not the "maker" of the alleged misrepresentations at issue.   In addition, plaintiffs' common law fraud claim seeks rescission, which is unavailable here as Paramount is not a party to any contract plaintiffs seek to rescind.  For these reasons, summary judgment should now be entered against all of plaintiffs' purported claims.

Finally, after the close of discovery, plaintiffs asserted, for the first time, through an expert damages report, that Paramount's supposed fraud also involved a failure to secure tax credits for the Melrose Slate films.  It is axiomatic that fraud must be pleaded with specificity in a complaint, and plaintiffs have never pleaded this theory.   As a result, the theory has been waived.  Nor, in any event, is there any material dispute of fact that would permit this newly-

minted theory to proceed to trial.  Accordingly, under all circumstances, summary judgment should be entered dismissing this new theory from the case.

### Statement of Facts

The following facts are drawn from the documents produced and the testimony taken during discovery in this action.  They are not subject to reasonable dispute:

### A.    Melrose Investors LLC

Melrose is a special purpose vehicle that was created to issue debt (the "Notes") and equity to investors, and then to use the funds it received from investors to assist in financing Paramount's production and distribution of the Melrose Slate of films.  Pursuant to a revenue participation agreement ("RPA") between Paramount and Melrose, in exchange for the funds it provided to Paramount, Melrose (and ultimately its investors) obtained revenue participation interests in the films in the Melrose Slate.  As the PPM explained, Melrose, through the RPA, provided "Paramount with committed co-financing across a diverse slate of films to be released in succession during [a specified period]" and "allow[ed] Paramount to diversify its capital sources for film production *while maintaining control over all aspects of its business*."[1]  [SOF ¶¶ 4–6.]

Investors in Melrose, all of whom were required to be "accredited investor[s]" and "qualified purchaser[s]," could purchase three types of securities issued by Melrose: two classes of Notes, Class A (Senior Notes) or Class B (Mezzanine Notes), or the most junior level of investment, equity in Melrose.  The three classes of Melrose securities formed a "waterfall"

---

[1]    Citations to ["SOF ¶ __"] refer to the Statement of Undisputed Facts filed in support of this motion pursuant to Local Rule 56.1.  Citations to ["TAC ¶ __"] refer to the Third Amended Complaint filed by Plaintiffs on February 15, 2012 (the "Complaint").  Citations to "Ex.__" refer to the exhibits attached to the Declaration of Allan J. Arffa.

structure in which the revenue participation payments that Melrose received would be forwarded to investors in order of seniority.  [SOF ¶¶ 8, 51–52.]

The total amount of funds invested in Melrose was approximately $231.3 million, of which $157.5 million was provided by Note A holders, $45.3 million was provided by Note B holders, and $28.5 million was provided by equity investors.  [TAC ¶¶ 15–16.]  Plaintiffs in this action represent only a fraction of the total amount provided by investors; plaintiffs invested approximately $40.1 million of the $231.3 million that Melrose raised.  Unlike plaintiffs here, who represent a small minority of the aggregate value invested in the transaction, none of these other investors in Melrose have elected to bring an action against Paramount concerning this transaction.

Ultimately, the Melrose Slate consisted of 25 films released between April 2004 and March 2006, including, among others, "Mean Girls," "The Stepford Wives," "The Manchurian Candidate," "Collateral," "Alfie," "Coach Carter," "The Longest Yard," "Elizabethtown," "Aeon Flux," and "Team America: World Police."  [SOF ¶ 13.]  The 25 films included in the Melrose Slate included all films produced by Paramount, during that period, that met certain objective criteria.  [SOF ¶¶ 14–15.]  Some of the films in the Melrose Slate performed well, earning money for Paramount and the Melrose investors.  [*E.g.*, SOF ¶ 442.]  Others did not.

### B.    The Melrose PPM and Subscription Materials

Investors in Melrose were solicited by means of the PPM, issued by Melrose and dated July 22, 2004.  All of the purported misrepresentations plaintiffs allege in their Complaint were contained in the PPM.

Paramount did not draft or issue the PPM; Melrose did.  The PPM expressly informed investors of this fact, in bolded, capitalized, unambiguous language:

**NONE OF PARAMOUNT PICTURES CORPORATION, VIACOM INC., ANY PARENT, SUBSIDIARY OR AFFILIATE THEREOF HAS PREPARED THIS DOCUMENT. NONE OF PARAMOUNT PICTURES CORPORATION, VIACOM INC., ANY PARENT, SUBSIDIARY OR AFFILIATE THEREOF (i) ASSUMES ANY LIABILITY FOR THE ADEQUACY OR ACCURACY OF THE INFORMATION SET FORTH HEREIN OR FOR ANY STATEMENTS MADE WITH RESPECT HERETO, (ii) ASSUMES ANY RESPONSIBILITIES WITH RESPECT TO THE OFFERING CONTEMPLATED HEREBY OR IN RELATION HERETO, OR (iii) ENDORSES OR MAKES ANY RECOMMENDATION FOR THE POTENTIAL INVESTMENT CONTEMPLATED HEREBY OR IN RELATION HERETO.**

[SOF ¶ 20–21.]

Melrose's PPM further explained that potential investors "will not be investors in Paramount Pictures Corporation, will have no direct interest in Paramount Pictures Corporation or any of its assets (including any motion picture) *and will have no standing or recourse against Paramount Pictures Corporation, Viacom Inc., or their affiliates*." [SOF ¶ 22 (emphasis added).]

The PPM also provided potential investors with warnings about the substantial risks of investing in Melrose, including warnings about the very risks that plaintiffs now complain materialized. In particular, the PPM specifically warned that Paramount had complete discretion over decisions as to the distribution of the Melrose Slate, including whether to enter into co-financing arrangements, such as international pre-sales.[2] Further, the PPM specifically

---

[2]   Co-financing arrangements include various cost-reduction devices, such as "shared pot" deals in which movie studios share costs (and revenues) with other studios, "split-rights" arrangements in which a third-party invests in a film and receives in exchange distribution rights as to various foreign territories or even all foreign distribution rights and international pre-sales. International pre-sales (sometimes called "foreign sales or presales" or "territory or territorial sales or presales") generally involve agreements where a movie studio receives a fixed sum from a third party in exchange for the right to distribute a film in a particular foreign territory, but thereby gives up the right to the revenues received from the film's distribution in that territory. Plaintiffs appear to include both "split-rights" deals that involve sales of rights in multiple foreign territories and international pre-sales involving a sale of distribution rights for a single foreign territory when they use the term "international pre-

explained, as to co-financing arrangements, that Paramount entered into such arrangements only when it believed that doing so would be advisable for Paramount; and that there were no guarantees or assurances that Paramount would, with respect to the Melrose Slate, either enter into any particular co-financing arrangements (including international pre-sales) or do so at any particular level.

Thus, the PPM informed prospective investors that:

- "Like other major studios, Paramount aims to achieve consistent film slate profitability by managing capital commitments for each film project, *opportunistically entering into output agreements and territory sales with third parties*, and emphasizing cost mitigation programs such as *split-rights deals*, co-financings and other transactions that take advantage of local production, tax and incentive opportunities in certain foreign jurisdictions (e.g., UK sale-leasebacks and German lease financings)." [SOF ¶ 25 (emphasis added).]

- "*There can be no assurance that Paramount will implement the same* [*co-financing*] *techniques or achieve similar results in the future as it has in the past*." [SOF ¶ 26 (emphasis added).]

- "Paramount *selectively* pursues and enters into co-production agreements, studio 'shared pot' deals, split rights deals and similar arrangements" and "[*t*]*hese types of arrangements are entered into on a selective basis and each such agreement is tailored to the specific film in question*." [SOF ¶ 27 (emphasis added).]

- "Although the interests of the Issuer [i.e., Melrose] and Paramount are *somewhat* aligned, as between Paramount and the Issuer, *Paramount will control all decisions (i.e., business, creative or otherwise) relating to the development and production of* [*each film in the Melrose Slate*] *as well as the decisions whether to pursue and consummate any co-financing transaction*, and the Issuer has no consultation or approval rights with respect thereto." [SOF ¶ 35 (emphasis added).][3]

- "Recent press has reported a desire by Viacom and Paramount management to pursue a more aggressive approach, both fiscally and artistically, to such development and production of motion pictures than it has in the past." [SOF ¶ 38.]

---

sales."  For purposes of this motion, we will adopt plaintiffs' usage of the term to cover both of these types of co-financing arrangements.

[3]   In fact, the PPM noted that Paramount expressly reserved the right to change its business strategy at any time.  [SOF ¶ 37.]

C.      **The Subscription Agreement and Its Release Language**

In addition to receiving the PPM, before purchasing the Notes or equity, each initial investor in Melrose was required to execute a subscription agreement (the "Subscription Agreement"), which included an express waiver of the very claims plaintiffs assert here.  The waiver and release language was consistent with the language in the PPM noted above in which investors were informed that they would have no recourse against Paramount (and its affiliates).

Specifically, by signing a Subscription Agreement, all investors acknowledged and agreed in Paragraph 4(t) of the Subscription Agreement "(i) that none of Paramount, Viacom Inc. or any of their affiliates owes any fiduciary duty, duty of care, duty of disclosure or other duty of any kind whatsoever under any law or otherwise to the Investor . . . and (ii) *that the Investor waives and releases all claims against Paramount, Viacom Inc. or any of their affiliates arising out of, or in connection with, the offering of the Securities*."   [SOF ¶ 48 (emphasis added).]

Paragraph 4(t) of the Subscription Agreement went on to provide that investors were specifically waiving and releasing Paramount and its affiliates "from liability arising out of any of the matters described in [P]aragraph [4](s) above."  [SOF ¶ 49.]  And, in Paragraph 4(s), each investor acknowledged and agreed that Paramount had not made "any express or implied representation, warranty, guarantee or agreement, written or oral, to the . . . Investor[s] . . . that [the Melrose Slate films] will . . . achieve any level of return . . . or *will be distributed in any particular manner*" or "will be marketed according to any particular marketing plan *or distributed* according to any particular release pattern (including so called 'wide releases') in the United States or *in any other territory . . . .*"  [SOF ¶ 50 (emphasis added).]

