UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ALLIANZ RISK TRANSFER AG, MARATHON STRUCTURED FINANCE FUND, LP, NEWSTAR FINANCIAL, INC., and MUNICH RE CAPITAL MARKETS NEW YORK, INC., <br><br> Plaintiffs, <br><br> v. <br><br> PARAMOUNT PICTURES CORPORATION, <br><br> Defendant. | No. 1:08-CV-10420 (TPG) |

**LOCAL RULE 56.1 STATEMENT OF UNDISPUTED FACTS
IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

TABLE OF CONTENTS ............................................................................................................. i

I.    The Melrose Transaction ............................................................................................ 1

II.   The Melrose PPM and Subscription Materials .......................................................... 4

      A.    The PPM ........................................................................................................... 4
      B.    The Subscription Agreement ........................................................................... 9
      C.    The RPA and the Investment Price Invoices ................................................. 12
      D.    The LLC Agreement ...................................................................................... 15
      E.    The Indenture ................................................................................................. 15

III.  Merrill Lynch ........................................................................................................... 17

IV.   Paramount ................................................................................................................ 23

V.    Plaintiffs ................................................................................................................... 24

      A.    Marathon ........................................................................................................ 24
      B.    NewStar .......................................................................................................... 36
      C.    Allianz ............................................................................................................ 48
      D.    Munich Re ...................................................................................................... 58

VI.   Post-Transaction Events .......................................................................................... 68

Pursuant to Rule 56 of the Federal Rules of Civil Procedure and Rule 56.1 of the Local Civil Rules of the United States District Court for the Southern District of New York, Defendant Paramount Pictures Corporation ("Paramount") respectfully submits this statement of undisputed facts in connection with Paramount's Motion for Summary Judgment Pursuant to Federal Rule of Civil Procedure 56(c).

## I.      The Melrose Transaction

1.      Melrose Investors LLC ("Melrose") is a Delaware limited liability company.  (Ex. 1 at PPC_MelSlate0004654.)[1]

2.      On January 28, 2004, Paramount executed a commitment letter from Merrill Lynch Asset America relating to Melrose and the transaction at issue in this case (the "Melrose Transaction").  (Ex. 3 at PPC_MelSlate0006896.)

3.      The January 28, 2004 commitment letter states:  "The proceeds of [the Melrose Transaction] would be used to co-invest with Paramount in a slate of films to be produced, released, marketed and distributed by Paramount . . . ."      (Ex. 3 at PPC_MelSlate0006896.)

4.      The Melrose Transaction was "structured to provide Paramount with committed co-financing across a diverse slate of films to be released in succession during the Investment Period."      (Third Amended Complaint ("TAC") ¶¶ 2, 15; Ex. 1 at PPC_MelSlate0004654.)

5.      The Melrose Transaction "allow[ed] Paramount to diversify its capital sources for film production *while maintaining control over all aspects of its business*."  (TAC ¶¶ 2, 15; Ex. 1 at PPC_MelSlate0004654 (emphasis added).)

---

[1]      All references to Ex. __ are references to the Exhibits attached to the Declaration of Allan J. Arffa in Support of Defendant's Motion for Summary Judgment.

6.      Melrose purchased revenue participation interests ("RPI") for films in the slate (the "Melrose Slate") pursuant to a Revenue Participation Agreement with Paramount dated July 29, 2004 (the "RPA").  (Ex. 1 at PPC_MelSlate0004655; Ex. 2 at GSS0032922.)

7.      The amount paid by Melrose to Paramount for an RPI was "generally" equal to 25% "of Paramount's estimated Net Production Investment in the related Covered Picture."  (Ex. 1 at PPC_MelSlate0004654–55.)

8.      In the Melrose Transaction, Melrose issued three types of interests (the "Securities") to investors (the "Investors"), all of whom were required to be "accredited investor[s]" and "qualified purchaser[s]":  (a) Class A Notes, representing the most senior class of securities issued; (b) Class B Notes, representing the next most senior (or mezzanine) class of securities issued; and (c) equity, representing membership interests in Melrose, which were the most junior securities offered to investors.  (TAC ¶ 16; Ex. 1 at PPC_MelSlate0004654.)

9.      The total amount of funds provided by Melrose to Paramount as a result of the Melrose Transaction was approximately $231.3 million.  (TAC ¶ 15.)

10.     Of the $231.3 million total, $157.5 million was provided by senior creditors (Class A Note holders), $45.3 million was provided by mezzanine creditors (Class B Note holders), and $28.5 million was provided by equity investors.  (TAC ¶ 16.)

11.     Melrose distributes the income it receives under the RPA among its noteholders and equity investors in order of seniority and pursuant to the terms of an indenture (the "Indenture") dated July 29, 2004, which governs the Notes.  (TAC ¶¶ 18–22.)

12.     The Melrose Slate was to include certain films (the "Covered Pictures") released by Paramount during a period not to exceed three years from the closing date of the Melrose Transaction.  (Ex. 1 at PPC_MelSlate0004654, PPC_MelSlate0004661.)

13.    The Melrose Slate ultimately consisted of 25 films, including, among others, "Mean Girls," "The Stepford Wives," "The Manchurian Candidate," "Collateral," "Alfie," "Coach Carter," "The Longest Yard," "Elizabethtown," "Aeon Flux," and "Team America: World Police."  (Ex. 1 at PPC_MelSlate0004695–96; Ex. 7 at PPC_MelSlate0023189–90.)

14.    The 25 films in the Melrose Slate included all films produced by Paramount, released between April 2004 and March 2006, that met certain objective criteria. (Ex. 1 at PPC_MelSlate0004661.)

15.    Among other things, a film met the criteria to be included in the Melrose Slate where the film was:

> produced or acquired by Paramount, in chronological order of the domestic theatrical release of each such film, the Release Date for which occurs during the period commencing on the Closing Date and ending on the last date of the Investment Period, if, and to the extent that, the Aggregate Investment Price is less than the Maximum Investment Price on the proposed Investment Date for such film, and:
>
> 1. which has received an MPAA rating no more restrictive than "R";
>
> 2. which has a running time of not less than 80 minutes (including main and end titles); <u>provided</u> that the foregoing minimum running time requirement will not apply to any animated film or any film receiving a "G" rating;
>
> 3. which is filmed predominately in the English language;
>
> 4. which is not a documentary;
>
> 5. which is being released theatrically in the United States and Canada by a major studio (which will include, without limitation, the traditional "majors", as well as DreamWorks, Miramax and New Line);
>
> 6. for which Paramount's estimated Net Production Investment is $5 million or more;
>
> 7. which is not distributed under the "Paramount Classics" label; and
>
> 8. for which Paramount controls the domestic theatrical distribution rights.

3

In addition, any film that Paramount co-produces and co-finances on a "shared pot" basis with another major studio (a "Studio Shared Pot Picture") will be a Covered Picture if such film satisfies each of the criteria enumerated in items 1 through 7 above so long as Paramount controls either the domestic or the foreign theatrical distribution rights with respect to such film.

(Ex. 1 at PPC_MelSlate0004661.)

16.     The Melrose Transaction initially closed on July 29, 2004.  (TAC ¶¶ 9–11.)

17.     A second closing, involving additional investors in the Melrose Transaction, occurred on October 13, 2004.  (TAC ¶ 12; Ex. 78 at PTFS00253832.)

## II.     The Melrose PPM and Subscription Materials

### A.     The PPM

18.     Before deciding to invest, plaintiffs received and reviewed a private placement memorandum (the "PPM") issued by Melrose in connection with the offering of the Securities.  (TAC ¶ 2.)

19.     On July 22, 2004, Melrose issued the final version of the PPM.  (TAC ¶ 2; Ex. 1 at PPC_MelSlate0004649.)

20.     The PPM includes in bold and capitalized language a "**GENERAL DISCLAIMER**" (the "Paramount Liability Waiver").  (Ex. 1 at PPC_MelSlate0004651–52.)

21.     The full text of the Paramount Liability Waiver states:

**NONE OF PARAMOUNT PICTURES CORPORATION, VIACOM INC., ANY PARENT, SUBSIDIARY OR AFFILIATE THEREOF HAS PREPARED THIS DOCUMENT.  NONE OF PARAMOUNT PICTURES CORPORATION, VIACOM INC., ANY PARENT, SUBSIDIARY OR AFFILIATE THEREOF (i) ASSUMES ANY LIABILITY FOR THE ADEQUACY OR ACCURACY OF THE INFORMATION SET FORTH HEREIN OR FOR ANY STATEMENTS MADE WITH RESPECT HERETO, (ii) ASSUMES ANY RESPONSIBILITIES WITH RESPECT TO THE OFFERING CONTEMPLATED HEREBY OR IN RELATION HERETO, OR**

4

**(iii) ENDORSES OR MAKES ANY RECOMMENDATION FOR THE POTENTIAL INVESTMENT CONTEMPLATED HEREBY OR IN RELATION HERETO.**

(Ex. 1 at PPC_MelSlate0004651–52.)

22.     The PPM states that potential Investors "will not be investors in Paramount Pictures Corporation, will have no direct interest in Paramount Pictures Corporation or any of its assets (including any motion picture) and will have no standing or recourse against Paramount Pictures Corporation, Viacom Inc., or their affiliates."   (Ex. 1 at PPC_MelSlate0004651.)

23.     The PPM states that each of Paramount's motion pictures "is a separate and distinct product with its financial success dependent upon many factors, among which cost and public response are of fundamental importance."  (Ex. 1 at PPCMelSlate0004658–59.)

24.     The PPM includes a section entitled "**Certain Investment Considerations**."  (Ex. 1 at PPC_MelSlate0004684–86.)

25.     In the "**Certain Investment Considerations**" section, the PPM states:

Like other major studios, Paramount aims to achieve consistent film slate profitability by managing capital commitments for each film project, *opportunistically* entering into output agreements and territory sales with third parties, and emphasizing cost mitigation programs such as split-rights deals, co-financings and other transactions that take advantage of local production, tax and incentive opportunities in certain foreign jurisdictions (e.g., UK sale-leasebacks and German lease financings).

(Ex. 1 at PPC_MelSlate0004684 (emphasis added).)

26.     In the same section, the PPM states: "There can be *no assurance that Paramount will implement the same techniques or achieve similar results in the future as it has in the past*."  (Ex. 1 at PPC_MelSlate0004684 (emphasis added).)

27.     In a later section of the PPM entitled "**Paramount Pictures Business Overview**," under a subheading called "**Production Financing and Co-Financing**," the PPM

5

states:  "Paramount *selectively pursues and enters into* co-production agreements, studio 'shared pot' deals, split rights deals and similar arrangements[,]" and "[t]hese *types of arrangements are entered into on a selective basis* and each such agreement is tailored to the specific film in question."  (Ex. 1 at PPC_MelSlate0004692 (emphasis added).)

28.     The PPM also includes a section entitled "**Risk Factors**."  (TAC ¶¶ 88–89; Ex. 1 at PPC_MelSlate0004687.)

29.     In the "**Risk Factors**" section, the PPM expressly warns potential investors that they "should carefully consider potential risks that include, but are not limited to," the risks described in the "**Risk Factors**" section of the PPM.  (TAC ¶¶ 88–89; Ex. 1 at PPC_MelSlate0004687.)

30.     In the "**Risk Factors**" section, the PPM states:  "Gross Receipts may fluctuate significantly and unexpectedly from period to period, and the results of any one period may not be indicative of the results for any future period."  (Ex. 1 at PPC_MelSlate0004687.)

31.     In the "**Risk Factors**" section, under a subheading entitled "**Uncertainty of Success of Covered Pictures**," the PPM states that:

> *Paramount and the Issuer cannot make, and have not made, any assurances* (i) *as to the amount of Gross Receipts* or the amount of Net Receipts which will be or may be derived from or collected in connection with the distribution of the Covered Pictures, (ii) *that there will be any sums payable to the Issuer* under the Revenue Participation Agreement in respect of the RPIs, or (iii) *that the Covered Pictures will perform in any particular manner* or will be favorably received by exhibitors or by the public, or will be distributed (other than with respect to the obligation of Paramount to release at least 20 Covered Pictures during the Investment Period) or that any such distribution will be continuous . . . .

(Ex. 1 at PPC_MelSlate0004687 (emphasis added).)

32.     In the "**Risk Factors**" section, under a subheading entitled "**Uncertainty of Production and Distribution**," the PPM states:  "The production and distribution of motion

pictures are subject to numerous uncertainties, including risks of completion, the availability of desired talent and quality material and the release schedule of Paramount and the motion pictures of Paramount's competitors." (Ex. 1 at PPC_MelSlate0004687.)

33. Under that same subheading, the PPM further states: "The ability to successfully distribute the Covered Pictures will depend on the capabilities of Paramount (as well as other factors beyond Paramount's control), as *the Issuer does not control the timing and manner in which the Covered Pictures are distributed or marketed*, which will directly impact the timing and amount of Gross Receipts generated by such pictures." (Ex. 1 at PPC_MelSlate0004687 (emphasis added).)

34. In the "**Risk Factors**" section, under a subheading entitled "**Increase of Production and Acquisition Costs**," the PPM states: "Production costs may continue to increase in the future, thereby increasing the Investment Price for individual RPIs and the risk borne by the Issuer." (Ex. 1 at PPC_MelSlate0004687.)

35. In the "**Risk Factors**" section, under a subheading entitled "**All Decisions Relating to Covered Pictures in Paramount's Control**," the PPM states: "Although the interests of the Issuer and Paramount are somewhat aligned, as between Paramount and the Issuer, Paramount will control all decisions (i.e., business, creative or otherwise) relating to the development and production of each Covered Picture *as well as the decisions whether to pursue and consummate any co-financing transaction*, *and the Issuer has no consultation or approval rights with respect thereto*." (Ex. 1 at PPC_MelSlate0004689 (emphasis added).)

36. Under that same subheading, the PPM states that Paramount "may modify, amend, cancel, adjust and alter all agreements, exhibition licenses, rental terms, sales methods

and policies relating to the distribution, exhibition and exploitation of the Covered Pictures and any other of its rights as it may deem advisable." (Ex. 1 at PPC_MelSlate0004689.)

37.   Under that same subheading, the PPM states that Paramount reserved "the right to change its business strategy with respect to the development and production of motion pictures." (Ex. 1 at PPC_MelSlate0004689.)

38.   Under that same subheading, the PPM notes: "Recent press has reported a desire by Viacom and Paramount management to pursue a more aggressive approach, both fiscally and artistically, to such development and production of motion pictures than it has in the past." (TAC ¶ 94; Ex. 1 at PPC_MelSlate0004689.)

