James A. Janowitz
William L. Charron
Bryan T. Mohler
Benjamin S. Akley
Kathleen M. Prystowsky
PRYOR CASHMAN LLP
7 Times Square
New York, New York 10036
(212) 421-4100
jjanowitz@pryorcashman.com
wcharron@pryorcashman.com
bmohler@pryorcashman.com
bakley@pryorcashman.com
kprystowsky@pryorcashman.com
*Attorneys for Plaintiffs Allianz Risk Transfer AG,*
*Marathon Structured Finance Fund, LP,*
*NewStar Financial, Inc. and Munich Re Capital Markets New York, Inc.*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
------------------------------------------------------------  x
                                                              :
ALLIANZ RISK TRANSFER,                                        :
MARATHON STRUCTURED FINANCE FUND, LP,                         :
NEWSTAR FINANCIAL, INC., and                                  :  No. 08 CV 10420 (TPG)
MUNICH RE CAPITAL MARKETS NEW YORK, INC.,                     :
                                                              :
            Plaintiffs,                                       :
                                                              :
      -v-                                                     :
                                                              :
PARAMOUNT PICTURES CORPORATION,                               :
                                                              :
            Defendant.                                        :
                                                              :
------------------------------------------------------------  x
```

# PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION
## TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES .................................................................................................. iii

PRELIMINARY STATEMENT ........................................................................................... 1

RELEVANT FACTS ............................................................................................................ 3

    A.    The Film Financing Risk-Mitigation Technique Known As "Foreign Pre-Sales" ................ 3

    B.    Paramount's Undisclosed Decision To Practically Abandon
        Foreign Pre-Sales In Connection With The Melrose Slate ........................................ 5

    C.    Paramount's Creation Of Melrose And Of The PPM ............................................ 7

    D.    The PPM Is False And Misleading ........................................................................ 9

    E.    Paramount's Use Of Historical Data Set Information To Mislead Investors ................... 11

    F.    Paramount Uses Moody's To Propagate The Fiction That The Melrose
        Slate Would Be Subject To Similar Foreign Pre-Sales Levels As The HDS ..................... 12

    G.    Plaintiff's Due Diligence Based Upon Paramount's Information .......................... 14

        i.    NewStar ........................................................................................................ 14

        ii.    MRCM ....................................................................................................... 16

        iii.    Allianz ........................................................................................................ 16

        iv.    Marathon ..................................................................................................... 17

    H.    The Tentative Slate Reports Did Not Cure Paramount's Fraud. ............................ 21

    I.    The Documentary Disclaimers In Favor Of Paramount Are Inapt And Ineffective. ........ 22

ARGUMENT .................................................................................................................... 23

    I.    THERE ARE GENUINE ISSUES OF MATERIAL FACT AS TO
        PARAMOUNT'S LIABILITY FOR FEDERAL SECURITIES FRAUD ...................... 23

        A.    The PPM Includes Material Misstatements Of Fact ...................................... 25

        B.    The PPM Also Suffers From A Material Omission Of Fact ......................... 27

        C.    Paramount "Made" The PPM's False Statements And Omissions ............................. 29

**TABLE OF CONTENTS** (cont'd)

D.  Plaintiffs Actually And Reasonably Relied On
    The PPM's False Statements And Omissions ................................................................. 31

   1.  Each Plaintiff's Actual And Reasonable Reliance On The PPM's
       Material Omission About Paramount's Undisclosed Change
       In Business Strategy Is Presumed And Unrebutted By Paramount ..................... 32

   2.  Marathon Actually Relied On The PPM's Material Misstatements ..................... 33

   3.  Allianz Actually Relied On The PPM's Material Misstatements ......................... 33

   4.  MRCM Actually Relied On The PPM's Material Misstatements ......................... 34

   5.  NewStar Actually Relied On The PPM's Material Misstatements ...................... 35

   6.  All Plaintiffs Reasonably Relied On The PPM's Misstatements ........................ 36

II.  THERE ARE GENUINE ISSUES OF MATERIAL FACT AS
     TO PARAMOUNT'S LIABILITY FOR COMMON LAW FRAUD ................................. 40

   A.  There Are Genuine Issues Of Fact Regarding The PPM's Misrepresentations ......... 40

   B.  There Are Genuine Issues Of Fact Regarding Paramount's Omission Of Fact ........ 42

   C.  Plaintiffs Elect The Remedy Of Damages, Not Rescission ........................... 43

III.  PLAINTIFFS' UNJUST ENRICHMENT CLAIM SHOULD BE TRIED ..................... 43

IV.  PLAINTIFFS DID NOT WAIVE OR RELEASE THEIR CLAIMS ................................ 44

CONCLUSION ................................................................................................ 45

## TABLE OF AUTHORITIES

**Cases**                                                                                                                **Pages**

*Abbey v. 3F Therapeutics, Inc.,*
   2011 U.S. Dist. LEXIS 17299 (S.D.N.Y. Feb. 18, 2011),
   *aff'd sub nom., Abbey v. Skokos,* 509 Fed. Appx. 92 (2d Cir. 2013) ...................................... 38

*In re Adelphia Communications Corp.,*
   376 B.R. 87 (Bankr. S.D.N.Y. 2007) ...................................................................... 43

*Affiliated Ute Citizens v. United States,*
   406 U.S. 128 (1972) ................................................................................ 28, 29, 32

*Albion Alliance Mezzanine Fund, L.P. v. State St. Bank & Trust Co.,*
   797 N.Y.S.2d 699 (1st Dep't), *aff'd,* 2 A.D.3d 162 (1st Dep't 2003) ...................................... 43

*Allianz Risk Transfer v. Paramount Pictures Corp.,*
   2010 U.S. Dist. LEXIS 32218 (S.D.N.Y. Mar. 31, 2010) .......................................... 43, 44

*Brown v. E.F. Hutton Group, Inc.,*
   991 F.2d 1020 (2d Cir. 1993) ............................................................................ 44

*Caiola v. Citibank, N.A.,*
   295 F.3d 312 (2d Cir. 2002) ............................................................................ 40

*Dodona I, L.L.C. v. Goldman, Sachs & Co.,*
   296 F.R.D. 261 (S.D.N.Y. 2014) ...................................................................... 32

*E*Trade Fin. Corp. v. Deutsche Bank AG,*
   420 F. Supp. 2d 273 (S.D.N.Y. 2006) ................................................................ 45

*Emergent Capital Inv. Mgmt., LLC v. Stonepath Group, Inc.,*
   343 F.3d 189 (2d Cir. 2003) ........................................................................ 38, 39

*Fogarazzo v. Lehman Bros.,*
   232 F.R.D. 176 (S.D.N.Y. 2005) .................................................................... 28, 32

*Gould v. Winstar Communications, Inc.,*
   692 F.3d 148 (2d Cir. 2012) ............................................................................ 24

*Harsco Corp. v. Segui,*
   91 F.3d 337 (2d Cir. 1996) ............................................................................ 44

*JHW Greentree Capital, L.P. v. Whittier Trust Co.,*
   2006 U.S. Dist. LEXIS 22400 (S.D.N.Y. Apr. 24, 2006) ............................................ 44

*JP Morgan Chase Bank v. Winnick,*
   350 F. Supp. 2d 393 (S.D.N.Y. 2004) ................................................................ 42

**Cases**                                                                                           **Pages**

*Janus Capital Group, Inc. v. First Derivative Traders,*
    131 S. Ct. 2296 (2011) .................................................................................. 24, 30

*Koch v. Greenberg,*
    2014 U.S. Dist. LEXIS 44581
    (S.D.N.Y. Mar. 31, 2014) ........................................................................ *passim*

*Krasner v. Rahfco Funds LP,*
    2012 U.S. Dist. LEXIS 134352 (S.D.N.Y. Aug. 9, 2012) ................................ 30

*In re Lehman Bros. Secs. & Erisa Litig.,*
    2013 U.S. Dist. LEXIS 152801 (S.D.N.Y. Oct. 22, 2013) ............................... 28

*Liberty Media Corp. v. Vivendi Universal, S.A.,*
    861 F. Supp. 2d 262 (S.D.N.Y. 2012) ........................................................... 30

*Louros v. Kreicas,*
    367 F. Supp. 2d 572 (S.D.N.Y. 2005) ...................................................... 32, 36

*Maddaloni Jewelers, Inc. v. Rolex Watch U.S.A., Inc.,*
    354 F. Supp. 2d 293 (S.D.N.Y. 2004) ........................................................... 45

*Mazzaro de Abreu v. Bank of America Corp.,*
    525 F. Supp. 2d 381 (S.D.N.Y. 2007) ........................................................... 43

*McMahan & Co. v. Wherehouse Entm't, Inc.,*
    900 F.2d 576 (2d Cir. 1990), *superseded by statute on other grounds, In re Harmonic Inc. Securities*
    *Litigation,* 163 F. Supp. 2d 1079 (N.D. Cal. 2001) ...................................... 25

*Municipality of Bremanger v. Citigroup Global Mkts., Inc.,*
    2013 U.S. Dist. LEXIS 49603 (S.D.N.Y. Mar. 28, 2013),
    *aff'd, Mun. Corp. v. Citigroup Global Mkts., Inc.,* 2014 U.S. App.
    LEXIS 2870 (2d Cir. Feb. 18, 2014) ............................................................ 36

*Omega Exec. Servs., Inc. v. Grant,*
    1980 U.S. Dist. LEXIS 13607 (S.D.N.Y. Aug. 22, 1980) .............................. 43

*In re Parmalat Securities Litigation,*
    2008 U.S. Dist. LEXIS 64296 (S.D.N.Y. Aug. 20, 2008) .............................. 28

*In re Prudential Securities Ltd. Partnerships Litigation,*
    930 F. Supp. 68 (S.D.N.Y. 1996) ................................................................. 37

*SEC v. Wyly,*
    788 F. Supp. 2d 92 (S.D.N.Y. 2011) ............................................................ 40

*Societe Nationale D'Exploitation Industrielle Des Tabacs Et Allumettes v. Salomon Bros., Int'l.*
    702 N.Y.S.2d 258 (1st Dep't 2000) ............................................................. 43

**Cases**                                                                                                   **Pages**

*In re Smith Barney Transfer Agent Litigation,*
    290 F.R.D. 42 (S.D.N.Y. 2013) ................................................................................ 28, 29, 31

*Steed Financial LDC v. Nomura Securities Int'l,*
    2004 U.S. Dist. LEXIS 18580 (S.D.N.Y. Sept. 13, 2004),
    *aff'd,* 148 Fed. Appx. 66 (2d Cir. 2005) .................................................................... 38

*Tahini Invest., Ltd. v. Bobrowsky,*
    99 A.D.2d 489 (2d Dep't 1984) ............................................................................... 45

*Turkish v. Kasenetz,*
    27 F.3d 23 (2d Cir. 1994) ........................................................................................ 45

*United States SEC v. China Northeast Petroleum. Holdings Ltd,*
    2014 U.S. Dist. LEXIS 45423 (S.D.N.Y. Mar. 26, 2014) ................................... 26

*United States SEC v. Syron,*
    934 F. Supp. 2d 609 (S.D.N.Y. 2013) ................................................. 26, 27, 39, 40

*Wilson v. Comtech Telecomms. Corp.,*
    648 F.2d 88 (2d Cir. 1981) ...................................................................................... 36

*In re WorldCom, Inc. Sec. Litigation,*
    219 F.R.D. 267 (S.D.N.Y. 2003) ..................................................................... 28, 32

Plaintiffs Allianz Risk Transfer AG ("Allianz"), Marathon Structured Finance Fund, LP ("Marathon"), NewStar Financial, Inc. ("NewStar"), and Munich Re Capital Markets New York, Inc. ("MRCM"; collectively at times, "Plaintiffs") respectfully submit this memorandum of law in opposition to the motion for summary judgment by defendant Paramount Pictures Corporation ("Paramount" or "Defendant") as against all of Plaintiffs' claims.

## PRELIMINARY STATEMENT

Paramount procured financing for a slate of motion pictures by fraud. This Court has previously rejected Paramount's prior attempts to evade liability for its fraud through motions to dismiss. This motion is simply Paramount's latest attempt to avoid having to answer for its fraud.

Employing an investment vehicle created by Paramount known as Melrose Investors LLC ("Melrose"), Paramount deceived Plaintiffs (and others) into believing that the slate of films at issue (the "Melrose Slate") would be subject to a risk-mitigation strategy known as "foreign pre-selling," by which Paramount would sell or license the international distribution rights to films within the Melrose Slate to distributors from particular foreign territories in exchange for substantial upfront payments from those distributors. Such pre-sales are an effective hedge against loss with respect to films that perform poorly at the box office.

Paramount intentionally induced Plaintiffs to believe that Paramount would employ foreign pre-selling in a manner consistent with past financing practices utilized by Paramount in connection with a 65-film "Historical Data Set" provided by Paramount, which materially utilized foreign pre-selling. However, unbeknownst to Plaintiffs, prior to their investment, Paramount abandoned its risk averse business model and employed virtually no foreign pre-sales in the Melrose Slate. Had Paramount adhered to its past foreign pre-selling practices, Plaintiffs and other investors would have suffered at least $100 million less in their aggregate losses in the Melrose Slate. Plaintiffs lost their entire investment of $40 million.

