UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ALLIANZ RISK TRANSFER AG, MARATHON STRUCTURED FINANCE FUND, LP, NEWSTAR FINANCIAL, INC., and MUNICH RE CAPITAL MARKETS NEW YORK, INC., <br><br> Plaintiffs, <br><br> v. <br><br> PARAMOUNT PICTURES CORPORATION, <br><br> Defendant. | No. 1:08-CV-10420 (TPG) |

**REPLY MEMORANDUM IN SUPPORT OF
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**


PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP
1285 Avenue of the Americas
New York, New York 10019-6064
Tel:  (212) 373-3000

– and –

KENDALL BRILL & KLIEGER LLP
10100 Santa Monica Boulevard, Suite 1725
Los Angeles, CA 90067
Tel:  (310) 556-2700

*Attorneys for Defendant
Paramount Pictures Corporation*

## Table of Contents

**Page**

Table of Authorities ...................................................................................................... ii

Preliminary Statement .................................................................................................. 1

I.    PLAINTIFFS WAIVED AND RELEASED ALL OF THEIR PURPORTED CLAIMS AGAINST PARAMOUNT .................................................................... 3

II.   PLAINTIFFS' CARBON-COPY DECLARATIONS THAT CONTRADICT THEIR DEPOSITION TESTIMONY CANNOT CREATE A MATERIAL QUESTION OF DISPUTED FACT .................................................................... 7

III.  PLAINTIFFS CANNOT PROVE THEIR FEDERAL SECURITIES CLAIMS .............. 9

    A.    The PPM Did Not Contain a False or Misleading Statement .................................... 9
        1.    Plaintiffs Do Not Identify a False Statement ................................................. 9
        2.    In the Absence of a False Statement, "Context" Is Insufficient to Sustain Plaintiffs' Fraud Claims ................................................................. 11

    B.    Plaintiffs Cannot Demonstrate Actual Reliance ...................................................... 13
        1.    Marathon ..................................................................................................... 14
        2.    NewStar ....................................................................................................... 14
        3.    Allianz ........................................................................................................ 15
        4.    Munich Re ................................................................................................... 16

    C.    Plaintiffs Cannot Demonstrate Reasonable Reliance .............................................. 17

    D.    There Was No Material Omission and the *Affiliated Ute* Presumption Does Not Apply .............................................................................................................. 20

IV.   PARAMOUNT IS NOT THE "MAKER" OF ANY ALLEGED MISREPRESENTATION .................................................................................... 21

V.    PLAINTIFFS CANNOT PROVE COMMON LAW FRAUD ............................... 22

VI.   PLAINTIFFS ARE NOT ENTITLED TO PUNITIVE DAMAGES ...................... 24

VII.  PLAINTIFFS CANNOT PROVE UNJUST ENRICHMENT ................................ 25

Conclusion .................................................................................................................. 25

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Abbey* v. *3F Therapeutics, Inc.*,
  2011 WL 651416 (S.D.N.Y. Feb 22, 2011), *aff'd sub nom. Abbey* v. *Skokos,*
  509 F. App'x 92 (2d Cir. 2013) ...................................................................................17

*Affiliated Ute Citizens of Utah* v. *United States*,
  406 U.S. 128 (1972).............................................................................................20, 21

*Allianz Risk Transfer* v. *Paramount Pictures Corp.*,
  2010 U.S. Dist. LEXIS 32218 (S.D.N.Y. Mar. 31, 2010) .......................................25

*Anderson* v. *City of New Rochelle*,
  2012 WL 3957742 (S.D.N.Y. Sept. 4, 2012)............................................................8

*In re Apple REITs Litig.*,
  2013 WL 1386202 (E.D.N.Y. Apr. 3, 2013) ...........................................................21

*Ashland Inc.* v. *Morgan Stanley & Co., Inc.*,
  700 F. Supp. 2d 453 (S.D.N.Y. 2010), *aff'd*, 652 F.3d 333 (2d Cir. 2011) ...........18

*Danann Realty Corp.* v. *Harris*,
  157 N.E.2d 597 (N.Y. 1959)....................................................................................6

*Dembeck* v. *220 Cent. Park S. LLC*,
  823 N.Y.S.2d 45 (1st Dep't 2006) .........................................................................23

*Ellington Credit Fund, Ltd.* v. *Select Portfolio Servicing, Inc.*,
  837 F. Supp. 2d 162 (S.D.N.Y. 2011).....................................................................24

*Fogarazzo* v. *Lehman Bros., Inc.*,
  232 F.R.D. 176 (S.D.N.Y. 2005) ............................................................................20

*Goodman* v. *Genworth Fin. Wealth Mgmt., Inc.*,
  2014 WL 1452048 (E.D.N.Y. Apr. 15, 2014) ...................................................20, 21

*Grumman Allied Indus., Inc.* v. *Rohr Indus., Inc.*,
  748 F.2d 729 (2d Cir. 1984)...............................................................................7, 23

*Hoeffner* v. *Orrick, Herrington & Sutcliffe LLP*,
  924 N.Y.S.2d 376 (1st Dep't 2011)........................................................................24

*Janus Capital Grp., Inc.* v. *First Derivative Traders*,
  131 S. Ct. 2296 (2011)...........................................................................................22

**Page(s)**

*JP Morgan Chase Bank* v. *Winnick*,
    350 F. Supp. 2d 393 (S.D.N.Y. 2004) ...........................................................23

*Koch* v. *Greenberg*,
    2014 WL 1284492 (S.D.N.Y. Mar. 31, 2014) ..................................................6

*Krasner* v. *Rahfco Funds LP*,
    2012 WL 4069300 (S.D.N.Y. Aug. 9, 2012) ..................................................21

*In re Lehman Bros. Sec. & ERISA Litig.*,
    2013 WL 5730020 (S.D.N.Y. Oct. 22, 2013) .............................................20, 21

*Maddaloni Jewelers, Inc.* v. *Rolex Watch U.S.A., Inc.*,
    354 F. Supp. 2d 293 (S.D.N.Y. 2004) .............................................................6

*McMahan & Co.* v. *Wherehouse Entm't, Inc.*,
    900 F.2d 576 (2d Cir. 1990) ....................................................................11, 12

*Municipality of Bremanger* v. *Citigroup Global Mkts. Inc.*,
    2013 WL 1294615 (S.D.N.Y. Mar. 28, 2013), *aff'd*, 555 F. App'x 85 (2d Cir.
    2014) .........................................................................................................14, 17

*Olkey* v. *Hyperion 1999 Term Trust, Inc.*,
    98 F.3d 2 (2d Cir. 1996) .................................................................................17

*Orlando* v. *Novurania of Am., Inc.*,
    162 F. Supp. 2d 220 (S.D.N.Y. 2001) ..........................................................25

*In re Parmalat Sec. Litig.*,
    2008 WL 3895539 (S.D.N.Y. Aug. 21, 2008) ................................................20

*Princes Point, LLC* v. *AKRF Eng'g, P.C.*,
    944 N.Y.S.2d 493 (1st Dep't 2012) ...........................................................24–25

*In re Prudential Sec. Inc. Ltd. P'ships Litig.*,
    930 F. Supp. 68 (S.D.N.Y. 1996) .................................................................17

*Raskin* v. *Wyatt Co.*,
    125 F.3d 55 (2d Cir. 1997) ..............................................................................8

*SEC* v. *Syron*,
    934 F. Supp. 2d 609 (S.D.N.Y. 2013) ...............................................11, 12, 19