The Subscription Agreement further provided in Paragraph 4(t) that Paramount and its affiliates would be third-party beneficiaries of the acknowledgments and agreements set

forth in the Subscription Agreement (including those cited above), and that investors would not be able to assert any claims contradicting those acknowledgments and agreements.  [SOF ¶ 49.]

Finally, the Subscription Agreement again repeated in bold letters, in what the Agreement refers to as a "<u>GENERAL DISCLAIMER</u>," that Paramount and its affiliates did not assume any liability as to the information contained in various transaction documents (other than the RPA) or "assume[] any responsibilities with respect to the [Melrose] offering."  [SOF ¶ 45.]

### D.   **Merrill Lynch Dealt with the Investors; Paramount Played a Minor Role**

#### 1.   **Merrill Lynch**

Merrill Lynch & Co., Inc. ("Merrill"), which is not a party to this action, served as the sole placement agent and underwriter for Melrose.   In these roles, Merrill acted as the primary point of contact for all potential investors and marketed the investment to them.

In connection with these roles, Merrill created a financial model (the "Merrill Model"), based on data received from Paramount concerning a historical slate of films previously released by Paramount (the "Historical Data Set").   Merrill provided its model, as well as the Historical Data Set, to potential investors, including plaintiffs.  [SOF ¶¶ 80–81, 84.] In the Historical Data Set, investors were again advised that Paramount did not assume any responsibility for the offering.  [SOF ¶ 82.]

The Merrill Model, as provided to investors, included a set of disclaimers, contained in an accompanying document entitled "Confidential Modeling Memorandum," "Modeling Summary," or just "Disclaimers."  These disclaimers advised that Paramount did not assume any responsibility for the Merrill Model and (yet again) with respect to the offering more generally.  [SOF ¶¶ 84–85.]  Further, these disclaimers included language warning that:

- The numbers in the Merrill Model "are not projections and should not be regarded as an indication that [Merrill, Melrose], Paramount or any other person considers such scenarios to be predictive of future events."  [SOF ¶ 86.]

- "[T]here can be no assurance that the assumptions will prove to be accurate or results similar to the scenarios will be realized in the transaction." [SOF ¶ 87.]

- "**The results reflected in the financial model are based on significant assumptions and are presented for illustrative purposes only**. Investors in the Issuer [i.e., Melrose] will have no interest in the films used to provide the financial results used for this financial model. This model should not be considered predictive of the results that will be achieved by or . . . that will relate to [the Melrose Slate]." [SOF ¶ 89 (emphasis in original).]

Merrill also responded to numerous due diligence requests from potential investors, including plaintiffs. In discovery, Merrill witnesses uniformly testified that they were fully forthcoming and responsive to these requests. [SOF ¶ 99.] At no point did Merrill "ever refuse any request of any of the investors for information." [SOF ¶ 99.] And, Merrill employees testified that, except for maintaining the confidentiality of the names of certain films in the historical slate, no one from Paramount ever asked anyone at Merrill to withhold information or provide inaccurate information to potential investors. [SOF ¶ 103.] Plaintiffs' witnesses did not contradict any of this.

More than that, the testimony from *all* witnesses was consistent that no one from Merrill—or Paramount—ever made any representation to potential investors that any particular amount or type of future co-financing, including international pre-sales, would be achieved with respect to the Melrose Slate. Indeed, all of the witnesses from Merrill, Paramount, and *plaintiffs themselves* consistently testified that nobody at Merrill or Paramount ever provided a "guarantee or assurance" that (1) "Paramount would for the Melrose [S]late achieve the same percentage level of co-financing as [it] had in the past," (2) "the precise same mix of co-financing techniques would be used on the Melrose [S]late as had been used in the past," or (3) "the Melrose [S]late would have the same level of territorial presales as Paramount had achieved in the past." [SOF ¶¶ 95–96; *see also* ¶¶ 148, 152, 154, 202, 286, 287, 368, 428, 440.]

9

In addition, Merrill provided to each plaintiff, prior to each plaintiff's investment in Melrose, a schedule containing information about the levels and types of co-financing that Paramount had arranged or anticipated to date with respect to the Melrose Slate.  [SOF ¶ 91.] Although the versions of the schedule the plaintiffs received (together, the "Melrose Slate Schedule") varied somewhat, each included (a) an estimate of the total production costs for the Melrose Slate, (b) an estimate of the total amounts of co-financing achieved to date, and (c) descriptions of the types of co-financing arrangements Paramount had entered into or anticipated at that point with respect to the Melrose Slate.  [SOF ¶¶ 92–93.]

Critically, this information advised all of the plaintiffs that co-financing levels for the Melrose Slate, including international pre-sales, were running at levels below those in the Historical Data Set.  (Indeed, as discussed further below, one plaintiff in fact expressly noted this fact internally.) Yet, there is absolutely no evidence that, after receiving this information, any plaintiff raised with Merrill (or with Paramount) any questions or concerns about co-financing levels or types.

Merrill eventually made a substantial investment of its own in Melrose securities. [SOF ¶ 71.]

## 2.   <u>Paramount</u>

Paramount is one of the nation's oldest motion picture companies.  For over a century, Paramount has produced, financed, and distributed "feature motion pictures and other audio visual and non-audio visual products."  [SOF ¶ 106.]

The success of Paramount's business depends on a variety of factors.  As the PPM explained to potential investors, each of Paramount's motion pictures "is a separate and distinct product with its financial success dependent upon many factors, among which cost and public response are of fundamental importance."  [SOF ¶ 23.]  The PPM further explained that, as part

10

of its business, "Paramount generally distributes its motion pictures for theatrical release outside the U.S. and Canada through United International Pictures ('UIP'), a company owned by Viacom and an affiliate of Universal Studios, Inc. ('Universal').   Pursuant to an agreement, UIP will continue to distribute each studio's films through 2006."  [SOF ¶ 41.]

Discovery confirmed that Paramount's role with respect to the Melrose offering was limited to (1) entering into the RPA with Melrose, (2) providing historical Paramount film information to Merrill, (3) providing certain information (including *actual co-financing amounts* achieved to date) with respect to the Melrose Slate to Merrill, and (4) attending a handful of due diligence meetings with some potential investors upon the investors' request.

### E.   Plaintiffs Are All Highly Sophisticated, Institutional Investors; All Understood Paramount Was Providing No Guarantees as to Co-Financing; and All Were Aware of the Lower Level of Co-Financing for the Melrose Slate

#### 1.   Marathon

On July 29, 2004, plaintiff Marathon purchased $7 million of Class B Notes and $3 million in equity in Melrose.

Marathon has admitted that it is "an extremely sophisticated asset manager" and "a very sophisticated investor."   [SOF ¶¶ 114–15.]   As such, in evaluating investments, Marathon uses a "research intensive approach," including a "fundamental bottom-up credit analysis." [SOF ¶ 123.]  Marathon has also conceded that it was "sophisticated enough to know that investing in movies is a pretty risky business," and that, in its view, the Melrose transaction "wasn't terribly complex." [SOF ¶¶ 121–22.]

Marathon reached its investment decision by using its "research intensive approach" in conducting due diligence about Melrose.  This due diligence included receiving and reviewing the PPM, receiving and reviewing the Historical Data Set, and receiving the Merrill

Model and "stress-test[ing]" it frequently.  [SOF ¶¶ 146, 155, 159.]  In fact, Marathon repeatedly asked Merrill "to rerun the model under different scenarios," and Merrill did so every time. [SOF ¶ 160.]  Marathon also hired an outside consultant, Houlihan Lokey, to evaluate Melrose and assist Marathon in "understanding everything that went into the model and all of the assumptions" the Merrill Model was based on.  [SOF ¶ 127.]

       As Marathon has conceded, based on all of its due diligence, it understood that Paramount was making no guarantee or representation about the levels of co-financing, including international pre-sales, Paramount would achieve for the Melrose Slate.  Specifically, Marathon understood "from the outset that it would be up to Paramount's reasonable business judgment how to produce, market and distribute all of the pictures."  [SOF ¶ 144.]  Marathon knew that Paramount was "making no assurances that the covered pictures would perform" or "would be distributed" in "any particular manner" [SOF ¶ 148], and knew that Paramount maintained discretion "whether to pursue and consummate *any* co-financing transaction."   [SOF ¶ 152 (emphasis added).]  And, Marathon understood that there was "no assurance that Paramount would implement the exact same co-financing techniques or achieve the same level of co-financing in the future as it had in the past."  [SOF ¶ 150.]

       As part of its due diligence, Marathon also understood that it was not "being guaranteed [or] assured a particular mix" of co-financing techniques to be used by Paramount as part of the Melrose Slate.  [SOF ¶ 194.]  Further, Marathon neither asked for "information specific to the amount of foreign presales on the Melrose Slate" nor sought a specific assurance that the Melrose Slate would achieve "a certain percentage of foreign presales."  [SOF ¶ 154.] Indeed, Marathon never asked Merrill or Paramount "to put into writing a specific representation

. . . about the amount of co-financing [Paramount] would do" or "about the types of co-financing [Paramount] would do."  [SOF ¶ 203.]

Even more than that, prior to its investment, Marathon—like all of the other plaintiffs, as noted above—received information about the *actual levels and types of co-financing* Paramount had achieved for the films to be included in the Melrose Slate.   In particular, on or about June 26, 2004, Marathon received a version of the Melrose Slate Schedule that provided estimates of production costs and co-financing amounts, and provided a brief description of the types of co-financing arrangements Paramount had entered into with respect to the Melrose Slate as of that date.  [SOF ¶¶ 180–85.]  The last page of this document included a summary of estimated production costs and co-financing arrangements.  This summary showed that the estimated production costs for the Melrose Slate were $1,204,664,000 and the estimated co-financing arrangements totaled $274,076,000, a level which equates to approximately 22.75% in co-financing.   [SOF ¶  182.]   Significantly, this disclosed level of co-financing was substantially *below* the level of co-financing (approximately 47%) reflected in the Historical Data Set of Paramount films.  Marathon did not raise any questions with Merrill or Paramount after receiving this disclosure as to the actual levels or types of co-financing that had been achieved by that point for the Melrose Slate.  [SOF ¶ 186.]