39.   In the "**Risk Factors**" section, under a subheading entitled "**Film Industry Risk**," the PPM states: "The motion picture industry involves substantial risks. Each motion picture is a creative work whose commercial success is primarily determined by audience reaction, which is unpredictable; accordingly, *there can be no assurance as to the financial success of any motion picture*." (Ex. 1 at PPC_MelSlate0004690 (emphasis added).)

40.   Under that same subheading, the PPM states that "Gross Receipts from Covered Pictures are dependent on numerous unpredictable and subjective factors." (Ex. 1 at PPC_MelSlate0004690.)

41.   The PPM discloses that "Paramount generally distributes its motion pictures for theatrical release outside the U.S. and Canada through United International Pictures ('UIP'), a company owned by Viacom and an affiliate of Universal Studios, Inc. ('Universal'). Pursuant to an agreement, UIP will continue to distribute each studio's films through 2006." (Ex. 1 at PPC_MelSlate0004659.)

42.     The PPM states that it did not "purport to describe Paramount's distribution rights (whether domestic or international or both), structured financings, [or] net production cost" with respect to any of the films in the Melrose Slate.   (Ex. 1 at PPCMelSlate0004695.)

**B.     The Subscription Agreement**

43.     All initial purchasers of Melrose Securities were required to sign a Subscription Agreement.  (Ex. 2 at GSS0033002, GSS0033009.)

44.     The Subscription Agreement includes a "<u>GENERAL DISCLAIMER</u>"—in capitalized, bolded terms.  (Ex. 53 at BOA-ML00001319, ¶ 16.)

45.     The full text of the <u>GENERAL DISCLAIMER</u> in the Subscription Agreement states:

> **NONE OF PARAMOUNT PICTURES CORPORATION, VIACOM INC., ANY PARENT, SUBSIDIARY OR AFFILIATE THEREOF HAS PREPARED THIS DOCUMENT, THE LLC AGREEMENT OR THE INDENTURE.  NONE OF PARAMOUNT PICTURES CORPORATION, VIACOM INC., ANY PARENT, SUBSIDIARY OR AFFILIATE THEREOF (i) ASSUMES ANY LIABILITY FOR THE ADEQUACY OR ACCURACY OF THE INFORMATION SET FORTH HEREIN OR FOR ANY STATEMENTS MADE WITH RESPECT HERETO, (ii) ASSUMES ANY RESPONSIBILITIES WITH RESPECT TO THE OFFERING CONTEMPLATED HEREBY OR IN RELATION HERETO, OR (iii) ENDORSES OR MAKES ANY RECOMMENDATION FOR THE POTENTIAL INVESTMENT CONTEMPLATED HEREBY OR IN RELATION HERETO; <u>PROVIDED</u>, <u>HOWEVER</u>, THAT THE FOREGOING DISCLAIMER SHALL NOT APPLY TO ANY OBLIGATIONS OF PARAMOUNT OR VIACOM TO THE ISSUER UNDER THE RPA DOCUMENTS.**

(Ex. 53 at BOA-ML00001319, ¶ 16.)

46.     In paragraph 4(c), the Subscription Agreement states:

The Investor has received and has carefully read and understands (i) the Private Placement Memorandum relating to the Notes and the LLC

Interests, including without limitation the 'Investor Eligibility and Transfer Restrictions' and 'Risk Factors' sections therein and the information set forth therein relating to the Revenue Participation Agreement, (ii) the LLC Agreement (for Investors subscribing for LLC Interests) and (iii) the Indenture (for Investors subscribing for Notes). The Investor has based its decision to purchase the Securities solely upon the information contained herein and therein and not upon any other information, if any, provided to it by any of the Issuer, the Manager, Viacom Inc., Paramount, Merrill Lynch, Pierce, Fenner & Smith Incorporated, or any of their respective affiliates, or any of their respective officers, directors, trustees, shareholders, members, partners, employees, counsel, agents or representatives thereof (collectively, the 'Relevant Parties').

(Ex. 53 at BOA-ML00001310–11, ¶ 4(c).)

47.    In paragraph 4(e), the Subscription Agreement states:

The Investor confirms that (i) none of the Relevant Parties is acting as a fiduciary or financial or investment adviser for the Investor; (ii) the Investor is *not relying (for purposes of making any investment decision or otherwise) upon any advice, counsel or representations (whether written or oral)* of any of the Relevant Parties other than the Private Placement Memorandum; (iii) none of the Relevant Parties has given to the Investor (directly or indirectly through any Person) *any assurance, guarantee or representation whatsoever* as to the expected or projected success, profitability, return, performance, result, effect, consequence, or benefit (including legal, regulatory, tax, financial, accounting, or otherwise) with respect to the Securities; (iv) the Investor has consulted with its own legal, regulatory, tax, business, investment, financial, and accounting advisers to the extent it has deemed necessary, and it has made its own investment decisions based upon its own judgment and upon any advice from such advisers as it has deemed necessary and not upon any view expressed by any Relevant Party; (v) the Investor is purchasing the Securities with a full understanding of all of the risks thereof (economic or otherwise) as described in the Private Placement Memorandum, or as known to it through its own experience, and it is capable of assuming and willing to assume (financially and otherwise) those risks; and (vi) the Investor is a sophisticated investor.

(Ex. 53 at BOA-ML00001311, ¶ 4(e) (emphasis added).)

48.    In paragraph 4(t), the Subscription Agreement states:

The Investor acknowledges and agrees (i) that none of Paramount, Viacom Inc. or any of their affiliates owes any fiduciary duty, duty of care, duty of

disclosure or other duty of any kind whatsoever under any law or otherwise to the Investor, the Issuer or other Relevant Party other than duties to the Issuer set forth in the RPA Documents or any other document executed or delivered by Paramount, Viacom Inc. or any of their affiliates in connection with the RPA Documents and (ii) *that the Investor waives and releases all claims against Paramount, Viacom Inc. or any of their affiliates arising out of, or in connection with, the offering of the Securities*.

(Ex. 53 at BOA-ML00001314–15, ¶ 4(t) (emphasis added).)

49.     In paragraph 4(t), the Subscription Agreement states:

The Investor acknowledges and agrees that each of Paramount and Viacom Inc. are express third-party beneficiaries of the acknowledgments and agreements set forth in this paragraph and in Paragraphs (c), (e), (f), (j), (k), (p), and (s) above and that both Paramount and Viacom Inc. have relied upon the foregoing acknowledgments and agreements of the Investor in entering into the transaction contemplated by the Revenue Participation Agreement with the Issuer. *The Investor waives and releases Paramount, Viacom Inc. and their affiliates from liability arising out of the matters described in paragraph (s) above, and agrees that in no event shall it assert any claim or bring any action contradicting the acknowledgments and agreements in this paragraph or in Paragraph (s) above*.

(Ex. 53 at BOA-ML00001314–15, ¶ 4(t) (emphasis added).)

50.     Paragraph 4(s) of the Subscription Agreement, which is referenced in

Paragraph 4(t), states:

The Investor acknowledges and agrees that none of the Relevant Parties has made *any express or implied representation, warranty, guarantee or agreement, written or oral, to the Issuer or the Investor*: (i) as to the amount of "Gross Receipts" or the amount of "Net Receipts" (as such terms are defined in the Revenue Participation Agreement) which will be or may be derived from or collected in connection with the distribution and exploitation of the "Covered Pictures" or "Index Pictures" (both as defined in the Revenue Participation Agreement), (ii) that there will be any sums payable to the Issuer under the Revenue Participation Agreement in respect of the Revenue Participation Interests, or that the business of the Issuer taken as a whole, and any investment therein, is likely to be profitable, (iii) that the Covered Pictures or Index Pictures will perform in any particular manner, will achieve any level of return or amount of revenue or license fees or will be favorably received by exhibitors or by the public, or *will be distributed in any particular manner*

11

or that any such distribution will be continuous, (iv) that Paramount or Viacom Inc. or any affiliate thereof will own or control any theatres or other facilities or means of distribution in any territories, (v) that any licensee will make payment of any sums payable pursuant to any agreement between such licensee and Paramount or its affiliates, Paramount's obligation under the Revenue Participation Agreement being limited to accounting only for such sums as may be actually received by Paramount from such licensee, (vi) that *Paramount, Viacom Inc. and any of their affiliates will expend any minimum amount or be limited in spending any amount in the marketing, publicizing, promotion, distribution and exploitation of the Covered Pictures and the Index Pictures individually or collectively*, or (vii) *that any Covered Picture or Index Picture will be marketed according to any particular marketing plan or distributed according to any particular release pattern (including so called 'wide releases') in the United States or in any other territory*, other than as expressly set forth in Section 10 of the Revenue Participation Agreement.

(Ex. 53 at BOA-ML00001314, ¶ 4(s) (emphasis added).)

> ### C.     The RPA and the Investment Price Invoices

51.     Under the terms of the RPA, payments of the RPI "are made to Melrose and distributed pursuant to a 'waterfall' to investors in order of seniority."  (TAC ¶ 22.)

52.     The RPI was "first distributed to pay the holders of Senior Class A Notes, then to holders of the subordinated Class B Notes, and finally to holders of the Equity of Melrose."  (TAC ¶ 22.)

53.     The RPA defines "Initial Investment Price Invoice" as "the invoice and certification provided by Paramount to [Melrose] . . . which shall contain the Estimated Net Production Investment and proposed Release Date for such Covered Picture and serve as the basis for [Melrose]'s payment of the Initial Investment Price."  (Ex. 2 at GSS0032961.)

54.     In calculating the Estimated Net Production Investment for a Covered Picture, the Initial Investment Price Invoice sets forth the estimated co-financing amount achieved as of the release date of the relevant Covered Picture.  (*E.g.*, Ex. 9 at GSS0004021.)

55.    The RPA states:  "Paramount shall deliver to Participant [i.e., Melrose] a preliminary Initial Investment Price Invoice for each Covered Picture no later than thirty (30) days prior to the Release Date for such Covered Picture.  No later than seven (7) calendar days prior to the Investment Date for such Covered Picture, Paramount shall deliver to Participant an updated Initial Investment Price Invoice, which updated Initial Investment Price Invoice shall serve as the basis for Participant's payment of the Initial Investment Price for such Covered Picture."  (Ex. 2 at GSS0032923.)

56.    The RPA defines "Investment Price Adjustment Statement" as "a statement prepared by Paramount reflecting a change in the Investment Price for a Covered Picture, whether as a result of an increase or decrease in the Investment Rate, an increase or decrease in Co-Financing Amounts, or as otherwise provided in the Agreement."  (Ex. 2 at GSS0032962.)

57.    The RPA states:  "From and after the Investment Date for a Covered Picture, in the event that there is an increase in the Investment Rate for such Covered Picture . . . or the Estimated Net Production Investment for such Covered Picture increases as a result of Paramount acquiring additional distribution rights for such Covered Picture, Paramount shall prepare and deliver to Participant an Investment Price Adjustment Statement."  (Ex. 2 at GSS0032923.)

58.    The RPA also states:  "From and after the Investment Date for a Covered Picture, in the event that the Co-Financing Amount for such Covered Picture increases (i.e., additional Co-Financing Amounts have been received by Paramount), Paramount shall prepare and deliver to Participant an Investment Price Adjustment Statement."  (Ex. 2 at GSS0032924.)

59.    By May 2006, Paramount had delivered an Initial Price Invoice or Investment Price Adjustment Statement to Melrose LLC for each film in the Slate.  (Ex. 8 at GSS0004019; Ex. 9 at GSS0004021; Ex. 10 at GSS0004024; Ex. 11 at GSS0004288; Ex. 12 at GSS0004304; Ex. 13 at GSS0004485; Ex. 14 at GSS0004552; Ex. 15 at GSS0004631; Ex. 16 at GSS0004747; Ex. 17 at GSS0005504; Ex. 18 at GSS0006462; Ex. 19 at GSS0006676; Ex. 20 at GSS0008573; Ex. 21 at GSS0008819; Ex. 22 at GSS0009173; Ex. 23 at GSS0009229; Ex. 24 at GSS0009362; Ex. 25 at GSS0010055; Ex. 26 at GSS0010280; Ex. 27 at GSS0010316; Ex. 28 at GSS0010452; Ex. 29 at GSS0010659; Ex. 30 at GSS0010975; Ex. 31 at GSS0011259; Ex. 32 at GSS0012571.)

60.    In a section titled "DISTRIBUTION OF THE COVERED PICTURES," the RPA states:  "*Paramount shall have complete authority to license, market, and exploit the Covered Pictures and all rights therein, or to refrain from so doing, in accordance with such sales methods, policies and terms as it may, in its reasonable business judgment determine*." (Ex. 2 at GSS0032937 (emphasis added).)

61.    The RPA further states:

> Paramount has not made and does not make any express or implied representation, warranty, guarantee or agreement to Participant (i) as to the amount of Gross Receipts or the amount of Net Receipts which will be or may be derived from or collected in connection with the distribution and exploitation of the Covered Pictures, or (ii) that there will be any sums payable to Participant hereunder in respect of the Revenue Participation Interests, or (iii) that the Covered Pictures will perform in any particular manner or will be favorably received by exhibitors or by the public or will be distributed (other than with respect to the Release Obligations and in accordance with Paragraph 10) or that any such distribution will be continuous . . . .

(Ex. 2 at GSS0032938.)

14

D.     **The LLC Agreement**

62.     Before deciding to invest, plaintiffs received an Amended and Restated Limited Liability Company Agreement for Melrose LLC (the "LLC Agreement") issued by Melrose in connection with the offering of membership interests (or equity) in Melrose.  (TAC ¶ 67; Ex. 5 at BOA-ML_00035865.)

63.     Section 8.2 of the LLC Agreement states:  "Each of the Issuer and the Manager shall permit any Member, and their respective representatives, upon reasonable prior written notice to the Issuer or the Manager . . . (c) to inspect, examine and make copies of their respective books and records relating to the Trust Estate (as such term is defined in the Indenture) and all other information relating to such Trust Estate at any reasonable time during normal business hours as often as may be reasonably requested . . . ."  (Ex. 5 at BOA-ML_00035905.)

E.     **The Indenture**

64.     Before deciding to invest, plaintiffs received a copy of the July 29, 2004 Indenture, to which Melrose and Wells Fargo Bank, National Association (the "Trustee") were parties, applicable to the Melrose Class A and Class B Notes.   (TAC ¶ 20; Ex. 6 at PPC_MelSlate0088440; Ex. 1 at PPC_MelSlate0004650.)