Paramount denies any change in its business strategy regarding pre-sales. Nevertheless, there is documentary evidence that approximately one year prior to Plaintiffs' investment, Paramount radically altered its arrangement with an important producer and co-financier of films to ensure that Paramount would self-distribute rather than pre-sell films from that producer. This important change in business strategy was reflected in a PowerPoint presentation that Paramount made to the Board of its parent company, Viacom, Inc. ("Viacom"), in or about March 2004, several months before Plaintiffs invested. In this PowerPoint presentation, Paramount's senior executives announced Paramount's intention to "Retain More Foreign Rights" (*i.e.* reduce foreign pre-sales) in connection with the Melrose Slate – an intention that Paramount studiously concealed from Plaintiffs. In addition to the documentary evidence showing an undisclosed change in Paramount's business strategy, discovery revealed that virtually no effort whatsoever was employed by Paramount to pre-sell films in the Melrose Slate.

In response to Plaintiffs' claims, Paramount offers primarily a series of technical defenses. First, despite overwhelming evidence to the contrary, it claims that it was a stranger to the Melrose transaction – despite the fact that Paramount was responsible for every detail of the transaction; it dealt directly with the investors; it sold the transaction on the strength of its reputation; and it was a recipient of over $200 million in investment funds. Second, Paramount claims that disclaimers in the Melrose Private Placement Memorandum (the "PPM") shielded Paramount from liability – despite the fact that none of those disclaimers focused on co-financing through pre-sales. Third, Paramount claims that Plaintiffs did not reasonably rely on its misrepresentations because they did not diligently investigate the use of foreign pre-sales in the Melrose Slate. In this connection Paramount relies heavily on documents that it claims disclosed the intended lack of use of foreign pre-sales prior to Plaintiffs' investments. However, the documents relied upon by Paramount are, by their own terms, "TENTATIVE" and incomplete. They did not in any way alert Plaintiffs to

Paramount's concealed change of strategy and fraud. To the contrary, the evidence shows Paramount trying to make investors believe that, regardless of those tentative documents, investors were to look at Paramount's "historical" pre-sales practices and "project" the same kinds of practices for the Melrose Slate.

There is no dispute that Plaintiffs are sophisticated investors. But, as this case demonstrates, even sophisticated investors who perform sophisticated and responsible due diligence (as Plaintiffs did here) can be defrauded. That fact does not reflect a lack of care by Plaintiffs, but rather a determined effort by Paramount to deceive.

Paramount has repeatedly tried to avoid having its conduct presented to a trier of fact. The evidence supports the conclusion that Paramount is liable for fraud both at common law and under the federal securities laws. Paramount's actions should be presented to a jury.[1]

## RELEVANT FACTS

**A.    The Film Financing Risk-Mitigation Technique Known As "Foreign Pre-Sales"**

Foreign pre-sales are a form of film co-financing where independent film distributors in foreign territories buy the distribution rights for a particular film in that territory. (Pls.' Rule 56.1 Counterstatement of Material Facts dated July 3, 2014 ("Rule 56.1-C") at ¶445.)

When a studio such as Paramount pre-sells a film, it receives a sum of money called a "minimum guarantee" from the territorial buyer or licensee. (*Id.* at ¶446.) The territorial buyer then assumes the responsibility of releasing the film, which includes collecting the revenues and assuming the costs. (*Id.* at ¶447.) Where a film does poorly, the risk of loss is entirely with the territorial distributor who has "bought" or licensed the film. (*Id.* at ¶448.) Because the studio that has pre-

---

[1] For the avoidance of any confusion, Plaintiffs are not suing for any damages based upon Paramount's efforts to obtain foreign tax credits. Plaintiffs are suing solely in connection with Paramount's failure to pursue foreign pre-sales for the films in the Melrose Slate.

sold the film bears no releasing costs (and has received payment for the distribution rights), not only does it avoid the loss suffered by a badly performing film, it receives net revenues. (*Id.* at ¶449.)

For outside investors (like Plaintiffs) who have contributed financing to the production of a film, the revenue generated by foreign pre-sales serves as a considerable hedge against loss of their investments. (*Id.* at ¶450.)

Major film studios (*e.g.*, Sony, Universal, Warner Bros., Disney and Fox) (the "Major Studios") do not generally pre-sell their films to foreign buyers because Major Studios generally have their own, direct means of self-distribution. (*Id.* at ¶451.) Consequently, the supply of Major Studio-level films available to foreign buyers is limited, notwithstanding the large foreign demand for Major Studio product. (*Id.* at ¶452.)[2]

Paramount, however, was a standout among the Major Studios in its desire to participate in the foreign pre-sale market. (*Id.* at ¶454.) Foreign pre-sales were such an important facet of Paramount's co-financing strategy during the relevant time period that the PPM defines the term "Co-Financing Amount" to mean:

> any net amount actually received by Paramount *(a) as a fixed amount in connection with foreign territorial sales or licenses … or (b) from other co-financings (including, without limitation, Studio Shared Pot Pictures)* or (c) from any so-called "soft money" benefits through sale/leaseback transactions, governmental subsidy/rebate programs or similar transactions, in each case, with respect to such Covered Picture.

(*Id.* at ¶455 (emphasis supplied).)  Thus, the PPM specifically identifies at least three different types of strategies, with foreign pre-sales set apart from "other" forms of co-financing.

Contrary to fact and contrary to the PPM, Paramount conflates the various risk-mitigation strategies as if they were fungible, including in particular so-called "shared pot deals" and foreign

---

[2] At the time of the Melrose transaction, Paramount did not have its own operation for foreign self-distribution, but instead did so through a joint venture with Universal and MGM called United International Pictures, or "UIP". (*Id.* at ¶453.)

pre-sales. They are not, as the PPM's own definition quoted above makes clear. (*Id.* at ¶457.) Generally speaking, in shared pot deals, studios co-invest. Each studio gives up half of a film's revenues in return for being responsible for only half of the film's budget. (*Id.* at ¶458.) Each studio continues to bear (on a shared basis) the undiminished risk of loss, however, with respect to films that perform poorly in foreign territories. (*Id.* at ¶459.) Shared pot deals may halve the losses in a territory, while foreign pre-sales eliminate such risk entirely. As such, foreign pre-sales are a much more effective means of downside risk mitigation than shared pot deals. (*Id.* at ¶¶460-461.)

**B.    Paramount's Undisclosed Decision To Practically Abandon Foreign Pre-Sales In Connection With The Melrose Slate**

In or about March 2004 (several months before Plaintiffs invested), Paramount's senior executives gave a PowerPoint presentation (the "PowerPoint Presentation") to the Board of its parent company, Viacom, concerning its feature film business. (*Id.* at ¶462.) Paramount identified the following "FEATURES STRATEGY" which, in relevant part, relates to the Melrose Slate:

- **Impact of Financing**
  - **Merrill Lynch**
- **Retain More Foreign Rights**

(*Id.* at ¶463 (emphasis supplied).) The reference to "Merrill Lynch" is a reference to the Melrose Slate: Merrill Lynch was Paramount's placement agent for the securities sold to Plaintiffs in the Melrose Slate. (*Id.* at ¶464.)

Thus, directly below a reference to securing financing for the Melrose Slate, Paramount informed its parent company that Paramount intended to "Retain More Foreign Rights", meaning the material reduction of foreign pre-sales.[3]

---

[3] Paramount has never voiced a coherent (or even consistent) alternative meaning for the "Retain More Foreign Rights" language. Paramount's Rule 30(b)(6) witness, Karen Magid (Paramount's in-house counsel), tried to explain away this language by claiming that, based on her conversations with an employee of Paramount who assisted in the preparation of the PowerPoint Presentation, Stephanie Love, she understood that the "Retain More Foreign Rights" language "was a reference to shared pot/split rights situation," not foreign pre-sales. (*Id.* at ¶465.) The next day, however, Ms. Love contradicted Ms. Magid's testimony and further testified that she had no recollection of what the "Retain More Foreign

Due to Paramount's dubious document retention policy, precious few documents have been produced respecting its change in foreign pre-sale strategy.[4] What little was produced shows that Paramount began changing its pre-sale strategy as early as mid-2003, one year before Plaintiffs invested in Melrose.

It was at that time that Paramount negotiated a new agreement with Lakeshore Entertainment Group, one of the primary buyers of international rights for the films in the HDS, which made clear that Paramount would "*be retaining worldwide distribution rights (with the exception of three territories) as compared with our retention of only domestic distribution rights under the current Lakeshore arrangement*" (the "Lakeshore Agreement"). (*Id.* at ¶469 (emphasis supplied).) This change in strategy was announced to Viacom during Paramount's PowerPoint Presentation the following year.

Paramount's change in foreign pre-sales strategy was not half-hearted. It all but abandoned foreign pre-sales as a risk mitigation strategy for the Melrose Slate. (*Id.* at ¶470.) Paramount produced no documentary or testimonial evidence that it pursued *any* foreign pre-sales opportunities for 23 of the 25 films in the Melrose Slate. (*Id.* at ¶471.) Paramount's Rule 30(b)(6) witness testified, unequivocally, that Paramount did not pursue a single pre-sale opportunity for 23 of the films in the Melrose Slate. (*Id.* at ¶472.) Paramount's former executive vice president with responsibility over foreign pre-sales similarly testified that he could not recall any efforts to pursue pre-sales for the films in the Melrose Slate. (*Id.* at ¶473.) One of Paramount's expert witnesses, William Shields, also confirms in his report that Paramount did not try to pre-sell most of the Melrose Slate films (while offering meritless excuses for why that may have been so). (*Id.* at ¶474.) Had Paramount tried to

---

Rights" language was intended to refer to. (*Id.* at ¶466.) Following Ms. Love's deposition, Paramount's counsel submitted corrections to Ms. Magid's deposition transcript seeking to change the phrase "**was** a reference to shared pot/split rights situation" to "**could be** a reference to shared pot/split rights situation," in an obvious effort to reconcile Ms. Magid's contradictory testimony. (*Id.* at ¶467.)

[4] Paramount produced almost no correspondence in discovery, claiming that it had all been destroyed pursuant to an "informal" and unwritten document destruction policy. (*Id.* at ¶468.)

pursue foreign pre-sale opportunities for the Melrose Slate, opportunities would have abounded for every film. (*Id.* at ¶475.)[5]

Not only did Paramount not share with Plaintiffs its plan to "retain more worldwide distribution rights," as articulated in the Lakeshore Agreement and the PowerPoint Presentation, it affirmatively represented to investors that the data for the past slates in the HDS respecting foreign pre-sales should be looked to and relied upon. (*Id.* at ¶480.)[6]

**C.   Paramount's Creation Of Melrose And Of The PPM**

Melrose was a special purpose administrative entity formed on May 7, 2004. (*Id.* at ¶481.) Melrose was created only to issue the securities supporting the Melrose Slate, to collect investment sums from outside investors in the Melrose Slate, and to distribute any returns to the investors. (*Id.* at ¶482.) Melrose had no decision-making authority or discretion with respect to its operations – it proceeded necessarily and automatically according to its governing documents, all of which were drafted to the specifications of Paramount. (*Id.* at ¶483.)[7]

Although the PPM carries Melrose's name and refers to Melrose six times, the PPM is entirely about Paramount and identifies Paramount *over 350 times*. (*Id.* at ¶486.) The PPM was drafted by Paramount and its agent, Merrill Lynch ("Merrill"), with the assistance of their respective lawyers at Shearman & Sterling LLP and Sidley & Austin LLP, before Melrose even existed. (*Id.* at ¶487.)

---

[5] The record reflects that Paramount claims to have entered into foreign pre-sales of various levels for five of the 25 films in the Melrose Slate. (*Id.* at ¶476.) However, two of those films – *Suspect Zero* and *Sky Captain and the World of Tomorrow* – are mischaracterized as foreign pre-sales because, in fact, Paramount acquired only domestic distribution rights to those films. (*Id.* at ¶477.) Another film, *Mission: Impossible III*, is similarly mischaracterized as having been the subject of foreign pre-sales because, in truth, Paramount received only a single payment for a premier event in Japan. (*Id.* at ¶478.) Only two of the 25 films in the Melrose Slate – *The Weather Man* and *Aeon Flux* – were the result of Paramount's activity in foreign pre-sales. (*Id.* at ¶479.)

[6] Paramount did not voluntarily produce the PowerPoint Presentation to Plaintiffs in discovery in this action. Instead, Plaintiffs had to ask the Court to compel Viacom to respond to a subpoena *duces tecum*, prompting Viacom to produce the PowerPoint Presentation in September 2013, more than two years after it was first requested from Paramount.

[7] The managers of Melrose are two companies named GSS Holdings, Inc. and Global Securitization Services LLC (collectively, "GSS"). (*Id.* at ¶484.) As set forth in GSS's website: "[GSS] specializes in the ownership and administration of special purpose vehicles ('SPVs') established in connection with structured finance transactions ...." (*Id.* at ¶485.) Melrose was one of thousands of entities in GSS's administrative mill. (*Id.*)

Belying any claim that Paramount was not involved in the drafting of the PPM, Paramount's attorneys at Shearman made clear to Merrill's attorneys at Sidley that the PPM was expressly subject to the approval of Paramount. (*Id.* at ¶488.)

Likewise, Paramount conditioned its entrance into the Melrose transaction – which occurred via Paramount's execution of a Revenue Participation Agreement ("RPA") – upon, *inter alia*, the following term from the RPA:

> 12.3    Participant [including Plaintiffs] shall have entered into the Indenture, Subscription Agreements and Limited Liability Company Agreement *in forms and substance acceptable to Paramount*, ....