*In re Smith Barney Transfer Agent Litig.*,
    290 F.R.D. 42 (S.D.N.Y. 2013) ....................................................................20

*Soroof Trading Dev. Co., Ltd.* v. *GE Fuel Cell Sys., LLC*,
    2013 WL 1286078 (S.D.N.Y. Mar. 28, 2013) ..............................................15

**Page(s)**

*Starr ex rel. Estate of Sampson* v. *Georgeson S'holder, Inc.*,
   412 F.3d 103 (2d Cir. 2005)...................................................................................20

*Tahini Invest., Ltd.* v. *Bobrowsky*,
   470 N.Y.S.2d 431 (2d Dep't 1984)..........................................................................6

*In re Victory Mkts., Inc.*,
   221 B.R. 298 (B.A.P. 2d Cir. 1998)........................................................................17

*Wilson* v. *Comtech Telecomm. Corp.*,
   648 F.2d 88 (2d Cir. 1988)......................................................................................14

## OTHER AUTHORITIES

Local Rule 56.1.................................................................................................................8

## **Preliminary Statement**

Plaintiffs' opposition to Paramount's motion for summary judgment does not enable plaintiffs' claims to escape dismissal as a matter of law.

*First*, plaintiffs' brief is an exercise in distraction from the irrefutable fact that plaintiffs all agreed to legally binding waiver and release provisions that bar the assertion of their claims against Paramount. Plaintiffs' effort to avoid these ironclad waiver and release provisions rests on the illogical assertion that the international pre-sales transactions that they concede form the basis of all of their claims have nothing to do with methods of film "distribution." Plaintiffs' own brief, pleading, expert report and witness testimony all expressly describe international pre-sales as a method of film "distribution"—which they are. These waivers and releases should therefore be the end of this case.

*Second*, plaintiffs continue to fail to identify any false statements in the Melrose PPM. Plaintiffs claim that the PPM stated that Paramount would enter into foreign pre-sales "selectively" and "opportunistically," and that these statements are false, because Paramount had decided to *reduce* the amount of foreign pre-sales. Yet, even plaintiffs effectively concede that the PPM was in fact "literally true" on this point. Paramount *did* selectively enter into foreign pre-sales transactions for the Melrose Slate. Nor do plaintiffs deny that the PPM was clear there was no promise that Paramount would enter into *any,* or achieve *any* particular level of, international pre-sales for films in the Melrose Slate. Thus, no reasonable jury could find the statements at issue to be false.

*Third,* plaintiffs fail to create a jury question as to their actual or reasonable reliance. As to actual reliance, plaintiffs are unable to identify any statement by Paramount on which they actually relied. Nor could they. During discovery, all of the plaintiffs failed to identify any

misrepresentations that Paramount made to them on which they relied; and, there is no competent evidence to show that plaintiffs actually relied on any statements as to international pre-sales.

In any event, plaintiffs do not deny that, *before they invested*, they received a schedule (the Melrose Slate Schedule) which provided them with information about the *actual* levels of film co-financing, including international pre-sales, in the Melrose Slate, and showed that such levels were running well below historical levels.  Indeed, plaintiffs admit that the Melrose Slate Schedule received by NewStar, Munich Re, and Allianz "plainly show other forms of risk mitigation, *including foreign presales*."  [Opp'n 19–20 n.11 (emphasis added).][1]  And, Marathon's version of the Schedule showed that the co-financing totals for the Melrose Slate were running at levels substantially below historical levels—and showed *no* international pre-sales.  Having received this information, plaintiffs could not have actually relied on the supposed misrepresentations they claim as to such pre-sales.

Further, given plaintiffs' conceded receipt of this information, no reasonable jury could conclude that reliance on any statement as to foreign pre-sales was *reasonable* in face of *disclosure of the actual data that supposedly constituted the fraud*.  Plaintiffs' rejoinder is to argue that the Melrose Slate Schedule disclosing the actual data was marked "tentative" and applied to only the first 20 films in the ultimately 25-picture slate.  That is irrelevant.  The Schedule put plaintiffs on notice that co-financings in general, and international pre-sales in particular, for the Melrose Slate were running behind historical trends.  Yet, upon receiving it, as plaintiffs' papers conceded, not one plaintiff asked any questions about the issue.

---

[1]  Unless otherwise indicated, capitalized and abbreviated terms refer to terms defined in the parties' initial briefs. "Br." refers to Paramount's opening brief.  "Opp'n" refers to plaintiffs' opposition brief.  "SOF Opp." refers to Plaintiffs' Response to Defendant's Local Rule 56.1 Statement of Undisputed Facts and Statement of Additional Material Facts.

*Finally*, we are compelled to comment on plaintiffs' extraordinary step, in a desperate effort to create a disputed issue as to a material fact, of submitting five factual declarations, each from a witness who was deposed in this case, and each of which flat-out contradicts that witness's deposition testimony.   The declarations use identical language cut and pasted from one declaration to another; even worse, each witness now purports to have detailed recollection of documents that, at deposition, he could not recall seeing.  The law is clear that a plaintiff cannot create a question of material fact by contradicting his own deposition testimony, and the Court should not reward this exercise by crediting declarations that contradict previous sworn testimony in this case.

On the undisputed facts, the Court should grant Paramount's motion for summary judgment.

<u>Argument</u>

## I.   PLAINTIFFS WAIVED AND RELEASED ALL OF THEIR PURPORTED CLAIMS AGAINST PARAMOUNT

This case should now be over for one simple reason: plaintiffs expressly waived and released all of their alleged claims against Paramount.

There is no dispute that plaintiffs acknowledged and agreed in the Subscription Agreement that Paramount did not owe "any fiduciary duty, duty of care, duty of disclosure or other duty of any kind whatsoever . . . to [plaintiffs]" and that plaintiffs "waive[d] and release[d] all claims against Paramount . . . arising out of, or in connection with, the offering of the [Melrose] Securities." [SOF ¶ 48; *see also* Opp'n 40 n.17 (conceding that Allianz and Munich Re are subject to all of the obligations of the offering).]

Nor is there any dispute that plaintiffs even more specifically "waive[d] and released[d] Paramount . . . from liability arising out of the matters described in Paragraph (s) [in the Subscription Agreement], and agree[d] that in no event shall [they] assert any claim or bring any

action contradicting the acknowledgements . . . in Paragraph (s)[.]"   [SOF ¶ 49.]   In turn, under Paragraph (s), plaintiffs specifically acknowledged that Paramount was making no representation or agreement that any film in the Melrose Slate would be marketed or "distributed in any particular manner"; thus, plaintiffs specifically waived and released all claims against Paramount relating to the methods used to distribute the Melrose Slate of films.  [*See* Br. 24–25 (quoting language).]

Recognizing that the Subscription Agreement's release and waiver provisions sound the death knell of this litigation, plaintiffs' reaction appears to be to encourage the Court to ignore the issue by burying their discussion of it at page 44 of their 45-page brief.   That strategy is understandable, because each of their three responses is less credible than the next:

*First*, astonishingly, plaintiffs' principal argument on this point is that the Subscription Agreement's "reference to 'any particular manner' of 'distribution' has nothing to do with co-financing" or "risk mitigation or foreign pre-sales whatsoever."  [Opp'n 44, 23.]   This argument is belied by *the very first page of plaintiffs' own brief*.   There, plaintiffs define "foreign pre-selling" as a method "by which Paramount would sell or license the international *distribution* rights to films within the Melrose Slate to *distributors* from particular foreign territories in exchange for substantial upfront payments from those *distributors*."  [Emphasis added; *see also id.* at 3 (repeating same).]   Indeed, in articulating Paramount's purported fraud, plaintiffs, in unequivocal terms, describe it as a change in business strategy where "Paramount would *self-distribute* rather than pre-sell films" in foreign territories.  [*Id.* at 2 (emphasis added).]