On July 19, 2004, Marathon also received "investment price invoices" from Merrill, which included "information about the estimated direct costs and estimated co-financing amount as of the release date for four of the pictures that were going to be in the Melrose deal." [SOF ¶¶ 187–88.]  These invoices showed that the amount of co-financing for two films in the Melrose Slate, "Mean Girls" and the "Manchurian Candidate," was $0 for each film.  [SOF ¶ 192.]

13

2.    **NewStar**

On July 29, 2004, plaintiff NewStar purchased $10 million of Melrose Class B Notes.

NewStar has admitted that it is a sophisticated investor, which has "extensive risk management experience and a disciplined, independent credit approval process."  [SOF ¶ 209.] As NewStar also conceded, prior to making an investment decision, NewStar engages in substantial due diligence.  [SOF ¶¶ 218–20.]

Here, this due diligence included receiving and reviewing the PPM, speaking with Moody's, a ratings agency, about Melrose, and hiring outside counsel to assist it.  [SOF ¶ 215–17.]  NewStar not only received the Merrill Model (and the Historical Data Set), but also created its own "in-house statistical model . . . based on [its] analysis of Paramount's historical slate performance."  [SOF ¶¶ 228, 236, 238.]  In doing so, NewStar ran a number of Monte Carlo simulations, "with the objective being to introduce some level of volatility into the historical performance to determine how the structure performs under different scenarios and on average."  [SOF ¶ 240.]

NewStar has conceded that, based upon its extensive due diligence, NewStar understood that Paramount was making no guarantees or representations about the level of co-financing, including international pre-sales, for the Melrose Slate.  On July 27, 2004, for example, NewStar circulated internally a memo about Melrose that identified "**Key Risks**" of the transaction.  [SOF ¶ 259.]  This memo warned that: "All distribution and marketing-related decisions are at the discretion of Paramount."  [SOF ¶ 260.]

That same day, NewStar employees circulated a memo titled "Credit Proposal – Melrose Investors, LLC."  [SOF ¶ 262.]    That memo includes a section titled "**Risk and Mitigants Summary**," which expressly notes that "*Melrose has no input into the marketing and*

14

*distribution of Covered Pictures.   Moreover, Melrose has limited means of verifying that Paramount is marketing and distributing the Covered Pictures in such a way that maximizes Gross Receipts.*"  [SOF ¶¶ 264–65 (emphasis in original).]

In fact, NewStar witnesses who made the recommendation to invest in Melrose securities have acknowledged that they understood that (1) there would be "no assurance that Paramount will implement the same [co-financing] techniques or achieve similar results in the future as it has in the past" [SOF ¶ 286], (2) Paramount controlled all decisions about whether to pursue any co-financing transactions [SOF ¶ 233], (3) "Paramount generally distributed internationally through UIP" [SOF ¶ 235], and (4) NewStar "had no ability to dictate to Paramount production or distribution decisions." [SOF ¶ 234.]

NewStar's witnesses also testified that, despite understanding these facts, they never had a single discussion with Paramount or Merrill about Paramount's co-financing strategies for the Melrose Slate.  The corporate representative of NewStar testified that he could not recall "ever speaking to anybody directly at Paramount" *at all* and could not recall receiving any representation from Paramount or Merrill that "Paramount would take any particular steps with respect to risk mitigation."  [SOF ¶¶ 282–83.]  Similarly, a second NewStar employee testified that he recalled only one phone call with Paramount employees, which "was fairly short" and did not include a discussion about Paramount's co-financing strategies.  [SOF ¶¶ 279–81.]

Prior to its investment decision, NewStar, like Marathon, received information about the *actual levels and types of co-financing* in the films to be included in the Melrose Slate. Specifically, NewStar received the Melrose Slate Schedule, which informed NewStar about the levels and types of co-financing achieved to date and that co-financing levels for the Melrose

Slate were running substantially below the levels of co-financing reflected in the historical slate. [SOF ¶¶ 246–53.] It thereafter raised no questions or concerns about the amounts or types of co-financing prior to investing. [SOF ¶ 254.]

  **3. <u>Allianz</u>**

  On October 13, 2004, plaintiff Allianz initially entered into a total swap return transaction with Hypo Public Finance Bank ("Hypo Bank"), pursuant to which Allianz received all payments that Hypo Bank was entitled to receive with respect to Hypo Bank's holdings of Melrose Class B Notes and equity. [TAC ¶ 12.] In 2006, Allianz acquired the Melrose Class B Notes and equity from Hypo Bank. [*Id.*]

  Allianz admitted that it is a sophisticated investor. In fact, prior to Melrose, Allianz had made two other film-related investments and was familiar with the risks associated with investing in films. [SOF ¶ 293.]

  As a sophisticated investor, like the other plaintiffs, Allianz conducted extensive due diligence. It received and reviewed the PPM, as well as the Merrill Model (and the Historical Data Set). [SOF ¶¶ 310, 320.] In addition, Allianz, too, created its own internal, proprietary financial model so that Allianz could "be creative in our own house so we would have control over it" and "demonstrate knowledge[]" of the transaction. [SOF ¶ 313.] This model recognized that the primary risk of investing in Melrose was that the Melrose Slate could perform poorly. [SOF ¶ 342.] In fact, Allianz witnesses testified that Allianz understood that there was at least a 14.69% probability that "Allianz would either break even or lose money" in Melrose. [SOF ¶ 314.]

  Allianz also hired an independent consultant, Harris Maslansky, to provide advice about Melrose. [SOF ¶ 304.] Maslansky created his own independent model (the "Maslansky Model") of possible outcomes for Melrose and provided it to Allianz. [SOF ¶ 315.] Maslansky

testified that he worked "intensively" with Allianz about modeling and offered "to discuss the comparison with the Merrill [M]odel whenever." [SOF ¶ 318.]

Allianz's due diligence also included an internal assessment of various features of Melrose. [SOF ¶ 347.] Among other things, Allianz concluded that:

- "[e]ach picture is a separate and distinct product with its financial success dependent upon many factors among which cost and public response are of fundamental importance" [SOF ¶ 351]; and

- the investment could conclude with a "negative result for [the] entire movie schedule." [SOF ¶ 352.]

Further, during discovery, Allianz specifically conceded that, as a result of its due diligence, Allianz understood that Paramount was making no guarantees or representations about the levels of co-financing, including international pre-sales, for the Melrose Slate. Thus, Allianz has admitted that it knew both that Paramount would "control all decisions, business, creative or otherwise relating to the . . . decision[] whether to pursue and consummate any co-financing transaction" [SOF ¶ 324] and that "there can be no assurance Paramount will implement the same [co-financing] techniques or achieve similar results in the future as it has in the past." [SOF ¶ 325.] Allianz further admitted that it understood that any decision to enter into international pre-sales or other specific distribution arrangements remained "within Paramount's complete discretion." [SOF ¶ 367.] Allianz also admitted that it received "no representation or assurance" that Paramount would pursue international co-financing techniques consistent with historical practice. [SOF ¶ 368.]

Indeed, Allianz could not identify *any specific representation at all that Paramount made* about risk mitigation for films in the Melrose Slate. Thus, Allianz's witnesses could not recall "any specific representations that anyone from Paramount made to [Allianz] in connection with the use of co-financing, in connection with the films in the Slate." [SOF ¶ 363.]

Perhaps even more to the point, Allianz witnesses conceded that, in making the decision whether Allianz should invest in Melrose, *they did not even consider the significance of co-financing techniques*.  [SOF ¶¶ 361, 364–65.]

As was the case with the other plaintiffs, Allianz, prior to making its investment decision, also received information showing actual levels and types of co-financing achieved to date for the films to be included in the Melrose Slate.  Like the other plaintiffs, Allianz received the Melrose Slate Schedule and thus knew that the co-financing percentage for the Melrose Slate was running at 22.75%, substantially lower than for films in the Historical Data Set.  [SOF ¶¶ 327–32, 335.]  And, the Maslansky Model, which Allianz received two months before making its investment decision, included a prominently displayed direct comparison of the percentage of known co-financing for the Melrose Slate and co-financing for the Historical Data Set.  [SOF ¶ 334.]  This comparison expressly noted that the known co-financing for the Melrose Slate was only "23%," which was approximately half of the known co-financing for the Historical Data Set, which it noted was 47%.  [SOF ¶ 334.]  Nonetheless, it thereafter raised no questions or concerns as to the co-financing amounts or types.  [SOF ¶ 336.]

Finally, it is worth noting that, by the time Allianz actually purchased outright Melrose Notes and equity in 2006, Melrose had already received the "investment price invoices" for *all* of the films in the Slate, which invoices included final co-financing, including international pre-sale, results (both in terms of the amounts and types of co-financing) for each picture in the Slate.  [SOF ¶¶ 55, 59.]  Under the terms of the Melrose LLC Agreement, Allianz had a right to inspect the Melrose books and records.  [SOF ¶ 63.]  This information was thus fully available to Allianz prior to its purchase of the Melrose Notes and equity.

4.   **Munich Re**

Similar to Allianz, plaintiff Munich Re did not initially purchase Melrose securities. Instead, on July 30, 2004, Munich Re entered into a total return swap transaction with Merrill, pursuant to which Munich Re received any payments that Merrill was entitled to receive with respect to certain Class B Melrose Notes that Merrill had purchased. [TAC ¶ 11.] In 2007, Munich Re purchased those Notes outright from Merrill. [*Id.*]

Munich Re admitted that it is a highly sophisticated investor; in fact, it is "one of the largest reinsurance and insurance companies in the world," with over "100 years of experience." [SOF ¶ 377.] At the time of its investment in Melrose, Munich Re had employees with prior experience in analyzing film deals, and knew that the "film industry was a risky one." [SOF ¶¶ 382, 390.]