65.     The Indenture states:  "[E]ach person that purchases or otherwise acquires any Note, shall be deemed, by its purchase or other acquisition thereof, to have represented, warranted and agreed as provided in the legends of such Note . . . Any Note issued upon the transfer, exchange or replacement of Notes shall bear the applicable legend set forth in Exhibit A . . . ."  (Ex. 6 at PPC_MelSlate0088455.)

66. Exhibit A to the Indenture contains a section entitled "**LEGENDS**."  In a subsection under that, titled "**Transfer Restrictions**," Exhibit A to the Indenture states in bold type:  "**The Transferee understands and agrees that any Transfer of this Note herein that does not comply with the requirements of the Indenture and the restrictions of this Note shall be null and void ab initio**."  (Ex. 6 at PPC_MelSlate0088532.)

67. The "**LEGENDS**" section of the Indenture also states in bold type:

> **The Transferee is a sophisticated investor with such knowledge and experience in financial and business matters as to be capable of evaluating the merits and risks of its investment in this Note, and the Transferee and any accounts for which it is acting are each able to bear the economic risk of investing in this Note . . . The Transferee understands that this Note is subject to substantial transfer restrictions imposed by applicable law, the terms of the Indenture, and the terms of this Note.**

(Ex. 6 at PPC_MelSlate0088533.)

68. The "**LEGENDS**" section of the Indenture also states in bold type:

> **The Transferee has received and has carefully read and understands (i) the Private Placement Memorandum dated July 22, 2004 (as supplemented and amended from time to time, the "Private Placement Memorandum") relating to the Notes, including without limitation the "Investor Eligibility and Transfer Restrictions" and "Risk Factors" sections therein and the information set forth relating to the Revenue Participation Agreement, and (ii) the Indenture. *The Transferee has based its decision to purchase this Note solely upon the information contained therein* and not upon any information, if any, provided to it by any of the Issuer, the Manager, Viacom Inc., Paramount Pictures Corporation, Merrill Lynch, Pierce, Fenner & Smith Incorporated, or any of their respective affiliates . . . [collectively, the "Relevant Parties"]. *The Transferee has had access to such financial and other information concerning the Issuer, the Manager, Viacom Inc., Paramount Pictures Corporation and the Securities, in each case as it deemed necessary or appropriate in order to make an informed investment decision with respect to its purchase of this Note, including an opportunity to ask questions of and request information from the Issuer.***

(Ex. 6 at PPC_MelSlate0088533 (emphasis added).)

16

69.     The "**LEGENDS**" section of the Indenture also states in bold type:

**In connection with each purchase of this note:  (a) none of the Relevant Entities is acting as a fiduciary or financial or investment adviser for the Transferee; (b) *the Transferee is not relying (for purposes of making any investment decision or otherwise) upon any advice, counsel or representations (whether written or oral) of any of the Relevant Entities other than the Private Placement Memorandum*; (c) *none of the Relevant Entities has given to the Transferee (directly or indirectly through any other Person) any assurance, guarantee, or representation whatsoever as to the expected or projected success, profitability, return, performance, result, effect, consequence or benefit (including legal, regulatory, tax, financial, accounting, or otherwise) with respect to this Note*; (d) the Transferee has consulted with its own legal, regulatory, tax, business, investment, financial and accounting advisers to the extent it has deemed necessary, and it has made its own investment decisions based upon its own judgment and upon any advice from such advisers as it has deemed necessary and not upon any view express by any Relevant Entity; (e) *the Transferee is purchasing this Note with a full understanding of all the risks thereof (economic and otherwise) as described in the Private Placement Memorandum, or as known to the Transferee through its own experience*, and it is capable of and willing to assume (financially and otherwise) those risks; and (f) the Transferee is a sophisticated investor.**

(Ex. 6 at PPC_MelSlate0088533–34 (emphasis added).)

## III.    Merrill Lynch

70.     Merrill Lynch & Co. ("Merrill") served as the sole placement agent for the Melrose Transaction.  (TAC ¶ 2; Ex. 1 at PPC_MelSlate0004654.)

71.     Merrill itself invested in the Melrose Transaction, purchasing $11.25 million in mezzanine debt (Class B Notes) and $11.25 million in equity interests in Melrose, in addition to other Class B Notes it initially purchased that formed part of a swap transaction with plaintiff Munich Re.  (Ex. 36 at BOA-ML_00182173; Ex. 78 at PTFS00253835; Ex. 119 at 101:24–102:3.)

17

72.     In 2004, Peter Hoffman worked as a Director in Merrill's Global Asset-Based Finance group.  (Ex. 116 at 14:22–15:11.)

73.     Hoffman worked at Merrill for approximately three years, from 2003–2006.  (Ex. 116 at 13:25–14:4, 18:11–13.)

74.     Of the Merrill employees involved in the Melrose Transaction, Hoffman was the most involved in direct interactions with Paramount.  (Ex. 116 at 94:10–21.)

75.     In 2004, Demetrios Tsipras worked in Merrill's Asset-Backed Securities group.  (Ex. 114 at 6:2–4, 11:1–20.)

76.     Tsipras worked at Merrill for approximately 12 years.  (Ex. 114 at 11:5–7.)

77.     In 2004, Eric Alini worked as a Managing Director in Merrill's "Principal Finance" department, which was responsible for investing Merrill's own funds into various transactions.  (Ex. 117 at 19:5–25.)

78.     Alini worked at Merrill for approximately 13 years.  (Ex. 117 at 18:16–17.)

79.     Robert "Bob" Stanley joined Merrill in 2004, and served as a member of Merrill's Melrose Transaction deal team.  (Ex. 116 at 94:3–9.)

80.     Merrill created a model (the "Merrill Model") of possible returns for the Melrose Transaction.  (TAC ¶¶ 75–76; *see, e.g.*, Ex. 33 at PTFS00218410.)

81.     In connection with its Model, Merrill circulated to potential investors a "Historical Data Set," which compiled the performance results of 65 pictures released by Paramount from 1998 through 2003.  (TAC ¶¶ 75–76; *E.g.*, Ex. 33 at PTFS00218424; Ex. 35 at BOA-ML00102157.)

18

82.   The Historical Data Set generally included capitalized disclaimer language, which reads in full:

> NONE OF PARAMOUNT PICTURES CORPORATION, VIACOM INC., ANY PARENT, SUBSIDIARY OR AFFILIATE THEREOF (i) ASSUMES ANY LIABILITY FOR THE ADEQUACY OR ACCURACY OF THE INFORMATION SET FORTH HEREIN OR FOR ANY STATEMENTS MADE WITH RESPECT HERETO, (ii) ASSUMES ANY RESPONSIBILITIES WITH RESPECT TO THE OFFERING CONTEMPLATED HEREBY OR IN RELATION HERETO, OR (iii) ENDORSES OR MAKES ANY RECOMMENDATION FOR THE POTENTIAL INVESTMENT CONTEMPLATED HEREBY OR IN RELATION HERETO.

(Ex. 33 at PTFS00218424; Ex. 35 at BOA-ML_00102157.)

83.   Merrill used the Historical Data Set to create its Model, which simulated the results achieved for 10,000 randomly generated slates of films.  (TAC ¶¶ 75–76; *E.g.*, Ex. 39 at PTFS00221835.)

84.   Merrill circulated its Model to potential investors, along with disclaimers included in an accompanying document entitled "Confidential Modeling Memorandum," "Confidential Modeling Supplement," "Modeling Summary," or "Disclaimers" (the "Disclaimer Documents").  (*E.g.*, Ex. 59 at PTFS00210634–36; Ex. 39 at PTFS00221832; Ex. 33 at PTFS00218410.)

85.   The Disclaimer Documents circulated with the Merrill Model included a capitalized and bolded version of the Paramount Liability Waiver.  (*E.g.*, Ex. 33 at PTFS00218411.)

86.   The Disclaimer Documents included explicit disclaimer language stating that, "[a]lthough the cash flow scenarios set forth in the [Merrill Model] are based on information relating to historical film slates, such scenarios are hypothetical in nature, are not projections and should not be regarded as an indication that the Placement Agent, the Issuer,

Paramount or any other person considers such scenarios to be predictive of future events."  (Ex. 33 at PTFS00218411; *see also* Ex. 59 at PTFS00210634–36; Ex. 39 at PTFS00221832; Ex. 114 at 167:24–169:2.)

87.    The Disclaimer Documents state that, "because the information contained in this [Disclaimer] is based on historical film releases and includes methodology based on a number of arbitrary assumptions subject to significant economic and competitive uncertainties and contingencies which are beyond the control of the Placement Agent, the Issuer or Paramount, *there can be no assurance that the assumptions will prove to be accurate or results similar to the scenarios will be realized in the transaction*."  (Ex. 33 at PTFS00218410 (emphasis added); *see also* Ex. 59 at PTFS00210634–36; Ex. 39 at PTFS00221832.)

88.    The Disclaimer Documents further state:   "The performance of future films may vary materially from those shown.  Accordingly, *no assurances are made or implied as to the reliability of the results of the financial model*."  (Ex. 33 at PTFS00218410 (emphasis added); *see also* Ex. 59 at PTFS00210634–36; Ex. 39 at PTFS00221832.)

89.    The Disclaimer Documents also state:   "**The results reflected in the financial model are based on significant assumptions and are presented for illustrative purposes only**.  Investors in the Issuer will have no interest in the films used to provide the financial results used for this financial model.  This model should not be considered predictive of the results that will be achieved by, or the ultimates that will relate to the Covered Pictures of the Issuer."   (Ex. 33 at PTFS00218411;  *see also*  Ex. 59 at PTFS00210634–36;  Ex. 39 at PTFS00221832.)

90.     Merrill made no representations to the Investors that contradicted the disclaimer language in the Disclaimer Documents.  (Ex. 116 at 191:15–192:25.)

91.     Merrill provided to each of the plaintiffs, prior to each plaintiff's investment in Melrose, versions of a document entitled "Paramount Pictures 2004 and 2005 Schedule of Covered Pictures" or "Paramount Pictures 2004 and 2005 Schedule of Covered Pictures—Co-Financing Detail," (the "Melrose Slate Schedule," or the "Schedule").   Each version included estimated co-financing figures (and information as to the types of co-financing involved) that Paramount had obtained or anticipated to date for the Melrose Slate.  (*E.g.*, Ex. 46 at PPC_MelSlate0092421; Ex. 55 at PTFS00213277; Ex. 62 at PTFS00200640; Ex. 104 at PTFS00225994; Ex. 35 at BOA-ML_00102133; Ex. 80 at PTFS00104387; *see also* Ex. 34 at PTFS00121934; Ex. 116 at 197:9–198:24.)

92.     Each version of the Melrose Slate Schedule received by plaintiffs included an estimate of the total production costs and the total overall co-financing level obtained or anticipated to date for the Melrose Slate; the totals reflected an overall co-financing percentage of approximately 22.75% (without including the impact of the Melrose Transaction itself).  (Ex. 46 at PPC_MelSlate0092422; Ex. 55 at PTFS00213306; Ex. 62 at PTFS00200683; Ex. 104 at PTFS00226023; Ex. 35 at BOA-ML_00102155; Ex. 80 at PTFS00104417.)

93.     Each version of the Melrose Slate Schedule received by plaintiffs included information as to the type of co-financing obtained or anticipated to date for each film, such as "shared pot" or "defeasance deal."  (Ex. 46 at PPC_MelSlate0092421; Ex. 55 at PTFS00213277; Ex. 62 at PTFS00200640; Ex. 104 at PTFS00225994; Ex. 35 at BOA-ML_00102133; Ex. 80 at PTFS00104387.)

94.     A co-financing rate of approximately 22.75% is less than the co-financing rate (approximately 25%) eventually achieved for the Melrose Slate (without including the impact of the Melrose Transaction itself).  (*Cf.* Ex. 7 at PPC_MelSlate0023190; Ex. 62 at PTFS00200683.)

95.     Merrill employees testified that nobody at Merrill or Paramount made any "guarantee or assurance" to the Investors that "Paramount would for the Melrose [S]late achieve the same percentage level of co-financing as [it] had in the past," or that "the precise same mix of co-financing techniques would be used on the Melrose [S]late as had been used in the past." (Ex. 116 at 179:8–182:12, 191:15–192:25; *see also* Ex. 117 at 104:20–105:19.)

96.     Merrill employees testified that nobody at Merrill or Paramount made any representations to the Investors guaranteeing that "the Melrose [S]late would have the same level of territorial presales as Paramount had achieved in the past."  (Ex. 116 at 179:8–182:12; *see also* Ex. 117 at 105:20–106:20.)

97.     Hoffman testified that he understood that "Melrose [would] have no consultation or approval rights on cofinancing transactions."  (Ex. 116 at 183:18–22.)

98.     Both Hoffman and Tsipras testified that Merrill made no representations to the Investors that Melrose would have consultation or approval rights on co-financing transactions.  (Ex. 116 at 183:18–184:3; Ex. 114 at 161:3–23.)

99.     Merrill employees testified that they were fully forthcoming and responsive to all due diligence requests from the Investors.  At no point did Merrill "ever refuse any request of any of the investors for information."  (Ex. 116 at 190:24–191:14; *see also* Ex. 114 at 155:23–156:15, 164:23–165:18; Ex. 117 at 100:9–17.)

100.    Hoffman testified that he believed the Investors were sophisticated "in every respect." (Ex. 116 at 177:17–178:4.)

101.    Alini testified that he was not aware of any effort by anyone at Merrill to provide false or misleading information to the Investors. (Ex. 117 at 100:9–17.)

102.    Tsipras testified that he was not aware of any effort by anyone at Merrill to provide false or misleading information to the Investors. (Ex. 114 at 155:15–157:17.)

103.    Merrill did not receive any requests from anyone at Paramount to withhold any information from the Investors, except to keep the titles of the films in the Historical Data Set confidential. (Ex. 116 at 154:11–155:3, 176:4–177:16; Ex. 114 at 156:16–157:17.)

104.    Hoffman testified that Merrill made no representations to the Investors contradicting the disclaimer language in the PPM that "there can be no assurance that Paramount will implement the same techniques or achieve similar results in the future as it has in the past." (Ex. 116 at 179:8–182:12.)

IV.     **Paramount**

105.    Paramount is a Delaware corporation wholly owned by Viacom Inc. (TAC ¶ 8; Ex. 2 at GSS0032943–44.)

106.    Paramount is a film and television production and distribution studio. For over a century, Paramount has produced, financed, and distributed "feature motion pictures and other audio visual and non-audio visual products." (TAC ¶ 8; Ex. 1 at PPC_MelSlate0004658, 4692.)