(*Id.* at ¶489 (emphasis supplied).)   The Subscription Agreements for the investors in Melrose (including Plaintiffs) fully integrate the PPM. (*Id.* at ¶490.)   In addition, the Subscription Agreements explicitly attribute the information contained in the PPM to Paramount.  (*Id.* at ¶491.)

Paramount did not execute the RPA until the same day that the Melrose transaction closed with Plaintiffs (July 29, 2004). (*Id.* at ¶492.) Thus, until the moment of closing, Paramount expressly conditioned its participation in the Melrose transaction upon its retention of total control over every aspect of the Melrose transaction, including the content of the PPM.

The PPM was finalized on July 22, 2004 (*i.e.*, about four months after the PowerPoint Presentation and a year after the Lakeshore Agreement).  (*Id.* at ¶493.)   However, the evidence shows that between January 28, 2004 (when Paramount and Merrill executed a Commitment Letter between them to prepare the PPM) and July 22, 2004, Paramount and Merrill worked in tandem to draft the PPM, with Paramount furnishing and curating all of the data and material descriptions of the investment.  (*Id.* at ¶494.)  The substantive terms and conditions in the PPM itself were dictated by, approved by or actually drafted by, Paramount.  (*Id.* at ¶495.)  Paramount agreed to indemnify Merrill for any liability arising from specific language provided by Paramount for insertion into the PPM (the "Indemnification Agreement").  (*Id.* at ¶496.)

Moreover, as set forth below, Paramount provided all of the analytic data to Merrill upon which Merrill and Plaintiffs could base their analysis and investment decisions. (*Id.* at ¶497.) Like a ventriloquist, Paramount literally spoke *through* Merrill executives, who have testified that all information provided to them was verified with Paramount. (*Id.* at ¶498.) As documents show, and as discussed more below, when supplying information in response to investor inquiries, Paramount negotiated the scope and detail of the responses and data directly with investors. (*Id.* at ¶499.) Almost all of Paramount's senior executives met with investors and concealed the change of business strategy while falsely emphasizing Paramount's continuity of business plan. (*Id.* at ¶500.)

**D.** **The PPM Is False And Misleading**

Among the PPM's substantive terms drafted and/or approved by Paramount were provisions addressed to Paramount's risk-averse "strategy," including foreign pre-sales. (*Id.* at ¶502.) The "Executive Summary" of the PPM states:

> In seeking to limit Paramount's financial exposure, Paramount has pursued a strategy of entering into agreements to share the financing of certain films with other parties. The parties to these arrangements include studio and non-studio entities, both domestic and foreign. *In some of these arrangements, other parties control certain distribution and/or other ownership rights.* [Emphasis added.]

(*Id.* at ¶503.) This language refers to foreign pre-sales. (*Id.* at ¶504.) This language was drafted by Paramount and was contractually required by Paramount to be inserted to the PPM *in haec verba.* (*Id.* at ¶505.) This language fails to inform investors that Paramount had actually decided by that time to "Retain More Foreign Rights" and not to pursue opportunities to engage in foreign pre-sales of the Melrose Slate. That information was omitted from the PPM and concealed by Paramount.

Page 31 of the PPM similarly states:

> Like other major studios, Paramount aims to achieve consistent film slate profitability by managing capital commitments for each film project, *opportunistically entering into output agreements and territory sales with third parties,* and emphasizing cost mitigation programs such as split-rights deals, co-financings and other transactions that take advantage of local production, tax and incentive opportunities in certain foreign jurisdictions (e.g., UK sale-leasebacks and German lease financings). The

purpose of these risk management techniques is to reduce a film's net production cost, thereby diversifying slate performance risk and creating a lower cost basis for Paramount.  [Emphasis supplied.]

(*Id.* at ¶506.)  This language was based upon information provided to Merrill by Paramount, and was approved as to final form – and partially drafted – by Paramount.  (*Id.* at ¶507.)[8]

Thus, whereas the PowerPoint Presentation informed Viacom that Paramount had decided to "Retain More Foreign Rights", the PPM falsely stated that Paramount would "aim[] to … opportunistically enter[] into output agreements and territory sales with third parties, …."

Likewise, page 39 of the PPM states:

Paramount selectively pursues and enters into co-production agreements, studio "shared pot" deals, split rights deals and similar arrangements under which, depending on the situation, either Paramount enters into an arrangement with a third party pursuant to which the party agrees to share in the cost of production of one of Paramount's films in exchange for obtaining certain distribution rights from Paramount or vice versa.

(*Id.* at ¶511.)

This and other language in the PPM speak in present tense terms (*e.g.,* "aims to achieve"; "selectively pursues"; "by … opportunistically entering into output agreements and territorial sales") signifying continuing effort by Paramount at the time of the PPM's issuance, including in the area of foreign pre-sales.  The PPM fails to advise potential investors (like Plaintiffs) that Paramount had already resolved to change its "strategy" so as to substantially abandon foreign pre-sales in order to "Retain More Foreign Rights."

Paramount relies heavily on a general caveat in the PPM that:  "There can be no assurance that Paramount will implement the same techniques or achieve similar results in the future as it has in the past."  (*E.g.,* Def.'s 4/21/14 Br. at 6.)  Moreover, as discussed below, Paramount was simultaneously telling investors (through its placement agent, Merrill) to "look at historical data to

---

[8] Paramount added the text:  "… and other transactions that take advantage of local production, tax and incentive opportunities in certain foreign jurisdictions."  (*Id.* at ¶508.)  Paramount also changed "German tax financings" to "German lease financings."  (*Id.* at ¶509.)  Paramount otherwise approved the remainder of this text.  (*Id.* at ¶510.)

determine what amounts have been co-financed by other means historically *and project that amount going forward*" for the Melrose Slate. (*Id.* at ¶513 (emphasis supplied).)

**E.   Paramount's Use Of Historical Data Set Information To Mislead Investors**

Paramount not only prepared the PPM with Merrill, it also provided data so that Merrill could prepare an accompanying model that calculated the financial results of hypothetical slates of films based upon 65 films released by Paramount between 1998 and 2003 (the "Historical Data Set" or "HDS"). (*Id.* at ¶514.) Plaintiffs do not assert a claim that any of the financial data in the HDS was, in and of itself, false.

Paramount provided Merrill with assumptions concerning the timing of revenues and costs associated with the release of its films in the HDS. (*Id.* at ¶515.) Included in the data was the total of co-financing for each film. (*Id.* at ¶515.) Embedded in the co-financing data (although not directly discernible) was the information on foreign pre-sales for each of the films in the HDS. (*Id.* at ¶516.) It is undisputed that an average of approximately 24% of the gross production costs of the films in the HDS had been offset by Paramount through foreign pre-sales. (*Id.* at ¶517.)

Using the HDS data supplied to it by Paramount, Merrill created a model for potential investors in Melrose (including Plaintiffs) to project and illustrate the range of reasonably anticipated returns and risk of loss on the Melrose Slate. (*Id.* at ¶518.) Such modeling was based on a well-established investment banking tool known as "Monte Carlo Simulation," which projects results based on thousands of possible combinations and iterations of the data provided. (*Id.* at ¶519.)

In this case, Merrill ran 10,000 iterations of the film data that Paramount provided in relation to the HDS, combining the data in random order to assess returns and risk of loss for the Melrose Slate. (*Id.* at ¶520.) The Monte Carlo Simulation based on Paramount's HDS data indicated that Plaintiffs' risk of losing any portion of their investment would be about 8%. (*Id.* at ¶521.) Nevertheless, Paramount knew that Merrill's Monte Carlo Simulation suffered from a materially

11

inaccurate assumption that only Paramount was in a position to correct: *i.e.*, the assumption of foreign pre-sales continuing for the Melrose Slate. Paramount, however, elected to remain silent.

**F.    Paramount Uses Moody's To Propagate The Fiction That The Melrose Slate Would Be Subject To Similar Foreign Pre-Sales Levels As The HDS**

Merrill engaged Moody's Investors Service, Inc. ("Moody's") to rate Melrose's senior notes. (*Id.* at ¶522.) Moody's, like Plaintiffs, relied upon the HDS and the Monte Carlo Simulation to conduct due diligence. (*Id.* at ¶523.) Paramount provided information to Moody's and therefore knew that the information supplied would be relied upon not only by the identified investors with whom it dealt, but also with as yet unidentified investors in the marketplace who relied on a Moody's rating. (*Id.* at ¶524.)

In or about May 2004 (*i.e.*, about two months after Paramount's PowerPoint Presentation), Moody's requested detail as to the various forms of co-financing for the HDS, which, as stated above, was not identifiable from the information provided by Paramount to Merrill. (*Id.* at ¶525.)

Peter Hoffman ("Hoffman"), a Managing Director at Merrill, responded to Moody's on or about May 12, 2004. (*Id.* at ¶526.) Hoffman copied *in haec verba* from an e-mail sent to him by Paramount's President, Tom McGrath ("McGrath"), in which McGrath provided some historical information and some current information with a representation that *"we are not done making deals yet and these figures will change."* (*Id.* at ¶527 (emphasis supplied).) Hoffman also sent Moody's a chart entitled "Paramount Co-Financing Overview," prepared "[b]ased on discussions with Paramount." (*Id.* at ¶528.) Among other things, the chart explained that "[t]erritorial [s]ales mitigate risk while providing an economic benefit." (*Id.* at ¶529.)

On or about May 13, 2004, Moody's requested more information on the composition of the co-financing in the HDS, and on that date Paramount provided Moody's with such a breakdown. (*Id.* at ¶530.) Moody's explained that it wanted this information to be able to determine "whether the

data we have [*i.e.*, the HDS information] properly reflects the risk/reward structure for the future movies" (*i.e.*, the Melrose Slate).  (*Id.* at ¶531.)

Hoffman, who had been acting as the conduit of information from McGrath and from Paramount's Senior Vice President of Corporate Development, Isaac Palmer ("Palmer"), who was running the Melrose deal, provided the requested information on the HDS.  (*Id.* at ¶532.)  Moody's responded and asked to see how closely the projected Slate (*i.e.*, the Melrose Slate) resembled the risk profile of the HDS.  (*Id.* at ¶533.)  Hoffman replied:

> Forward slate info contains info on those films that will be co-produced with other studios.  *I would look at historical data to determine what amounts have been co-financed by other means historically and project that amount going forward.*  For conservatism, you could assume slightly lower amounts since the German $ and other structured deals are generally entered into on an opportunistic basis.

(*Id.* at ¶534 (emphasis supplied).)

The first sentence of Mr. Hoffman's message refers to co-productions with other studios, *i.e.*, shared pot deals, and the term "forward slate info" refers to certain "tentative" status reports created prior to Plaintiffs' investments showing that foreign pre-sale levels of the Melrose Slate at the time were running below HDS levels (the "Tentative Slate Reports").  Versions of the Tentative Slate Reports had been provided to Merrill by Paramount as early as December 2003.  (*Id.* at ¶535.)

In other words, Hoffman was saying in the first sentence (based upon information from Paramount) that the Tentative Slate Reports are reliable with respect to shared pot deals.

However, the second sentence of Mr. Hoffman's message refers to all other forms of co-financing, including foreign pre-sales. Hoffman was saying in the second sentence (based upon information from Paramount) that the Tentative Slate Reports do not accurately reflect foreign pre-sales, and that such co-financing should be projected by Moody's as being in line with HDS levels: *i.e.*, about 24% of the gross production costs of the films in the Melrose Slate.

Hoffman testified that he never delivered this kind of information to investors without first verifying same with Paramount. (*Id.* at ¶536.)

Thus, the record reflects that Paramount told Merrill to tell Moody's in May 2004 that foreign pre-sales would continue for the Melrose Slate at approximately the same level employed by Paramount for the films in the HDS. By March 2004, however, Paramount had already privately decided largely to abandon foreign pre-sales in order to retain more foreign rights. Paramount's information to Moody's was false, misleading, and plainly designed to deceive potential investors.

## G.   Plaintiffs' Due Diligence Based Upon Paramount's Information

Each of the Plaintiffs is a sophisticated financial investor and each conducted its own due diligence to further "stress-test" the HDS data furnished by Paramount and the accompanying Monte Carlo Simulation. (*Id.* at ¶537.) As described below, each Plaintiff varied and randomized the Monte Carlo inputs within reasonable ranges and, between them, ran tens of thousands of additional Monte Carlo iterations. (*Id.* at ¶¶538-39.)

Nevertheless, unbeknownst to any of Plaintiffs, no amount of reasonable variation and stressing of the HDS data could have accurately projected the Melrose Slate risk of loss because Paramount had secretly and unpredictably decided to bring foreign pre-sales levels from 24% (for the HDS) all the way down to 3.5% for the Melrose Slate, *a reduction of over 80%*. (*Id.* at ¶¶541.)

### i.   NewStar

NewStar's analysis of the Melrose investment opportunity is memorialized in a series of memoranda presented to its credit committee for its review in evaluating the transaction. In one dated July 14, 2004, NewStar analyzed:

> Loss History:  Paramount has historically [*i.e.*, based upon the HDS] pursued a strategy of risk mitigation and therefore typically limits the amount of its film investment to create a smoother earnings profile....

(*Id.* at ¶542.)