Plaintiffs' own Complaint characterizes plaintiffs' claims the same way.   In it, plaintiffs allege that "[f]rom 1998 to 2003, Paramount *distributed* a significant percentage of its films internationally through the use of . . . international 'pre-sales,' whereby third-party *distribution* companies purchased the right *to distribute* a film in specific foreign countries and territories in

exchange for a fixed sum, or minimum guarantee." [TAC ¶ 41 (emphasis added).] As this explanation makes clear, the use of international pre-sales directly concerns how Paramount *distributes* its films internationally. Given that all of plaintiffs' claims are based on the allegation that Paramount somehow misled investors as to the extent it would enter into foreign pre-sales, all of those claims indeed relate to the manner of "distribution" of the films at issue.

As if it were not clear enough from plaintiffs' own opposition brief and pleadings that "distribution" encompasses international pre-sales, their testimony confirms it. For example, Neil Hohmann (on behalf of Munich Re) testified that the alleged misrepresentation at issue in the case concerned "certain *distribution* practices . . . in particular, the sale of international rights." [Ex. 229 at 26:15–27:9 (emphasis added).] The same is true of plaintiffs' experts. Plaintiffs' damages expert, Philip Fier, expressly defined international pre-sales in terms of "distribution." [Ex. 228 at 8 (defining "Presales" as "arrang[ing] for the *distribution* of their films outside the US through contractual arrangements with foreign territorial *distributors*.") (emphasis added).] Similarly, Fier stated that "Paramount *distributed* its films outside the US in three ways (1) *selling distribution rights in a particular territory for a minimum guaranteed payment* (*i.e.*, *Presales*) . . . ." [*Id.* at 17 (emphasis added).]

In sum, throughout the entire case, plaintiffs have considered pre-sales a method of "distribution." Now, facing dismissal because of their waiver and release of "distribution" claims, and citing no evidence, they do a complete about-face. The Court should reject that gambit.

*Second*, plaintiffs attempt to escape the import of the release and waiver that they signed by dismissing it as a mere "general disclaimer." [Opp'n 44.] Plaintiffs are wrong as a matter of fact and law. As a matter of fact, the disclaimer language here is quite specific to the matters about which plaintiffs now bring suit—namely, an alleged misrepresentation about whether the

Melrose Slate would "be *distributed* in any particular manner," which is the precise term plaintiffs repeatedly use when defining international pre-sales.   The decisions plaintiffs cite concerning generalized release provisions are therefore inapposite.[2]

       *Finally*, plaintiffs attempt to argue that the waiver and release provisions do not apply because the specific facts addressed by the waiver and release were "peculiarly within Paramount's knowledge."  This is not the law.  Under New York law, waivers with the specificity of those at issue here are generally enforced.  *E.g., Danann Realty Corp.* v. *Harris*, 157 N.E.2d 597, 602 (N.Y. 1959). The decisions plaintiffs cite on this point involved narrow exceptions to that rule for certain sales transactions, neither of which applies here.  *See, e.g.*, *Tahini Invest., Ltd.* v. *Bobrowsky*, 470 N.Y.S.2d 431 (2d Dep't 1984) (purchaser may not be precluded from relying on an oral representation if facts misrepresented were peculiarly within seller's knowledge; at issue was seller's knowledge of 15 drums of chemicals *buried in the ground*); *Koch* v. *Greenberg*, 2014 WL 1284492 (S.D.N.Y. Mar. 31, 2014) (property sold "as is" clause did not bar fraud claim where critical facts known solely to seller; at issue were 23 counterfeit bottles of wine in a sale of *2,600 bottles*).

       In any event, in those decisions, the purchasers could *not* have discovered the truth through the exercise of ordinary diligence.  Here, plaintiffs not only could have discovered the facts, but received a schedule, which made them aware, *before* the closing, of the actual co-financing arrangements that were in place for the Melrose Slate.  After receiving this information, plaintiffs were free, if they so desired, to further investigate co-financing levels.  That they chose not to do so does not mean that the material facts were incapable of discovery by the plaintiff "no matter how

---

[2]    *E.g., Maddaloni Jewelers, Inc.* v. *Rolex Watch U.S.A., Inc.,* 354 F. Supp. 2d 293, 299 (S.D.N.Y. 2004) ("*The language and context of this release provision are so non-specific* that I cannot . . . conclude as a matter of law that the parties intended to release the defendants of liability for [their] claims.") (emphasis added).

diligent its investigation." *See, e.g.*, *Grumman Allied Indus., Inc.* v. *Rohr Indus., Inc.*, 748 F.2d 729, 738 (2d Cir. 1984).

In sum, the provisions in the Subscription Agreement are clear, they are specific to international pre-sales, and they bar all plaintiffs from asserting all of the claims alleged here.

## II.   PLAINTIFFS' CARBON-COPY DECLARATIONS THAT CONTRADICT THEIR DEPOSITION TESTIMONY CANNOT CREATE A MATERIAL QUESTION OF DISPUTED FACT

Before turning to the remaining issues, we note that, in an attempt to run from the record, and manufacture factual disputes, plaintiffs submit carbon-copy, self-serving declarations in which each of their fact witnesses contradicts his prior deposition testimony.  These declarations all include a series of paragraphs containing *identical* language, and each witness now remembers, in verbatim terms, events or documents that he could not recall at his deposition.

The declarations are stunning in their similarities—regardless of the true facts.  For instance, Mr. Hohmann offers a declaration which states: "[Munich Re's] decision to invest in the Melrose Slate occurred at the time of the closing in July 2004[.]"  [Ex. 122 ¶ 10.]  Allianz's corporate representative regurgitates this same "fact": "Allianz's decision to invest occurred at the time of the closing in July 2004[.]"  [Ex. 123 ¶ 10.]  Yet, it is undisputed that Allianz did not decide to invest in Melrose until the second closing of the Melrose Transaction, in *October 2004*.

The problems with these manufactured declarations go far beyond careless copying and pasting by lawyers.  Witnesses also now recall their reactions to documents that, at the time of their depositions, they could not recall seeing before.  For example, Buck Burnaman (of NewStar) now declares that, when NewStar reviewed the PPM language stating that "[t]here can be no assurance that Paramount will implement the same [risk-mitigation] techniques . . . in the future as it has in the past," NewStar "did not understand that this language reflected that Paramount had made a decision to materially reduce its use of co-financing."  [Ex. 124 ¶¶ 22–23.]  Yet, at his deposition,

when asked about this same language, Burnaman testified: "Subject to the stipulation *that I don't recall*, but I'll posit that this is my document and I marked it up, so I presume that I read it . . . it says here that there's no assurance that they'll implement the same techniques." [Ex. 111 at 129:24–130:11 (emphasis added).]

The declaration from Harris Maslansky, a film industry consultant retained by Allianz and Munich Re, is similarly flawed. After receiving and analyzing the Melrose Slate Schedule, Maslansky sent Allianz a chart expressly noting that the "known cofinance" for the Melrose Slate was approximately *half* of the co-financing for the Historical Data Set ("HDS"). [SOF ¶ 334.] At his deposition, Maslansky had *no recollection* of the chart he sent. [Ex. 120 at 108:10–109:3.] Now, in his declaration, Maslansky includes a detailed description of what he intended to convey in the document. [Ex. 126 ¶ 39.]