Before making its investment decision, Munich Re conducted extensive due diligence and reviewed the PPM and a number of other documents associated with Melrose. [SOF ¶¶ 398, 427.] Munich Re also received a description of the Melrose Slate financing structure, a term sheet, the Merrill Model, the Historical Data Set, and the Melrose Slate Schedule. [SOF ¶¶ 386, 391, 404, 407, 418.]

Munich Re's due diligence also included hiring Maslansky as its independent consultant. Maslansky testified that he "understood in connection with the Melrose Slate that Paramount had complete discretion with respect to distribution decisions" and "with respect to the level of co-financing that it employed." [SOF ¶ 397.] As a result, Maslansky specifically discussed with Munich Re "a risk that [Paramount] will not deal in the international market the way [it] dealt with [the market] before." [SOF ¶ 403.]

Further, Munich Re had discussions with Moody's about a model that Moody's had created about Melrose. From these discussions, Munich Re learned that Moody's "used the

19

prospective slate to populate [its] model, adding volatility of plus/minus 10% around those numbers.  [It] also used the Net Production Cost as we planned.  The addition of the volatility was to cover the fact that there could be budget over-runs *and that certain co-financing techniques (e.g. German tax deals) may not be as relevant in the current market* . . . ."  [SOF ¶ 416 (emphasis added).]

Munich Re created its own proprietary model to analyze Melrose.  [SOF ¶¶ 407, 409.]  Based on this model, Munich Re recognized a "skew toward bigger budget" films in the Melrose Slate.  [SOF ¶ 422.]  This meant that "key results that jump out are the skew of the fixed slate toward larger budget, on-average less profitable films and the resulting decline in mean profitability versus historical and fixed slate."  [SOF ¶ 424.]

There is also no dispute that Munich Re understood that Paramount was making no guarantees or representations about the levels of co-financing, including international pre-sales, for the Melrose Slate.  Thus, Munich Re has conceded that it knew that Paramount had "sole control over all production and distribution decisions on each picture."  [SOF ¶¶ 387, 397.]  And, it understood that "production, marketing and distribution for all Covered Pictures" would be "determined in accordance with Paramount's reasonable business judgment[.]"  [SOF ¶ 396.]  Munich Re also conceded during discovery that it knew that "there can be no assurance that Paramount will implement the same [co-financing] techniques or achieve similar results in the future as it has in the past," and that UIP was distributing films internationally on Paramount's behalf.  [SOF ¶ 428, 430.]

Discovery also revealed that Munich Re could not recall, prior to its investment, "any discussion . . . of international distribution" or "any discussion of UIP and its use."  [SOF

¶ 435.]  Nor could Munich Re recall ever asking for a representation that "Paramount would take any particular action with respect to risk mitigation."  [SOF ¶ 440.]

Finally, like every other plaintiff, Munich Re received information about the *actual* levels and types of co-financing in the films to be included in the Melrose Slate prior to its investment decision.  In particular, prior to its swap agreement with Merrill, Munich Re received and reviewed the Melrose Slate Schedule.  [SOF ¶¶ 418–20, 422–25.]  Additionally, by the time Munich Re actually purchased Melrose Notes in March 2007, Melrose had received the "investment price invoices" for *all* of the films in the Melrose Slate, which included final co-financing, including international pre-sale, results for the Slate.  [SOF ¶¶ 55, 59.]  Such information was thus readily available to Munich Re prior to its purchase of the Melrose Notes.

## Procedural History

Plaintiffs filed this action on December 2, 2008.

On March 31, 2010, the Court dismissed all of plaintiffs' claims without prejudice, holding that "the PPM statements quoted by plaintiffs in the amended complaint are too general to be actionable under Section 10(b) and Rule 10b-5," and therefore finding "no fraud, either under the federal securities laws or the common law of the State of New York" or unjust enrichment.  *Allianz Risk Transfer* v. *Paramount Pictures Corp.*, 2010 WL 1253957, at *9–10 (S.D.N.Y. Mar. 31, 2010).  Plaintiffs filed an amended complaint on June 1, 2010.  The Court denied Paramount's motion to dismiss the amended complaint based on plaintiffs' allegation that Paramount had, in the PPM, misrepresented its intentions as to international film distribution.

After the Supreme Court issued its ruling in *Janus Capital Group, Inc.* v. *First Derivative Traders*, 131 S. Ct. 2296 (2011), Paramount filed a renewed motion to dismiss, arguing that, as the issuer of the PPM, Melrose—not Paramount—was the only party to "make"

21

the statements at issue in this action.  The Court denied the motion based strictly on the pleadings, and allowed plaintiffs to amend their complaint in light of the *Janus* decision. Plaintiffs filed the operative Complaint on February 15, 2012.  Discovery then ensued.

### Applicable Legal Standards

Summary judgment is warranted when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a). The moving party meets its burden when it shows that, "due to the paucity of evidence presented by the non-movant, no rational jury could find in favor of the non-moving party."  *Milestone Shipping, S.A.* v. *Estech Trading LLC*, 811 F. Supp. 2d 915, 921 (S.D.N.Y. 2011).  Although a court is to view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor, "[m]ere 'conclusory statements, conjecture, or speculation by the party resisting the motion will not defeat summary judgment.'"  *Footbridge Ltd. Trust* v. *Countrywide Fin. Corp.*, 770 F. Supp. 2d 618, 622 (S.D.N.Y. 2011) (quoting *Kulak* v. *City of New York*, 88 F.3d 63, 71 (2d Cir. 1996)).

To prevail on a federal securities fraud claim under Section 10(b) and Rule 10b-5, which plaintiffs assert here, a plaintiff must prove that the defendant "(1) made misstatements or omissions of material fact; (2) with scienter; (3) in connection with the purchase or sale of securities; (4) upon which plaintiffs relied; and (5) that plaintiffs' reliance was the proximate cause of their injury."  *Steed Fin. LDC* v. *Nomura Sec. Int'l, Inc.*, 2004 WL 2072536, at *5 (S.D.N.Y. Sept. 14, 2004) (quoting *In re I.B.M. Corp. Sec. Litig.*, 163 F.3d 102, 106 (2d Cir. 1998)).

For common law fraud under New York law, also asserted here, a plaintiff must prove: (1) a material misrepresentation of fact, (2) knowledge of its falsity, (3) an intent to induce reliance, (4) justifiable reliance on the part of the plaintiff, and (5) resulting damages.

22

*Eurycleia Partners, LP* v. *Seward & Kissel, LLP*, 12 N.Y.3d 553, 559 (2009) (citing *Ross* v. *Louise Wise Servs., Inc.*, 8 N.Y.3d 478, 488 (2007)).  "Each element of the [New York common law] fraud claim must be shown by clear and convincing evidence, at the summary judgment stage as well as at trial."  *Century Pac., Inc.* v. *Hilton Hotels Corp.*, 528 F. Supp. 2d 206, 219 (S.D.N.Y. 2007), *aff'd*, 354 F. App'x 496 (2d Cir. 2009).

Finally, with respect to plaintiffs' purported claim of unjust enrichment under New York law, "a plaintiff must establish (1) that the defendant benefited; (2) at the plaintiff's expense; and (3) that equity and good conscience require restitution."  *Fernbach, LLC* v. *Capital & Guarantee Inc.*, 2009 WL 2474691, at *3 (S.D.N.Y. Aug. 12, 2009) (quoting *Beth Israel Med. Ctr.* v. *Horizon Blue Cross & Blue Shield of N.J., Inc.*, 448 F.3d 573, 586 (2d Cir. 2006)).  While New York courts occasionally sustain unjust enrichment claims even where fraud claims are dismissed, "in such cases, some underlying fraud must be present."  *Allianz Risk Transfer*, 2010 WL 1253957, at *10.

### Argument

Plaintiffs' claims are based on alleged misrepresentations in the PPM concerning Paramount's use of "international pre-sales as a means of reducing cost and minimizing risk of loss[.]"  [TAC ¶ 47.]  Paramount is entitled to summary judgment on all of plaintiffs' purported claims because the undisputed facts establish that (1) plaintiffs waived all claims against Paramount relating to the Melrose offering, and specifically waived the claims asserted here, (2) there is no evidence that Paramount ever made any false statement on the subject of international pre-sales (or any other subject), (3) plaintiffs did not actually or reasonably rely on any such alleged misrepresentation, and (4) as a matter of law, Paramount is not considered the "maker" of the alleged misrepresentations at issue.

**I.**
## SUMMARY JUDGMENT IS WARRANTED BECAUSE PLAINTIFFS CANNOT PREVAIL ON THEIR CLAIMS AGAINST PARAMOUNT

To begin with, all of plaintiffs' claims against Paramount are barred by the express waiver and release provisions of the Subscription Agreement.

### A.    Marathon and NewStar Directly Waived and Released All Claims Against Paramount with Respect to the Matters at Issue

Prior to investing in Melrose, Marathon and NewStar signed the Subscription Agreement, and, thereby expressly waived and released the specific claims they purport to assert here.    As explained above, by executing the Subscription Agreement, these plaintiffs acknowledged and agreed that Paramount did not owe them any "duty of any kind," and "waive[d] and released[d] all claims against Paramount . . .  arising out of . . . the offering of the [Melrose] Securities."  [SOF ¶ 48.]