107.    Paramount entered into the RPA with Melrose. (Ex. 2 at GSS0032922.)

108.    Paramount provided the Historical Data Set to Merrill, which included "certain film ultimates (the 'Ultimates') prepared by Paramount's management as of

December 31, 2003 as attested to by Paramount's independent auditor, PricewaterhouseCoopers LLP ('PwC'), for the 65 pictures released by Paramount in the calendar years 1998 through 2003 which, in Paramount's estimation, would have met the qualifying criteria for the Covered Pictures as set forth in the Revenue Participation Agreement."  (Ex. 39 at PTFS00221833.)

## V.     Plaintiffs

109.    Plaintiffs are sophisticated investors.  (TAC ¶¶ 2, 23.)

110.    Plaintiffs' decision to invest in Melrose was a "highly analytic one," which included a careful evaluation of the PPM.  (TAC ¶ 23.)

### A.     Marathon

111.    On July 29, 2004, plaintiff Marathon Structured Finance Fund, LP ("Marathon") purchased $7 million of mezzanine debt issued by Melrose, as well as $3 million of equity interests in Melrose.  (TAC ¶ 10.)

112.    Marathon is a Delaware limited partnership.  (TAC ¶ 10.)

113.    Marathon is a subsidiary of Marathon Asset Management.  (Ex. 112 at 5:15–7:7.)

114.    Marathon is a sophisticated, institutional investor.  (TAC ¶¶ 23–24; Ex. 54 at p. 2; Ex. 53 at BOA-ML00001311, ¶ 4(e)(vi).)

115.    In 2004, "Marathon Asset Management, the fund manager for Marathon Structured Finance Fund was an extremely sophisticated asset manager" and "a very sophisticated investor."  (Ex. 112 at 28:20–29:11.)

116.    Marathon was "sophisticated in the area of structured financial products," including "asset-backed securities."  (Ex. 112 at 29:16–23.)

117.    Andrew Springer is a Senior Portfolio Director and Partner at Marathon. (Ex. 112 at 25:19–26:18.)

118.    Springer testified in this case as the corporate representative for Marathon. (Ex. 112 at 15:21–16:3.)

119.    At the time of the Melrose Transaction in 2004, Springer had approximately 17 years of experience "in analyzing, underwriting and purchasing mortgage assets and structured credit." (Ex. 112 at 15:4–9.)

120.    Springer testified that "a lot of Marathon's business is – is buying distressed securities, with probably structures that are more complex" than the one used for the Melrose Transaction. (Ex. 112 at 60:17–61:15; *see also* Ex. 54 at p. 2.)

121.    Springer testified that "the securitization part of the structure" of the Melrose Transaction "wasn't terribly complex." (Ex. 112 at 60:17–61:15.)

122.    Marathon was "sophisticated enough to know that investing in movies is a pretty risky business." (Ex. 112 at 109:18–21.)

123.    In conducting due diligence on Melrose, Marathon used a "research intensive approach," which included a "fundamental bottom-up credit analysis." (Ex. 112 at 59:23–60:11.)

124.    Marathon "understood the capital structure and how [the Melrose Transaction] worked" in terms of structure. (Ex. 112 at 60:17–61:15.)

125.    Marathon hired Houlihan Lokey, an investment bank and advisory firm, in connection with the Melrose Transaction. (Ex. 112 at 53:22–54:13.)

126.    Marathon's primary contact at Houlihan Lokey was Andrew Walter. (Ex. 112 at 56:19–25.)

127.   Marathon hired Houlihan Lokey, in part, because Marathon wanted help from a company with entertainment industry expertise so that it could "really understand[] everything that went into the model and all of the assumptions."  (Ex. 112 at 54:14–55:9, 181:3–11.)

128.   Houlihan Lokey advised Marathon about the entertainment industry.  (Ex. 112 at 181:12–15.)

129.   Houlihan Lokey also helped Marathon with modeling the Melrose Transaction.  (Ex. 45 at BOA-ML_00216240; Ex. 112 at 75:9–23; 181:8–11.)

130.   Marathon hired outside counsel at Jenkins & Gilchrist to review the Melrose deal documentation.  (Ex. 112 at 205:3–20.)

131.   On May 5, 2004, Springer received a draft confidentiality agreement from Merrill.  (Ex. 37 at PTFS00219229.)

132.   Springer testified that someone at Marathon "must have" signed the confidentiality agreement.  (Ex. 112 at 84:5–21.)

133.   The confidentiality agreement states: "[N]one of [Merrill] or Paramount or our respective Representatives . . . makes any express or implied representation or warranty as to the accuracy or completeness of any Proprietary Information."  (Ex. 37 at PTFS00219236; Ex. 112 at 87:2–17.)

134.   The confidentiality agreement also states that Merrill Lynch, Paramount, or their respective representatives would not "have any liability to [Marathon] relating to or arising from" Marathon's use "of any Proprietary Information or for any errors therein or omissions therefrom, except to the extent such Proprietary Information is the subject of representations and warranties contained in any subsequent agreement relating to the proposed

transaction, subject to the terms and conditions of such agreement."  (Ex. 37 at PTFS00219236; Ex. 112 at 87:18–88:13.)

135.    The confidentiality agreement states that "**[a]ny decision to invest in any securities sold by or placed by Merrill Lynch must be based solely upon the information set forth in the offering memorandum related thereto, which should be carefully read by prospective investors in such securities and their advisers.**"  (Ex. 37 at PTFS00219237.)

136.    After signing the confidentiality agreement, Marathon received documents from Merrill relating to the Melrose Transaction.  (Ex. 38 at PTFS00218956.)

137.    Springer reviewed all documents provided to him by Merrill, including the PPM.  (Ex. 112 at 57:7–58:4.)

138.    On May 13, 2004, Springer received from Merrill a "Term Sheet" concerning the Melrose Transaction.  (Ex. 38 at PTFS00218956.)

139.    The Term Sheet states that "[a]ny decision to invest in Issuer *must be based solely upon the information set forth in the PPM, which should be carefully read by prospective investors and their advisers*."  (Ex. 38 at PTFS00218957 (emphasis added).)

140.    Springer testified that he reviewed this language in the Term Sheet.  (Ex. 112 at 91:17–92:19.)

141.    The Term Sheet also states:  "None of Merrill Lynch, Paramount, Viacom, or any of their respective affiliates have any responsibility to update any of the information provided in this summary document.  In addition to the foregoing, the information in this summary document is subject to the **GENERAL DISCLAIMER** set forth at the end hereof." (Ex. 38 at PTFS00218957.)

27

142.   The **GENERAL DISCLAIMER** in the Term Sheet is identical to the Paramount Liability Waiver in the PPM set forth in ¶ 21 above.  (*Cf.* Ex. 38 at PTFS00218971; Ex. 1 at PPC_MelSlate0004651–52.)

143.   Springer testified that he understood the language of this disclaimer and had no objection to it.  (Ex. 112 at 96:19–23, 98:19–99:5.)

144.   Springer testified that Marathon understood "from the outset that it would be up to Paramount's reasonable business judgment how to produce, market and distribute all of the pictures."  (Ex. 112 at 94:23–95:7.)

145.   On May 13, 2004, Springer received an April 2004 draft of the PPM from Merrill.  (Ex. 38 at PTFS00218972.)

146.   Merrill sent Springer the final PPM, which he reviewed.  (Ex. 112 at 121:16–18.)

147.   Springer testified that he understood the risks outlined in the "**Risk Factors**" section of the PPM.  (Ex. 112 at 115:20–120:12.)

148.   Marathon understood that Paramount was "making no assurances that the covered pictures would perform" or "would be distributed" in "any particular manner."  (Ex. 112 at 117:15–22.)

149.   Marathon "understood there might be zero money coming out of this deal."  (Ex. 112 at 117:11–14.)

150.   Marathon understood that "there was no assurance that Paramount would implement the exact same co-financing techniques or achieve the same level of co-financing in the future as it had in the past."  (Ex. 1 at PPC_MelSlate0004684; Ex. 112 at 124:10–24.)

151.    Marathon understood that Paramount "had the right to change their business strategy." (Ex. 1 at PPC_MelSlate0004689; Ex. 112 at 129:15–130:15.)

152.    Marathon understood that Paramount maintained discretion "whether to pursue and consummate *any* co-financing transaction." (Ex. 112 at 126:15–19 (emphasis added).)

153.    Marathon understood that "Paramount generally distributed its motion pictures for theatrical release outside the U.S. and Canada" through UIP. (Ex. 112 at 113:7–25.)

154.    Before deciding to invest, Marathon neither asked for "information specific to the amount of foreign presales on the Melrose Slate" nor sought a specific assurance that the Melrose Slate include "a certain percentage of foreign presales." (Ex. 112 at 221:24–222:11, 223:6–18.)

155.    On May 17, 2004, Stanley sent Springer a version of the Merrill Model, including the Historical Data Set. (Ex. 33 at PTFS00218409.)

156.    This version of the Merrill Model includes a May 5, 2004 version of the Confidential Modeling Memorandum. (Ex. 33 at PTFS00218410.)

157.    On May 17, 2004, Springer also received a second version of the Merrill Model from Merrill. (Ex. 39 at PTFS00221831.)

158.    This version of the Merrill Model includes a May 14, 2004 "Confidential Modeling Supplement." (Ex. 39 at PTFS00221832.)

159.    Springer testified that Marathon "stress tested the model by seeing how it would change under certain conditions." (Ex. 112 at 169:8–11.)

160.    Marathon "felt free to ask Merrill Lynch to rerun the model under different scenarios," and Merrill "accommodated" all such requests from Marathon.  (Ex. 112 at 169:4–17.)

161.    On May 25, 2004, at Springer's request, Tsipras sent Springer an updated Merrill Model, which "contain[ed] the final capital structure."  (Ex. 40 at PTFS00219385.)

162.    The May 25, 2004 version of the Merrill Model sent to Springer stated that "there can be no assurance that the assumptions will prove to be accurate or results similar to the scenarios will be realized in the transaction."  (Ex. 40 at PTFS00219386–87.)

163.    The May 25, 2004 version of the Merrill Model sent to Springer also included a version of the Paramount Liability Waiver, stating:

> **NONE OF PARAMOUNT PICTURES CORPORATION, VIACOM INC., ANY PARENT, SUBSIDIARY OR AFFILIATE THEREOF HAS PREPARED THIS MODEL.   NONE OF PARAMOUNT PICTURES CORPORATION, VIACOM INC., ANY PARENT, SUBSIDIARY OR AFFILIATE THEREOF (i) ASSUMES ANY LIABILITY FOR THE ADEQUACY OR ACCURACY OF THE INFORMATION SET FORTH HEREIN OR FOR ANY STATEMENTS MADE WITH RESPECT HERETO, (ii) ASSUMES ANY RESPONSIBILITIES WITH RESPECT TO THE OFFERING CONTEMPLATED HEREBY OR IN RELATION HERETO, OR (iii) ENDORSES OR MAKES ANY RECOMMENDATION FOR THE POTENTIAL INVESTMENT CONTEMPLATED HEREBY OR IN RELATION HERETO.**

(Ex. 40 at PTFS00219386–87.)

164.    On May 25, 2004, Merrill's Tsipras also sent Springer Excel attachments containing "the results of running 10,000 random slates through the model."   (Ex. 41 at PTFS00221894.)

165.    These Excel files also include the Paramount Liability Waiver that was part of the May 25, 2004 Merrill Model that Springer received.  (Ex. 41 at PTFS0021896.)

166.    On May 28, 2004, at Springer's request, Hoffman sent Springer yet another updated version of the Merrill Model.  In the email, Hoffman offered "to discuss the methods applied to develop these scenarios."  (Ex. 42 at PTFS00220425.)

167.    This version of the Merrill Model included a May 28, 2004 version of the Confidential Modeling Memorandum.  (Ex. 42 at PTFS00220426.)

168.    On June 28, 2004, Hoffman sent Springer a version of the Merrill Model, including a "Rolling 30 film analysis," which showed results of model runs reflecting "equity returns and blended mezz/equity returns for the various sequential slate scenarios."  (Ex. 48 at PTFS00225217; Ex. 112 at 176:8–19.)

169.    On June 30, 2004, Merrill's Stanley sent Springer another version of the Merrill Model.  In his email, Stanley wrote that he had attached "the requested analysis" and that Merrill "will be calling you to discuss."  (Ex. 49 at PTFS00223274.)

170.    This version of the Merrill Model includes the Paramount Liability Waiver quoted in ¶ 163 above.  (*Cf.* Ex. 49 at PTFS00223275; Ex. 40 at PTFS00219386–87.)

171.    On July 1, 2004, Stanley sent Springer an Excel file called "Blended Return Analysis," which showed the modeling results of "different assumptions" and "different types of analysis and stresses" that Marathon had asked Merrill to run.  (Ex. 50 at PTFS00218296; Ex. 112 at 178:4–179:9.)

172.    This version of the Merrill Model includes the Paramount Liability Waiver quoted in ¶ 163 above.  (*Cf.* Ex. 50 at PTFS00218297; Ex. 40 at PTFS00219386–87.)

173.    At Springer's request, Tsipras sent Springer a modified version of the Merrill Model on July 16, 2004.  (Ex. 51 at PTFS00220455.)

174.     This version of the Merrill Model includes the Paramount Liability Waiver quoted in ¶ 163 above.  (*Cf.* Ex. 51 at PTFS00220456; Ex. 40 at PTFS00219386–87.)

175.     Springer testified that Merrill "accommodated" all requests from Marathon to rerun the Merrill Model.  (Ex. 112 at 169:4–17.)

176.     On June 23, 2004, Springer received an email from Walter (of Houlihan Lokey) listing a number of requests Houlihan Lokey wished to make "from Paramount/Merrill," including a request regarding "[b]reakout of size and type of co-financing by picture."  (Ex. 44 at PTFS00253613; Ex. 112 at 187:15–19.)

177.     Springer forwarded the requests from Houlihan Lokey to Merrill.  (Ex. 112 at 185:21–25.)

178.     On June 24, 2004, Hoffman sent Springer and Walter an Excel file listing co-financing information for the films in the Historical Data Set.  (Ex. 43 at PTFS00225160; Ex. 45 at BOA-ML_00216240; Ex. 112 at 182:2–16.)

179.     In a June 25, 2004 internal Paramount fax from Isaac Palmer to Thomas McGrath, two executives at Paramount, Palmer wrote:  "After two days of negotiations over Houlihan's request for more data from us, Marathon has settled on asking for:  1. An annual summary of the Ultimates of the pictures in the 65-film data set, 2. A break-down of the co-financings for the upcoming 2004/2005 slate, and 3. A 'rolling,' i.e. sequential, equity IRR analysis, starting with the first picture of the 65-film data set released in 1998."  Palmer added: "I've put together the first two items.  Shall I fax them to you?"  (Ex. 46 at PPC_MelSlate0092419.)