14

In an Underwriting Memo, NewStar analyzed:

Our internal analysis *focused on the three drivers* ... with the objective being to introduce some level of volatility into the historical performance to determine how the structure performs under the different scenarios .... Using the statistical model to draw random realizations of *gross revenue, production cost, and print and advertising expenses* we are able to ... calculate an expected IRR, net of losses, of 8.20% ....

(*Id.* at ¶543 (emphases supplied).)

NewStar summarized the basis for its statistical conclusions, in part, as follows:

Expected loss calculation for the transaction takes the following into consideration:
1. Business practices of Paramount and its long history in the business (both qualitatively, and quantitatively)
2. Historical slate performance for 65 films released in the period covering 1998 through 2003
3. Frequency distribution of Production Costs, Print and Advertising Expenses per film, and Gross receipts per film and the relationship between these key variables

(*Id.* at ¶544.)

Thus, in testing or "stressing" the data, NewStar focused on variables that were reasonably thought to be subject to fluctuations that could impact the Melrose investment. (*Id.* at ¶545.) As identified by NewStar above, these variables were gross revenue, production cost, and distribution expenses (print and advertising). NewStar was given no reason to believe that foreign pre-sales should be similarly stressed, let alone reduced practically to zero. (*Id.* at ¶546.)

Indeed, NewStar spoke with the Moody's analyst involved in rating the Melrose Class A notes and confirmed that its analysis was entirely consistent with the methodology employed by Moody's, and that its stressing of production cost, of which co-financing amount is a part, was also consistent with Moody's analysis. (*Id.* at ¶547.) Moody's confirmation of NewStar's methodology reflected Paramount's information to Moody's that the level of pre-sales would remain approximately consistent with that in the HDS and was therefore not a variable. (*Id.* at ¶548.)

After completing its due diligence, on or about July 30, 2004, NewStar purchased $10 million of the Class B notes in the Melrose Slate. (*Id.* at ¶549.)

ii.    **MRCM**

MRCM hired an investment advisor, Harris Maslansky ("Maslansky"), to help develop a Monte Carlo model complementary to Merrill's Monte Carlo Simulation, and to run additional iterations of variables to project the Melrose Slate's risk of loss. (*Id.* at ¶550.) MRCM also received assurances from Paramount executives (including Paramount's then-COO and CFO) that Paramount was continuing its risk averse business strategy for the films to be included in the Melrose Slate. (*Id.* at ¶551.)

MRCM "stressed" its model by varying certain of the model's assumptions, such as box office receipts, revenues, expenses, and tails of distribution, and also adjusted the model to match the means and volatility of the profitability observed in the HDS. (*Id.* at ¶552.) MRCM also adjusted the assumed net production cost for the HDS films in the model by approximately 10% to account for volatility from the known unavailability of certain German tax credit deals. (*Id.* at ¶553.) MRCM additionally spoke to Moody's to verify that its modeling approach was in line with that of Moody's. (*Id.* at ¶554.)

This turned out to be a waste of time, as Paramount sat quietly with the knowledge that foreign pre-sales would effectively be eliminated as a variable altogether, a fact that *no* Monte Carlo simulation had any reason to take into account.

On or about July 30, 2004, MRCM entered into a total return swap transaction with respect to $10 million of the Class B notes in Melrose by which MRCM acquired the material economic benefit and risk of the investment in Melrose. (*Id.* at ¶555.)[9]

iii.    **Allianz**

Allianz similarly hired Maslansky and also ended up spinning its wheels developing and "stressing" its own Monte Carlo model. (*Id.* at ¶557)

---

[9] On or about March 21, 2007, MRCM acquired the underlying Class B notes and membership interests through an in-kind exchange with the swap counterparty. (*Id.* at ¶556.)

Like MRCM, Allianz received assurances from Paramount executives that Paramount would continue its risk averse practices and that its interests were aligned with those of the investors. (*Id.* at ¶558.) This, too, was false. While Plaintiffs saw their $40 million investment wiped out, and in the aggregate Melrose investors lost over $100 million, Paramount earned over *$400 million* in revenues from "distribution fees" deducted from the revenues shared with the Melrose investors (including, of course, Plaintiffs). (*Id.* at ¶559.) Indeed, in a forecast prepared with respect to the anticipated Melrose Slate prepared months before the closing of the transaction, Paramount privately forecast a loss on the 2004 films of $32 million for the investors and a profit of $37 million for Paramount. (*Id.* at ¶560.)

Relying on the HDS, Allianz stressed other variables outside of Paramount's control (such as box office performance) while maintaining the integrity of the co-financing data of the HDS. (*Id.* at ¶561.) As summarized in Allianz's modeling memorandum:

> In the course of evaluating this transaction, it was discussed whether the model should run by (1) selecting movies from the database [the HDS] and running them through the waterfalls; (2) generating curves of net movie results and production costs, and generating movies from these curves, or; (3) generating curves of movie revenues, expenses and production costs and generating movies from these curves....

(*Id.*)

On or about October 13, 2004, Allianz entered into a total return swap with respect to $7.125 million of the Class B notes and $3 million of membership interests in Melrose, by which Allianz acquired the material economic benefit and risk of the investment in Melrose. (*Id.* at ¶562.)[10]

### iv.   Marathon

Plaintiff Marathon hired the investment advisory firm of Houlihan Lokey ("Houlihan") to assist in evaluating the potential Melrose investment. (*Id.* at ¶565.) Among other things, Houlihan, with respect to the HDS, specifically asked Paramount (through Merrill) to provide:

---

[10] On or about June 30, 2006, Allianz acquired the underlying Class B notes and membership interests through an in kind exchange with the swap counterparty. (*Id.* at ¶563.)

> Breakout of size and type of co-financing by picture (ie "8mm German Tax Deal, 20mm from shared pot financing, 2mm UK sale leaseback for 30mm total 'co-financing' on film X"). Here we are looking at trends in the types of structures used historically.

(*Id.* at ¶566.)  This same information – *i.e.*, the detailed co-financing composition of the films in the HDS – had been requested by Moody's and delivered by Paramount.  (*Id.* at ¶567.)

Despite the fact that Paramount (through Merrill) had already provided this information to Moody's, the same request coming from Marathon (through Houlihan) set off demonstrable anxiety within Paramount, revealing Paramount's concern about having to share specific co-financing information with potential investors in Melrose.  Paramount and Merrill negotiated with Houlihan and Andrew Springer of Marathon for *two days* to try to substantially reduce Marathon's requests for specific information.  (*Id.* at ¶568.)  The back-and-forth between the parties is illuminating.

On June 23, 2004, Houlihan asked Merrill for HDS film ultimates with specific co-financing information, including the "[b]reakout of size and type of co-financing by picture."  (*Id.* at ¶569.) That evening, Isaac Palmer at Paramount, in reporting to Tom McGrath in an email with the subject line "CONFIDENTIAL Merrill Lynch – Marathon," reacted as follows:

> Eric Alini at [Merrill] (senior to Peter Hoffman) agreed with me that the second request [ultimates for films released after *Tomb Raider II*] is *problematic* because, among other things, it would take weeks to gather the information, vet it through [PricewaterhouseCoopers] and analyze.  *More importantly, it would have to be shared with the other investors, with unpredictable results.*  He suggested instead that we give Marathon/Houlihan the co-financing data on the post-TRII pictures since that is the only non-public piece of data that can't be derived from publicly available information and Houlihan's own data base and assumptions about revenues and costs.  *My view is that even this information would have to be shared with unpredictable results....*

(*Id.* at ¶570 (emphases supplied).)

Thus, while Paramount articulated a concern about burden, the "more important" concern for Paramount was that the open and honest sharing of such information with all potential investors would lead to "unpredictable results," meaning, of course, the possible loss of investment interest.

Later that same evening, Palmer wrote to Peter Hoffman (at Merrill) to say that Paramount would prefer not to provide Houlihan/Marathon with the same information as Paramount had given Moody's, and that Paramount would prefer to delete "the detail of the territorial rights" purportedly "for confidentiality reasons" – reasons that were not explained and did not really exist. (*Id.* at ¶571.) Palmer also sought assurance that Merrill would not "have to provide this information to the other investors as well". (*Id.* at ¶572.) The following day, June 24, 2014, Hoffman faxed the co-financing detail for the HDS to Marathon. (*Id.* at ¶573.)

The next day, June 25, 2014, Palmer wrote to McGrath to explain that "[a]fter two days of negotiations over Houlihan's request for more data from us, Marathon has settled on asking for [among other things] ... [a] break-down of the co-financings for the upcoming 2004/2005 slate [*i.e.*, the Melrose Slate]". (*Id.* at ¶574.) Palmer told McGrath that "Eric Alini [at Merrill] believes that Marathon will walk if we don't give them this information." (*Id.* at ¶575.)

That same day, Palmer asked Hoffman whether Marathon had "detailed or summary 2004/2005 slate information." (*Id.* at ¶576.) Though other investors received the detailed 2004/2005 slate information, the co-financing breakdown for the Melrose Slate that Paramount provided to Marathon included only a portion of co-financing information concerning the Melrose Slate: "defeasance deals, sales/leasebacks, tax credits and similar transactions" for "Paramount Pictures 2004 and 2005 Schedule of Covered Pictures". (*Id.* at ¶577.) Paramount did *not* provide Marathon with information about foreign pre-sales with respect to the Melrose Slate. (*Id.* at ¶578.)[11]

---

[11] Paramount's 56.1 Statement ("SOF") ¶¶ 180-185 are disputed because they are false. SOF ¶ 180 refers to a "version" of the Tentative Slate Reports entitled "Paramount Pictures 2004 and 2005 Schedule of Covered Pictures -- Co-Financing Detail." (Ex. 46.) Although Paramount had generated numerous iterations of the Tentative Slate Reports, Ex. 46 is not one of them. While the Tentative Slate Reports identify some (albeit incomplete and preliminary) financial information for several different categories of co-financing, including foreign presales, Ex. 46 provides information only for the "defeasance deals, sales/leasebacks, tax credits and similar transactions" category. (*Id.*) The categories for "territorial sales/acquisitions" and "other equity investments" categories are blank, and though the shared pot films are identified, no accompanying financial detail is provided. Ex. 46 also provides no production cost information, leaving the reader without anything against which to compare even the limited co-financing information provided. (*Id.*) Paramount wrongly claims in SOF ¶ 183 that the absence of data next to the various forms of co-financing indicates that

Paramount again justified its refusal to provide other detail to Marathon based upon "confidentiality" concerns. (*Id.* at ¶579.) That was a lie: the information that Paramount withheld from Marathon, Paramount provided to Moody's, Allianz, MRCM and NewStar. (*Id.* at ¶580.) What Paramount was really trying to do was to create silos of information among the investors to prevent them from correlating the foreign pre-sales data among the HDS and Melrose Slate films.

In a thoroughly disingenuous follow up communication on June 26, 2004, Palmer wrote to Andrew Springer at Marathon to confirm that Paramount had "faxed the information you requested to your office this afternoon," with the insincere "hope [that] it gives you the data you need to make an informed decision about the Melrose investment." (*Id.* at ¶581.) Palmer added:

> On a personal note, I want to thank you for coming up with the solution you proposed today. Your understanding of Paramount's position on the confidentiality of its proprietary information [which was a fiction] is much appreciated. *I'm certain that if you decide to invest, you will find that Paramount's careful business practices and almost obsessive attention to detail are hallmarks of its financial behavior, and that you will benefit from them as an investor.*

(*Id.* at ¶582 (emphasis supplied).)

On or about July 30, 2004 Marathon purchased $7 million of the Class B notes and $3 million of membership interests in Melrose. (*Id.* at ¶583.)

---

no such co-financing had been achieved to date for any of the films in the Melrose Slate. (SOF ¶ 183). However, this characterization of Ex. 46 (which was dated June 25, 2004) is belied by the fact that various earlier iterations of the Tentative Slate Reports (as of May 27, 2004) plainly show other forms of risk mitigation, including foreign presales. Moreover, it is easy enough to see that the amount of co-financing referred to in Ex. 46, *i.e.*, over $274 million, is vastly in excess of the sum of all financings attributable to defeasance deals, etc., which amounted at the time to only about $37 million. Thus, rather than indicating that no co-financings other than those identified had taken place with respect to the Melrose Slate, by Ex. 46 Paramount provided an intentionally limited picture of what co-financing Paramount had obtained for the listed films. (*Id.*) Paramount thus has mischaracterized Ex. 46 in order to make it appear to contain more information than it, in fact, does contain. The significance of Ex. 46 is that this disclosure provided Marathon with absolutely no information about the use of foreign presales for some of the films likely to be included in the Melrose Slate.

**H.    The Tentative Slate Reports Did Not Cure Paramount's Fraud**

Paramount relies heavily on the fact that it provided Plaintiffs with Tentative Slate Reports in or about June 2004, which reported various levels of information for approximately 20 films identified at the time as being part of the Melrose Slate. (*Id.* at ¶584.)