There is simply no way in which these newly-minted declarations can be reconciled with the record, and they cannot serve to create a question of fact on *any* element of plaintiffs' claims. *Raskin* v. *Wyatt Co.*, 125 F.3d 55, 63 (2d Cir. 1997) ("[A] party may not create an issue of fact by submitting an affidavit in opposition to a summary judgment motion that, by omission or addition, contradicts the affiant's previous deposition testimony.") (internal quotation marks omitted).[3] We now discuss each element in turn.

---

[3]  Plaintiffs also flout the requirements of Local Rule 56.1, inserting numerous "factual" assertions in their Statement of Facts that merely replicate the contents of their brief, without actual support from the record. [*Cf.* SOF Opp. ¶ 483 and Opp'n 7.] Many of these paragraphs are also legal arguments masquerading as "facts." [*E.g.*, SOF Opp. ¶ 498; SOF Opp. ¶ 596.] This is improper. *See Anderson* v. *City of New Rochelle*, 2012 WL 3957742, at *6 (S.D.N.Y. Sept. 4, 2012) (finding 56.1 responses "improper" because they contained "assertions that do not specifically controvert the facts").

III.     **PLAINTIFFS CANNOT PROVE THEIR FEDERAL SECURITIES CLAIMS**

    A.     <u>**The PPM Did Not Contain a False or Misleading Statement**</u>

        1.     **Plaintiffs Do Not Identify a False Statement**

Plaintiffs contend that the PPM inaccurately states that "Paramount intended to 'opportunistically enter[] into output agreements and territory sales with third parties' and to 'selectively pursue[] such opportunities in connection with the Melrose Slate." [Opp'n 25.] Yet, plaintiffs effectively acknowledge that these statements are "literally true." [*Id.*] If so, there was no false statement.

To try to create an issue as to falsity, plaintiffs claim the statements made are misleading because Paramount had, in reality, decided to *reduce* the level of foreign pre-sales. Putting aside whether that is true (and it is not), the PPM made absolutely clear that Paramount was not promising to engage in *any* international pre-sales for the Melrose Slate: "There can be no assurance that Paramount will implement the same techniques or achieve similar results in the future as it has in the past." [SOF ¶ 26.] And, the PPM made clear that Paramount reserved "the right to change its business strategy." [SOF ¶ 37.] Thus, the plain meaning of the words plaintiffs cite to is simply that Paramount may, from time to time, enter into foreign pre-sales. As plaintiffs concede, Paramount did exactly that.

Plaintiffs try to bolster their claim of falsity by making much of the contention that Paramount supposedly pre-sold foreign rights for only *two* of the twenty-five films in the Slate. As an initial matter, this is inconsistent with plaintiffs' previous positions in this case; for instance, their own expert found that Paramount pre-sold *five* of twenty-five films in the Melrose Slate, i.e., twenty percent of the Slate. [*See* Ex. 218 at 22, 23, 31, 32, 34.][4]

---

[4]   Plaintiffs now assert that two of these five films do not qualify as foreign pre-sales because "Paramount only acquired domestic distribution rights to those films." [Opp'n 7 n.5.] Under this logic, however, one would also

More importantly, whether the "correct" number is two or five does not render false the statements that Paramount would "selectively" and "opportunistically" enter into co-financing arrangements—certainly not where the PPM also expressly informed potential investors that there was no guarantee about the amount or type of co-financing, including international pre-sales, that Paramount would (or would not) use in the Melrose Slate.  Indeed, when asked at their depositions, all of the plaintiffs uniformly testified that they fully understood there was no guarantee of *any* level of co-financing or particular co-financing techniques.  [SOF ¶¶ 150, 152, 286, 287, 325, 368, 428.]

Now, in a last-ditch effort to avoid summary judgment, each of the plaintiffs has submitted a declaration contradicting and embellishing his deposition testimony.  Even these impermissible declarations speak only vaguely of each plaintiff's "understanding" of Paramount's business practices—with no attribution to any particular statement by Paramount. [Ex. 122 ¶¶ 20–21; Ex. 123 ¶¶ 20–21; Ex. 124 ¶¶ 22–23; Ex. 125 ¶¶ 16–17.]  This does not suffice to sustain a claim of misrepresentation.

Further, plaintiffs' argument that the mere number of films that included international pre-sales creates a triable issue of fact about the falsity of the PPM is wrong-headed.  [Opp'n 25.]  This argument is a classic attempt to suggest fraud by hindsight.  A retrospective assessment of the number of films featuring some pre-sales does not prove that the statements in the PPM about the types of co-financing techniques Paramount might use on an opportunistic and selective basis are false.

Indeed, plaintiffs' only "evidence" of a decision to reduce foreign pre-sales is a single

---

need to reduce the *total* number of films in the Slate available for foreign pre-sale, because Paramount only had foreign rights for twenty films.  Further, plaintiffs' new theory ignores their own expert's concession that five of those twenty films could *not* have been individually pre-sold abroad because of the films' subject matter.  [Ex. 218 at 23, 26, 27, 31, 33.]

bullet point in a March 2004 PowerPoint presentation, which states "retain more foreign rights." Plaintiffs cite no evidence as to what this means. They *speculate* that it means that, by March 2004, Paramount made a decision "to abandon the practice of pre-sales." [Opp'n 27.] Paramount witnesses, however, uniformly testified that there was no decision to abandon foreign pre-sales. [*E.g.*, Ex. 134 at 114:14–18; Ex. 139 at 104:3–4; Ex. 142 at 169:12–171:8.] And, when questioned about this bullet point, Paramount's corporate representative testified that this language likely referred to shared pot or split rights deals—*not* foreign pre-sales. There is thus no competent evidence raising a material question of disputed fact concerning this "decision."[5]

### 2. In the Absence of a False Statement, "Context" Is Insufficient to Sustain Plaintiffs' Fraud Claims

Perhaps recognizing that none of their arguments serves to render the PPM false and misleading, plaintiffs effectively acknowledge—as they must—that the PPM is "literally true." [Opp'n 25.] To support their claims, however, plaintiffs argue the statements should be viewed as false due to their "context."

The argument fails. The decisions plaintiffs cite on this issue, *SEC* v. *Syron*, 934 F. Supp. 2d 609, 629 (S.D.N.Y. 2013), and *McMahan & Co.* v. *Wherehouse Entm't, Inc.*, 900 F.2d 576, 579 (2d Cir. 1990), are inapposite. In each, the Court found a literally true statement that was materially misleading in the context of the particular document containing the statement; that is simply not the case here.

---

[5]   In aid of their argument, plaintiffs erect and attack a straw man by criticizing the testimony of Karen Magid (Paramount's 30(b)(6) witness) about the meaning of this bullet point. Ms. Magid testified merely that the bullet point "*could* mean that in situations where you have a split rights deal, that Paramount should opt for the foreign portion of the rights," or that it "*could also* mean . . . retaining more of the foreign rights to the pictures that we distribute," or that it "*could also* . . . be focusing on non-theatrical rights . . . television rights." [Ex. 141 at 64:7–65:24 (emphasis added).] Such testimony does not support the inference plaintiffs seek to draw, and does not create any disputed issue of material fact. Similarly, plaintiffs' assertion that Ms. Magid "testified, unequivocally, that Paramount did not pursue a single pre-sale opportunity for 23 of the films in the Melrose Slate" is false. [Opp'n 6.] Ms. Magid testified only that she was not "aware of what was done to identify any company that might be interested in acquiring distribution rights in a foreign territory" for every film in the Slate, *including* films that were in fact presold. [Ex. 141 at 83:6–88:12.]