This waiver and release included not only a general waiver of claims, but also waivers *specific* to the matters about which plaintiffs now bring suit.   Thus, under the Subscription Agreement, these plaintiffs expressly "waive[d] and release[d] Paramount . . . from liability arising out of the matters described in [P]aragraph [4](s) [of the Subscription Agreement], and agree[d] that *in no event shall [plaintiffs] assert any claim or bring any action* contradicting the acknowledgements and agreements in this paragraph or in Paragraph [4](s) [of the Subscription Agreement]." [SOF ¶ 49 (emphasis added).]   In turn, Paragraphs 4(s) of the Subscription Agreement specifically addressed the alleged misrepresentations at issue here:

> The Investor acknowledges that [Paramount has not] made any express or implied representation, warranty, guarantee or agreement, written or oral, to the Issuer or the Investor: . . . (iii) that the Covered Pictures or Index Pictures will perform in any particular manner, will achieve any level of return or amount of revenue . . . *or will be distributed in any particular manner* . . . [and] (vii) that any Covered Picture or Index Picture will be marketed according to any particular marketing plan *or distributed* according to any particular release pattern (including so called

"wide releases") in the United States or *in any other territory*, other than as expressly set forth in Section 10 of the Revenue Participation Agreement.

[SOF ¶ 50 (emphasis added).]

This clear and specific waiver and release of claims concerning Paramount's distribution decisions, including those as to foreign distribution, clearly and directly forecloses any claim by Marathon and NewStar against Paramount based on Paramount's use (or lesser use) of international pre-sales as a risk mitigation technique. *E.g., Harsco Corp.* v. *Segui*, 91 F.3d 337, 345 (2d Cir. 1996) ("where a party specifically disclaims reliance upon a particular representation in a contract, that party cannot, in a subsequent action for common law fraud, claim it was fraudulently induced to enter into the contract by the very representation it has disclaimed reliance upon"); *see also id.* (recognizing that the same principle applies in "the securities fraud context"); *accord Brown* v. *E.F. Hutton Grp., Inc.*, 991 F.2d 1020, 1033 (2d Cir. 1993).

Accordingly, Paramount is entitled to summary judgment on all of Marathon's and NewStar's claims.

B.     **Allianz and Munich Re Also Cannot Assert Any Claims Against Paramount**

Because Allianz and Munich Re did not initially purchase Melrose Notes or equity but rather entered into swap transactions with counter-parties that initially purchased the Notes or equity,[4] their counter-parties to the swap—and not Allianz or Munich Re—signed Subscription Agreements.

---

[4]     At the time of their swap agreements (2004), the swap agreements themselves were not "securities." *See In re Bear Stearns Cos., Inc. Sec., Derivative, & ERISA Litig.*, 2014 WL 463582, at \*9–10 (S.D.N.Y. Feb. 5, 2014). Accordingly, even if Allianz and Munich Re erroneously assert that they are not subject to the obligations of the Melrose transaction documents because they initially entered into swap agreements with counter-parties, their federal securities claims fail as a matter of law because they did not thereby purchase any securities.

Nevertheless, Allianz and Munich Re are subject to the same obligations that their counterparties assumed and agreed to by purchasing the Notes and equity. *See CSX Corp.* v. *Children's Inv. Fund Mgmt. (UK) LLP*, 562 F. Supp. 2d 511, 548 (S.D.N.Y. 2008) (noting that a party cannot use a total return swap transaction to evade the reporting requirements of beneficial ownership), *aff'd on other grounds*, 292 F. App'x 133 (2d Cir. 2008), *and aff'd in part, vacated in part, and remanded on other grounds*, 654 F.3d 276 (2d Cir. 2011). By entering into the swap arrangements to obtain their counter-parties' economic rights, Allianz and Munich Re could not have acquired *greater* rights than their counter-parties possessed. Thus, Paragraphs 4(s) and (t) of the Subscription Agreement bar Allianz's and Munich Re's claims here for the same reasons discussed above as to the other plaintiffs.

Nor can there be any reasonable dispute that, in 2006 and 2007, when Allianz and Munich Re, respectively, purchased outright the Notes and equity from their counter-parties, both of them, in turn, acquired their counter-parties' rights and obligations under the Melrose transaction documents, including the Subscription Agreement.

For all of these reasons, Allianz and Munich Re are subject to the terms of the offering documents, including the Subscription Agreements, and are thus barred from asserting any claims against Paramount for the reasons set forth above.

## II.
## SUMMARY JUDGMENT IS WARRANTED ON
## PLAINTIFFS' FEDERAL SECURITIES FRAUD CLAIMS

In any event, plaintiffs' federal securities law claims fail for several reasons:

### A.  **Plaintiffs Cannot Prove that Paramount Made a Material Misrepresentation**

Plaintiffs allege that Paramount, in the PPM, misrepresented its intentions as to international film distribution, and international pre-sales in particular. Specifically, they allege that Paramount falsely represented that it would use international pre-sales for the Melrose Slate

26

"in a manner consistent with historical practice." [TAC ¶ 52.]   After extensive discovery, however, the undisputed facts establish that there were no false or misleading statements in the PPM on this subject.

*First,* all of the plaintiffs have conceded that Paramount did not represent in the PPM that it would be able to achieve *any* level of either co-financing or international pre-sales for the Melrose Slate.  Indeed, as plaintiffs' witnesses all have admitted, the PPM expressly said precisely the opposite: "There can be no assurance that Paramount will implement the same techniques . . . in the future as it has in the past."  [SOF ¶¶ 150, 286, 325, 428.]  In other words, the PPM cannot be considered misleading because it expressly put plaintiffs on notice that Paramount might not use the same risk mitigation techniques, including international pre-sales— or use any of them to the same extent—as it had done in the past.

*Second,* the undisputed facts show that the statements in the PPM about the use of international pre-sales as a risk mitigation technique *were accurate*.  The PPM disclosed that Paramount used international pre-sales on an "opportunistic[]" and "selective" basis, which is exactly what Paramount did with respect to the films in the Melrose Slate. [SOF ¶¶ 25, 27.] There can be no dispute that Paramount used international pre-sales on a selective basis for films in the Melrose Slate; plaintiffs merely complain about the *amount* of such arrangements.  Thus, the facts demonstrate that nothing in the PPM about Paramount's prior or potential future use of international pre-sales is incompatible with what Paramount actually did with respect to the Melrose Slate.

*Third*, there is no evidence of any misrepresentation by Paramount *outside* of the PPM.   As described above, not a single witness identified a specific representation that Paramount made to any plaintiff outside of the PPM about the expected levels of co-financing,

including international pre-sales, for the Melrose Slate.  [SOF ¶¶ 199–202, 283, 363, 368, 439.]

Indeed, certain plaintiffs were unable to identify any statements made to them by Paramount at

all.  [SOF ¶¶ 282, 370, 438, 441.]  And, no plaintiff has suggested that, outside of the PPM, it

received any guarantees, assurances, or representations from Paramount about the levels of co-

financing, including international pre-sales, for the Melrose Slate.  There is thus no factual basis

to support plaintiffs' assertions that Paramount made misrepresentations about this (or any other)

risk mitigation technique.

   *Finally*, there was no actionable material omission.  This action is properly

viewed, under the federal securities laws, as a "misrepresentation" and not an "omission" case—

given the existence of "positive statements" in the PPM about the use of co-financing techniques,

including international pre-sales.  *E.g.*, *In re Lehman Bros. Sec. & ERISA Litig.*, 2013 WL

5730020 (S.D.N.Y. Oct. 22, 2013) (explaining the distinction between "misrepresentation" and

"omission" securities fraud claims).  As the *Lehman* Court noted, because "[e]very

misrepresentation can be characterized as an omission if it were defined in terms of absence of

the information that would correct the misrepresentation," *id*. at *3, a case can be considered an

"omission" case only when "no affirmative statements upon which plaintiffs could have relied"

exist, *id*.  That is not the circumstance here, where the PPM spoke directly to the matters that

plaintiffs now contend were supposedly omitted.

   Further, even if this case could be characterized as an "omission" case (which it

could not), it is undisputed that each plaintiff in fact received information showing that the actual

co-financing arrangements for the Melrose Slate, including international pre-sales, were running

at levels substantially lower than those for films in the historical slate of films for which

Paramount had provided information to Merrill.  [SOF ¶¶ 180, 182, 246, 248, 250–51, 327–28,

418–19.]  Thus, plaintiffs cannot prove any actionable omission when they were aware of, and given accurate information about, the co-financing arrangements that actually occurred.  In short, the undisputed fact that plaintiffs understood that the amounts of other co-financing arrangements in the Melrose Slate were lower than in the Historical Data Set is fatal to any "omission" theory of liability.

### B.  Plaintiffs Also Cannot Prove Actual or Reasonable Reliance

Paramount is also entitled to summary judgment on plaintiffs' federal securities law claims because the undisputed facts establish that plaintiffs did not actually or reasonably rely on representations in the PPM (or, for that matter, omissions) concerning Paramount's use of "international pre-sales as a means of reducing cost and minimizing risk of loss."  [TAC ¶ 47.]

Under Section 10(b) and Rule 10b-5, a plaintiff not only has to establish actual, but also "*reasonable* reliance on the alleged misrepresentations or omissions."  *Emergent Capital Inv. Mgmt., LLC* v. *Stonepath Grp., Inc.*, 343 F.3d 189, 195 (2d Cir. 2003) (emphasis added).  In that regard, "where . . . a party has been put on notice of the existence of material facts which have not been documented and he nevertheless proceeds with a transaction without securing the available documentation or inserting appropriate language in the agreement for his protection, he may truly be said to have willingly assumed the business risk that the facts may not be as represented."  *Id.* (quoting *Rodas* v. *Manitaras*, 552 N.Y.S.2d 618, 620 (1st Dep't 1990) (emphasis omitted); *see also Lazard Freres & Co.* v. *Protective Life Ins. Co.*, 108 F.3d 1531, 1543 (2d Cir. 1997).  Plaintiffs' claims fail to satisfy these standards.

### 1.  Plaintiffs Did Not *Actually* Rely on Any Purported Misrepresentations by Paramount

None of plaintiffs in fact relied on a supposed representation that Paramount would use international pre-sales "in a manner consistent with historical practice" in deciding to

29

invest.