180.     The June 25, 2004 fax from Palmer to McGrath attached "an annual summary of the Ultimates of the pictures" in the Historical Data Set, as well as a version of the

Melrose Slate Schedule entitled "Paramount Pictures 2004 and 2005 Schedule of Covered Pictures—Co-Financing Detail." (Ex. 46 at PPC_MelSlate0092421.)

181.    On the upper right-hand corner of this document, there is a handwritten notation reading "Marathon ML." (Ex. 46 at PPC_MelSlate0092421.)

182.    This version of the Schedule lists $1,204,664,000 in total "Est. Prod Cost," and $274,076,000 in total estimated "Co-Financing." (Ex. 46 at PPC_MelSlate0092422.)

183.    This version of the Schedule identified when (if any) "Defeasance Deals, Sale/Leasebacks, Tax Credits & Similar transactions" (that is, various types of co-financing) applied to the co-financing estimate for a particular film. (Ex. 46 at PPC_MelSlate009421.) It also reflected that no "Territorial Sales/Acquisitions" had been achieved to date for any films in the Melrose Slate. *Id.*

184.    The next day, on June 26, 2004, Palmer sent an email to Springer, writing: "Andy, I faxed the information you requested to your office this afternoon. I hope it gives you the data you need to make an informed decision about the Melrose investment." (Ex. 47 at BOA-ML_00217734.)

185.    Springer testified that he had "no reason not to believe" that he had received this version of the Melrose Slate Schedule. (Ex. 112 at 196:2–11.)

186.    There is no evidence that, after receiving the Melrose Slate Schedule, Marathon raised with Merrill (or Paramount) any questions or concerns as to the amounts or types of co-financing that had been achieved with respect to the Melrose Slate.

187.    On July 19, 2004, at Springer's request, Hoffman sent an email to Springer and Springer's outside counsel attaching "Initial Investment Price Invoices" for four films to be included in the Melrose Slate. (Ex. 52 at PTFS00218929.)

188.   The Initial Investment Price Invoices contained "information about the estimated direct costs and estimated co-financing amount as of the release date for four of the pictures that were going to be in the Melrose deal."  (Ex. 112 at 207:21–208:10.)

189.   The Initial Investment Price Invoice for "The Stepford Wives" states: "This Covered Picture qualifies as a Shared Pot Picture.  Paramount distributes in the domestic market and its Shared Pot Partner, Dreamworks, distributes in the foreign markets.  Direct Costs are shared 50-50 except for $1,609,418 of scene enhancement costs borne 100% by Paramount."  (Ex. 52 at PTFS00218940.)

190.   The Initial Investment Price Invoice for "Collateral" states: "This Covered Picture qualifies as a Shared Pot Picture.  Paramount distributes in the domestic market and its Shared Pot Partner, Dreamworks, distributes in the foreign markets.  Direct Costs are shared 50-50."  (Ex. 52 at PTFS00218943.)

191.   The Initial Investment Price Invoice for "Mean Girls" states:  "Paramount engaged in certain production activities in Canada with respect to this Covered Picture, and as a result of such activities, Paramount will  be seeking to obtain Canadian labor tax rebates . . . However, there can be no assurance that such tax rebates will in fact be paid to Paramount, or that the timing or expected net proceeds will be as indicated above."  (Ex. 52 at PTFS00218946.)

192.   The Initial Investment Price Invoices note that the "Estimated co-financing amount as of release date" was $0 for two films in the Melrose Slate:  "Mean Girls" and "Manchurian Candidate."  (Ex. 52 at PTFS00218941–47; Ex. 112 at 215:2–216:13.)

193.   Springer testified that Marathon "didn't focus on the percentage" of co-financing, but rather "the characterization" of the co-financing.  (Ex. 112 at 265:13–267:25.)

194.   Springer testified that Marathon understood that it was not "being guaranteed [or] assured a particular mix" of co-financing techniques to be employed by Paramount in connection with the Melrose Slate.  (Ex. 112 at 201:2–22; *see also* Ex. 112 at 94:23–95:7.)

195.   Springer testified that Marathon also understood that "Melrose had no consultation or approval rights with respect" to potential co-financing transactions for the Melrose Slate.  (Ex. 112 at 126:15–23.)

196.   Marathon reviewed the RPA before the closing of the Melrose Transaction.  (Ex. 112 at 246:22–24.)

197.   Marathon understood that Paramount had "complete authority to license, market, and exploit the Covered Pictures and all rights therein, or to refrain from so doing, in accordance with such sales methods, policies and terms as it may, in its reasonable business judgment determine."  (Ex. 2 at GSS0032937; Ex. 112 at 247:5–18.)

198.   Marathon understood that Paramount had "not made and does not make any express or implied representation, warranty, guarantee or agreement to Participant" that "the Covered Pictures will perform in any particular manner or will be favorably received by exhibitors or by the public or will be distributed (other than with respect to the Release Obligations and in accordance with Paragraph 10) or that any such distribution will be continuous."  (Ex. 2 at GSS0032938; Ex. 112 at 249:6–25.)

199.   At the time of Springer's deposition, Marathon had "no information" demonstrating "that prior to the closing a decision had been made at Paramount not to seek foreign presales."  (Ex. 112 at 221:19–223:18.)

200.    At the time of Springer's deposition, Marathon could not identify any document, dated prior to the closing of the Melrose Transaction, indicating that Paramount had decided to change its approach to risk mitigation or co-financing.  (Ex. 112 at 155:20–156:2.)

201.    Springer testified that he could not recall a specific meeting or phone call during which Palmer (of Paramount) or Hoffman (of Merrill) gave him an assurance that Paramount would continue to operate its business in the future as it had in the past.  (Ex. 112 at 156:3–157:8.)

202.    Marathon acknowledged that Paramount never talked "specifics" about the "percentage of foreign sales, as opposed to [shared] pot deals," and did not recall asking, before the closing, for a specific assurance that the Melrose Slate would include "a certain percentage of foreign presales."  (Ex. 112 at 108:24–109:7, 221:19–223:18.)

203.    Nor did Marathon ever ask Paramount or Merrill "to put into writing a specific representation . . . about the amount of co-financing they would do" or "about the types of co-financing they would do."  (Ex. 112 at 109:10–17.)

204.    Marathon signed the Subscription Agreement.  (*See* Ex. 53 at BOA-ML00001325.)

**B.    NewStar**

205.    On July 29, 2004, plaintiff NewStar Financial, Inc. ("NewStar") purchased $10 million of mezzanine debt (Class B Notes) issued by Melrose.   (TAC ¶ 9.)

206.    NewStar is a Delaware corporation.  (TAC ¶ 9.)

207.    NewStar is an institutional investor.  (TAC ¶¶ 23–24.)

208.    In 2004, NewStar "was in the business collectively of making non-investment grade loans and investments," as well as low investment grade loans and investments. (Ex. 111 at 38:18–39:4.)

209.    In 2004, NewStar "had extensive risk management experience and a disciplined, independent credit approval process."  (Ex. 111 at 43:12–21.)

210.    NewStar's due diligence process "was rigorous because it incorporated best practices from the institutions" where NewStar's staff had previously worked, including JPMorgan, Citigroup, Fleet, and ING Bank.  (Ex. 111 at 45:9–19.)

211.    In   2004,   Phillip   "Buck"   Burnaman—NewStar's   corporate representative—was head of the asset-backed securities team at NewStar.  (Ex. 111 at 34:7–20, 73:18–20.)

212.    In 2004, Thomas Calhoun was a Managing Director at NewStar.  (Ex. 111 at 48:20–49:14, 73:18–20; Ex. 118 at 14:16–15:14.)

213.    Calhoun focused on asset-backed securities ("ABS"), and worked as the point person from NewStar responsible for the Melrose Transaction.  Calhoun reported to Burnaman.  (Ex. 111 at 48:20–49:14, 73:18–20; Ex. 118 at 14:16–15:14.)

214.    Before joining NewStar, Calhoun had participated in a number of film transactions.  (Ex. 111 at 54:23–55:14.)

215.    NewStar engaged Dechert LLP as outside counsel in connection with the Melrose Transaction.  (Ex. 111 at 98:11–24; Ex. 118 at 130:9–17.)

216.    NewStar also communicated with counsel at Sidley Austin LLP in connection with the Melrose Transaction.  (Ex. 60 at PTFS00214020; Ex. 63 at PTFS00210182; Ex. 118 at 21:24–22:6; Ex. 111 at 90:16–91:10.)

217.   Calhoun spoke with Moody's in connection with the Melrose Transaction. (Ex. 60 at PTFS00214020; Ex. 118 at 21:24–22:6.)

218.   NewStar's due diligence process for a specific transaction generally began with a "48 hour meeting," which was a "preliminary meeting with senior credit officers to run through the outline of the transaction."  (Ex. 111 at 35:5–23.)

219.   If a particular transaction was approved at the "48 hour meeting," NewStar's ABS team would work with "the credit side of NewStar" to "do more complete underwriting" and to "develop a package of our complete credit file and present that to the investment committee for their ultimate signoff."  (Ex. 111 at 35:24–36:8.)

220.   Before NewStar invested in a particular transaction, the transaction had to be approved by both an Underwriting Committee and an Investment Committee.  (Ex. 68 at PTFS00204245–46; Ex. 111 at 106:24–107:3.)

221.   On July 8, 2004, Calhoun sent an email to Burnaman (among others), stating:  "I just signed a confidentiality agreement with a friend of mine at Merrill Lynch to look at up to $20 million of Class B Notes of Melrose Investors, LLC ('Melrose') . . . I know the underwriters, attorneys and the asset class very well so I'm going to do some digging around and develop a 48 hr. memo if warranted."  (Ex. 56 at PTFS00233379–80.)

222.   On July 8, 2004, Calhoun received an email from Stanley (of Merrill) attaching a number of documents concerning the Melrose Transaction, including a "Transaction Summary."  (Ex. 55 at PTFS00213317.)

223.   The Transaction Summary states (bolded in the original):   "**This Summary does not constitute an offer of, or an invitation to subscribe for or purchase any securities of the Issuer, which can only be made by the PPM.**"  (Ex. 55 at PTFS00213317.)

224.    The Transaction Summary also states:  "The information contained herein is subject to and qualified in its entirety by reference to the PPM which contains a full description of the Issuer, including various investment considerations, risk factors and conflicts of interest related to investment in the Issuer, as well as the documents referred to therein . . . *Any decision to invest in the Issuer must be based solely upon information set forth in the PPM, which should be carefully read by prospective investors and their advisors*."  (Ex. 55 at PTFS00213317 (emphasis added).)

225.    The Transaction Summary also includes the Paramount Liability Waiver quoted in ¶ 21 above.  (*Cf.* Ex. 55 at PTFS00213317; Ex. 1 at PPC_MelSlate0004651–52.)

226.    In a section titled "**KEY STRUCTURAL BENEFITS**," the Transaction Summary states:  "Melrose shares pro rata, pari passu in all Paramount 'co-financings' which are credited against the Production Cost of each film (if applicable).  Co-financings reduce Paramount's and Melrose's base investment amount."  (Ex. 55 at PTFS00213318; *see also* Ex. 57 at PTFS00210176.)

227.    NewStar acknowledged that, "[t]o the extent that Paramount was in fact pari passu," it was fair to say that, "if Paramount used a lower degree of co-financing" for the Melrose Slate, "those pictures were riskier for Paramount as well as the investors."  (Ex. 111 at 83:23–85:16.)

228.    In addition to the "Transaction Summary," the July 8, 2004 email from Stanley to Calhoun included:  (1) an April 2004 draft of the PPM (Ex. 55 at PTFS00213191); (2) the Melrose Slate Schedule (Ex. 55 at PTFS00213277); (3) the Historical Data Set (Ex. 55 at PTFS00213309); and (4) a summary of results achieved for 10,000 randomly generated slates of films simulated by the Merrill Model.  (Ex. 55 at PTFS00213323.)

229.    Calhoun reviewed the PPM carefully.  (Ex. 118 at 83:16–24.)

230.    Calhoun testified that he carefully read the "**Risk Factors**" and "**Certain Investment Considerations**" sections of the PPM.  (Ex. 118 at 83:16–24.)

231.    Burnaman also received and reviewed the final PPM.  (Ex. 71 at PTFS00253619.)

232.    It was NewStar's practice to review all transaction documents carefully. (Ex. 111 at 93:18–21.)

233.    Before making its investment decision, NewStar understood that "Paramount will control all decisions (i.e., business, creative or otherwise) relating to the development and production of each Covered Picture as well as decisions whether to pursue and consummate any co-financing transaction, and the issuer has no consultant or approval rights with respect thereto."  (Ex. 1 at PPC_MelSlate0004689; Ex. 111 at 133:3–20; Ex. 118 at 96:7–97:25.)

234.    Calhoun understood that NewStar "had no ability to dictate to Paramount production or distribution decisions."  (Ex. 118 at 99:10–13.)

235.    Calhoun "understood before the investment was made that Paramount generally distributed internationally through UIP."  (Ex. 118 at 85:19–86:18.)

236.    On July 14, 2004, Calhoun forwarded a version of the Merrill Model to colleagues at NewStar, in a file entitled "model with disclaimer.zip."  (Ex. 59 at PTFS00210633.)

237.    This version of the Merrill Model includes the Paramount Liability Waiver quoted in ¶ 163 above.  (*Cf.* Ex. 59 at PTFS00210634–36; Ex. 40 at PTFS00219386–87.)

238.   In addition to the Merrill Model, NewStar prepared an "in-house statistical model based on [NewStar's] analysis of Paramount's historical slate performance."  (Ex. 65 at PTFS00210282.)

239.   NewStar's in-house model allowed NewStar to analyze "the relationship between three key profitability drivers, which are, production costs, lifetime revenues, and total print and advertising expenses."  (Ex. 65 at PTFS00210282.)

240.   As part of its internal modeling process, NewStar also ran Monte Carlo simulations, "with the objective being to introduce some level of volatility into the historical performance to determine how the structure performs under different scenarios and on average."  (Ex. 65 at PTFS00210283.)

241.   On July 14, 2004, Calhoun circulated a "48-Hour Memo" concerning the Melrose Transaction in preparation for a "48-hour meeting" to be held on July 15, 2004.  (Ex. 57 at PTFS00210172; Ex. 72 at PTFS00169835.)