Nevertheless, what Paramount ignores is that the Tentative Slate Reports all specifically cautioned that they were "TENTATIVE," "SUBJECT TO CHANGE" and "LIKELY TO BE ADJUSTED FROM TIME TO TIME." (*Id.* at ¶585.)  This caveat resonated, particularly given the fact that five more films eventually in the Melrose Slate were not identified at that time, including *Mission: Impossible III* and *War of the Worlds*, the largest films in the slate and each of which could have been pre-sold internationally for enormous sums. (*Id.* at ¶586.)[12]

Additionally, Plaintiffs had no ability to directly compare the (limited) co-financing information presented in the Tentative Slate Reports with the same information for the films in the HDS.  That is because Paramount, ostensibly for "confidentiality" reasons (which we now know was a sham excuse), refused to provide equivalent information to Plaintiffs. (*Id.* at ¶588.)  Instead, Paramount provided an aggregate co-financing amount for the films in the HDS. (*Id.* at ¶589.)

Moreover, there was no way for Plaintiffs to predict how many more films or what other films would become part of the Melrose Slate at the time the Tentative Slate Reports were provided. (*Id.* at ¶590.)  Plaintiffs did not know when they invested if there would be five more films or twenty. The ultimate number of films in the Melrose Slate was a function of how quickly the investors' capital was spent, which depended on a host of factors, including the amount of co-financing in the future films and their resultant net production cost, which only Paramount could have known or estimated. (*Id.* at ¶591.)

---

[12] At least Paramount's caveat to the Slate Update was accurate:  another film mentioned in the Slate Update, *The Weather Man*, actually was the subject of foreign pre-sales but was not identified as such. (*Id.* at ¶587.)

Thus, notwithstanding Paramount's current litigation position, the Tentative Slate Reports were not meaningful, full disclosures, and certainly did not indicate (and were not intended to indicate) to Plaintiffs that Paramount intended there to be practically no foreign pre-sales for the films in the Melrose Slate.

## I.    The Documentary Disclaimers In Favor Of Paramount Are Inapt And Ineffective

A "General Disclaimer" at the beginning of the PPM purporting that Paramount and its affiliates had nothing to do with the preparation of the PPM is false.  (*Id.* at ¶592.)  The General Disclaimer states, *inter alia*:

> NONE OF PARAMOUNT PICTURES CORPORATION, VIACOM INC., ANY PARENT, SUBSIDIARY OR AFFILIATE THEREOF HAS PREPARED THIS DOCUMENT.

(*Id.* at ¶593.)

Discovery revealed that *Paramount* drafted the General Disclaimer and required Merrill to insert it into the PPM.  (*Id.* at ¶594.)  The statement in the General Disclaimer that Paramount had not prepared the document is, itself, a lie.  Moreover, as this Court previously found, the General Disclaimer fails to address the use of international pre-sales specifically, and is thus ineffective to bar Plaintiffs' claim as a matter of law. (4/12/11 Hrg. Tr. at 22:8-33:23)

A further boilerplate disclaimer in the PPM that "[t]here can be no assurance that Paramount will implement the same techniques or achieve similar results in the future as it has in the past" is itself misleading in suggesting that foreign pre-sales remained a viable technique still implemented by Paramount at the time, when, in fact, Paramount had already privately decided no longer to implement that technique in any material fashion (and to conceal that fact from potential investors). (Rule 56.1-C at ¶¶595-96).[13]

---

[13] Paramount cites to another disclaimer in the PPM that potential investors in Melrose "will not be investors in Paramount Pictures Corporation, will have no direct interest in Paramount Pictures Corporation or any of its assets (including any motion picture) and will have no standing or recourse against Paramount Pictures Corporation, Viacom

Other disclaimers in the Subscription Agreement to the Melrose securities transaction are simply ineffective to bar Plaintiffs' claims against Paramount.

Paragraph 4(s) of the Subscription Agreement, relied upon heavily by Paramount and stating (*inter alia*) that no representations were made as to whether the films in the Melrose Slate "will be distributed in any particular manner", is entirely irrelevant as it deals with the manner in which Paramount was to "market" and "release" – *i.e.*, "distribute" – its films to audiences: *e.g.*, Paramount retained the right to determine whether the films in the Melrose Slate should be subject to "wide releases" (of thousands of theaters) or "platform" releases (of only several theaters). (*Id.* at ¶598.) Paragraph 4(s) does not address co-financings, risk mitigation or foreign pre-sales whatsoever.

Likewise, Paragraph 4(t) of the Subscription Agreement, which "waives and releases Paramount … from liability arising out of the matters described in paragraph 4(s)", is ineffective. (*Id.* at ¶598.) Paragraph 4(t) is inapposite for the same reason that paragraph 4(s) is inapposite: Plaintiffs have not sued based upon the manner of theatrical releases of the films in the Melrose Slate or asserted that the Melrose Slate should have achieved some guaranteed level of performance. Nor is the purported general release of Paramount in paragraph 4(t) effective to acquit Paramount of its fraud as a matter of law, particularly where none of Plaintiffs knew of Paramount's misconduct with an intent to release Paramount from its wrongdoing.

## ARGUMENT

I. **THERE ARE GENUINE ISSUES OF MATERIAL FACT AS TO PARAMOUNT'S LIABILITY FOR FEDERAL SECURITIES FRAUD**

Plaintiffs and their professional investment advisors – sophisticated investors – were duped by Paramount because it concealed its intention to abandon a crucial risk mitigation strategy, foreign

---

Inc., or their affiliates." (*Id.* at ¶22.) This disclaimer is immaterial because Plaintiffs are not claiming that they became investors of Paramount and they are not purporting to sue Paramount as such. Plaintiffs are suing Paramount for fraudulently inducing them to purchase securities in Melrose based upon Paramount's false and intentionally misleading statements and omissions in the PPM. Paramount does not actually rely on this language in making any specific arguments in its summary judgment motion.

23

pre-sales, which materially changed the risk profile of Plaintiffs' investment to their detriment. Paramount changed its strategy away from foreign pre-sales (which provided protection to Paramount's outside investors) in favor of shared pot deals (which favored Paramount as a studio). Paramount misled and lulled investors into thinking that the HDS constituted a fair and accurate standard of comparison by which to evaluate and invest in Melrose, and Paramount encouraged extensive due diligence on a data set that only Paramount knew was substantially meaningless.

Paramount's mantra is that Plaintiffs are "highly sophisticated," as if that frees Paramount to engage in fraud without risk. A sophisticated investor may well be capable of using disclosed information to make an informed investment decision. But where the disclosed information is false, and material facts are concealed, no amount of sophistication will save the investor from making the wrong investment decision. Paramount's selective portrayal of the evidence in this case easily could (and likely would) be rejected by a jury. Paramount's motion for summary judgment should be denied. *E.g.*, *Gould v. Winstar Commc'ns, Inc.*, 692 F.3d 148, 158 (2d Cir. 2012) ("'[a]n issue of fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'") (citation omitted) (reversing summary judgment in Rule 10b-5 action).

"To sustain a claim under Section 10(b) of the Exchange Act and Rule 10b-5, [a plaintiff] must show '(i) a material misrepresentation or omission; (ii) scienter; (iii) "a connection with the purchase or sale of a security" [;] (iv) reliance by the plaintiff(s); (v) economic loss; and (vi) loss causation.'" *Id.* (citations omitted). In addition, the defendant must have "made" the material misstatements and/or omissions in the challenged prospectus, meaning the defendant must have had "ultimate authority over the statement, including its content and whether and how to communicate it." *Janus Capital Grp., Inc. v. First Derivative Traders*, 131 S. Ct. 2296, 2302 (U.S. 2011).

Paramount selectively challenges Plaintiffs' Rule 10b-5 claim and contends that: (a) the PPM does not misstate or omit any material facts; (b) Paramount did not have ultimate authority over and

did not "make" the material misstatements and omissions in the PPM; and (c) Plaintiffs could not have actually and justifiably relied on the PPM's misstatements and omissions.  A jury could readily return a finding in favor of Plaintiffs on every one of these issues.

### A.     The PPM Includes Material Misstatements Of Fact

The PPM states that Paramount intended to "opportunistically enter[] into output agreements and territory sales with third parties" and to "selectively pursue[]" such opportunities in connection with the Melrose Slate.  (Rule 56.1-C at ¶506.)  These statements were false.

The record shows that Paramount did not try at all to "pursue" pre-sales for 23 of the 25 films in the Melrose Slate.  (*Id.* at ¶471.)  Paramount's Rule 30(b)(6) deponent made clear that no efforts at pre-sales were made by Paramount for nearly all of the films in the Melrose Slate, and that no consideration was even given to the subject.  (*Id.* at ¶472.)  Paramount has no evidence that would support its claim that it "pursued" foreign pre-sales for nearly the entirety of the Melrose Slate, "opportunistically," "selectively," or otherwise.  (*Id.* at ¶471-74.)

Likewise, merely pre-selling two of the 25 films in the Melrose Slate, without even being open to the possibility of pre-selling the other 23 films, provides no basis for a jury to find that Paramount was "opportunistic" and "selective" about anything.  The falsity of the PPM on this issue is at least a triable question of fact.

Paramount argues that because it did pre-sell two of the films in the Melrose Slate, and thus did *something*, the PPM is technically accurate in stating that Paramount would "opportunistically" and "selectively" pursue foreign pre-sales, and that Plaintiffs should not be heard to complain about the final amount of pre-selling that was done.  (Def.'s 4/21/14 Br. at 27.)  Paramount's "literal truth" argument is meritless.

It is "'well settled'" that "'so called "half truths" – literally true statements that create a materially misleading impression – will support claims for securities fraud.'"  *United States SEC v.*

25

*Syron*, 934 F. Supp. 2d 609, 629 (S.D.N.Y. 2013) (citations omitted); *see also McMahan & Co. v. Wherehouse Entm't, Inc.*, 900 F.2d 576, 579 (2d Cir. 1990), *superseded by statute on other grounds*, *In re Harmonic Inc. Secs. Litig.*, 163 F. Supp. 2d 1079 (N.D. Cal. 2001) (reversing grant of summary judgment to defendant in securities fraud action and explaining: "We disagree with the district court's atomistic consideration of the presentation of the debentureholders' right to tender. The district court concluded that defendants had not misled plaintiffs [all sophisticated financial institutions] because the information they included in the written and oral representations was 'literally true'. We think, however, that when read as a whole, the defendants' representations connoted a richer message than that conveyed by a literal reading of the statements…. *Some statements, although literally accurate, can become, through their context and manner of presentation, devices which mislead investors.*") (internal citation omitted) (emphasis supplied).

Paramount may not avoid liability upon the pretense and technicality that its *de minimis* pre-sales efforts render the PPM truthful. A jury could certainly find that, according to any common sense understanding of the terms "opportunistic" and "selective," Paramount intended the PPM to connote a fundamentally different message than merely that it intended to pre-sell two films in the Melrose Slate. *See United States SEC v. China Ne Petroleum Holdings Ltd*, 2014 U.S. Dist. LEXIS 45423, at *22-25 (S.D.N.Y. Mar. 26, 2014) ("[The defendant's] suggested definition is so broad as to render the phrase 'general corporate purposes' meaningless. Any common-sense understanding of 'general corporate purposes' does not include funneling shareholder funds to company insiders and their family members, ….'") (citation omitted).

Particularly given the context of the HDS, which employed a level of pre-sales far in excess of what Paramount intended to achieve for the Melrose Slate (*i.e.*, 24% for the HDS versus 3.5% for the Melrose Slate), and which Paramount said should be used as a basis for projection, a jury could find that the PPM required something more than a *de minimis* effort. The quantum of pre-sales

embedded in the co-financing data of the HDS created a benchmark against which to measure Paramount's future performance for the Melrose Slate, and is relevant to determining whether Paramount acted in accordance with its representations in the PPM. *See Syron*, 934 F. Supp. 2d at 626-27 (finding that prefatory paragraph in financial statements "establishe[d] the baseline against which to judge the accuracy of the company's disclosures").

**B.**    **The PPM Also Suffers From A Material Omission Of Fact**

The PPM omits a material fact that makes the PPM misleading:  *i.e.*, that Paramount had changed its business strategy to "Retain More Foreign Rights".

Nowhere in the PPM did Paramount disclose that it had decided to fundamentally change its risk mitigation activities by adopting a new strategy away from foreign pre-sales well before Plaintiffs invested.   As this Court observed years ago, in connection with Paramount's *second* motion to dismiss:

> And I would like to say that investors, and I would include sophisticated investors in this, if they are considering an investment of tens of millions of dollars, they are inevitably interested in facts. And something that would inevitably be important to such an investor, if there was some change in the practice of the company they're investing in, or a related company that's important, if there is a change, that is of particular importance. It's of importance beyond definitions and general statements. It would have, in my view, unique and particular importance.

(4/28/11 Hrg. Tr. at 33:5-14.)

Instead of disclosing its change and plan to abandon the practice of pre-sales, Paramount willfully misled Plaintiffs into attempting to evaluate the statements in the PPM and the risk of investing by reference to Paramount's past practices as reflected in the HDS.  Paramount likewise informed Plaintiffs and Moody's that there would be no significant change in Paramount's use of pre-sales.  Paramount purposefully lulled and deflected Plaintiffs' attention away from any analysis of the quantum of pre-sales that might be done in the future.  Paramount now cynically argues that

Plaintiffs should have inquired more about Paramount's intended use of international pre-sales. (Def.'s 4/21/14 Br. at 33.)