For example, in *Syron*, defendants argued that Freddie Mac's quarterly statement truthfully indicated that 0.2 percent of loans underlying its "single-family mortgage portfolio" could be classified as containing subprime mortgage loans.  934 F. Supp. 2d at 628.  The court found that this statement was misleading because it could be construed to represent all of the assets in the company's "Single Family" line of business, which it did not.  *Id*.  Such facts are not present here.  Not only did the Melrose PPM not contain a single representation concerning the percentage of international pre-sales that Paramount would use in the Melrose Slate, it expressly informed investors that there could be *no* assurance that *any* co-financing technique would be used.  Thus, unlike what the court found in *Syron*, the context of the language in the Melrose PPM does not create a misleading impression about the topic addressed, that is, the use of international pre-sales.  Similarly, in *McMahan*, defendants allegedly misled investors about debentures by touting the right to tender the debentures back to the issuer, when the issuer allegedly knew the right was wholly illusory.  900 F.2d at 578.  That cannot be said here, where Paramount in fact continued to enter into co-financings, including foreign pre-sales.

To try to fall within these decisions, plaintiffs point to historical information as to foreign pre-sales contained in an entirely separate document—the Merrill Model.  This argument is misguided for several reasons.

For one, each plaintiff *expressly warranted* that it was not "relying (for purposes of making any investment decision or otherwise) upon any advice, counsel or representations (whether written or oral) of any of the Relevant Parties other than the PPM."  [SOF ¶ 47.]  Accordingly, plaintiffs cannot now claim that information contained outside of the PPM made the statements contained in the PPM misleading.[6]

---

[6]   This conclusion is confirmed by plaintiffs' own testimony.  Allianz's corporate representative, for example, testified that Allianz only "relied on the prospectus" in making its investment decision.  [SOF ¶ 322.]

Additionally, the PPM and Merrill Model are different documents, addressing different subjects, authored by two different entities (Melrose and Merrill). More fundamentally, though, even if one (wrongly) attributed the Merrill Model to Paramount, the Merrill Model expressly informed plaintiffs that it could *not* be used to predict events as to the Melrose Slate, as every plaintiff acknowledged. Among other things, plaintiffs were informed that:

- the cash flow scenarios set forth in the [Merrill Model] . . . are hypothetical in nature, are not projections and should not be regarded as an indication that the Placement Agent, the Issuer, Paramount or any other person considers such scenarios to be predictive of future events. [SOF ¶ 86]; and

- there can be no assurance that the assumptions [used in the Model] will prove to be accurate or results similar to the scenarios will be realized in the transaction. [SOF ¶ 87.]

Thus, the context of the Merrill Model, if anything, expressly told plaintiffs they could *not* assume the future would mirror the past.

In sum, the statements plaintiffs point to were indeed "literally true" and cannot form the basis of a securities fraud claim.

**B.       Plaintiffs Cannot Demonstrate Actual Reliance**

Plaintiffs must also prove that they actually relied upon any alleged misrepresentations. The undisputed facts show that they cannot do so.

Vast portions of plaintiffs' arguments on this point are devoted to matters that have no bearing on the issue of actual reliance on statements about international pre-sales in the PPM. This includes pages of ink spilled about plaintiffs' purported reliance on the Merrill Model and their subjective, unexpressed belief—phrased vaguely, without attribution—that Paramount's use of international pre-sales would remain the same as in prior years.[7] These arguments utterly fail to

---

[7]   Perhaps the best example of plaintiffs' strained attempt to suggest an issue of fact concerning actual reliance is their claim, without record support, that "Paramount told Merrill to tell Moody's in May 2004 that foreign pre-sales would continue for the Melrose Slate at approximately the same level employed by Paramount for the

address the detailed record with respect to each plaintiff establishing that they did *not* actually rely on any statement in the PPM about Paramount's possible use of international pre-sales:

### 1.   Marathon

There is no dispute that Paramount never made any misrepresentation to Marathon about the use of international pre-sales in the Melrose Slate.   In fact, Marathon's corporate representative admitted that Marathon understood that it was not "being guaranteed [or] assured a particular mix" of co-financing techniques to be employed by Paramount.  [SOF ¶ 194.]

In an effort to divert the Court's attention from this undisputed evidence, Marathon describes negotiations its advisor, Houlihan Lokey, had with Merrill and Paramount about obtaining co-financing information about the HDS and the Melrose Slate.  [Opp'n 17–20.]  That evidence merely shows that Marathon *received* such information, which included a version of the Melrose Slate Schedule.  Marathon complains that the version of the Melrose Slate Schedule that it received did not include the "greater detail" that the three other plaintiffs subsequently received.  But that does not matter.  There is no dispute that this document showed that the actual levels of co-financing were running substantially lower, and included a section for territorial pre-sales, with *no such sales* reflected in it.  This information thus shows that Marathon was provided with information that was the opposite of what it claims it relied upon.

### 2.   NewStar

NewStar also cannot prove actual reliance.   NewStar's corporate representative (Buck Burnaman) failed to identify *any* specific representation that Paramount made to it about

---

films in the HDS."  [Opp'n 14.]  To begin with, the statement is false.  There is no evidence that anyone at Paramount ever told anyone at Merrill to convey such a message.  Nor did Merrill do so.  As discussed further below, Merrill told Moody's to assume that co-financing levels would be *lower*.  [Ex. 215 at BOA-ML 00040847.]  More fundamentally, plaintiffs' fictional statement could not prove actual reliance because there is no evidence that any plaintiff was aware of this statement.  It is black-letter law that misrepresentations or omissions must be made to a plaintiff.  *Wilson* v. *Comtech Telecomm. Corp.*, 648 F.2d 88, 94 (2d Cir. 1988); *Municipality of Bremanger* v. *Citigroup Global Mkts. Inc.*, 2013 WL 1294615, at *18 (S.D.N.Y. Mar. 28, 2013), *aff'd*, 555 F. App'x 85 (2d Cir. 2014).

taking "any particular steps with respect to risk mitigation."[8]   [SOF ¶ 283.]   Further, NewStar understood that Paramount controlled all decisions about risk mitigation and that there was no assurance that such decisions would be consistent with past practices.   [Br. 30.]   In fact, at a meeting prior to investing, NewStar staff expressly discussed "a number of risks associated with making this investment," including "*the reliability of historical performance* as a—and the projection of future performance."   [SOF Opp. ¶ 273 (emphasis added).]   NewStar thus cannot prove actual reliance.

Nor does NewStar's claim that it subjectively believed that Paramount "was going to continue to use the business judgment that they had previously" support a claim of actual reliance. [Opp'n 35.]   This supposed understanding is not traced to the PPM or to any representation made by Paramount.   Further, it is expressly contradicted by the statements in the PPM, which informed plaintiffs that (i) there could be no assurance that Paramount would continue the same practices as in the past and (ii) the "Press" was reporting "a desire by Viacom and Paramount management to pursue a more aggressive approach."   [SOF ¶¶ 26, 38.]