### (a)    Marathon

Marathon admitted that it could not point to any evidence showing that Paramount made a misrepresentation to Marathon about international pre-sales.  [SOF ¶¶ 154, 199–202.] Indeed, Marathon acknowledged that Paramount never talked "specifics" about the "percentage of foreign sales, as opposed to [shared] pot deals."  [SOF ¶ 202.]  And, Marathon conceded that it understood that, by making an investment in Melrose, it was not "being guaranteed [or] assured a particular mix" of co-financing techniques to be employed by Paramount.  [SOF ¶ 194.]  Accordingly, Marathon did not in fact actually rely on any misrepresentation (or omission) made by Paramount on this subject.

### (b)    NewStar

Nor did NewStar rely on any representations (or omissions) as to Paramount's use of international pre-sales.  Not only did NewStar fail to identify a single representation that Paramount made to it about co-financing or international pre-sales, but NewStar conceded that it understood that Paramount controlled all decisions about risk mitigation and that there was no guarantee that such decisions would be consistent with past practices.  [SOF ¶¶ 233, 283, 286– 87.]  Thus, NewStar could not have actually relied on a misrepresentation (or omission) about the intended use of co-financing or international pre-sales in the Melrose Slate.  *See Wilson* v. *Comtech Telecomm. Corp.*, 648 F.2d 88, 94 (2d Cir. 1981); *see also Municipality of Bremanger* v. *Citigroup Global Mkts., Inc.*, 2013 WL 1294615, at *14 (S.D.N.Y. Mar. 28, 2013) (granting summary judgment where party did not consider the alleged misrepresentation).

### (c)    Allianz

Allianz as well did not rely on representations (or omissions) about Paramount's use of international pre-sales in making its investment decision because it admitted that *it did not*

30

*even consider the significance of various co-financing techniques to mitigate risk*, including Paramount's use of international pre-sales, prior to investing.  [SOF ¶¶ 361, 364–65.]  Given that Allianz did not consider *any* representations about international pre-sales prior to investing, there is no plausible way in which Allianz can prove actual reliance on such representations.  *See, e.g.*, *Wilson*, 648 F.2d at 94 (affirming dismissal where plaintiff failed to demonstrate actual reliance on alleged misrepresentations in making an investment decision).

### (d)     Munich Re

So, too, for Munich Re.  Munich Re could not identify a single misrepresentation made to it by Paramount.  Further, Munich Re conceded that Paramount had discretion as to "distribution decisions."  [SOF ¶¶ 396, 431.]  And, it knew that "there can be no assurance that Paramount will implement the same techniques or achieve similar results in the futures as it has in the past," and that "UIP was distributing films on Viacom's behalf."  [SOF ¶¶ 428, 430.]  Indeed, Munich Re's independent consultant specifically advised it of the "risk that [Paramount] will not deal in the international market the way [it] dealt with [the market] before."  [SOF ¶ 403.]  All of these undisputed facts completely undermine any assertion that Munich Re actually relied on any misrepresentation (or omission) about co-financing or international pre-sales.  *See Wilson*, 648 F.2d at 94; *see also Municipality of Bremanger*, 2013 WL 1294615, at *14.

### (e)     All of the Plaintiffs

Finally, the undisputed facts establish that all of the plaintiffs are unable to prove actual reliance for an additional reason:  prior to investing, each plaintiff received information about the *actual levels of co-financing, including international pre-sales*, in the Melrose Slate as of that date.  This information—which plaintiffs reviewed and understood—showed that the actual levels of co-financing, including international pre-sales, were running substantially below historical levels.  [SOF ¶¶ 91–93.]  Accordingly, plaintiffs cannot prove actual reliance on a

purported misrepresentation or omission about those subjects where they possessed information that was the opposite of what they assert they relied upon.

### 2. Plaintiffs Are Sophisticated Investors Who Could Not Reasonably Have Relied on Any Alleged Misrepresentations

Even assuming that plaintiffs could prove actual reliance on a misrepresentation or omission (which they cannot), their claims still fail because any such reliance was unreasonable as a matter of law.

In assessing the reasonableness of a plaintiff's alleged reliance, courts consider the entire context of the transaction, including the sophistication of the parties. *E.g.*, *Emergent Capital*, 343 F.3d at 195. Here, there can be no serious dispute that plaintiffs are all highly sophisticated actors. Nor can there be any serious dispute that, assuming they in fact relied on information as to international pre-sales (which was not the case), as highly sophisticated actors, plaintiffs neglected their duty of independent investigation and ignored information contradicting their alleged reliance.

To begin with, the disclosures in the PPM made any supposed reliance by plaintiffs unreasonable as a matter of law. The PPM specifically informed plaintiffs that it did not "purport to describe Paramount's distribution rights (whether domestic or international or both), structured financings, [or] net production cost" with respect to any of the films in the Melrose Slate [SOF ¶ 42]; that "[t]here can be no assurance that Paramount will implement the same [risk-mitigation] techniques . . . in the future as it has in the past" [SOF ¶ 26]; and that Paramount reserved "the right to change its business strategy with respect to the development and production of motion pictures" and to "modify, amend, cancel, adjust and alter all agreements, exhibition licenses, rental terms, sales methods and policies relating to the distribution, exhibition and exploitation of the [Melrose Slate] and any other of its rights as it

may deem advisable" [SOF ¶¶ 36–37]; it also disclosed a "reported . . . desire by Viacom and Paramount management to pursue a more aggressive approach, both fiscally and artistically, to [the] development and production of motion pictures than it has in the past." [SOF ¶ 38.]  These disclosures should have prompted, had plaintiffs truly cared about the subject, an independent evaluation by each plaintiff of Paramount's use of co-financing generally and international pre-sales in particular for the Melrose Slate.  *See, e.g., Steed Fin. LDC*, 2004 WL 2072536, at *8 (holding that plaintiff's reliance was unreasonable where disclosure put plaintiff on notice that further investigation was necessary).

But the undisputed facts show that no such evaluation occurred.  Plaintiffs never inquired—even after receiving the Melrose Slate Schedule—about Paramount's intended use of co-financing techniques or international pre-sales, much less sought a guarantee or representation that Paramount would continue to use international pre-sales "in a manner consistent with historical practice."  *See Emergent Capital*, 343 F.3d at 196 (affirming dismissal of securities fraud claims for lack of reasonable reliance where sophisticated buyer did not insist that allegedly misrepresented facts be included in stock purchase agreement).

Moreover, the information plaintiffs obtained in due diligence made any reliance by them unreasonable as a matter of law.  As noted, the undisputed facts establish that, *prior* to their investments, each plaintiff received a version of the Melrose Slate Schedule, which included both co-financing amounts achieved to date for the Melrose Slate and a description of the co-financing techniques used.  Significantly—and fatal to plaintiffs' claims—these disclosures showed that the co-financing levels of the Melrose Slate, including international pre-sales, were running at substantially lower levels than the co-financing numbers reflected in the historical slate.  Given the disclosure of these numbers, plaintiffs, had they truly cared about the

subject, should have independently evaluated both Paramount's use of co-financing techniques, including international pre-sales, and the potential implication that these numbers might have on an investment in Melrose; or inquired further into the subject; or obtained guarantees and assurances about it.   Plaintiffs' failure to do any of this makes their supposed reliance unreasonable as a matter of law.

For example, in *Abbey* v. *3F Therapeutics, Inc.*, 2011 WL 651416, at *8 (S.D.N.Y. Feb. 22, 2011) *aff'd sub nom. Abbey* v. *Skokos*, 509 F. App'x 92 (2d Cir. 2013), the plaintiff alleged that the defendant made a misrepresentation concerning the number of firm offers defendant had for the sale of a company.   Because plaintiff was a sophisticated investor who had access to materials that called into doubt the representation at issue, the court granted summary judgment to the defendant, finding plaintiff's alleged reliance was unreasonable.   As the court explained, "no rational juror could conclude that a plaintiff's reliance on a defendant's alleged misrepresentations was reasonable."   *Id.*

The same is true here.   Plaintiffs were put on notice that Paramount might not use the same level of risk mitigation techniques as it had in the past and were given information about co-financings achieved to date for the Melrose Slate that disclosed a lower level of co-financings, including international pre-sales.   There is no evidence, however, that the disclosure of this information prompted plaintiffs to make any further inquiry whatever about Paramount's plans concerning risk mitigation, co-financing or international pre-sales.   Given their failure to do so, plaintiffs cannot now, as a matter of law, prove that their alleged reliance was reasonable.

### C.   Paramount Is Not the "Maker" of Any Alleged Misrepresentation or Omission

To prevail on its federal securities law claim, plaintiffs must show that Paramount itself made the alleged misrepresentation about co-financings, including international pre-sales.

*Janus Capital Grp., Inc.* v. *First Derivative Traders*, 131 S. Ct. 2296, 2302 (2011).   As we argued at the motion to dismiss stage, plaintiffs cannot make such a showing here because, under *Janus*, Paramount was not the "maker" of the statement in the PPM; that was Melrose, the issuer of the PPM and the securities.   Although this Court rejected that argument based on the pleadings, since that time, the undisputed facts developed during discovery have confirmed that Paramount cannot be considered the "maker" of the statement in the PPM, and, therefore, this Court should review the argument in light of discovery.

Specifically, the undisputed facts now confirm that Paramount neither issued the PPM nor was "the filer" of the PPM—Melrose did both.   This means that Paramount can be considered the "maker" of the statements in the PPM only if there is evidence that "(a) [Paramount] filed the prospectus and falsely attributed statements to the purported filer or (b) there is evidence on the face of the prospectus that the statements in the prospectus came from [Paramount]."   *Krasner* v. *Rahfco Funds LP*, 2012 WL 4069300, at *5 (S.D.N.Y. Aug. 9, 2012). Neither showing can be made here.   In fact, the PPM expressly *disclaimed* attribution to Paramount in prominent, bold type.   [SOF ¶ 21 ("NONE OF PARAMOUNT PICTURES CORPORATION, VIACOM INC., ANY PARENT, SUBSIDIARY OR AFFILIATE THEREOF HAS PREPARED [THE PPM]").]   It is of no moment that Paramount may have provided some information to Merrill that ultimately made its way into the PPM—as *Janus* itself, and its many progeny decided since this Court denied the motion to dismiss now make clear, what matters is *who made* the challenged statement to the market.   *Janus*, 131 S. Ct. at 2302–04; *Krasner*, 2012 WL 4069300, at *5.   No reasonable jury could conclude that Paramount made any statement contained within the PPM.