242.   The 48-Hour Memo states:   "Each picture is a separate and distinct product with its financial success dependent upon many factors, among which cost and public response are of fundamental importance."  (Ex. 57 at PTFS00210173.)

243.   On July 14, 2004, in response to an email received from Calhoun, Hoffman (of Merrill) wrote to Calhoun:  "for call, these are stats I have on the B Notes:  13.% loss frequency / loss severity is 49% / EL is 6.3% / Average risk-adjusted yield is 8.3%."  (Ex. 58 at PTFS00213912.)

244.   On July 16, 2004, at Calhoun's request, Hoffman sent Calhoun "publicly available information regarding Viacom/Paramount and industry info."   (Ex. 61 at PTFS00209702.)

41

245.   In this email to Calhoun, Hoffman writes:   "During the due diligence process, you requested from us various information, including but not limited to model results, scenarios or outputs.  As a reminder, the data or numbers provided as a result of these requests is subject to the [D]isclaimer attached to the Confidential Modeling Memorandum dated May 5, 2004.  For your convenience, a copy of that [D]isclaimer is attached to this email.  Please be aware that all future requests for numerical information, statistical analysis or model output are also subject to this [D]isclaimer."  (Ex. 61 at PTFS00209702, PTFS00209827.)

246.   On July 8, 2004, Stanley (of Merrill) sent Calhoun a version of the Melrose Slate Schedule.  (Ex. 55 at PTFS00213277.)

247.   Calhoun testified that he "would have seen" this version of the Schedule. (Ex. 118 at 74:16–25.)

248.   This version of the Schedule provided NewStar with an estimate of $1,204,664,000 in "2004 & 2005 In Production & Greenlit totals," and an estimate of $274,126,000 in total "Co-Financing."  (Ex. 55 at PTFS00213306.)

249.   This version of the Schedule included information as to the type of co-financing obtained for each film, such as "shared pot" or "German defeasance deal."  (Ex. 55 at PTFS00213277.)

250.   On July 16, 2004, Hoffman sent Calhoun an email attaching another version of the Melrose Slate Schedule.  (Ex. 62 at PTFS00200621.)

251.   This version of the Schedule provided NewStar with an estimate of $1,204,664,000 in "2004 & 2005 In Production & Greenlit totals," and an estimate of $274,126,000 in total "Co-Financing."  (Ex. 62 at PTFS00200683.)

252.    This version of the Schedule included information about the type and amount of co-financing achieved to date for individual films to be included in the Melrose Slate. (Ex. 62 at PTFS00200640.)

253.    After receiving the Melrose Slate Schedule, NewStar was aware that, as of May 27, 2004, the total co-financing achieved to date for the Melrose Slate was approximately 22.75% of total production costs.  (Ex. 111 at 168:12–169:20.)

254.    There is no evidence that after receiving either version of the Melrose Slate Schedule, NewStar raised with Merrill (or Paramount) any questions or concerns about the amounts or types of co-financing that had been achieved with respect to the Melrose Slate.

255.    Calhoun testified that, before the closing, NewStar reviewed "the percentage of cofinancing as it related to the estimated production costs for the films to be included in the slate."  (Ex. 118 at 77:20–25.)

256.    The total percentage of co-financing eventually achieved for the actual Melrose Slate (apart from the effect of the Melrose Transaction itself) was in fact higher than the total percentage of co-financing (22.75%) disclosed in versions of the Melrose Slate Schedule sent to NewStar.  (*Cf.* Ex. 7 at PPC_MelSlate0023190; Ex. 55 at PTFS00213306; Ex. 62 at PTFS00200683; *see also* Ex. 111 at 168:12–169:20.)

257.    On July 26, 2004, NewStar's Underwriting Committee held a meeting concerning the Melrose Transaction.  (Ex. 68 at PTFS00204246.)

258.    The internal minutes of the Underwriting Committee meeting state: "Expected loss (EL) for this transaction is estimated at **7.46%** based on a cumulative default frequency of **16.5%** and an expected loss given default (LGD) of **45%**.  The EL was calculated using the weighted average of the Merrill Lynch model and an internally developed model that

43

accounts for the statistical distribution and correlation between key performance drivers." (Ex. 68 at PTFS00204246.)

259.    On July 27, 2004, Calhoun circulated a memorandum concerning the Melrose Transaction that identified "**Key Risks**." (Ex. 64 at PTFS00233296–297; Ex. 118 a 91:10–24.)

260.    Among other "**Key Risks**," the memorandum states: "All distribution and marketing-related decisions are at the discretion of Paramount." (Ex. 64 at PTFS00233297; Ex. 118 at 91:10–92:8.)

261.    In the "**Key Risks**" section, the memorandum also includes a section titled "Slate Risk," which states that, "although we have performed numerous monte carlo simulations of the projected slate, it is possible that we may jointly get a grossly underperforming slate that may put our Notes at risk of repayment – mitigated by our cumulative expected loss calculation of 7.5% leading to an estimated IRR of 10.1%." (Ex. 64 at PTFS00233297.)

262.    Calhoun also circulated a July 27, 2004 memorandum titled "Credit Proposal – Melrose Investors, LLC" (the "Credit Memo"). (Ex. 65 at PTFS00210273.)

263.    Burnaman testified that the Credit Memo "was the synthesis of the transaction and the due diligence that the business people at NewStar and the credit people at NewStar had done with respect to the security or the loan that was presented to the investment committee of NewStar, which was the final approval prior to making an investment or loan." (Ex. 111 at 147:20–148:8.)

264.    The Credit Memo contains a section titled "**Risk and Mitigants Summary**." (Ex. 65 at PTFS00210279–80.)

265.     Among other things in the "**Risks and Mitigants Summary**" section, the Credit Memo states that "*Melrose has no input into the marketing and distribution of Covered Pictures. Moreover, Melrose has limited means of verifying that Paramount is marketing and distributing the Covered Pictures in such a way that maximizes Gross Receipts.*"  (Ex. 65 at PTFS00210280.)

266.     The Credit Memo also includes a section titled "**Recommendation and Summary Rationale**."  (Ex. 65 at PTFS00210280–81.)

267.     In the "**Recommendation and Summary Rationale**" section, the Credit Memo states that "Paramount, by virtue of its ownership of up to 75% of the residual that is not owned by Melrose, is highly incented to act in a manner that maximizes Net Receipts – our source of repayment."  (Ex. 65 at PTFS00210281.)

268.     In the same section, the Credit Memo states that "Melrose shares pro rata, pari passu in all Paramount 'co-financings' which are credit against the Production cost of each film (if applicable).  Co-financings reduce Paramount's and Melrose's base investment amount." (Ex. 65 at PTFS00210281.)

269.     On July 28, 2004, NewStar's Investment Committee held a meeting about the Melrose Transaction.  (Ex. 68 at PTFS00204245.)

270.     The internal minutes of the Investment Committee meeting state: "Expected loss (EL) for this transaction is estimated at **7.46%** based on a cumulative default frequency of **16.5%** and an expected loss given default (LGD) of **45%**.  The EL was calculated using the weighted average of the Merrill Lynch model and an internally developed model that accounts for the statistical distribution and correlation between key performance drivers."  (Ex. 68 at PTFS00204245.)

271.    Notes from the Investment Committee meeting state:  "Cap for us on the downside – i.e. we are only in it to the extent of our investment."  (Ex. 66 at PTFS00146273.)

272.    According to Burnaman, at the Investment Committee meeting, NewStar staff discussed "a number of risks associated with making this investment."   (Ex. 111 at 149:6–20.)

273.    A risk discussed at the Investment Committee meeting was "the reliability of historical performance as [a] projection of future performance."  (Ex. 111 at 149:6–20.)

274.    Another risk discussed at the Investment Committee meeting was NewStar's "dependence on Paramount."  (Ex. 111 at 149:6–20.)

275.    Another risk discussed at the Investment Committee meeting was "the estimated grade of return on the transaction."  (Ex. 111 at 149:6–20.)

276.    Hours before the Melrose Transaction closed, Calhoun continued to ask due diligence questions of Merrill.  (Ex. 69 at PTFS00233514; Ex. 70 at PTFS00210198; Ex. 111 at 112:16–19.)

277.    Shortly before the closing of the Melrose Transaction, Calhoun participated in a conference call with Paramount.  (Ex. 118 at 22:16–25, 25:6–24.)

278.    Calhoun could not recall the names of any individuals on the conference call from Paramount.  (Ex. 118 at 23:1–3.)

279.    Calhoun testified that this conference call "was fairly short" and "fairly high level."  (Ex. 118 at 25:6–13.)

280.    Calhoun could not recall any discussion about Paramount's co-financing efforts or strategies during the course of the conference call.  (Ex. 118 at 25:6–9.)

281.    Apart from this single conference call, Calhoun was not aware of any direct communication between Paramount and NewStar.  (Ex. 118 at 138:24–139:10.)

282.    Nor could Burnaman recall "ever speaking to anybody directly at Paramount." (Ex. 111 at 131:19–21.)

283.    NewStar could not recall receiving any representation from Paramount or Merrill that "Paramount would take any particular steps with respect to risk mitigation."  (Ex. 111 at 131:19–21, 153:20–154:9.)

284.    Calhoun testified that NewStar's "information primarily, predominantly or basically all the time was coming from Merrill"—not from Paramount.  (Ex. 118 at 138:24–139:10.)

285.    Calhoun could not recall receiving information from Merrill about a "specific threshold" of co-financing that would be required for the Melrose Slate.  (Ex. 118 at 110:11–21.)

286.    NewStar acknowledged that the PPM disclosed that "there can be no assurance that Paramount will implement the same [co-financing] techniques or achieve similar results in the future as it has in the past." (Ex. 111 at 129:18–130:11.)

287.    Calhoun acknowledged that he understood that Paramount was making no assurance that it would implement the same techniques in the future as it had in the past.  (Ex. 118 at 95:5–14.)

288.    NewStar signed the Subscription Agreement.  (*See* Ex. 67 at BOA-ML00001395, BOA-ML00001416.)

47

C.    Allianz

289.    On October 13, 2004, plaintiff Allianz Risk Transfer AG ("Allianz") entered into a total return swap transaction with Hypo Public Finance Bank (formerly known as Hypo Real Estate Bank International, or "Hypo") with respect to $7.125 million of mezzanine debt (Class B Notes) and $3 million of equity interests in Melrose.  (TAC ¶ 12.)

290.    On June 30, 2006, Allianz acquired the underlying mezzanine debt (Class B Notes) for $7.125 million, as well as the underlying equity interests for $3 million.  (TAC ¶ 12.)

291.    Allianz is an insurance company organized under the laws of Switzerland. (TAC ¶ 12.)

292.    Allianz is an institutional investor.  (TAC ¶¶ 23–24.)

293.    Prior to the Melrose Transaction, Allianz had previously made two other film-related investments and was familiar with the risks associated with investing in films.  (Ex. 115 at 56:25–57:7; Ex. 119 at 39:24–41:5.)

294.    Joseph Flynn—Allianz's corporate representative—is currently a Principal at Allianz.  (Ex. 115 at 12:16–13:16.)

295.    Flynn joined Allianz in 1998.  In 2004, when Allianz conducted due diligence on the Melrose Transaction, Flynn was a "Transactor" in Allianz's New York office. (Ex. 115 at 12:5–10, 18:3–15.)

296.    William Seery joined Allianz in approximately 1999.   (Ex. 119 at 13:20–21.)

297.    In 2004, Seery was one of two Principals in Allianz's New York office. (Ex. 115 at 15:4–6.)

298.    Seery was the lead Transactor from Allianz on the Melrose Transaction, serving as the primary point of contact with Merrill.  (Ex. 119 at 41:9–42:3.)

299.    Before working on the Melrose Transaction, Seery helped to underwrite two film securitizations in which Allianz participated.  (Ex. 119 at 39:24–41:5.)

300.    In 2004, Thomas Lamb was the second of two Principals in Allianz's New York office.  (Ex. 115 at 15:4–6.)

301.    Lamb was a Transactor at Allianz, whose "function was similar" to that of Seery.  (Ex. 119 at 62:6–13.)

302.    János Blum was Allianz's chief actuary at the time of the Melrose Transaction.  (Ex. 115 at 23:21–24:4.)

303.    Blum prepared the "Analytic Sign-Off" for Allianz's participation in the Melrose Transaction.  (Ex. 93 at PTFS00001178.)

304.    Allianz also hired an independent consultant, Harris Maslansky, to serve in an advisory capacity in evaluating the Melrose Transaction.  (Ex. 115 at 57:11–20; Ex. 119 at 42:24–43:20.)

305.    As of 2004, Maslansky "had a lot of different positions within the film industry," had "been involved in [the film] sector for over thirty years," and "was involved in the two transactions that [Allianz] successfully commuted" prior to the Melrose Transaction.  (Ex. 83 at PTFS00085143; Ex. 78 at PTFS00253834–35; Ex. 115 at 57:17–25.)

306.    On or around June 29, 2004, Allianz entered into a confidentiality agreement with Merrill.  (Ex. 74 at BOA-ML_00102198.)

307.    By executing the confidentiality agreement, Allianz acknowledged that "none of [Merrill] or Paramount or our respective Representatives . . . makes any express or

implied representation or warranty as to the accuracy or completeness of any Proprietary Information." (Ex. 73 at BOA-ML_00266139.)

308.    By executing the confidentiality agreement, Allianz acknowledged that Merrill, Paramount, or their respective representatives would not "have any liability to [Allianz] relating to or arising from" Allianz's use "of any Proprietary Information or for any errors therein or omissions therefrom, except to the extent that such Proprietary Information is the subject of representations and warranties contained in any subsequent agreement relating to the Proposed Transaction, subject to the terms and conditions of such agreement."   (Ex. 73 at BOA-ML_00266139.)

309.    By executing the confidentiality agreement, Allianz acknowledged that "**[a]ny decision to invest in any securities sold by or placed by Merrill Lynch must be based solely upon the information set forth in the offering memorandum related thereto, which should be carefully read by prospective investors in such securities and their advisers.**" (Ex. 73 at BOA-ML_00266140.)

310.    After the confidentiality agreement was executed, Seery received the Historical Data Set and Merrill Model from Merrill.  (Ex. 35 at BOA-ML_00102157–97.)

311.    In addition to the Historical Data Set and Merrill Model it received from Merrill, Allianz created its own internal model of potential outcomes of the Melrose Transaction. (TAC ¶¶ 75–76; Ex. 115 at 59:17–61:11.)

312.    Flynn was responsible for creating and updating Allianz's internal model. (Ex. 77 at PTFS00086331; Ex. 115 at 18:3–15.)