Citing *In re Lehman Bros. Secs. and ERISA Litig.*, 2013 U.S. Dist. LEXIS 152801, at *10-11 (S.D.N.Y. Oct. 22, 2013), Paramount contends that, because the subject of pre-sales was specifically raised in the PPM, Plaintiffs may not characterize Paramount's failure to disclose its change in business plan as an "omission." (Def.'s 4/21/14 Br. at 28.) Paramount argues that its omission is nothing more than the flip-side of a misrepresentation (Paramount makes this argument to avoid the presumption of reliance afforded in omissions cases under *Affiliated Ute Citizens v. United States*, 406 U.S. 128, 153-54 (1972)). (*Id.*) Nevertheless, the authorities are clear that a fraud may consist of *both* misrepresentations and omissions and that, where the omission is independent, or at least interdependent, the presumption of reliance under *Affiliated Ute* should apply regardless of the characterization of the case as a "misrepresentation" or "omission" action. *E.g.*, *In re Parmalat Secs. Litig.*, 2008 U.S. Dist. LEXIS 64296, at *32 (S.D.N.Y. Aug. 20, 2008); *Fogarazzo v. Lehman Bros., Inc.*, 232 F.R.D. 176, 186 (S.D.N.Y. 2005); *In re WorldCom, Inc. Secs. Litig.*, 219 F.R.D. 267, 298 (S.D.N.Y. 2003).

For example, in *In re Smith Barney Transfer Agent Litig.*, 290 F.R.D. 42, 48 (S.D.N.Y. 2013), the plaintiffs alleged that certain statements made by the defendants were false and misleading because the statements "fail[ed] to mention anything about the transfer agent scheme that [the defendants had] concocted." *Id.* The defendants argued (as Paramount does here) that the existence of positive statements made the case one about misrepresentations, not about omissions. The court disagreed.

The court found that "[a] diligent investor could scour the relevant prospectuses and learn only that (1) [defendant A] served as the Funds' transfer agent; (2) [defendant B] served as the Funds' sub-transfer agent; and (3) both of these entities performed certain services for the funds." *Id.* at 48. The court found that "[t]hese disclosures are truthful, as far as they go. *But what makes them misleading*

28

*is what they do not say:*  that [defendant A] did virtually nothing, that [defendant B] performed the bulk of the transfer agent services at a discounted rate, and that [defendant C] pocketed the difference." *Id.* (emphasis supplied)  Thus, "[w]hile investors could potentially rely on the disclosures that [defendants A and B] performed certain functions, they could not know – and therefore could not rely on – the fact that this arrangement was implemented to generate profits for [defendant C] at the Funds' expense." *Id.*  Because "the real nature of the arrangement" had been concealed, an omission claim was raised. *Id.*

So, too, here.  Although the PPM identified pre-sales as a risk mitigation technique, there was absolutely nothing to alert Plaintiffs that this technique had been abandoned. *No* study of the PPM could yield that piece of information.

Moreover, the quantitative analysis of the HDS that Paramount encouraged Plaintiffs to do, and which they in fact performed, was meaningless with respect to the level of pre-sales in the Melrose Slate because all the simulations were based on the data provided by Paramount, which included a robust level of pre-sales instead of the vestigial amount actually used in the Melrose Slate.

This is precisely the kind of situation in which the presumption of reliance under *Affiliated Ute* should apply.  It is a situation in which the omission is material and comes of out left field, blindsiding the plaintiff and preventing (as intended) effective inquiry or diligence.  Given Paramount's studied and consistent efforts to conceal the important change in business plan from Plaintiffs, Plaintiffs never could have ferreted out the true level of pre-sales that Paramount intended to use in the Melrose Slate.

## C.   Paramount "Made" The PPM's False Statements And Omissions

In connection with Paramount's *third* motion to dismiss, this Court rejected Paramount's *Janus*-based argument that Paramount could not have "made" the actionable statements and omissions in connection with the PPM.  Specifically, the Court ruled:

29

> The second amended complaint alleges quite clearly that Paramount made the statements in the PPM which are alleged to be false and misleading.... It is clear that the allegation is that Paramount withheld the information about that change and that in so doing Paramount made the parts of the PPM relevant to that subject false and misleading.

(1/19/12 Hrg. Tr. at 34:21-35:16.)

Discovery has confirmed the accuracy of Plaintiffs' allegations. Paramount's motion for summary judgment should be denied.

The Supreme Court explained in *Janus* that, "[f]or purposes of Rule 10b-5, the maker of a statement is the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it. Without control, a person or entity can *merely suggest* what to say, not '*make*' a statement in its own right. One who prepares or publishes a statement on behalf of another is not its maker." 131 S. Ct. at 2302 (emphases supplied).[14]

Melrose is a construct. It has no information to give or conceal. Every bit of information ostensibly imparted by Melrose is Paramount's information. A jury could (and likely would) find that Paramount "made" the statements and omissions at issue.

Paramount controlled the PPM's content. (Rule 56.1-C at ¶¶486-496.) The PPM is almost entirely about Paramount, which is mentioned over 350 times. (*Id*.) Paramount conditioned its participation in the Melrose transaction on the term that the PPM and related documents would be "in forms and substance acceptable to Paramount". (*Id*.) Paramount approved or drafted the PPM's language. (*Id*.) Paramount curated all of the HDS data. (*Id*.) Paramount decided what

---

[14] Paramount misstates the law when it claims that it "can be considered the 'maker' of the statements in the PPM only if there is evidence that '(a) [Paramount] filed the prospectus and falsely attributed statements to the purported filer or (b) there is evidence on the face of the prospectus that the statements in the prospectus came from [Paramount]." (Def.'s 4/21/14 Br. at 35 (quoting *Krasner v. Rahfco Funds LP*, No. 11 CV 4092 (VB), 2012 U.S. Dist. LEXIS 134352, at *11 (S.D.N.Y. Aug. 9, 2012)).) *Janus* is not such a narrow holding. *E.g., Liberty Media Corp. v. Vivendi Universal, S.A.*, 861 F. Supp. 2d 262, 271 (S.D.N.Y. 2012) ("But *Janus* states that 'in the ordinary case, attribution within a statement or implicit from surrounding circumstances is strong evidence that a statement was made by – and only by – the party to whom it is attributed.'... [In this case] there is no issue of fact that the documents containing the omissions and misstatements, including press releases, went through a long vetting process and were ultimately approved by the Board of Directors, indicating that the corporation had ultimate control.") (quoting *Janus*, 131 S. Ct. at 2302).

information *not* to provide to Plaintiffs.  (*Id.* at ¶499.)  Paramount often spoke through Merrill to provide investment information to Plaintiffs and Moody's; although in dealing with Marathon, Paramount communicated directly to provide information that would purportedly help Marathon "make an informed decision about the Melrose investment."  Top executives of Paramount met with the Plaintiffs personally to exploit Paramount's business plan while concealing the truth. (*Id.* at ¶500.) While Plaintiffs believe that, as a matter of law, Paramount is responsible for the entirety of the PPM, at the very least there are genuine issues of fact as to Paramount's "ultimate authority" over what the PPM did – and did not – say.

Paramount's invocation of the PPM's disclaimer that Paramount purportedly did not "prepare" the PPM has almost an *Alice In Wonderland* sense to it.  (Def.'s 4/21/14 Br. at 35.)  First, the disclaimer itself is false because even it was prepared by Paramount.   ((*Id.* at ¶¶592-94.) Moreover, it is indisputable that Paramount, not Melrose, is the source of all information and the ultimate arbiter of what was included and what was excluded from the PPM (and how it was said).[15]

### D.   Plaintiffs Actually And Reasonably Relied On The PPM's False Statements And Omissions

Contrary to Paramount's mischaracterization of the evidence, the record shows that each Plaintiff actually and reasonably relied on the PPM in making their investment decisions.  (*Id. at* ¶¶537-83.)  This included, in particular, relying on the PPM's statements that foreign pre-sales of the Melrose Slate would, in fact, be "pursued" by Paramount in reasonable relation to the HDS levels. (*Id.* at ¶537-583.)

---

[15] The requirement of *Janus* applies only to Plaintiffs' federal securities fraud claim, not to their common law fraud and fraudulent concealment claims.

**1.      Each Plaintiff's Actual And Reasonable Reliance On The PPM's
Material Omission About Paramount's Undisclosed Change
In Business Strategy Is Presumed And Unrebutted By Paramount**

As mentioned above, "[t]here is no burden to prove reliance on an omission." *In re
WorldCom, Inc. §. Litig.*, 219 F.R.D. 267, 298 (S.D.N.Y. 2003) (citing *Affiliated Ute*, 406 U.S. at 153-54).
That is because Plaintiffs could not possibly prove that they relied upon a fact they knew nothing
about – because Paramount actively concealed such information from Plaintiffs. *See, e.g., In re Smith
Barney*, 290 F.R.D. at 47; *see also Louros v. Kreicas*, 367 F. Supp. 2d 572, 592 (S.D.N.Y. 2005)
(justifiable reliance is presumed, rebuttably, in omissions cases).

Plaintiffs are thus presumed to have actually and reasonably relied on Paramount's material
omission of its change in strategy to "Retain More Foreign Rights". Moreover, because this case
primarily involves Paramount's failure to disclose its change in strategy, the *Affiliated Ute*
presumption of reliance applies to Plaintiffs' federal claim, notwithstanding that the claim is "'based
on a combination of omissions and misstatements". *Fogarazzo*, 232 F.R.D. at 186; *accord Dodona I,
LLC v. Goldman, Sachs & Co.*, 296 F.R.D. 261, 269-70 (S.D.N.Y. 2014); *WorldCom*, 219 F.R.D. at 298.

While the presumption of reliance is rebuttable, Paramount adduced no evidence to rebut it.
In other words, contrary to Paramount's assertion, Plaintiffs were not under a duty to ferret out a
fraud that had been concealed from them.

Paramount's reliance on the Tentative Slate Reports as having supposedly provided Plaintiffs
with "the actual levels of co-financing, including international pre-sales, in the Melrose Slate as of
that date," is wholly misplaced. (Def.'s 4/21/14 Br. at 31.) The Tentative Slate Reports hardly
rebut the presumption of Plaintiffs' reliance on Paramount's undisclosed intention to practically
abandon foreign pre-sales as a risk mitigation strategy. Indeed, the record reflects that Paramount
told Moody's (through Merrill) that the Tentative Slate Reports' omission of detail and scant
reporting as to "other means" of co-financing, including foreign pre-sales, meant that investors

should "look at historical data" (*i.e.*, from the HDS) to determine anticipated co-financing levels "and project that amount going forward" for the Melrose Slate. (Rule 56.1-C at ¶534.) In addition, the Tentative Slate Reports, which were incomplete documents that failed to identify some of the biggest films that would become part of the Melrose Slate, included specific caveats that they were "TENTATIVE," "SUBJECT TO CHANGE" and "LIKELY TO BE ADJUSTED". (*Id.* at ¶585.)

### 2.     Marathon Actually Relied On The PPM's Material Misstatements

Marathon relied on the PPM's statements about Paramount's intention to opportunistically pursue foreign pre-sales for the Melrose Slate. Paramount's assertion that "Marathon acknowledged that Paramount never talked 'specifics' about the 'percentage of foreign sales, as opposed to [shared] pot deals,'" is in direct conflict with the facts. (Def.'s 4/21/14 Br. at 30.)

The record reflects that Marathon specifically asked Paramount for the "[b]reakout of size and type of co-financing by picture" for the HDS, and also asked for the "breakdown of the co-financings for the upcoming [Melrose Slate]." (Rule 56.1-C at ¶¶569, 577.) After much bargaining, Paramount provided the HDS breakout, which had been provided previously to Moody's, and also provided a document relating to the Melrose Slate, which did not identify the amount of pre-sales on the falsely stated ground that such information was "confidential" and "proprietary." (*Id.* at ¶579-82.) Unbeknownst to Marathon, Paramount had provided the other Plaintiffs with greater detail. (*Id.* at ¶580.) That deliberate evasion by Paramount does not disprove Marathon's actual reliance on the PPM and on Paramount's insistence that the HDS should be considered in evaluating Melrose.

### 3.     Allianz Actually Relied On The PPM's Material Misstatements

Paramount's assertion that Allianz supposedly "admitted that it did not even consider the significance of various co-financing techniques to mitigate risk, including Paramount's use of international pre-sales," is false. To support this assertion, Paramount relies on the testimony of a subpoenaed individual formerly associated with Allianz (ten years ago), who testified that he could

not recall anything about foreign pre-sales (or almost anything else) one way or another, but who nonetheless also testified that Allianz's investment advisor, Harris Maslansky, could answer questions about Allianz's consideration of foreign pre-sales. Maslansky did so, and testified that he was most certainly "led to believe" by Paramount that the Melrose Slate would be subject to similar foreign pre-sales levels as the HDS, and that he relied on that position in advising Allianz. (Rule 56.1-C at ¶540.)

Paramount also ignores the testimony of Allianz's Rule 30(b)(6) witness, who testified on the subject of co-financing (among other things):

> Q. Did Allianz ask for information about co-financing?
> **A. We relied on the prospectus.**
> ***
> Q. Did you rely on any information outside of the prospectus?
> **A. Only in conjunction with the prospectus.**

(*Id.* at ¶540.) Paramount chose not to ask Allianz's corporate representative any more specific or further questions about its consideration of foreign pre-sales specifically. (*Id.*) Had those questions been asked, Allianz would have testified (as it does in connection with these opposition papers) that it absolutely relied on the PPM's statements about foreign pre-sales. (*Id.*)

### 4.   MRCM Actually Relied On The PPM's Material Misstatements

Paramount acknowledges Maslansky's role in advising MRCM about the Melrose transaction; but Paramount distorts Maslansky's testimony on the subject of reliance.