### 3.   Allianz

Bill Seery—the Allianz employee with primary responsibility for the Melrose Transaction—testified that he could not recall "doing *any* diligence . . . concerning Paramount's practices" with respect to "foreign territorial sales and licenses," and could also not recall "any specific representations that anyone from Paramount made to [him] in connection with the use of co-financing, in connection with the films in the slate."   [SOF Opp. ¶¶ 361, 363 (emphasis added).][9]

---

[8]   Plaintiffs cannot avoid this concession with their weak assertion that Burnaman testified only "personally." [SOF Opp. ¶ 283.]   *See Soroof Trading Dev. Co., Ltd.* v. *GE Fuel Cell Sys., LLC*, 2013 WL 1286078, at *4–5 (S.D.N.Y. Mar. 28, 2013) (rejecting a claim that a 30(b)(6) witness's testimony should be treated as personal and not binding on the corporation as "nonsensical and groundless") (internal quotation marks omitted).

[9]   Remarkably, plaintiffs attempt to disavow Seery's lack of recollection by stating that he was last associated with Allianz ten years ago.   The Melrose Transaction, however, closed ten years ago, so his departure from the company after the transaction closed is of no consequence.

Similarly, Allianz's corporate representative (Joseph Flynn) testified that Allianz relied on representations about co-financing "only in conjunction with the prospectus," and further testified that, consistent with the PPM's disclaimer language, Allianz received "no representation or assurance . . . that [international co-financing techniques] would be the same." [Ex. 115 at 56:7–15; 80:4–7.] Plaintiffs now seek to turn this testimony on its head, claiming that Flynn *meant to say* that Allianz "relied on the PPM's statements about foreign pre-sales." [Opp'n 34.] But hypothetical testimony dreamed up by counsel is not enough to defeat summary judgment.

The fact that Allianz cannot prove reliance is confirmed by the document Allianz received from Harris Maslansky, its independent consultant, discussed above. After receiving and analyzing the Melrose Slate Schedule, Maslansky sent Allianz a chart expressly noting that the "known co-finance" for the Melrose Slate was approximately half of the known co-financing for the Historical Data Set. [SOF ¶ 334.] This document conclusively shows that Allianz was aware that the co-financing levels were running substantially lower than historical levels.

### 4.    Munich Re

Munich Re also does not dispute that it could not identify a single misrepresentation Paramount made to it, and that it knew there was no guarantee that Paramount would use the same co-financing techniques. These undisputed facts preclude any showing of reliance.

In response, Munich Re attempts to clarify what its advisor, Maslansky, meant when he testified that he discussed with Munich Re the risk that Paramount "will not deal in the international market the way [it] dealt with [the market] before." [Opp'n 34.] Although this "clarification" makes no sense since it does not deny Munich Re was aware of this risk, it, in any event, is irrelevant. Maslansky's alleged, subjective belief that Paramount would continue to do business in the international market as it had in the past does not prove that (i) Paramount made a misrepresentation or (ii) that Munich Re actually relied on one attributable to Paramount.

16

In sum, none of the plaintiffs can prove actual reliance.

**C.     Plaintiffs Cannot Demonstrate Reasonable Reliance**

In any event, plaintiffs, all concededly highly sophisticated investors, cannot prove that their alleged reliance was reasonable.

To begin with, the PPM precludes any reasonable reliance.  The PPM clearly put plaintiffs on notice that (a) there was no guarantee that Paramount would use the same level of international pre-sales as it had in the past, (b) Paramount would have total discretion over such matters, and (c) Paramount could change its business strategy (and cited press reports indicating Paramount might be taking a "more aggressive approach").  [SOF ¶¶ 26, 37, 38.]

Plaintiffs contend that these disclosures are "boilerplate" and thus "do not disprove Plaintiffs' reasonable reliance."  In aid of this argument, plaintiffs cite a single, irrelevant decision[10] and suggest that the PPM's disclosures do not negate the reasonableness of their reliance.  [Opp'n 37.]  This argument misses the point.

The question is not whether the disclosures are boilerplate or general (which they are not in any event),[11] but rather whether plaintiffs received information that called into question the alleged representations at issue.  *Abbey* v. *3F Therapeutics, Inc.,* 2011 WL 651416, at *8 (S.D.N.Y. Feb 22, 2011), *aff'd sub nom. Abbey* v. *Skokos*, 509 F. App'x 92 (2d Cir. 2013).  Here, there is no question that the PPM disclosures made clear there were limits on the representations plaintiffs allege.  In particular, they informed plaintiffs that (i) there can be no

---

[10]   Plaintiffs cite *In re Prudential Securities Inc. Ltd. Partnerships Litigation*, 930 F. Supp. 68, 72 (S.D.N.Y. 1996), but *Prudential* merely stands for the straight-forward proposition that "*[g]eneral* risk disclosures in the face of specific known risks which border on certainties do not bespeak caution."  *Id.*  (emphasis added).

[11]   The disclosures in the PPM are highly specific, making plaintiffs' claim that they are somehow "boilerplate," and therefore inapplicable, meritless.  In any event, even if the disclosures were "boilerplate"—and they are not—labeling language "boilerplate" does not mean it should be disregarded.  *See In re Victory Mkts., Inc.*, 221 B.R. 298, 304 (B.A.P. 2d Cir. 1998); *see also Olkey* v. *Hyperion 1999 Term Trust, Inc.*, 98 F.3d 2, 8 (2d Cir. 1996); *Municipality of Bremanger*, 2013 WL 1294615, at *18.

assurance that Paramount would implement the same co-financing techniques as it had in the past and (ii) Paramount might well elect to take a more aggressive approach to the development of films.

Perhaps more fundamentally, plaintiffs' reliance cannot be considered reasonable based on the information they received during due diligence.  The undisputed facts establish that, prior to making their investment decisions, each plaintiff received a version of the Melrose Slate Schedule showing that co-financing amounts, including foreign pre-sales, were running substantially lower than historical levels.  Having received this information, "it was unreasonable, perhaps reckless," for these sophisticated plaintiffs not to inquire further into the subject before investing millions of dollars into Melrose.  *Ashland Inc.* v. *Morgan Stanley & Co., Inc.*, 700 F. Supp. 2d 453, 471 (S.D.N.Y. 2010), *aff'd*, 652 F.3d 333 (2d Cir. 2011).

Given these disclosures, plaintiffs invent facts and resort to a series of flimsy excuses about the "various limitations" of the Melrose Slate Schedule.  [Opp'n 21–22, 39.]  None of these arguments succeeds.

*First*, plaintiffs falsely assert that Paramount told Moody's "that the minimal foreign pre-sales reflected [in the Melrose Slate Schedule] were *not* to be relied upon."  [Opp'n 39.]  Plaintiffs cite no evidence to support this assertion, nor could they.  Paramount never made such a statement.  In any event, this assertion does not cure the defect in the reasonableness of plaintiffs' alleged reliance.  By receiving the Melrose Slate Schedule, plaintiffs were put on notice that the actual co-financing (including foreign pre-sales) for the Melrose Slate was different than the amount reflected in the HDS.  That information should have prompted more diligence on plaintiffs' part.  Their failure to do so was unreasonable as a matter of law.

18

*Second*, plaintiffs suggest that the Melrose Slate Schedule was "useless" because it included "disclaimers of reliability," was only "tentative," "did not provide Plaintiffs with means to evaluate and compare data in the [Melrose Slate Schedule] to the HDS," and was missing information concerning additional films in the Melrose Slate. [Opp'n 39.]  Again, this argument misapprehends the issue.  The Melrose Slate Schedule provided information about the Melrose Slate that casts doubt on the representations plaintiffs allege that they relied upon.  That information—whether it was tentative or final—put a sophisticated investor on notice that its supposed belief was questionable.