For these reasons, under clear and dispositive Supreme Court precedent, Paramount cannot be considered the "maker" of any statements in the PPM, and plaintiffs' federal securities claims fail as a matter of law.

**D.** **In Any Event, Plaintiffs' Belated Theory of Liability as to Tax Credits Fails**

In what appears to be a Hail Mary attempt to salvage their securities fraud theories, plaintiffs' expert report on damages, for the first time, asserts an entirely new theory of liability nowhere pleaded in any of the four complaints that plaintiffs filed in this case. Plaintiffs now claim—for the first time—that Paramount purportedly committed securities fraud by failing to obtain certain tax credits for films in the Melrose Slate. This new theory of liability has both been waived and, in any event, does not raise a material question of fact warranting trial.

**1.** **Plaintiffs Waived Any Fraud Claim Predicated on Disclosures Concerning Efforts to Obtain Tax Credits**

Plaintiffs' "new theory must be rejected because of its patent, and prejudicial, untimeliness." *In re I.B.M. Corp. Sec. Litig.*, 954 F. Supp. 81, 83 n.3 (S.D.N.Y. 1997), *aff'd*, 163 F.3d 102, 110 (2d Cir. 1998).

Plaintiffs are bound by the allegations in their Complaint. Indeed, applicable law requires plaintiffs asserting fraud claims *specifically* to identify each alleged misrepresentation made. *See In re Initial Pub. Offering Sec. Litig.*, 241 F. Supp. 2d 281, 354 (S.D.N.Y. 2003) (noting that plaintiffs are bound by the allegations of their pleadings); Fed. R. Civ. P. 9(b). Here, plaintiffs' complaint contains no reference to an alleged misrepresentation concerning tax credits. Plaintiffs' failure to allege misrepresentations about Paramount's efforts to obtain certain tax credits in the Complaint means that they cannot, as a matter of law, predicate any liability on such purported misrepresentations. *See, e.g., In re I.B.M.*, 163 F.3d at 110 (holding

that plaintiffs waived any claims relating to a theory of liability asserted in an expert report, but never pleaded in the complaint).

This Court's prior rulings in this case underscore the impropriety of plaintiffs' belated effort to adopt a new theory of fraud.  The Court initially dismissed the Complaint because plaintiffs' allegations concerning the purported failure to pursue risk mitigation in connection with the Melrose Slate were "too general to be actionable" in fraud.  *Allianz Risk Transfer*, 2010 WL 1253957, at *9. Even after plaintiffs repleaded and offered more specific (albeit, as we demonstrate above, unsupportable) allegations, the Court sustained its prior view that plaintiffs had failed to allege any actionable misrepresentations about the PPM, except for the single "allegation that prior to the purchase of the securities by the plaintiffs, Paramount's management decided to change its strategy of mitigating the risk of loss through the regular and heavy use of international pre-sales, and it implemented a new strategy of increasing its handling of most of its foreign distribution through UIP."  Ex. 110 Tr. at 32–33; *see also id.* ("Now, everything I said in the original decision describing the PPM, I believe, is correct.  And I don't depart from that.").  This narrow theory of liability that the Court sustained did not concern obtaining certain tax credits for the Melrose Slate.

Moreover, an expert report is not the place for the assertion of a new claim.  The Second Circuit has expressly said as much.  In *In re I.B.M.*, 163 F.3d at 110, plaintiffs submitted an expert report calculating damages based on a purported understatement in third quarter earnings of the company.  This theory of damages, however, was never identified in the complaint.  As a result, on summary judgment, the district court rejected the new theory of liability.  *In re I.B.M.*, 954 F. Supp. at 83.  On appeal, the Second Circuit affirmed, holding that

plaintiffs' failure to plead such a theory of liability in the complaint meant that they had waived any claims relating to such a theory.  *In re I.B.M.*, 163 F. 3d at 110.[5]

So, too, here.  Plaintiffs waived any claims based on a failure to obtain certain tax credits by not pleading such a theory in their Complaint, and cannot plead an alleged securities fraud for the first time in an expert report.

### 2.   Plaintiffs Cannot Raise A Material Question of Disputed Fact Concerning Their Newly Minted Alleged Fraud

Even if plaintiffs did not waive their new theory of securities law liability, they have failed to raise a material question of fact with respect to it.  Indeed, the most they can say is that the amount of tax credits obtained for films in the Historical Data Set—as opposed to the Melrose Slate films—differed.  That is not the stuff of fraud.  There is not a scintilla of evidence—much less a material question of disputed fact—that Paramount made a misrepresentation about tax credits, nor that any plaintiff relied on any representation as to tax credits in deciding to invest.

### (a)   Plaintiffs Cannot Prove Paramount Made a Material Misrepresentation

To begin with, not a single plaintiff testified that the PPM (or Paramount) ever made a false or misleading representation about obtaining certain tax credits in the Melrose Slate.  Nor is there any evidence that Paramount ever made a representation that it would obtain certain tax credits in the Melrose Slate.  Indeed, as noted above, the PPM expressly informed investors that there "can be no assurance that Paramount will implement the same

---

[5]   Moreover, at this point, it would be deeply prejudicial to Paramount were plaintiffs permitted to amend their Complaint for a fifth time, to assert this new theory.  Fact discovery is now long closed. Paramount was not on notice of this supposed alleged theory, and had no ability to question any of plaintiffs' witnesses, nor key third party witnesses, concerning a supposed securities fraud involving tax credits; discovery focused on the use of territorial pre-sales as a risk mitigation technique.  The record in this case underscores why state and federal law require the pleading of fraud with specificity—so defendants are on notice and may effectively rebut the allegations against them through discovery.

techniques . . . in the future as it has in the past." [SOF ¶ 26.] Thus, as explained above, the PPM put investors on notice that Paramount might not use the same techniques, including obtaining tax credits, to the same extent as it had in the past.

Moreover¸ like plaintiffs' laments about Paramount's use of international pre-sales, the undisputed facts show that any statements in the PPM about obtaining certain tax credits were accurate. The undisputed facts establish that Paramount obtained certain tax credits for some films in the Melrose Slate. [SOF ¶¶ 59, 191.] This means that plaintiffs are not complaining about a failure to obtain tax credits, but merely complain about the *amount* of tax credits Paramount obtained. The PPM, however, makes no assurances about the number of tax credits Paramount would obtain. Thus, any divergence between the number of tax credits Paramount obtained in the Melrose Slate with the number obtained in the past does not establish that a misrepresentation was made.

### (b)   Plaintiffs Also Cannot Prove Actual or Reasonable Reliance

Nor can plaintiffs prove reliance on any misrepresentations as to tax credits. *First*, there is no evidence that, in deciding whether to invest, any plaintiff relied on any representations about Paramount's efforts to obtain certain tax credits. In fact, not a single plaintiff identified Paramount's efforts to obtain certain tax credits as a basis for its investment decision. Since there is no evidence that any plaintiff even considered the tax credit issue, none of them is able to prove actual reliance. *See, e.g.*, *Wilson*, 648 F.2d at 94.

*Second*, plaintiffs' new theory of liability based on a purported misrepresentation about obtaining certain tax credits fails because any reliance was unreasonable. In particular, as highly sophisticated investors, plaintiffs ignored information contradicting their purported reliance and completely failed to investigate the tax credit issue. As noted above, the PPM specifically informed plaintiffs that it did not provide any assurance that Paramount would use

the same techniques as it had in the past.  *Supra* pp. 27, 38-39.  Accordingly, as explained above, these disclosures should have prompted plaintiffs independently to evaluate Paramount's efforts to obtain certain tax credits.  *See, e.g.*, *Steed Fin. LDC*, 2004 WL 2072536, at *8.  But they never did so.

And, such a failure is particularly unreasonable considering that, during due diligence, plaintiffs received (or had access to) information about tax credits that Paramount had obtained to date in the Melrose Slate.  Thus, the Melrose Slate Schedule that each plaintiff received included information about tax incentives and foreign sale/leaseback transactions, where applicable, for each film in the Melrose Slate.  [*E.g.*, SOF ¶ 93.]   And, the investment price invoices for each film disclosed information as to tax credits, where applicable.  [*E.g.*, SOF ¶¶ 59, 191.]  These disclosures should have, at a minimum, prompted plaintiffs to inquire further about the subject if it were in fact material to their investment decisions.  Plaintiffs' failure to do so, as a matter of law, shows that any purported reliance was unreasonable.  *E.g.*, *Abbey*, 2011 WL 651416 at *8.

**III.**
**SUMMARY JUDGMENT IS WARRANTED ON**
**PLAINTIFFS' COMMON LAW FRAUD CLAIMS**

Largely for the same reasons just noted, plaintiffs' common law fraud claims fail as well.

### A.    **Plaintiffs Cannot Prove Common Law Fraud**

As noted above, under New York common law, plaintiffs must (as with their federal securities law fraud claim) demonstrate both that Paramount made a material misrepresentation of fact and that plaintiffs actually and justifiably relied upon that misrepresentation.  Indeed, as also noted above, New York law requires "clear and convincing" proof of such elements.  *Century Pac., Inc.*, 528 F. Supp. 2d at 219; *In re Vivendi Universal, S.A.*

*Sec. Litig.*, 765 F. Supp. 2d 512, 534 (S.D.N.Y. 2011) (holding that common law fraud claims "are subject to a higher burden of proof" than Section 10(b) claims).