313.   Allianz created an internal model "to be creative in our own house so [Allianz would] have control over it," and to "demonstrate[] knowledge" of the Melrose Transaction.  (Ex. 115 at 59:17–61:11.)

314.   Based on its internal modeling of the transaction, Allianz understood that there was at least a 14.69% probability that "Allianz would either break even or lose money" in Melrose.  (Ex. 93 at PTFS00001178; Ex. 88 at PTFS00086459; Ex. 78 at PTFS00253838; Ex. 115 at 131:25–132:6; Ex. 119 at 96:12–97:15.)

315.   Allianz also received and reviewed an independent model of potential outcomes of the Melrose Transaction from Maslansky (the "Maslansky Model").  (Ex. 119 at 92:17–93:9.)

316.   The Maslansky Model incorporated data from the Historical Data Set. (Ex. 119 at 92:17–93:9.)

317.   The Maslansky Model also incorporated "generic data," which included film performance numbers for films from studios other than Paramount.   (Ex. 84 at PTFS00085900; Ex. 87 at PTFS00087719; Ex. 76 at PTFS00086218, PTFS00086241.)

318.   Maslansky worked "intensively" with the Allianz employees responsible for modeling, and also offered "to discuss the comparison with the Merrill model whenever" Allianz wished to discuss such a comparison.  (Ex. 87 at PTFS00087719; Ex. 120 at 17:4–7.)

319.   Seery testified that Allianz was fully satisfied with the services provided to it by Maslansky.  (Ex. 119 at 42:24–43:20.)

320.   On July 26, 2004, Hoffman (of Merrill) sent Seery the final PPM.  (Ex. 75 at PTFS00087136.)

321.     That same day, Seery forwarded the PPM to Maslansky, who reviewed the document, including its sections on risk mitigation techniques.  (Ex. 75 at PTFS00087136; Ex. 120 at 18:20–19:2, 51:25–52:16, 59:11–21.)

322.     Flynn testified that, for information regarding the potential co-financing to be included in the Melrose Slate, Allianz "relied on the prospectus," and used any information outside of the prospectus "[o]nly in conjunction with the prospectus."  (Ex. 115 at 56:7–15.)

323.     Before deciding to invest, Allianz personnel reviewed the "**Risk Factors**" section of the PPM in detail. (Ex. 115 at 76:14–17, 82:15–22; Ex. 119 at 105:20–106:11; Ex. 120 at 60:2–14.)

324.     Allianz understood that "Paramount will control all decisions, business, creative or otherwise relating to the development and production of each covered picture as well as the decisions whether to pursue and consummate any co-financing transaction."  (Ex. 115 at 83:5–21.)

325.     The PPM sent to Allianz states that "*there can be no assurance Paramount will implement the same techniques or achieve similar results in the future as it has in the past*."  (Ex. 75 at PTFS00087174 (emphasis added); Ex. 115 at 78:3–8.)

326.     Flynn could not identify any statement to the contrary relied upon by Allianz in deciding to invest in the Melrose Transaction.  (Ex. 115 at 78:14–79:2.)

327.     On June 29, 2004, Merrill sent Seery a version of the Melrose Slate Schedule.  (Ex. 35 at BOA-ML_00102133.)

328.     This version of the Schedule provided Allianz with an estimate of $1,204,664,000 in "2004 & 2005 In Production & Greenlit totals," and an estimate of $274,126,000 in total "Co-Financing."  (Ex. 35 at BOA–ML00102155.)

329.    This version of the Schedule included information as to the type of co-financing obtained for each film, such as "shared pot" or "German defeasance deal."  (Ex. 35 at BOA–ML00102133.)

330.    On August 16, 2004, Merrill sent Seery another version of the Melrose Slate Schedule.  (Ex. 81 at PTFS00121933.)  That same day, Seery forwarded the Schedule to Lamb and Maslansky.  (Ex. 80 at PTFS00104385.)

331.    This version of the Schedule provided Allianz with an estimate of $1,204,664,000 in "2004 & 2005 In Production & Greenlit totals," and an estimate of $274,126,000 in total "Co-Financing."  (Ex. 80 at PTFS00104417.)

332.    This version of the Schedule included information about the type and amount of co-financing achieved to date for individual films to be included in the Melrose Slate. (Ex. 80 at PTFS00104387.)

333.    Maslansky testified that he believed he "would have reviewed the estimated co-financing numbers included in" the Melrose Slate Schedule as part of his analysis of the Melrose Transaction.  (Ex. 120 at 76:7–15.)

334.    On August 17, 2004, Maslansky sent Seery and Lamb an Excel file entitled "Comparison Future – Hist.xls."  (Ex. 82 at PTFS00087800.)  The "Comparison" chart includes a row for "Percentage of known cofinance," noting that the percentage of known co-finance for the "Melrose Pictures" (23%) was approximately half that of the percentage of known co-finance for the "Historical" pictures (47%).  (Ex. 82 at PTFS00087801; Ex. 120 at 108:13–109:3.)

335.    After receiving various versions of the Melrose Slate Schedule, Allianz was aware that the co-financing total planned for the Melrose Slate was approximately 22.75%.

Allianz considered this information as part of its investment process. (Ex. 115 at 106:17–107:21.)

336. There is no evidence that, after receiving either version of the Melrose Slate Schedule, Allianz raised with Merrill (or Paramount) any questions or concerns about the amounts or types of co-financing achieved to date with respect to the Melrose Slate.

337. Allianz's corporate representative acknowledged that the level of co-financing eventually achieved for the actual Melrose Slate was in fact higher than the level of co-financing disclosed in the Melrose Slate Schedule, which Allianz considered during its pre-closing diligence process. (*Cf.* Ex. 7 at PPC_MelSlate0023190; Ex. 115 at 106:17–108:5.)

338. Allianz had an Underwriting Committee, which decided whether Allianz would continue to pursue a specific new transaction. (Ex. 115 at 113:11–13; Ex. 119 at 51:3–13.)

339. In an August 16, 2004 email to the Underwriting Committee, Lamb wrote that the Melrose Transaction was "structured to allow Paramount Pictures to share 25% of their upside/downside in a slate of films." (Ex. 79 at PTFS00085056.)

340. Allianz recognized that "Paramount has an alignment of interest in controlling cost and acting rationally due to their majority 75% participation in the covered pictures." (Ex. 78 at PTFS00253831; Ex. 119 at 57:3–11; *see also* Ex. 83 at PTFS00085143.)

341. Before the closing, Seery recognized that "there were a lot" of risks involved with the Melrose investment. (Ex. 119 at 44:25–46:5.)

342. In the "Analytic Sign-off" prepared regarding the Melrose Transaction, Blum noted that "the main risk" was "the economic success of the films." (Ex. 93 at PTFS00001178.)

343.    Allianz acknowledged that the primary risk of the Melrose Transaction was film performance.  (Ex. 115 at 64:7–23.)

344.    Allianz acknowledged that investing in films is a "risky investment."  (Ex. 115 at 64:7–23.)

345.    Allianz understood that "most movies either lose money or produce a small profit."  (Ex. 115 at 130:12–131:7.)

346.    Before the closing, Allianz knew there was a risk that the Melrose Slate would not include any "blockbusters," and knew that if "no blockbusters get selected, the probability of losing money increases."  (Ex. 88 at PTFS00086459; Ex. 115 at 131:8–16.)

347.    On August 16, 2004, Allianz created an internal "Deal Memo" summarizing Allianz's internal analysis of the terms of the Melrose Transaction.  (Ex. 78 at PTFS00253822.)

348.    The Deal Memo states:  "Paramount generally distributes its motion pictures for theatrical release throughout the U.S. and Canada through UIP."  (Ex. 78 at PTFS00253829; Ex. 115 at 70:22–73:5, 139:3–15.)

349.    Prior to its investment in the Melrose Transaction, Allianz was aware that Paramount retained control over distribution decisions.  (Ex. 115 at 74:11–25.)

350.    The Deal Memo identified a risk of an "[i]ncrease of production and acquisition costs and passive investment risk."  (Ex. 78 at PTFS00253831; *see also* Ex. 86 at PTFS00086046.)

351.    The Deal Memo states that "[e]ach picture is a separate and distinct product with its financial success dependent upon many factors among which cost and public response are of fundamental importance."  (Ex. 78 at PTFS00253829.)

352.     The Deal Memo also identified a "risk" that the Melrose investment could conclude with a "negative result for [the] entire movie schedule."  (Ex. 78 at PTFS00253831.)

353.     On September 7, 2004, Merrill sent Seery a copy of the final Subscription Agreement.  (Ex. 85 at BOA-ML_00042068.)

354.     The Subscription Agreement is attached to Allianz's Deal Memo in a list of key documents relating to the Melrose Transaction.  (Ex. 78 at PTFS00253830.)

355.     On October 13, 2004, Hypo executed the Subscription Agreement.  (*See* Ex. 89 at GSS0005315; Ex. 90 at BOA-ML_00351401.)

356.     On October 13, 2004, Allianz and Hypo signed an ISDA Master Agreement and a Schedule to the ISDA Master Agreement governing the total return swap transaction between the parties.  (*See* Ex. 91 at PTFS00122856; Ex. 92 at PTFS00122875.)

357.     An October 13, 2004 swap confirmation signed by Allianz and Hypo states that each party:

> UNDERSTANDS THAT THE TRANSACTION CONTEMPLATED HEREUNDER IS SUBJECT TO COMPLEX RISKS WHICH MAY ARISE WITHOUT WARNING AND MAY AT TIMES BE VOLATILE AND THAT LOSSES MAY OCCUR QUICKLY AND IN UNANTICIPATED MAGNITUDE AND IS WILLING TO ACCEPT SUCH TERMS AND CONDITIONS AND ASSUME (FINANCIALLY AND OTHERWISE) SUCH RISKS.

(Ex. 92 at PTFS00122896.)

358.     In the same swap confirmation, Allianz represented and acknowledged that "(i) it has read the Transferee Certificate," and "(ii) it is hereby deemed to make all of the representations and warranties contained in the Transferee Certificate (excluding Representation M thereunder); and (iii) it has received and has carefully read and understands (i) the Private Placement Memorandum relating to the Notes and the LLC Interests, including without

limitation the 'Investor Eligibility and Transfer Restrictions' and 'Risk Factors' sections therein and the information set forth therein relating to the Revenue Participation Agreement . . . ." (Ex. 92 at PTFS00122896–97.)

359.   On June 30, 2006, Allianz executed a Transferee Certificate to acquire the Class B Notes and equity interests underlying its swap with Hypo.   (Ex. 94 at PTFS00122929.)

360.   The   Transferee   Certificate   executed   by   Allianz   included   the representations and transfer restrictions contained in the "**LEGENDS**" section of Exhibit A of the Indenture, quoted in ¶¶ 66–69 above.  (TAC ¶ 12; *cf.* Ex. 94 at PTFS00122922–26; Ex. 6 at PPC_MelSlate0088533.)

361.   Seery could not recall doing "any diligence prior to the transaction" about Paramount's use of foreign territorial sales or licenses.  (Ex. 119 at 75:14–25.)

362.   Seery did not receive any representation from Merrill about the use of co-financing in the Melrose Slate.  (Ex. 119 at 11–18.)

363.   Seery could not recall "any specific representations that anyone from Paramount made to [Allianz] in connection with the use of co-financing, in connection with the films in the Slate." (Ex. 119 at 80:23–81:7.)

364.   Seery could not "recall analyzing anything about co-financing in connection with [the] diligence process." (Ex. 119 at 73:15–18.)

365.   Seery could not recall conducting any diligence about Paramount's use of shared pot deals or "soft money benefits" prior to Allianz's investment in the Melrose Transaction.  (Ex. 119 at 76:18–21, 77:20–24.)

366.    Before the Melrose Transaction closed, Allianz understood that only some—but not all—films in the Melrose Slate would be distributed by shared pot deals.  (Ex. __ 115 at 120:3–14.)

367.    Prior to its investment decision, Allianz understood that the decision to enter into international presales or other specific distribution arrangements remained "within Paramount's complete discretion."  (Ex. 115 at 74:11–21.)

368.    Allianz received "no representation or assurance" that Paramount would pursue international co-financing techniques consistent with historical practice.  (Ex. 115 at 80:4–7.)

369.    Seery could not recall the substance of any specific meetings with Merrill.  (Ex. 119 at 79:4–80:10.)

370.    Seery could not recall the substance, location, or timing of the one "brief meeting" he attended involving Paramount personnel.  (Ex. 119 at 79:4–80:10.)

**D.    Munich Re**

371.    On July 29, 2004, plaintiff Munich Re Capital Markets New York Inc. ("Munich Re") (formally known as Munich American Capital Markets, Inc.) entered into a total return swap transaction with Merrill Lynch Mortgage Capital, Inc., a Merrill affiliate, with respect to $10 million of mezzanine debt (Class B Notes) in Melrose purchased by Merrill Lynch Mortgage Capital, Inc.  (TAC ¶ 11.)

372.    On July 27, 2004, Merrill Lynch Mortgage Capital, Inc. executed the Subscription Agreement.  (Ex. 107 at GSS0002975.)

373.    On March 21, 2007, Munich Re acquired the underlying bond from Merrill Lynch Mortgage Capital, Inc. for $10 million.  (TAC ¶ 11.)

58

374.    Munich Re is a Delaware corporation wholly owned by Munich Reinsurance Company AG through Munich American Holding Corporation.  (TAC ¶ 11.)

375.    Munich Re is a sophisticated institutional investor.  (TAC ¶¶ 23–24.)

376.    The business function of Munich Re was "to assist [Munich Reinsurance Company AG] in transferring some of its specific risk to the capital market and also engaging [in] particular capital markets transactions [that] might be valuable to the firm."  (Ex. 113 at 12:18–25.)

377.    Munich Reinsurance Company AG, the parent company of Munich Re, is "one of the largest reinsurance and insurance companies in the world," and is "a firm with 100 years of experience."  (Ex. 113 at 12:7–17.)

378.    Beginning in 2003, Neil Hohmann—Munich Re's corporate representative—served as head of Munich Re's structured products team.  (Ex. 113 at 7:21–24, 14:25–15:8.)

379.    Hohmann has a Ph.D. in economics from the University of Chicago.  (Ex. 113 at 8:2–4.)

380.    In 2004, Jennifer Hanf was a member of Munich Re's structured products team, reporting to Hohmann.  (Ex. 113 at 15:9–12, 41:24–42:5.)

381.    Hanf was responsible for doing "the bulk of the first level work" and was "the lead" on the Melrose Transaction.  (Ex. 113 at 41:24–42:3, 42:11–12.)