Paramount claims that Maslansky "specifically advised [MRCM] of the 'risk that [Paramount] will not deal in the international market the way [it] dealt with [the market] before.'" (Def.'s 4/21/14 Br. at 31.) Paramount's counsel elected not to clarify with Maslansky what he meant by that particular answer, but it does not matter because *the very next line of questioning* made Maslansky's (and MRCM's) reliance on the PPM's statements about pre-sales clear:

> Q. Okay. Was one of the risks that you discussed with [MRCM] that the investors had no control over how Paramount would distribute and finance the pictures?

> **A. Certainly on the domestic side that we have discussed. There weren't, you know, as Jen pointed out in her memo, and we probably discussed it, as far as domestic distribution, there was no control. *As far as international, I believe I was led to believe that [Paramount] would continue doing business the way they had done business [i.e., in connection with the HDS].***

(Rule 56.1-C at ¶540 (emphasis supplied).)

Paramount's assertion that MRCM "conceded that Paramount had no discretion as to 'distribution decisions'" is likewise not meaningful. (Def.'s 4/21/14 Br. at 31.) As discussed above, "distribution decisions" concern the method of audience release, such as "wide releases" or "platform releases." "Distribution decisions" are not the equivalent of co-financing methods, including foreign pre-sales.

### 5.   NewStar Actually Relied On The PPM's Material Misstatements

Paramount similarly ignores the relevant record and mischaracterizes the evidence concerning NewStar's actual reliance on the PPM, electing instead simply to parrot the PPM's ineffective boilerplate disclaimer. (Def.'s 4/21/14 Br. at 30.)

As discussed above, NewStar prepared a series of internal memos making clear its reliance on the HDS as informing the meaning of the PPM. (Rule 56.1-C at ¶¶542-44.) NewStar's Rule 30(b)(6) deponent similarly testified:

> Q. But did you understand, sir, that Paramount had discretion to operate differently than it had historically with respect to the films covered by the Melrose Slate?
> **A. I'm not sure I did understand that. I understood that Paramount was going to continue to use the business judgment that they had previously in order to manage their business…. [I]t was important to understand the historical operating policies, procedures and activities of Paramount in order the get comfortable with how they would perform in the future.**
>
> * * *
>
> Q. Do you understand, sir, from the PPM that Paramount had full discretion as to the development, marketing and financing of these films?
> **A. I don't recall if I understood it from the PPM, but it was my general understanding, as I testified previously, that Paramount was the operating partner in the Melrose transaction and that we were, to a large degree, believing that they were going to perform in a way that was in the best interest of Melrose. And was consistent with my understanding of the way they had performed historically….**

35

(*Id.* at ¶540.)

NewStar, like all Plaintiffs, made the mistake of actually relying on the PPM and on Paramount's position that when the PPM stated Paramount would "opportunistically pursue" foreign pre-sales of the Melrose Slate, that should be taken to mean in a manner akin to Paramount's practices with the HDS.[16]

### 6.   All Plaintiffs Reasonably Relied On The PPM's Misstatements

Plaintiffs are all sophisticated parties and were advised, respectively, by sophisticated investment advisors.  Paramount managed to fool them all.  That fact does not reflect a lack of reasonable reliance on the PPM, as Paramount now claims; it reflects the depth of Paramount's efforts to deceive.

Reasonable or justifiable reliance exists when an investor could not have discovered the truth "through minimal diligence . . .".  *Louros*, 367 F. Supp. 2d at 590 (citation omitted).

In this case, the controlling facts are Paramount's concealment of its fraud, its efforts to make important information inaccessible to Plaintiffs through bogus claims of "confidentiality," Plaintiffs' concomitant inability to detect Paramount's fraud notwithstanding their sophisticated Monte Carlo analyses and other diligence efforts, and the specificity of the PPM's and Paramount's statements that Paramount would "pursue" foreign pre-sales of the Melrose Slate in line with the HDS.  (Rule 56.1-C at ¶¶537-583.)  Plaintiffs were not reckless; they were duped.

---

[16] Paramount's reliance on *Wilson v. Comtech Telecomm. Corp.*, 648 F.2d 88, 94 (2d Cir. 1981), is misplaced.  The court in *Wilson* found that the plaintiff could not identify an actionable omission by the defendants because the record showed the plaintiff "did not rely upon any statement by [the defendants] in purchasing his shares . . ." whatsoever.  *Id.*  The defendant's omission, therefore, would have been harmless to the plaintiff.  Unlike the situation in *Wilson*, NewStar, like all Plaintiffs, did read and rely upon the PPM.  The same is true of *Municipality of Bremanger v. Citigroup Global Mkts., Inc.*, No. 09 Civ. 7058 (VM), 2013 U.S. Dist. LEXIS 49603, at *40-41 (S.D.N.Y. Mar. 28, 2013), *aff'd, Mun. Corp. v. Citigroup Global Mkts. Inc.*, 2014 U.S. App. LEXIS 2870 (2d Cir. Feb. 18, 2014), also relied upon by Paramount, where the plaintiff "ha[d] not proffered any facts suggesting that it reviewed or relied [upon] the [challenged disclosures] in making its decision to invest . . . ."

Once again, the PPM's boilerplate disclaimers about "future performance" do not disprove Plaintiffs' reasonable reliance on the PPM's statements about "opportunistic pursuit" of foreign pre-sales for the films in the Melrose Slate. (Def.'s 4/21/14 Br. at 32-33.) The record establishes that Paramount went out of its way to encourage Plaintiffs to believe that "opportunistic pursuit" would mean a level on a par with Paramount's pre-sales practices for the HDS. (Rule 56.1-C at ¶¶522-583.) While the PPM disclaimed any *specific level* of pre-sales for the Melrose Slate, it did nothing to correct the specifically implanted misconception that the HDS should guide Plaintiffs' understanding of what level of foreign pre-sales would be "pursued" by Paramount. In fact, however, Paramount already knew that it intended to pursue *no* foreign pre-sales for nearly all of the films in the Melrose Slate. (*Id.* at ¶596.) *See In re Prudential Secs. Inc. Ltd. P'ships Litig.*, 930 F. Supp. 68, 72 (S.D.N.Y. 1996) ("General risk disclosures in the face of specific known risks which border on certainties do not bespeak caution .... The doctrine of bespeaks caution provides no protection to someone who warns his hiking companion to walk slowly because there might be a ditch ahead when he knows with near certainty that the Grand Canyon lies one foot away.") (citation omitted).

Paramount claims that the PPM's disclaimers "should have prompted, had plaintiffs truly cared about the subject, an independent evaluation by each plaintiff of Paramount's use of co-financing generally and international pre-sales in particular for the Melrose Slate." (Def.'s 4/21/14 Br. at 33.) *That is precisely what each Plaintiff did.* Each Plaintiff independently evaluated the PPM by, among other things, independently evaluating the HDS. (Rule 56.1-C at ¶¶537-583.)

Paramount now disingenuously tries to fault Plaintiffs for not asking Paramount for more information about foreign pre-sales specifically. (Def.'s 4/21/14 Br. at 33.) Yet, the record shows that: (a) Paramount provided the HDS and asked Merrill to run the Monte Carlo Simulation so that Plaintiffs would have the benefit of all of the co-financing data embedded therein, including foreign pre-sales, with the advice to treat such data as the measuring stick for the Melrose Slate; and (b)

37

when Paramount was asked for more specific co-financing breakdowns with respect to the HDS and the Melrose Slate (*i.e.*, by Moody's and by Marathon), Paramount provided different information to different investors under false claims of "confidentiality," and *never* made full and honest disclosures of information to any one party, let alone to all of them. (Rule 56.1-C at ¶¶537-583.)

For these reasons, Paramount's reliance on *Steed Fin. LDC v. Nomura Secs. Int'l, Inc.*, 2004 U.S. Dist. LEXIS 18580, at *26-28 (S.D.N.Y. Sept. 13, 2004), *aff'd*, 148 Fed. Appx. 66 (2d Cir. 2005), is misplaced. In that case, unlike here, the plaintiff was provided a "Litigation Disclosure" that put the plaintiff on notice of "many 'red flags'", which the plaintiff failed to investigate. *Id.* at *27. The PPM did not exempt the plaintiff from having to perform diligence into information that was accessible. *Id.* at *26; *see also Abbey v. 3F Therapeutics, Inc.*, 2011 U.S. Dist. LEXIS 17299, at *33 (S.D.N.Y. Feb. 18, 2011), *aff'd sub nom.*, *Abbey v. Skokos*, 509 Fed. Appx. 92 (2d Cir. 2013) (also inappositely relied upon by Paramount, and finding no reasonable reliance where investor "fail[ed] to review the information made available to him" and "did not seek additional information before investing" even though additional information was accessible to the investor).

In this case, Paramount made certain that Plaintiffs' own due diligence would suffer from misinformation planted by Paramount, and made sure that the true and material information would be inaccessible to Plaintiffs.

Paramount's reliance on *Emergent Capital Inv. Mgmt., LLC v. Stonepath Grp., Inc.*, 343 F.3d 189, 196 (2d Cir. 2003), is similarly misplaced. In that case, the defendant overstated the value of its interest in a property, which was a material basis for the plaintiff's investment decision. *Id.* at 192-93. However, unlike here, the defendant's misstatement did not occur in any written disclosure materials, but rather was made during an oral presentation. *Id.* The plaintiff failed to have the defendant's representation memorialized, and thus the court found that the plaintiff failed to adequately protect itself sufficient to prove reasonable reliance. *Id.* at 196.

Paramount's misstatements are memorialized in the PPM. Moreover, Plaintiffs would not and could not have demanded that Paramount commit in the PPM to any specific foreign pre-sales level because Plaintiffs understood and respected the *real* purpose of the PPM's boilerplate disclaimer, which was to make clear that Paramount intended a specific course of conduct for the Melrose Slate in line with its treatment of the HDS, but not necessarily to proceed in lock-step with the HDS. (Rule 56.1-C at ¶¶537-83.) This case bears no resemblance to *Emergent*.

Finally, Paramount cannot genuinely rely on the Tentative Slate Reports as supposedly putting Plaintiffs "on notice that Paramount might not use the same level of risk mitigation techniques as it had in the past". (Def.'s 4/21/14 Br. at 33-34.) When describing the Tentative Slate Reports to Moody's, Paramount insisted that the minimal foreign pre-sales levels reflected therein were *not* to be relied upon, and that Moody's (and thus the general community of investors) should *"look at historical data to determine what amounts have been co-financed by other means historically and project that amount going forward."* (Rule 56.1-C at ¶534.)

In addition, the Tentative Slate Reports suffer from various limitations which render them largely useless, including, but not limited to, the following:

- They contain disclaimers of reliability.
- Paramount did not provide Plaintiffs with means to evaluate and compare the data in the Tentative Slate Reports to the HDS data.
- The Tentative Slate Reports were missing critical data including any information concerning substantial numbers of additional films.
- Paramount specifically told the investors that the Tentative Slate Reports were incomplete and they should rely on Paramount's pre-sale practice in the HDS.

In *Syron*, the S.E.C. sued former executives of the Federal Home Loan Mortgage Corporation ("Freddie Mac") under the Exchange Act based upon company disclosures that "misled investors as to the true extent of [one of Freddie Mac's lines of business's] subprime exposure." 934 F. Supp. 2d at 625. Defendants argued in *Syron*, as Paramount does here, that even if Freddie Mac's disclosures misrepresented the subprime exposure, the quantitative data provided "refute" any

suggestion that a reasonable investor could have been misled and that the investors could have easily calculated the extent of subprime exposure themselves. *Id.*

The court in *Syron* found that, whatever the merits of Defendants argument based on the quantitative data: "[T]he court cannot conclude that no reasonable investor could have found the alleged misrepresentations and omissions to be material in light of the quantitative disclosures.... *Not every mixture with the true will neutralize the deceptive.*" *Id.* at 630 (emphasis supplied).

In this case, the highly limited and unreliable Tentative Slate Reports do not cure the deceptive nature of the PPM. The impact of the Tentative Slate Reports on the mix of information provided to the Plaintiffs and Plaintiffs' reasonable reliance thereon is a jury question.[17]

## II.    THERE ARE GENUINE ISSUES OF MATERIAL FACT AS TO PARAMOUNT'S LIABILITY FOR COMMON LAW FRAUD

### A.    There Are Genuine Issues Of Fact Regarding The PPM's Misrepresentations

The evidence of fraudulent misstatements by Paramount is overwhelming. (Paramount does not try to contest the element of "scienter.") Even under New York's "clear and convincing" standard of proof, Plaintiffs have demonstrated genuine issues of fact for trial.