*Third*, in a statement entirely of their own invention, plaintiffs state that Paramount "specifically told the investors that [the Melrose Slate Schedule was] incomplete and they should rely on Paramount's pre-sale practice in the HDS." [Opp'n 39.]  One would search the record in vain to find such a statement from Paramount *because there is no evidence that Paramount ever made such a representation*, which explains why plaintiffs offer no record cite to support this brazen assertion.

Given these undisputed facts, plaintiffs' reliance on *Syron* is misplaced, for the reasons noted above.  *See supra* pp. 11–12.  Further, *Syron* was an enforcement action for violations of the anti-fraud provisions of the federal securities laws.  As such, proof of reasonable reliance was not at issue because the SEC, unlike a private plaintiff, is not required to prove reasonable reliance.  In fact, the discussion in *Syron* that plaintiffs cite in support of their argument about reasonableness concerns proof of materiality, not reliance.  *Syron,* 934 F. Supp. 2d at 630 ("this argument is ultimately about the materiality of the alleged misrepresentations").

19

### D.     There Was No Material Omission and the *Affiliated Ute* Presumption Does Not Apply

Given their obvious problems in proving either actual or reasonable reliance, plaintiffs pursue a misguided effort to take advantage of the presumption of reliance that applies to omission cases under *Affiliated Ute Citizens of Utah* v. *United States*, 406 U.S. 128 (1972). The presumption does not apply here.

Plaintiffs' federal securities claims turn on alleged misrepresentations—not omissions. *See Affiliated Ute*, 406 U.S. at 153; *Starr ex rel. Estate of Sampson* v. *Georgeson S'holder, Inc.*, 412 F.3d 103, 109 n.5 (2d Cir. 2005) (*Affiliated Ute* presumption applies only in connection with claims involving *primarily* a failure to disclose). It is black-letter law that, where a plaintiff identifies allegedly false affirmative statements on a topic, it cannot invoke the presumption. *E.g.*, *In re Lehman Bros. Sec.* & *ERISA Litig.*, 2013 WL 5730020, at *3 (S.D.N.Y. Oct. 22, 2013); *Goodman* v. *Genworth Fin. Wealth Mgmt., Inc.*, 2014 WL 1452048, at *12–13 (E.D.N.Y. Apr. 15, 2014) (refusing to apply the *Affiliated Ute* presumption because "although couched as failures to disclose, the alleged omissions merely restate plaintiffs' core misrepresentation claim").

*In re Smith Barney Transfer Agent Litig.*, 290 F.R.D. 42, 48 (S.D.N.Y. 2013), does not suggest a different result.[12]   There, the *Affiliated Ute* presumption applied because the "the relevant disclosures [were] so sparse that, in practical terms, they approximate total non-disclosure"; thus, "a diligent investor could scour the relevant prospectuses" and learn nothing about the allegedly

---

[12]   The other decisions plaintiffs cite are also inapt. *In re Parmalat Securities Litigation*, 2008 WL 3895539, at *8 (S.D.N.Y. Aug. 21, 2008), applied the *Affiliated Ute* presumption where defendants "fail[ed] to disclose material facts that made the reporting of certain information and transactions, although perhaps not deceptive in themselves, otherwise misleading."   By contrast, plaintiffs here allege that Paramount's representations in the PPM were *themselves* misleading. [TAC ¶ 46.]   As the *Parmalat* court notes: "The availability of the *Affiliated Ute* presumption permits generalized proof of reliance with respect to . . . omission claims, *but perhaps not with respect to those claims that rest predominantly on alleged misrepresentations.*"  *Id.* at *8 (emphasis added).   In *Fogarazzo* v. *Lehman Bros., Inc.*, 232 F.R.D. 176 (S.D.N.Y. 2005), the Court applied the fraud-on-the-market presumption of reliance, as well as the *Affiliated Ute* presumption.   Unlike here, *Fogarazzo* involved independent omissions that were not merely information that correct the alleged misrepresentation.

20

fraudulent scheme.  *Id.* at 48.  That is not the case here.  As noted above, the PPM provided significant disclosures concerning co-financing techniques.

Instead, this case is more like *Goodman*, where the court held that the *Affiliated Ute* presumption did *not* apply in a situation where the relevant disclosure document indicated that a mutual fund was going to employ one type of strategy, but in fact did not do so.  As the *Goodman* Court explained, the alleged failure to disclose the omitted fact concerning the strategy did not turn the case into one of omissions because the "omissions merely exacerbated the misleading nature of affirmative statements" about the strategy.  2014 WL 1452048, at *13 (internal quotation marks omitted).  So, too, here.

Plaintiffs' attempt to turn this into an omissions case is particularly baseless, because each plaintiff in fact received the Melrose Slate Schedule, which explicitly *disclosed* the very information plaintiffs now claim Paramount omitted.  *See In re Apple REITs Litig.*, 2013 WL 1386202, at *12 (E.D.N.Y. Apr. 3, 2013) ("Defendants cannot be alleged to have misrepresented or omitted that which they plainly disclosed.").[13]

## IV.   PARAMOUNT IS NOT THE "MAKER" OF ANY ALLEGED MISREPRESENTATION

The above discussion assumes that Paramount "made" the statements in the PPM.  But it did not.  There is no dispute that *Melrose* both issued and filed the PPM.  Nor is there any "evidence *on the face of the prospectus* that the statements in the prospectus came from [Paramount]."  *Krasner* v. *Rahfco Funds LP*, 2012 WL 4069300, at *5 (S.D.N.Y. Aug. 9, 2012) (emphasis added).

Plaintiffs argue that, because Paramount had some involvement in drafting the PPM,

---

[13]   It is undisputed that the *Affiliated Ute* presumption does not apply to plaintiffs' common law claims.  *See Lehman*, 2013 WL 5730020, at *4 & n.44 (collecting cases).

Paramount is the "maker" of the statements. But that is not the law. Under the Supreme Court's decision in *Janus Capital Grp., Inc.* v. *First Derivative Traders*, 131 S. Ct. 2296 (2011), what matters is who filed the prospectus, and evidence of the source of the relevant statements *on the face of the prospectus*. And discovery has shown that the PPM both was issued by Melrose and, on its face, explicitly disclaims attribution to Paramount in prominent, bold type.[14] [SOF ¶ 21.]

## V.   PLAINTIFFS CANNOT PROVE COMMON LAW FRAUD

For the same reasons noted above, plaintiffs also cannot prove common law fraud. *See supra* pp. 3–21; *see also* Br. 40–43.

In a last ditch argument to save their case, plaintiffs nonetheless argue that their common law fraud claims are supported by Paramount's alleged "misrepresentations" *to Moody's*. This argument is utterly meritless. The alleged "misrepresentation" is found in an email from Hoffman (of Merrill) to Moody's, which neither plaintiffs nor Paramount ever saw. [Ex. 215 at BOA-ML 00040847.] The email innocuously states:

> Forward slate info contains info on those films that will be co-produced with other studios. I would look at historical data to determine what amounts have been co-financed by other means historically and project that amount going forward. For conservatism, you could assume slightly lower amounts since the German $ and other structured deals are generally entered into on an opportunistic basis.

By its own terms, the email informs Moody's that it should assume *lower* amounts of co-financing in the Slate. Nothing in this statement is false, nor could it be attributed to Paramount.