New York law also imposes on sophisticated commercial parties a particularly stringent duty of reasonable inquiry before finding that reliance was justified. *Lazard Freres*, 108 F.3d at 1541 ("It is well established that where sophisticated businessman engaged in major transactions enjoy access to critical information but fail to take advantage of that access, New York courts are particularly disinclined to entertain claims of justifiable reliance.") (internal quotation marks, alteration, and citation omitted); *Abrahami* v. *UPC Constr. Co., Inc.*, 638 N.Y.S.2d 11, 14 (1st Dep't 1996) (noting that, sophisticated actors—like plaintiffs here—have "a duty to exercise ordinary diligence and conduct an independent appraisal of the risk they [are] assuming").

Because, for the reasons noted above, plaintiffs cannot prove at all, let alone by clear and convincing evidence, either that Paramount made a material misrepresentation or that plaintiffs actually or reasonably relied on any misrepresentation, their common law fraud claims fail as a matter of law. *See supra* pp. 26–40.

**B.     Plaintiffs' Common Law Fraud Claims Also Cannot Be Based on Any Supposed Omission**

There is an additional reason plaintiffs' common law fraud claims fail. To the extent plaintiffs now claim their common law fraud claims are instead based on an alleged *failure to disclose* information—namely, some failure to disclose details about Paramount's use of co-financing techniques, including international pre-sales—any such claim fails as a matter of law. Under New York law, fraud claims cannot be based on any alleged omission except under extreme circumstances, which are not present here.

41

Omissions are rarely actionable as common law fraud in New York.  Absent a fiduciary relationship (which certainly does not exist here), New York courts have upheld fraud claims based on omissions only when faced with egregious factual situations, where it was clear that a defendant was intentionally trying to mislead.  *Compare Standish-Parkin* v. *Lorillard Tobacco Co.*, 786 N.Y.S.2d 13 (1st Dep't 2004) (refusing to dismiss fraud claim asserted against cigarette company for actively concealing health risks of smoking), *with Dembeck* v. *220 Central Park S. LLC*, 823 N.Y.S.2d 45 (1st Dep't 2006) (dismissing fraud claim even where facts suggested that seller had intentionally concealed information about property).

In particular, it is well-settled under New York law that fraud claims cannot be based on omissions where a plaintiff never requested the allegedly concealed information, especially where the plaintiff is a sophisticated entity that could easily have done so.  *E.g., Albion Alliance Mezzanine Fund, L.P.* v. *State St. Bank & Trust Co.*, 797 N.Y.S.2d 699, 704–05 (1st Dep't 2003) (dismissing fraud claim alleging a failure to disclose information where plaintiffs were sophisticated financial institutions that had access to the information at issue and could have done their own research); *Societe Nationale D'Exploitation Industrielle Des Tabacs Et Allumettes* v. *Salomon Bros. Int'l, Ltd.*, 702 N.Y.S.2d 258, 259 (1st Dep't 2000) (dismissing fraud claim where plaintiff was a "sophisticated institutional investor" who could have obtained information at issue).

Here, as already discussed, there is no dispute that plaintiffs are highly sophisticated investors.  *See supra* p. 32.  Further, there is no dispute that plaintiffs could have requested the information that they now appear to claim was so essential to their investment decision.  *See supra* p. 33.  Indeed, the undisputed facts establish both that Merrill and Paramount provided all plaintiffs with all of the information that they requested and that

plaintiffs never made a specific request for information concerning Paramount's use of co-financing techniques, including international pre-sales.  *See supra* p. 33.  More than that, as noted above, the undisputed facts establish that, *prior* to their investments, each plaintiff received a version of the Melrose Slate Schedule, which included both the overall amount of co-financing achieved to date for the Melrose Slate and a description of co-financing techniques used.  *See supra* p. 33.  Under these circumstances, plaintiffs cannot prove a New York common law fraud claim based on any failure to provide information.

**C.**     **Plaintiffs' Common Law Fraud Claim Fails Because Plaintiffs Are Not Entitled to Rescission**

In addition, plaintiffs' Complaint asserts only that plaintiffs are entitled to rescission (and punitive damages) in connection with their common law fraud claims—not compensatory damages.  [TAC ¶¶ 115–16.]  Rescission, however, is not an available remedy here, for three reasons:

*First*, Federal Rules of Civil Procedure 12(b)(7) and 19(b) both mandate dismissal of an action seeking rescission of a contract unless all parties to the contract are joined.  *See Richmond Lace Works, Inc.* v. *Epstein*, 31 F.R.D. 150, 153 (S.D.N.Y. 1962) ("The law of New York on this point is well established that where rescission of a contract would materially affect the rights of some persons under an agreement, such persons are indispensable parties."); *Tudor* v. *Riposanu*, 461 N.Y.S.2d 6, 7 (1st Dep't 1983) ("In an action for rescission, all parties to the agreement must be joined as necessary parties.").  The Subscription Agreement by which each plaintiff (or its swap counter-party) purchased the Melrose securities, however, is between plaintiffs (or their swap counter-parties) and *Melrose LLC*, not Paramount.  In other words, notably absent from this action are the parties who entered into the relevant contract with

plaintiffs—i.e., Melrose and other investors.  Plaintiffs' failure to join all of the parties to the agreement means that their common law fraud claim should be dismissed.

*Second*, rescission is not a remedy against a non-party to a contract.  *See, e.g.*, *Genager* v. *Genager*, 966 N.Y.S.2d 346 (Sup. Ct. N.Y. Cnty. 2013) ("the remedy of reformation or rescission is unavailable against a nonparty to a contract").  Plaintiffs have no contract with Paramount whatsoever, nor do they own securities issued by Paramount.  As a consequence, Paramount is not a party to any agreement with any plaintiff that can be "rescinded."  Given that rescission is the remedy plaintiffs seek on their common-law fraud claims, judgment should be entered in Paramount's favor on those claims.

*Finally*, rescission is an extraordinary remedy, and in order to obtain rescission, an equitable remedy, the party seeking it must show that (a) "it has no adequate remedy at law," *Rosewood Apartments Corp.* v. *Perpignano*, 200 F. Supp. 2d 269, 272 (S.D.N.Y 2002) (citing *Lichtyger* v. *Franchard*, 18 N.Y.2d 528, 537 (1966)), *and* (b) the status quo may be substantially restored.  *Rudman* v. *Cowles Communications, Inc.*, 30 N.Y.2d 1, 13 (1972).  Therefore, rescission is unavailable where damages will adequately compensate the wrong, *see New Shows, S.A. de C.V.* v. *Don King Productions, Inc.*, 210 F.3d 355 (2d Cir. 2000), or "where restoration of the status quo ante is made impractical by a substantial change of position . . . or by the nature of the transaction at issue."  *Sokolow, Dunaud, Mercadier & Carreras LLP* v. *Lacher*, 747 N.Y.S.2d 441, 446–47 (1st Dep't 2002).

Here, it is manifestly the case that monetary damages (if warranted, which Paramount strenuously denies) would adequately compensate plaintiffs; indeed, it is the sole remedy plaintiffs seek on their federal securities claims.  Plaintiffs have submitted a 51-page expert report, replete with appendices, detailing the calculations supporting their purported

damages.   Plaintiffs cannot seriously contend, in light of this analysis, that damages are insufficient to fully compensate them here.   For this reason too, summary judgment in Paramount's favor is warranted on their common law fraud / rescission claims.[6]

### IV.
### SUMMARY JUDGMENT IS WARRANTED ON
### PLAINTIFFS' UNJUST ENRICHMENT CLAIMS

Finally, plaintiffs' unjust enrichment claims are expressly predicated on their fraud claims.  [TAC ¶ 120.]  Because, for the reasons stated above, plaintiffs cannot prove facts sufficient to support their fraud claims, their unjust enrichment claim necessarily fails as well. *Allianz Risk Transfer*, 2010 WL 1253957, at *10.

### Conclusion

For the reasons set forth above, Paramount's motion for summary judgment should be granted, and judgment should be entered dismissing all of plaintiffs' claims.

---

[6]  We assume that plaintiffs' request for punitive damages is based on plaintiffs' request for rescission, and that, once the request for rescission is dismissed, plaintiffs will have no basis for seeking punitive damages.  To the extent that assumption is incorrect, there is, in any event, absolutely no basis for any award of punitive damages here.  *E.g., Career Initiatives Corp.* v. *Palmer*, 893 F. Supp. 295, 296 (S.D.N.Y. 1995) ("In order to recover 'punitive damages in an action for fraud, it must appear that the fraud was upon the general public, that is, aimed at the public generally, is gross and involves a high degree of moral culpability'") (quoting *Diker* v. *Cathray Constr. Corp.*, 552 N.Y.S.2d 37, 38 (2d Dep't 1990)); *see also Walker* v. *Sheldon*, 10 N.Y.2d 401 (1961) (same).   None of that exists here.

Dated:   May 23, 2014
         New York, New York

                                        Respectfully submitted,

                                         PAUL, WEISS, RIFKIND, WHARTON &
                                         GARRISON LLP

                                      By:  s/Allan J. Arffa
                                         Leslie Gordon Fagen (lfagen@paulweiss.com)
                                         Allan J. Arffa (aarffa@paulweiss.com)
                                         Andrew J. Ehrlich (aehrlich@paulweiss.com)
                                         Patrick J. Somers (psomers@paulweiss.com)

                                         1285 Avenue of the Americas
                                         New York, New York 10019
                                         Tel: (212) 373-3000
                                         Fax: (212) 757-3990

                                         KENDALL BRILL & KLIEGER LLP
                                         Richard B. Kendall (rkendall@kbkfirm.com)
                                         Robert N. Klieger (rklieger@kbkfirm.com)
                                         Philip M. Kelly (pkelly@kbkfirm.com)

                                         10100 Santa Monica Boulevard, Suite 1725
                                         Los Angeles, California  90067
                                         Tel:  (310) 556-2700
                                         Fax: (310) 556-2705

                                         *Attorneys for Defendant Paramount Pictures*
                                         *Corporation*