382.    Before conducting due diligence on the Melrose Transaction, Hanf had prior experience analyzing film deals.  (Ex. 113 at 36:9–15.)

383.    Jonathan Hill was a structured products analyst at Munich Re.  Hill's role was "somewhat more quantitative" than Hanf's.  (Ex. 113 at 42:16–43:3.)

384.    Munich Re hired an independent consultant, Harris Maslansky, to serve in an advisory capacity in evaluating the Melrose Transaction.  (Ex. 113 at 42:13–15, 52:9–13.)

385.    Hohmann testified that Maslansky "seemed to know many senior executives" in the film industry.  (Ex. 113 at 54:20–23.)

386.    On December 23, 2003, Hoffman (of Merrill) sent Hanf "a description of the slate financing structure."  (Ex. 95 at BOA-ML_00010220.)

387.    Under a subheading titled "Studio Obligations," the description of the "fund structure" states:  "Production, marketing and distribution for all Eligible Films.  Studio has sole control over all production and distribution decisions on each picture."  (Ex. 95 at BOA-ML_00010234.)

388.    On January 5, 2004, Hanf responded to Hoffman's December 23, 2003 email, writing:  "My colleague Harris Maslansky and I had an opportunity to review the proposal and had some questions."  (Ex. 96 at BOA-ML_00010422.)

389.    Maslansky reviewed the PPM in connection with his work for Munich Re.  (Ex. 120 at 18:20–19:2.)

390.    Munich Re understood that "the film industry was a risky one."  (Ex. 113 at 59:22–24.)

391.    On March 22, 2004, Hanf forwarded to Hohmann a Term Sheet received from Merrill concerning the Melrose Transaction.  (Ex. 97 at PTFS00227881.)

392.    Hohmann testified that it "would have been our practice" to review the Term Sheet.  (Ex. 113 at 63:5–8.)

393.    The Term Sheet states that "[a]ny decision to invest in Issuer must be based solely upon the information set forth in the PPM, which should be carefully read by prospective investors and their advisers."  (Ex. 97 at PTFS00227882.)

394.    The Term Sheet also states:  "None of Merrill Lynch, Paramount, Viacom, or any of their respective affiliates have any responsibility to update any of the information provided in this summary document.  In addition to the foregoing, the information in this summary document is subject to the **GENERAL DISCLAIMER** set forth at the end hereof." (Ex. 97 at PTFS00227882.)

395.    In capitalized, bolded terms, the Term Sheet includes the Paramount Liability Waiver quoted in ¶ 21 above.  (*Cf.* Ex. 97 at PTFS00227896; Ex. 1 at PPC_MelSlate0004651–52.)

396.    Under a heading entitled "Paramount Responsibilities and Obligations," the Term Sheet states:  "Production, marketing and distribution for all Covered Pictures (in a manner similar to the manner in which Paramount distributes comparable films that are not Covered Pictures, *determined in accordance with Paramount's reasonable business judgment*) . . . ."  (Ex. 113 at 65:6–21; Ex. 97 at PTFS00227888 (emphasis added).)

397.    Maslansky testified that he "understood in connection with the Melrose slate that Paramount had complete discretion with respect to distribution decisions" and "with respect to the level of co-financing that it employed."  (Ex. 120 at 32:3–10.)

398.    On April 28, 2004, Hanf sent Hohmann an email attaching "draft due diligence meeting minutes," which relate to an April 23, 2004 meeting about the Melrose Transaction held at Viacom's offices in New York City.  (Ex. 98 at PTFS00227706–07.)

399.    According to Hanf's draft minutes, the April 23, 2004 meeting was attended by Hanf, Hill, and Maslansky, among others.  (Ex. 98 at PTFS00227707.)

400.    The draft minutes state:

> Unlike most transactions, *there are no minimum release requirements for the films* with regard to number of screens, venues, etc., nor do the films have to qualify for the company's output deals which often provide for minimum guarantees for other non-theatrical windows such as pay television.  The only minimum film requirements are that Paramount's investment be greater than $5.0 million and the film not be an art film. *Given the absence of release requirements, we will need to gain enough comfort that Paramount will distribute the films as best it sees fit to maximize revenues.*  This concern is somewhat alleviated by the fact that Paramount is advancing all distribution costs and 75% of production costs. Note that production costs and participations and residuals (both uncapped) are recouped prior to production costs which are recouped by Paramount and Investors (75/25%) pari passu.

(Ex. 98 at PTFS00227708 (emphasis added).)

401.    The draft minutes also state:  "Lastly, while *the ultimate risk we would take in this transaction is film portfolio risk* should we opt to pursue the deal . . . "  (Ex. 98 at PTFS00227708 (emphasis added).)

402.    Maslansky testified that film portfolio risk was "a great risk" of the Melrose Transaction.  (Ex. 120 at 48:10–49:3.)

403.    Maslansky testified that he recalled discussing a number of other risks with the Munich Re, including "a risk that [Paramount] will not deal in the international market the way they dealt with before," a risk of "soft money disappearing," and other "normal risks of movie distribution."  (Ex. 120 at 50:4–18.)

404.    On May 5, 2004, Hanf forwarded the Merrill Model to Hohmann and Hill.  (Ex. 100 at PTFS00226650.)

405.    The version of the Merrill Model forwarded by Hanf includes a May 5, 2004 version of the Confidential Modeling Memorandum.   (Ex. 100 at PTFS00226652.)

406.    On May 28, 2004, Hanf forwarded to Hohmann and Hill an email Hanf received that same day from Tsipras (of Merrill).   In the email forwarded by Hanf, Tsipras writes:  "During the due diligence process, you requested from us various information, including but not limited to model results, scenarios or outputs.  As a reminder, the data or numbers provided as a result of these requests is subject to the [D]isclaimer attached to the Confidential Modeling Memorandum dated May 5, 2004.  For your convenience, a copy of that [D]isclaimer is attached to this e-mail.  Please be aware that all future requests for numerical information, statistical analysis or model output are also subject to this [D]isclaimer."  (Ex. 101 at PTFS00226176.)

407.    In addition to receiving the Merrill Model and the Historical Data Set, Munich Re constructed an internal model of the Melrose Transaction as part of its "standard underwriting practice."  (TAC ¶¶ 75-76; Ex. 99 at PTFS00227674; Ex. 113 at 128:17–129:14.)

408.    Hohmann had "primary responsibility" for Munich Re's internal model. (Ex. 113 at 117:20–118:2.)

409.    Munich Re constructed its internal model "to determine for ourselves whether . . . the risk profile that we're estimating [is] reflective of the structure."  (Ex. 113 at 128:17–129:14.)

410.    Munich Re was "particularly interested [in] tail outcomes, you know, in extreme outcomes of that model and what those extreme outcomes – what the result of that would be in terms of the return on – you know, on a mez investment or on a senior investment." (Ex. 113 at 131:9–14.)

411.    On May 4, 2004, Hohmann sent an email to Hanf regarding "preliminary model results," writing:  "Jen, shall we talk about expanding the model to run simulated slates under alternative sets of assumptions or possibly calibrate with prior non-Paramount database?" (Ex. 99 at PTFS00227675.)

412.    Hohmann testified that the "prior non-Paramount database" referred to a "database that Harris [Maslansky] provided us of film results," which Munich Re used "to develop a model before we got the Paramount historical results."  (Ex. 113 at 133:15–23.)

413.    On June 1, 2004, Hanf sent an email to Hohmann and Hill regarding the "Estimated Slate RPIs," stating:  "Please see attached file . . . Neil said we can run the model on the Bloomberg terminal."  (Ex. 102 at PTFS00226167.)

414.    That same email attached a chart with a column for "Co-Financing Amount" for a number of films in the Melrose Slate.  The chart shows no co-financing for six of those films.  (Ex. 102 at PTFS00226168.)

415.    On June 18, 2004, Hanf sent an email to Hohmann (among others) about a discussion between Hanf and Moody's concerning the Melrose Transaction.   (Ex. 103 at PTFS00226084.)

416.    In that June 18, 2004 email, Hanf wrote that Moody's "used the prospective slate to populate their model, adding volatility of plus/minus 10% around those numbers.  They also used the Net Production Cost as we planned.  The addition of the volatility was to cover the fact that there could be budget over-runs and that *certain co-financing techniques (e.g. German tax deals) may not be as relevant in the current market as per the point I raised earlier*."  (Ex. 103 at PTFS00226084 (emphasis added).)

64

417.   In that same email, Hanf further wrote:  "We do not know how much of the 'Co-Financing Amount' of the historical numbers was actually related to such soft money deals versus split rights/shared pot arrangements hence the need for some volatility."  (Ex. 103 at PTFS00226084.)

418.   On June 21, 2004, Hanf sent Hohmann (among others) a version of the Melrose Slate Schedule, stating:  "Attached below please find updated slate info with proxy release dates."  (Ex. 104 at PTFS00225993.)

419.   This version of the Schedule provided Munich Re with an estimate of $1,204,664,000 in "2004 & 2005 In Production & Greenlit totals," and an estimate of $274,126,000 in total "Co-Financing."  (Ex. 104 at PTFS00226023.)

420.   This version of the Schedule included information as to the type of co-financing obtained for each film, such as "shared pot" or "German defeasance deal."  (Ex. 104 at PTFS00225994.)

421.   There is no evidence that, after receiving the Melrose Slate Schedule, Munich Re raised with Merrill (or Paramount) any questions or concerns about the amounts or types of co-financing that had been achieved with respect to the Melrose Slate.

422.   On June 30, 2004, Hanf sent an email to Hohmann (among others):  "I took a look at the upcoming slate . . .  I see the skew toward bigger budget 40+ as we discussed on Friday."  (Ex. 105 at PTFS00225884.)

423.   Munich Re was given "guidance as to the budgets of the films," which it used as an input in its internal model.  (Ex. 113 at 153:22–154:24.)

424.   On July 6, 2004, Hohmann sent an email to Hill and Hanf (among others): "Attached is the promised spreadsheet that puts the new 'fixed slate' model results in the context

of the historical and simple monte carlo model results.  The key results that jump out are the skew of the fixed slate toward larger budget, on-average less profitable films and the resulting decline in mean profitability versus historical and fixed slate." (Ex. 106 at PTFS00225798.)

425.    Hohmann testified that the "fixed slate" referenced in this email "represents the updated slate that we were provided in terms of budget by Paramount." (Ex. 113 at 156:12–20.)

426.    Munich Re understood that the budgets of the films in the Melrose Slate "did skew larger than the historical." (Ex. 113 at 153:22–154:24, 159:17–19.)

427.    Munich Re received and reviewed the final PPM before entering into the Melrose Transaction.  (Ex. 109 at PTFS00123723; Ex. 113 at 71:21–72:9.)

428.    Munich Re understood that "there can be no assurance that Paramount will implement the same techniques or achieve similar results in the future as it has in the past." (Ex. 109 at PTFS00123758; Ex. 113 at 92:18–93:23.)

429.    Hohmann testified that "generally reviewing the risk factors would have been part of our underwriting practice." (Ex. 113 at 102:21–103:3.)

430.    Munich Re agreed that the PPM "represented that UIP was distributing films on Viacom's behalf." (Ex. 113 at 81:16–82:3.)

431.    Munich Re understood that it "would not have control over those distribution decisions." (Ex. 113 at 106:10–25.)

432.    On July 27, 2004, Hanf circulated a "Business Recommendation Memo" about the Melrose Transaction.  (Ex. 108 at PTFS00225368.)

433.   The Business Recommendation Memo "set forth the rationale for the investment," with the goal of summarizing "the risk and reward of the transaction."  (Ex. 113 at 160:19–161:4, 167:8–17.)

434.   The Business Recommendation Memo was provided to Munich Re's credit committee.  (Ex. 113 at 161:11–13.)

435.   Munich Re could not recall "any discussion . . . of international distribution" or "any discussion of UIP and its use, either in the [Business Recommendation] memo or from [its] discussions at the time."  (Ex. 113 at 172:6–17.)

436.   Hohmann testified that "the retention of international distribution by Paramount increased the risk for Paramount as well."  (Ex. 113 at 165:12–15.)

437.   Hohmann testified that he did not believe that he had met with "anyone associated with Merrill Lynch over the course of the diligence process for the Melrose transaction."  (Ex. 113 at 48:19–23.)

438.   Before the closing, Hohmann did not speak with any Paramount employee about the Melrose Transaction.  (Ex. 113 at 49:21–50:2.)

439.   Munich Re could not identify any "specific representations . . . concerning the business of Paramount" made by Paramount to Jennifer Hanf.  (Ex. 113 at 50:12–22, 68:19–69:8.)

440.   Munich Re could not recall ever asking for a representation "in the transaction documents that Paramount would take any particular action with respect to risk mitigation."  (Ex. 113 at 172:18–174:13.)

441.   Nor could Munich Re recall "whether it was Merrill or Paramount and who said what when" with respect to any alleged misrepresentation.  (Ex. 113 at 173:8–14.)

**VI.      Post-Transaction Events**

442.      Some of the films in the Melrose Slate performed well, earning money for Paramount and investors.   (*See, e.g.*, Ex. 7 at PPC_MelSlate00231890 *and* Ex. 9 at GSS0004021.)

443.      Although some of the films in the Melrose Slate performed well, the Melrose Slate as a whole did not perform well financially, as a number of films made little to no profit.  (Ex. 7 at PPC_MelSlate00231890.)

444.      As a result of the underperformance of certain films in the Melrose Slate, a number of Investors—including plaintiffs—did not profit from their investments.   (Ex. 7 at PPC_MelSlate00231890.)

Dated:   May 23, 2014
         New York, New York

                                 Respectfully submitted,

                                 PAUL, WEISS, RIFKIND, WHARTON &
                                 GARRISON LLP

                                 By:  s/Allan J. Arffa
                                      Leslie Gordon Fagen (lfagen@paulweiss.com)
                                      Allan J. Arffa (aarffa@pauwleiss.com)
                                      Andrew J. Ehrlich (aehrlich@paulweiss.com)
                                      Patrick J. Somers (psomers@paulweiss.com)

                                      1285 Avenue of the Americas
                                      New York, New York 10019
                                      (212) 373-3000

                                      KENDALL BRILL & KLIEGER LLP
                                      Richard B. Kendall (rkendall@kbkfirm.com)
                                      Robert N. Klieger (rklieger@kbkfirm.com)
                                      Philip M. Kelly (pkelly@kbkfirm.com)

                                      10100 Santa Monica Boulevard, Suite 1725
                                      Los Angeles, California 90067
                                      Tel:  (310) 556-2700

                                      *Attorneys for Defendant Paramount Pictures
                                      Corporation*