Under New York law, "[f]raud requires the following elements:  (1) representation of material fact; (2) falsity; (3) scienter; (4) reasonable reliance; and (5) injury." *Koch v. Greenberg*, 2014 U.S. Dist. LEXIS 44581, at *9-10 (S.D.N.Y. Mar. 31, 2014) (citation omitted).  Unlike Section 10(b)

---

[17] Paramount's far-fetched and footnoted argument that Allianz and MRCM somehow "did not ... purchase securities" in 2004 when they, through swap transactions serving effectively as loans, assumed the economic risks and benefits of the Melrose notes, ignores settled law. (Def.'s 4/21/14 Br. at 25 n.4.) *See Caiola v. Citibank, N.A.*, 295 F.3d 312, 325 (2d Cir. 2002) ("The Supreme Court has cautioned that 'in searching for the meaning and scope of the word "security" ... the emphasis should be on economic reality.'...   [T]he economic reality approach 'permits the SEC and the courts sufficient flexibility to ensure that those who market investments are not able to escape the coverage of the Securities Acts by creating new instruments that would not be covered by a more determinate definition.'") (citations omitted); *see also SEC v. Wyly*, 788 F. Supp. 2d 92, 11-122 (S.D.N.Y. 2011) (holding swap transactions meet the "in connection with" test required to sustain a section 10b-5 claim).  Paramount's argument that Allianz and MRCM cannot prove reliance because they had notice of Paramount's fraud when they took legal possession of the notes in 2006 and 2007, respectively, also lacks merit.  Allianz and MRCM's investment decisions occurred in 2004, as plainly illustrated by the relevant swap documentation, which transferred all economic benefits and risks to Allianz and MRCM as of the 2004 closings, including voting and disposition rights, as well as all clawback, indemnification and due diligence obligations.  In other words, Allianz and MRCM could not escape the obligations of beneficial ownership of the Melrose Securities after the 2004 closings.

claims, material misrepresentations that are not "'made to the plaintiff directly'" can be actionable under New York law, "so long as [the] plaintiff is among the 'class of persons' intended to rely on the statement." *Id.* at *14-15 (citations and quotation omitted).

Plaintiffs' common law fraud claim against Paramount enjoys the benefit of even more directly actionable evidence than Plaintiffs' federal securities fraud claim. In addition to the actionable misrepresentations in the PPM described above, which are equally actionable under New York law, Paramount's blunt misrepresentation to Moody's (through Merrill) that historical co-financing data from the HDS should be projected for the Melrose Slate is itself actionable under New York law. *See id.* at *15 ("[E]ven if Greenberg's statements were made to Zachys or its owner, rather than to Koch himself, so long as Greenberg reasonably expected auction attendees to rely on those statements ... they may be actionable representations under New York law.").

Furthermore, where the evidence shows that Paramount was the "driving force" behind Merrill's representations to Moody's (Rule 56.1-C at ¶¶ 513), Paramount is liable for fraud under New York law. *Koch*, 2014 U.S. Dist. LEXIS 44581, at *15-16 ("[G]iven the testimony at trial, it was reasonable for the jury to find that Greenberg was a driving force behind the catalogue's representations.").

Likewise, Plaintiffs have demonstrated genuine issues of fact concerning their reasonable reliance. Short of spying on Viacom's board room, there was no way for Plaintiffs to discover Paramount's true intentions regarding foreign pre-selling of the Melrose Slate. (*See* Rule 56.1-C at ¶¶512, 525, 541.) Contrary to Paramount's assertion, Plaintiffs' general sophistication is no bar to their relief. (Def.'s 4/21/14 Br. at 41.) *See Koch*, 2014 U.S. Dist. LEXIS 44581, at *21 ("[I]t was reasonable for the jury to conclude that, in light of all the circumstances, and despite Koch's sophistication and his right to inspect the bottles [of fake wine], it was unreasonably difficult or impossible for him to have discovered 'what Greenberg knew.'") (citation omitted); *JP Morgan Chase*

*Bank v. Winnick*, 350 F. Supp. 2d 393, 407-10 (S.D.N.Y. 2004) ("[T]he Second Circuit has characterized the inquiry into what constitutes reasonable reliance as 'always nettlesome because it is so fact-intensive.'… [E]ven had the Banks exercised their right to inspect GC's books, there is no evidence on the present record that they necessarily had the means to discover the fraud…. [T]he obligation to exercise the right of inspection must be understood as contingent on either '*indisputable access* to truth-revealing information,' or some suspicious event or information triggering the duty to inquire. The mere existence of the right to inquire, without more, is not dispositive.") (citations and quotation omitted).

**B.**    **There Are Genuine Issues Of Fact Regarding Paramount's Omission Of Fact**

Paramount misstates New York law when it claims that Plaintiffs' fraud claim cannot be predicated on Paramount's omission or fraudulent concealment of material fact regarding its secret plan to "Retain More Foreign Rights." (Def.'s 4/21/14 Br. at 41-42.)

Notwithstanding Paramount's invented "rule" that only fiduciary relationships or "egregious factual situations" (whatever that may mean) are actionable as omissions or fraudulent concealment claims, the truth is that, "under New York law, silence or omission with respect to a material fact can serve as the equivalent of an affirmative misrepresentation where either: (1) 'one party possesses superior knowledge, not readily available to the other,' or (2) 'the party has made a partial or ambiguous statement, on the theory that once a party has undertaken to mention a relevant fact to the other party it cannot give only half of the truth.'" *Koch*, 2014 U.S. Dist. LEXIS 44581, at *16 (quotation omitted); *see also Winnick*, 350 F. Supp. 2d at 410 ("Under New York law, a plaintiff is not precluded from claiming reliance if the facts allegedly misrepresented [by concealment] are 'peculiarly within the [defendant's] knowledge.'") (quotation omitted).

There is no question that Paramount possessed superior knowledge (relative to Plaintiffs) about its undisclosed PowerPoint Presentation and its privately held plan to all-but abandon foreign

pre-sales in connection with the Melrose Slate.   (Rule 56.1-C at ¶462-63.)   Plaintiffs have

demonstrated ample basis to have a jury decide their fraudulent concealment claim.[18]

### C.    Plaintiffs Elect The Remedy Of Damages, Not Rescission

As Paramount well knows from the parties' exchange of extensive damages expert reports,

Plaintiffs seek damages under their common law fraud claim, not rescission.   To the extent their

pleading continues to mistakenly indicate otherwise notwithstanding the later discovery in the case,

Plaintiffs' pleading should be conformed to Plaintiffs' actual election of remedies.   *See, e.g., Omega*

*Exec. Servs., Inc. v. Grant*, 1980 U.S. Dist. LEXIS 13607, at *2-7 (S.D.N.Y. Aug. 22, 1980); *In re*

*Adelphia Communs. Corp.*, 376 B.R. 87, 106 (Bankr. S.D.N.Y. 2007).[19]

## III.    PLAINTIFFS' UNJUST ENRICHMENT CLAIM SHOULD BE TRIED

To state a claim for unjust enrichment under New York law, a plaintiff must allege that the

defendant benefited at the plaintiff's expense, and that the circumstances are such that equity and

good conscience require the defendant to make restitution.   *Mazzaro De Abreu v. Bank of Am. Corp.*,

525 F. Supp. 2d 381, 397 (S.D.N.Y. 2007).

---

[18] Paramount's authorities cited at page 42 of their brief are distinguishable because in each case the plaintiff had a viable means to access the omitted information. *Albion Alliance Mezzanine Fund, L.P. v. State St. Bank & Trust Co.*, 797 N.Y.S.2d 699, 704-05 (1st Dep't 2003), *aff'd*, 2 A.D.3d 162 (1st Dep't 2003); *Societe Nationale D'Exploitation Industrielle Des Tabacs Et Allumettes v. Salomon Bros. Int'l, Ltd.*, 702 N.Y.S.2d 258, 259 (1st Dep't 2000). Paramount's assertion that Plaintiffs "could have requested the information they now appear to claim was so essential to their investment decision" is galling where the record shows that Paramount went to great lengths to conceal the whole truth from those who did ask for more information than the HDS and Monte Carlo Simulation, including Marathon and Moody's. (Rule 56.1-C at ¶¶522, 536, 565-583.)

[19] Paramount is also mistaken that there is "absolutely no basis for any award of punitive damages here." (Def.'s 4/21/14 Br. at 45 n.6.) Punitive damages may be awarded under New York law where the fraud "'is founded upon such moral indifference as to be . . . demonstrative of a criminal indifference to civil obligations.'" *Koch*, 2014 U.S. Dist. LEXIS 44581, at *62 (citation omitted). The record reflects Paramount's moral indifference to the truth and its conscious efforts to conceal the truth. Paramount played a shell game with its information among potential investors, and it offered false protests of "confidentiality" to avoid further scrutiny. Making matters worse, Paramount treated its discovery obligations in this case as merely optional, and it embarked a plan of parading witnesses who professed not to know the most basic information about the Melrose Slate, and of withholding material documents concerning foreign pre-sales, including in particular the PowerPoint Presentation. As Paramount points out, a number of Melrose investors never sued Paramount. That enabled Paramount to recover a windfall of over $30 million (on top of the compensatory damages owed to Plaintiffs). Paramount is undeserving of that windfall, which is the proceeds of its fraud. Punitive damages to Plaintiffs will be appropriate in this case.

For all the reasons stated above, Plaintiffs have demonstrated abundant genuine issues of fact that would prove Paramount's unjust enrichment. *See, e.g., Allianz Risk Transfer v. Paramount Pictures Corp.*, 2010 U.S. Dist. LEXIS 32218, at *26-27 (S.D.N.Y. Mar. 31, 2010) (previously finding that "Paramount's argument that the dismissal of plaintiffs' fraud claims requires dismissal of the unjust enrichment claim is not correct."); *JHW Greentree Cap., L.P. v. Whittier Trust Co.*, 2006 U.S. Dist. LEXIS 22400, at *22 (S.D.N.Y. Apr. 24, 2006).

## IV.   PLAINTIFFS DID NOT WAIVE OR RELEASE THEIR CLAIMS

Paramount is incorrect that Plaintiffs' claims "are barred by the express waiver and release provisions of the Subscription Agreement." (Def.'s 4/21/14 Br. at 24, 26.)  Paragraphs 4(s) and 4(t) of that agreement do not bar any of Plaintiffs' claims.

Paragraph 4(s) concerns the method of film "distribution" by Paramount, meaning distribution to the public in "wide release" or "platform release" formats. (Rule 56.1-C at ¶597.) Paragraph 4(s)'s reference to "any particular manner" of "distribution" has nothing to do with co-financing. (*Id.* at ¶597.)  Paramount is disingenuous when it contends that Paragraph 4(s) is "*specific to the matters about which plaintiffs now bring suit.*" (Def.'s 4/21/14 Br. at 24.)

Likewise, Paragraph 4(t) is not specific to the issues in this case because Paragraph 4(t) implements a waiver and release only in connection with "the matters described in paragraph [4](s)," which are inapposite. (Rule 56.1-C at ¶598.)[20]

To the extent Paragraph 4(t) provides a general disclaimer of any "duty" to Plaintiffs, that general disclaimer is ineffective and does not bar Plaintiffs' claims as a matter of law.  At all times, the material facts were "'peculiarly within [Paramount's] knowledge'" and not "accessible" to

---

[20] Paramount's reliance on *Harsco Corp. v. Segui*, 91 F.3d 337, 345 (2d Cir. 1996), and *Brown v. E.F. Hutton Grp., Inc.*, 991 F.2d 1020, 1033 (2d Cir. 1993), is misplaced.  Those cases restate the rule that "where a party *specifically* disclaims reliance upon a *particular* representation in a contract," that party cannot later claim fraudulent inducement. *Id.* (citation omitted) (emphases supplied).  Nothing in Paragraphs 4(s) or 4(t) purports to specifically disclaim reliance on the subject of foreign pre-sales.

Plaintiffs or discoverable by Plaintiffs through "'the exercise of ordinary intelligence'". *Koch*, 2014 U.S. Dist. LEXIS 44581, at *19 (citation omitted). Thus, Paragraph 4(t) is no bar to Plaintiffs' claims. *See also Turkish v. Kasenetz*, 27 F.3d 23, 27-28 (2d Cir. 1994) ("We could not uphold any provision intended to insulate parties from their own fraud.") (citation omitted); *E\*Trade Fin. Corp. v. Deutsche Bank AG*, 420 F. Supp. 2d 273, 284 (S.D.N.Y. 2006) ("Because E\*Trade has alleged that in October 2003 it was unaware of the facts giving rise to its claims here, E\*Trade did not and could not release any of its tort or statutory claims."); *Maddaloni Jewelers, Inc. v. Rolex Watch U.S.A., Inc.*, 354 F. Supp. 2d 293, 299 (S.D.N.Y. 2004) ("New York law does not construe a general release to bar claims for injuries unknown at the time the release was executed, even when the release contains broad language") (citation omitted).

Furthermore, where Paramount affirmatively offered information to Plaintiffs, both through Merrill and directly, with the intention for Plaintiffs to rely on that information, Paramount cannot now turn around and disclaim that it had "any duty" to have spoken truthfully and to have disclosed all material facts that were peculiarly within its knowledge. *See, e.g., Tahini Invest., Ltd. v. Bobrowsky*, 99 A.D.2d 489, 490 (2d Dep't 1984) ("[E]ven where the parties have executed a specific disclaimer of reliance on a seller's representations, a purchaser may not be precluded from claiming reliance on any oral misrepresentations if the facts allegedly misrepresented are peculiarly within the seller's knowledge") (citations omitted).

## CONCLUSION

For the foregoing reasons, and upon the papers accompanying this memorandum of law, Plaintiffs respectfully request that the Court deny Defendant Paramount's motion for summary judgment in all respects, and that the Court award Plaintiffs such other and further relief as deemed just and proper.

Dated:  New York, New York
        July 3, 2014

PRYOR CASHMAN LLP

By: _____
     James A. Janowitz
     William L. Charron
     Bryan T. Mohler
     Benjamin S. Akley
     Kathleen M. Prystowsky
7 Times Square
New York, New York  10036
(212) 421-4100
*Attorneys for Plaintiffs*