Plaintiffs nevertheless blatantly mischaracterize the record on this point, claiming that "Hoffman testified that he never delivered [due diligence] information to investors without first verifying same with Paramount," thus suggesting the information came from Paramount. [Opp'n 14.] Hoffman's testimony says precisely the opposite, although plaintiffs omitted it from the relevant

---

[14]   Plaintiffs suggest that the disclaimer in the PPM should not count because Paramount "prepared" the PPM. This argument was flatly rejected in *Janus* itself, which explained that what matters is who is identified as the speaker of a statement, not who in fact wrote it. *Janus*, 131 S. Ct. at 2302–04.

exhibit.   [*See* Ex. 146.]   In fact, on pages 144–45 of Hoffman's deposition transcript, Hoffman testified that most likely he was offering his own views: "I think that I'm probably giving advice to Moody's to say look, for conservatism, use your judgment: assume that there could be lower amounts." [Ex. 230 at 144:7–147:5.]   The undisputed facts thus show that Paramount did *not* make any alleged misstatements to Moody's.

For similar reasons, plaintiffs' reasonable reliance argument under New York law fails as well.   New York law does not allow plaintiffs to ignore information and assert reasonable reliance.   If anything, it puts a greater burden on sophisticated investors to learn available information.   [*See* Br. 40-41 (citing cases).]   Citing *JP Morgan Chase Bank* v. *Winnick*, 350 F. Supp. 2d 393, 407–10 (S.D.N.Y. 2004), plaintiffs nonetheless argue that "there was no way for Plaintiffs to discover Paramount's true intentions regarding foreign pre-selling of the Melrose Slate." [Opp'n 41–42.]   But *Winnick*—decided at the motion to dismiss stage—explicitly notes that the fraud claim would not succeed if "further evidence will emerge in discovery . . . indicating that, had the [plaintiffs] performed even a cursory inquiry, they would have been able to ascertain" the information allegedly misrepresented.   *Winnick*, 350 F. Supp. 2d at 410.   In this case, they actually received the information at issue.   *See supra* pp. 14–16, 18.

Nor can plaintiffs sustain an omissions-based fraud claim under New York law. Here, plaintiffs simply misstate the law.   New York law is well-settled that fraud claims cannot be based on omissions absent a proven "duty to disclose" material information—which generally does not exist between parties engaged in arms-length business transactions.   *Dembeck* v. *220 Cent. Park S. LLC*, 823 N.Y.S.2d 45, 47 (1st Dep't 2006); *see also Grumman*, 748 F.2d at 738–39.[15]   In this

---

[15]   Although New York courts have occasionally sustained omissions-based fraud claims "where the parties enjoy a fiduciary relationship" or "where one party possesses superior knowledge, *not readily available to the other*, and *knows that the other is acting on the basis of mistaken knowledge*," *Grumman*, 748 F.2d at 739 (emphasis added) (internal quotation marks omitted), there is no record evidence to support such a finding here.

case, no such duty existed since plaintiffs expressly agreed that Paramount was not a fiduciary and owed no duty of disclosure.  [SOF ¶ 47.]

## VI.    PLAINTIFFS ARE NOT ENTITLED TO PUNITIVE DAMAGES

After six years, plaintiffs finally concede their pleading "mistakenly" sought rescission for their common law fraud claim, and attempt to "conform[]" their pleadings—without seeking any leave to amend their complaint—to seek damages.  [Opp'n 43.]  If the Court allows plaintiffs at this late date to seek damages rather than rescission on that claim (which it should not), under no circumstances should plaintiffs be entitled to seek punitive damages.  In New York, "punitive damages are not available in the ordinary fraud and deceit case," and are permitted "only when a defendant's wrongdoing is not simply intentional but evince[s] a high degree of moral turpitude and demonstrate[s] such wanton dishonesty as to imply a criminal indifference to civil obligations."  *Hoeffner* v. *Orrick, Herrington & Sutcliffe LLP*, 924 N.Y.S.2d 376, 377 (1st Dep't 2011) (internal quotation marks and citations omitted).

Plaintiffs cannot make such a showing here.[16]  Plaintiffs allege that Paramount's purportedly fraudulent decision was made because "[n]ot employing international pre-sales would increase the profits of Paramount as producer and distributor with respect to highly successful films." [TAC ¶ 43.]  Thus, plaintiffs contend that, at worst, Paramount was motivated by potential profit— i.e., Paramount allegedly committed a "garden-variety commercial fraud."  *See Ellington Credit Fund, Ltd.* v. *Select Portfolio Servicing, Inc.*, 837 F. Supp. 2d 162, 198 (S.D.N.Y. 2011).  New York courts consistently refuse to award punitive damages in such cases.  *Id.*; *see also Princes Point, LLC*

---

[16]   Plaintiffs curiously assert that punitive damages are warranted because every other Melrose investor refrained from bringing a lawsuit against Paramount.  [Opp'n 43 n.19.]  Not only do plaintiffs not have standing to assert claims by other investors, this argument ignores the more plausible inference that these investors' decision not to sue Paramount is because they agree Paramount did not commit any fraud.

v. *AKRF Eng'g, P.C.*, 944 N.Y.S.2d 493, 494 (1st Dep't 2012); *Orlando* v. *Novurania of Am., Inc.*, 162 F. Supp. 2d 220, 226 (S.D.N.Y. 2001).

## VII.   PLAINTIFFS CANNOT PROVE UNJUST ENRICHMENT

Finally, because plaintiffs cannot prove their fraud claims, their unjust enrichment claims—which are expressly predicated on their fraud claims—necessarily fail.

To avoid this outcome, plaintiffs once again misrepresent the record and claim that this Court previously found that "Paramount's argument that the dismissal of plaintiffs' fraud claims requires dismissal of the unjust enrichment claim is not correct."   [Opp'n 44 (citing *Allianz Risk Transfer* v. *Paramount Pictures Corp.*, 2010 U.S. Dist. LEXIS 32218, at *26–27 (S.D.N.Y. Mar. 31, 2010).]   But plaintiffs omit *the very next sentence* of this Court's decision, which explained: "Nevertheless, since we have found no fraud, either under the federal securities laws or the common law of the State of New York, it is difficult to imagine, and plaintiffs do not explain, how the elements of an unjust enrichment claim could be met in this case."   Thus, the Court concluded: "Here, because all underlying fraud claims are to be dismissed, the claim for unjust enrichment should also be dismissed."   *Id.*   For the same reasons, this claim fails here.

<u>Conclusion</u>

Paramount's motion for summary judgment should be granted, and judgment should be entered dismissing all of plaintiffs' claims.


Dated:   July 25, 2014
            New York, New York

Respectfully submitted,

PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP

By:  s/Allan J. Arffa

Leslie Gordon Fagen (lfagen@paulweiss.com)
Allan J. Arffa (aarffa@paulweiss.com)
Andrew J. Ehrlich (aehrlich@paulweiss.com)
Patrick J. Somers (psomers@paulweiss.com)

1285 Avenue of the Americas
New York, New York 10019
Tel: (212) 373-3000
Fax: (212) 757-3990


KENDALL BRILL & KLIEGER LLP
Richard B. Kendall (rkendall@kbkfirm.com)
Robert N. Klieger (rklieger@kbkfirm.com)
Philip M. Kelly (pkelly@kbkfirm.com)

10100 Santa Monica Boulevard, Suite 1725
Los Angeles, California  90067
Tel:  (310) 556-2700
Fax: (310) 556-2705

*Attorneys for Defendant Paramount Pictures
Corporation*

26