# EXHIBIT 10

1  Mark Holscher (S.B.N. 139582)
   mark.holscher@kirkland.com
2  Diana M. Torres (S.B.N. 162284)
   diana.torres@kirkland.com
3  David A. Klein (S.B.N. 273925)
   david.klein@kirkland.com
4  KIRKLAND & ELLIS LLP
   333 South Hope Street
5  Los Angeles, California  90071
   Telephone: (213) 680-8400
6  Facsimile:  (213) 680-8500

7  Attorneys for Plaintiff

8              SUPERIOR COURT OF THE STATE OF CALIFORNIA

9                        COUNTY OF LOS ANGELES

10

11

12  MELROSE INVESTORS 2 LP,              Case No.:  BC474310

            Plaintiff,
13                                       The Honorable Michael P. Linfield

14        vs.                           DEPT.: 10

15  PARAMOUNT PICTURES CORPORATION,     **FIRST AMENDED COMPLAINT FOR
    DW STUDIOS L.L.C.,                  (1) BREACH OF CONTRACT; (2)
16                                      FRAUD; (3) UNFAIR COMPETITION;
            Defendants.                 (4) DECLARATORY RELIEF**

17                                      **DEMAND FOR JURY TRIAL**

18

19

20

21

22

23

24

25

26

27

28

Δ π **EXHIBIT** 282

Deponent  FIER

Date 1/15/14 Rptr. KK
WWW.DEPOBOOK.COM

                                   1

**INTRODUCTION**

1.      On Melrose Avenue, at the oldest existing film studio in Hollywood, Paramount Pictures Corporation ("Paramount") routinely calculates "net receipts" to rake in huge returns on one set of books while reporting losses to its profit participants on another.

2.      In this case, the "losses" reported by Paramount on behalf of itself and its former subsidiary DreamWorks Studios arose because of Defendants' practices in underreporting the revenues and over-reporting the costs attributable to the 29 films co-financed by their equity partner Melrose Investors 2 LP ("Melrose 2"). Through this lawsuit, Melrose 2 seeks to end Defendants' deceptive practices, and recover the amounts Melrose 2 is owed.

3.      In September, 2006, Paramount and DreamWorks Studios, now known as DW Studios L.L.C. ("DreamWorks"), and Melrose 2 entered an agreement through which Melrose 2 would own up to 25% of the copyright interest in up to thirty (30) films that Defendants would produce (the "Agreement"). To acquire this ownership interest, Melrose 2 agreed to fund up to 25% of Defendants' production costs. Melrose 2 met its obligations and has, to date, provided Defendants with roughly $375 million to produce 29 of their films.

4.      By any objective measure, the slate of films financed in part with funding from Melrose 2 (the "Melrose 2-funded films") has been a tremendous success. The Melrose 2-funded films include *Mission Impossible 3*, *Charlotte's Web*, *Dreamgirls*, *Flags of Our Fathers*, *Blades of Glory*, *Transformers*, *Transformers 2*, and *Transformers 3,* among others. Collectively, the Melrose 2-funded films have grossed close to $7 billion.

5.      The funding provided by Melrose 2 has served Defendants well financially. To date, Paramount has taken in more than $700 million in distribution fees alone from the Melrose 2-funded films, in addition to the untold amounts in actual profits. Indeed, when Paramount's distribution fees are added to the portion of "Net Receipts" not paid to Melrose 2, the amount is more than $2 billion. Upon information and belief, that figure understates Defendants' actual profits by a significant amount.

6.      In addition, on information and belief, Paramount and DreamWorks have allowed Viacom Inc. ("Viacom"), their parent corporation, to barter the exploitation rights to Melrose 2-

1  funded films to obtain for itself and its subsidiaries online ad serving services reportedly worth $500

2  million, none of which has been allocated to any Melrose 2-funded film.

3       7.    In contrast, five years after the Agreement was signed, Melrose 2 has still not seen a

4  dollar of profit from its $375 million investment.  As set forth more fully below, this lopsided

5  distribution of earnings comes about as a direct result of Defendants' practice of understating gross

6  receipts, delaying payments to Melrose 2, overstating production and distribution costs and

7  hindering Melrose 2's ability to exercise its audit rights and verify the revenues and costs associated

8  with the films it funded.

9  **THE PARTIES**

10       8.    Plaintiff Melrose Investors 2 LP, formerly known as Melrose Investors 2 LLC, is a

11  Delaware Limited Partnership with its principal place of business in New York, New York.

12       9.    Defendant Paramount Pictures Corporation is a Delaware Corporation with its

13  principal place of business in Los Angeles, California.

14       10.    Defendant DW Studios L.L.C., formerly known as DreamWorks L.L.C., is a

15  Delaware Limited Liability Company with its principal place of business in Universal City,

16  California.

17       11.    On information and belief, from January 2006 through late 2008, DreamWorks was a

18  wholly owned subsidiary of Paramount.  On information and belief, Paramount retained the right,

19  even after its ownership of DreamWorks ended, to co-finance and co-distribute any new movie that

20  DreamWorks produced through the end of 2009.

21       12.    On information and belief, defendant Paramount is and at all relevant times has been

22  a wholly owned subsidiary of Viacom.

23       13.    On information and belief, at all relevant times, Defendants and their corporate

24  affiliates have been the agents of each other, concerted actors, and/or joint venturers.  It is alleged

25  that such agents, concerted actors, and/or joint venturers acted in concert and gave substantial

26  assistance to the conduct resulting in harm to Melrose 2.

27

28

FIRST AMENDED COMPLAINT

## NON-PARTY ALTER EGOS ACTING AS A SINGLE ENTERPRISE

14.     National Amusements, Inc. ("National Amusements") is the owner of a controlling percentage of Viacom. Viacom, in turn, owns and controls Paramount and MTV Networks ("MTV"), among others. National Amusements operates more than 950 movie screens in the United States, Great Britain, and Latin America. National Amusements is a closely held company operating under the family leadership of Sumner Redstone and his daughter Shari Redstone. In 1987, National Amusements acquired 83 percent of Viacom and to this day is Viacom's controlling shareholder and parent company. Indeed, key National Amusements executives and board members, including Sumner and Shari Redstone, are also executives or board members of Viacom, which in turn controls Paramount. As widely reported in the media, since late 2008, National Amusements has faced severe problems with its debt. To raise money, National Amusements has been forced to restructure its obligations with bankers, sell some of its theaters, and sell nonvoting shares of Viacom stock.

15.     On information and belief, Viacom, National Amusements, Paramount, DreamWorks, and MTV have been the alter egos of one another, acting as a single enterprise. Among other things, Viacom, National Amusements, Paramount, DreamWorks, and MTV are effectively controlled by the same shareholders and share officers and directors. Viacom, National Amusements, Paramount, DreamWorks, and MTV have also disregarded their separate corporate identities in dealings with each other. National Amusements and/or Viacom have directed revenue and other benefits from the exploitation of Paramount and DreamWorks films to themselves or their subsidiaries, instead of to Paramount and DreamWorks, thus depriving Paramount and DreamWorks' profit participants their share of that revenue. Accordingly, Defendants have used the imprimatur of their supposed corporate separateness to work a fraud and injustice on Melrose 2 by depriving Melrose 2 of revenues and value to which Melrose 2 would otherwise be entitled under the Agreement.

## THE MULTI-PICTURE INVESTMENT AGREEMENT

16.     The basic concept of the Agreement is simple: in exchange for its funding, Melrose 2 earned the right to own an undivided interest in the copyright held by the studio (either Paramount or

1   DreamWorks, as applicable) and the right to receive its pro-rata share of the income for each picture

2   it helped to fund.

3        17.    The Agreement defines the income of the Melrose 2-funded films as all revenues

4   derived from the distribution and exhibition of each Melrose 2-funded film in all media minus a set

5   distribution fee for the film, certain distribution costs, certain third party participations, taxes and

6   retroactive wage adjustments.  Upon information and belief, the purpose of this income-sharing

7   format was to establish incentives for Defendants that never aligned with Melrose 2's interests.

8   Pursuant to the express terms of the Agreement, Defendants must prepare and deliver to Melrose 2

9   preliminary and final Initial Investment Price Invoices, followed by a Final Investment Price

10  Invoice, for each Melrose 2-funded film (collectively, the "Investment Price Invoices").  The Initial

11  Investment Price Invoices determine the amounts that Melrose 2 initially pays for each Melrose 2-

12  funded film.  The Final Investment Price Invoice determines the ultimate amount Melrose 2 pays for

13  each Melrose 2-funded film.  In addition, the Agreement provides that Defendants must account to

14  Melrose 2 periodically with fair and accurate Participation Statements.   Defendants are required to

15  pay Melrose 2 the amounts owed at the time the Participation Statements are due.

16       18.    The Agreement contains a number of other provisions designed to ensure that

17  Melrose 2 actually receives its fair share of the films' profits.  For example, because studios often

18  receive revenue or incur costs for a slate of films collectively, the Agreement contains a number of

19  provisions requiring Defendants to apportion all revenues received and costs incurred to each of the

20  Melrose 2-funded films, even if received or incurred partially in connection with other films as well.

21  Similarly, while Defendants retain the right to make business and creative decisions for the films

22  they produced, Defendants are required to enter transactions with affiliates on an arms-length basis

23  and enforce their rights against those affiliates in the same manner that they would against unrelated

24  third parties.  And, while Defendants have the right to use their own facilities and personnel for

25  certain work that would otherwise be performed by third parties, Defendants can charge no more

26  than market rates and cannot charge internal costs and overhead as production costs of the Melrose

27  2-funded films.

28

FIRST AMENDED COMPLAINT

19.     In keeping with the overall scheme of the Agreement, Defendants are also not entitled to dilute Melrose 2's profits by giving profit participations to their affiliates and then subtracting those participations before making payments to Melrose 2.  Indeed, the Agreement expressly prohibits that type of self-dealing.

20.     To ensure that Melrose 2 is able to protect its interests, Defendants and their wholly owned subsidiaries are required to keep books and records relating to each Melrose 2-funded film and related transactions, which Melrose 2 has the right to review and audit.  Moreover, the Defendants are obligated to take reasonable steps in advance of Melrose 2's audits to make available materials and reasonable staffing so that Melrose 2 can complete its audits in a timely fashion.

21.     The Agreement contains windows of time in which Melrose 2 is permitted to perform audits and make objections to Defendants' statements of costs and receipts related to Melrose 2-funded films.  If Melrose 2 does not perform the audits and make objections within those specific windows, the Agreement provides that Melrose 2 loses the ability to take any action, including instituting an action or proceeding in court, to enforce its rights under the Agreement.

## DEFENDANTS' ACCOUNTING IMPROPRIETIES

### Defendants Repeatedly Hindered and Refused to Cooperate With Melrose 2's Audits

22.     As is customary in the entertainment industry, Melrose 2 began to exercise its audit rights after it had received a certain amount of information about the costs and revenues of its films.  In early 2008, Melrose 2's auditors contacted Paramount to notify the studio of its intent to audit the production costs of *World Trade Center*, *Barnyard*, and *Flags of Our Fathers* and request the information necessary to begin the audit.

23.     Paramount provided two categories of requested items within a few weeks but, for the remainder of the requested items, took one of three tacks: delayed for months, refused to provide the information or simply refused to respond.  For example, to date, Paramount has never provided the Paramount facilities agreements and rate cards for the use of its facilities during production, despite an express provision in the Agreement requiring the use of studio facilities to be reasonable and the charges to be non-discriminatory and made in good faith.  Similarly, although Paramount claims that *Flags of Our Fathers* ultimately cost nearly twice its budgeted amount, Paramount refused to

1   provide the acquisition agreement for that film, again despite a formal request in early 2008 and an

2   express provision in the Agreement requiring it to do so.  Paramount ignored that express provision

3   in the Agreement again when it refused to provide the acquisition agreement for *Zodiac*.  And,

4   although tax rebates and German financing deals are common ways of reducing production costs and

5   appear to have been employed for these films, Defendants simply ignored all requests since 2008 for

6   documentation of these accounting devices.  Similarly, in connection with a later audit, Defendants

7   failed to provide the domestic and foreign production cost records for *Dreamgirls* and *Norbit*.

8       24.    Paramount's obstructionist tactics were even more egregious in connection with

9   Melrose 2's first distribution audit.  In September, 2008, Melrose 2 sought to perform a routine audit

10  of the net receipts of the first three films that it had funded: *Barnyard*, *Jackass 2*, and *Nacho Libre*.

11  Although product summaries, work paper packages relating to income and expense items, and

12  domestic distribution expense cost reports are all fundamental documents provided in a net receipts

13  audit and should be readily available, Paramount withheld them for nearly half a year, effectively

14  preventing the audit from taking place during that time.  Even more egregiously, Paramount never

15  provided the reconciliations that were requested beginning in 2008, despite express provisions in the

16  Agreement requiring it to do so.  Paramount also refused to provide Melrose 2 with the applicable

17  studio facilities agreement and rate cards for any of the productions that would allow Melrose 2 to

18  evaluate the reasonableness of Paramount's high internal facilities charges.  Paramount also failed to

19  provide any supporting documentation for charges relating to the theatrical launch costs of

20  *Barnyard*, *Jackass 2*, and *Nacho Libre*.

21      25.    Defendants have also been cagey about other sources of revenue.  For example,

22  although there appears to be a fair amount of product placement in Melrose 2-funded films such as

23  *Transformers*, *Transformers 2*, *Heartbreak Kid*, *Blades of Glory*, and *Shooter*, Defendants refuse to

24  provide documentation of product placement so that Melrose 2 can determine whether it was

25  properly credited for cost reductions in connection with those deals.  On information and belief,

26  Paramount's practice is to withhold documentation of product placement in all Melrose 2-funded

27  films and thereby frustrate any ability of Melrose 2 to verify proper allocation of revenues or other

28  benefits obtained through product placement deals.  Paramount similarly claims that there is no

attributable merchandising revenue for *Jackass 2* because such rights are owned by its sister company MTV, yet refuses to provide support for its blanket assertion. And when Paramount reported millions of dollars in merchandising revenue from the Hasbro *Transformers* toy line, Paramount refused to provide the agreements that would allow Melrose 2 to evaluate the accounting of this revenue.

26.     The above-referenced delays and refusals to provide information are only a smattering of the many examples of this type of conduct. Indeed, on each of the seven audits Melrose 2 has completed, Defendants refused to provide or, at best, have taken many months to provide, documents that should be provided quickly and without question. These delays have effectively prevented Melrose 2 from completing its audits in the time frames contemplated by the Agreement.

**Defendants Repeatedly Underreport The Revenues of the Melrose 2-Funded Films**

27.     Despite Paramount's delays and obfuscation, Melrose 2 has learned through its audits that Defendants have paid short shrift to their contractual obligations. First, on a routine basis, Defendants have understated the revenues received in connection with the exploitation of the Melrose 2-funded films. For example:

  a.     Although the Agreement expressly prohibits deducting payments to affiliates as "third party participations," Defendants did just that when they deducted payments to their sister company MTV as a third party participant in connection with *Nacho Libre* and *Charlotte's Web*.

  b.     Although the Agreement expressly prohibits deducting payments to Walden Media for *Charlotte's Web*, Defendants again did just that.

  c.     Similarly, although the Agreement requires Defendants to allocate to the Melrose 2-funded films their fair share of money received from foreign licensees, Defendants ignored that provision and kept for themselves revenues received from a pay television provider in France for the distribution rights for *Barnyard*, *Jackass 2*, *Nacho Libre*, *Dreamgirls*, *Charlotte's Web*, *World Trade Center*, *Transformers*, *Shooter*, *Norbit* and others.

FIRST AMENDED COMPLAINT

1         d.     And, Paramount underreported the gross receipts for DVD sales of *Barnyard*,

2    *Jackass 2*, *World Trade Center*, and *Transformers* without any explanation as to why.

3        28.     On information and belief, Paramount has also improperly failed to account for

4    benefits derived from the exploitation of Melrose 2-funded films because its parent Viacom

5    structured those deals in such a way as to obtain for itself and its subsidiaries in-kind benefits that it

6    does not allocate. For instance, in late 2007, Viacom and Microsoft announced a deal which gave

7    Microsoft the right to use content from Paramount films on MSN and the Xbox 360 gaming system

8    and, in exchange, Viacom received ad serving services for itself and its subsidiaries reportedly worth

9    at least $500 million. On information and belief, none of the value of those services, paid for in part

10   through the exploitation of Melrose 2-funded films, has been credited to any Melrose 2-funded film.

11   On further information and belief, there are other third-party benefits related to the exploitation of

12   Melrose 2-funded films that are received through Viacom, not Paramount, so that Defendants can

13   conceal these benefits in Paramount's accountings to profit participants. It is not surprising that

14   Viacom would enter into such deals; in 2011, Viacom's filmed-entertainment revenue climbed 46%

15   to $1.79 billion dollars in no small part because of *Transformers 3*--a Melrose 2-funded film. By

16   intentionally structuring lucrative deals for the licensing of Paramount films in a way that provides

17   in-kind services and other benefits to Viacom and its subsidiaries, Paramount and Viacom have

18   deprived Melrose 2 of value that should have been allocated to it under the Agreement.

19       29.     Moreover, under the Agreement, Melrose 2 has the right to invest in films that are

20   derivative works of Melrose 2-funded films, even after the investment period contemplated by the

21   Agreement has ended. Defendants have notified Melrose 2 of these options for the derivative works

22   but refuse to share expense information about those films that would be important for anyone

23   making a decision to invest, claiming that the Agreement does not expressly require them to provide

24   such information. When the Agreement was entered, however, Defendants provided expense

25   information about the original slate of Melrose 2-funded films so that Melrose 2 could evaluate its

26   investment. Not having similar information about derivative works hindered Melrose 2's ability to

27   reliably assess the risks of future investments, and Melrose 2 lost potentially valuable investment

28   opportunities as a result.

30.     Defendants also delay reporting revenue, apparently to reduce their own internal cost of capital, at Melrose 2's expense.  For example, despite the Agreement's requirement to account for revenues at the time they are received or credited to the studio, Paramount refused to report money that it received for licensing *Barnyard* to Nickelodeon at the time it was received, holding it instead until the picture actually became available for exhibition and thereby depriving Melrose 2 of the interest on those funds.

31.     The above-referenced examples are but a few of the many instances in which Defendants have improperly reduced the amount of revenues that should be allocated to the Melrose 2-funded films.  Indeed, in each and every audit Melrose 2 has performed, Melrose 2 has seen numerous examples of underreported income.  Melrose 2 has provided Defendants with its written reports showing these false accounting entries but Defendants have, to date, never corrected them or paid Melrose 2 the amounts it is owed.  Rather than pay Melrose 2 these amounts and the interest to which it is expressly entitled under the Agreement, Defendants have held this money and used it for their own benefit.

**Defendants Repeatedly Overstate The Costs of the Melrose 2-Funded Films**

32.     Defendants have also routinely overstated the costs they have incurred in connection with the production and distribution of each of the Melrose 2-funded films.  For example, Defendants inexplicably and undeniably overstated the costs of production of *World Trade Center*, *Barnyard*, *Transformers*, *Shooter*, *Dreamgirls*, and *Norbit*, but even when presented with their own records showing these blatantly false accounting entries, did nothing.  Similarly, Defendants charged Melrose 2 for salaries of production personnel in relation to *Transformers* and *Shooter*, despite the explicit exclusion of salaries and expenses of any administrative or executive personnel in the definition of Direct Costs in the Agreement.  Again, when shown their false accounting entries, Defendants did nothing.

33.     Likewise, Defendants routinely overstate their distribution costs for the Melrose 2-funded films.  For example, Defendants outsourced their advertising and promotional work for *Barnyard*, *Jackass 2*, *Nacho Libre*, *Dreamgirls*, *Charlotte's Web*, *World Trade Center*, *Transformers*, *Shooter*, and *Norbit*, charged Melrose 2 for those costs, and then imposed an

1  additional fee for Paramount's in-house staff supposedly to perform the very same work.  Melrose 2

2  has performed three distribution audits of nine Melrose 2-funded films and this fee has uniformly

3  been imposed on each audited film.  It is Defendants' standard practice to overstate the distribution

4  costs for the Melrose 2-funded films by imposing this additional fee and on information and belief,

5  Defendants indeed imposed this additional fee on all Melrose 2-funded films.  The Agreement

6  prohibits this type of double-charging by limiting advertising and promotional charges to market

7  rates.  Charging double is not charging a market rate.

8    34.    In another example of gouging, Defendants charged Melrose 2-funded films nearly

9  $1.5 million for Paramount's in-house advertising agency--Viacom's indirect subsidiary 5555

10  Communications--to create websites for *Dreamgirls*, *Charlotte's Web*, *World Trade Center*,

11  *Transformers*, *Shooter*, and *Norbit*.  Such charges are clearly not at competitive rates and, not

12  surprisingly, Defendants have refused to provide the rate cards that would belie any such claim.  On

13  information and belief, Defendants have overstated the costs of all Melrose 2-funded films as a result

14  of Defendants' practice of overcharging for Paramount's in-house advertising personnel.

15    35.    On information and belief, Defendants have also overcharged Melrose 2 for the cost

16  of advertising Melrose 2-funded films by entering into secret agreements with third parties to receive

17  rebates on media spending that Defendants have not allocated to Melrose 2, even though the

18  Agreement requires Defendants to allocate such cost reductions to the Melrose 2-funded films.

19    36.    Defendants also routinely charge Melrose 2 for overhead costs that are explicitly

20  excluded from the definition of allowable distribution costs in the Agreement.  These improper

21  overhead charges include but are not limited to (i) more than half a million dollars allocated to

22  *Dreamgirls*, *Charlotte's Web*, *World Trade Center*, *Barnyard*, *Jackass 2*, *Nacho Libre*, and

23  *Transformers* for attending standard trade shows and conventions that the studios attend in the

24  ordinary course of business; (ii) property premium insurance that is an inherent cost in running a

25  film studio and not allowed under the Agreement; (iii) unspecified charges for anti-piracy efforts;

26  (iv) generic market research; and (v) costs relating to a logo design that would be used generally for

27  Nickelodeon Movies.

28

1    37.    Defendants also had the audacity to charge Melrose 2 for nearly $3 million in

2    charitable contributions, claiming that these charges were somehow costs of the films.  Indeed, while

3    it is admirable that Defendants donate to worthy charities some of the profits they have received,

4    such contributions are simply not production or distribution costs, and should be borne by

5    Defendants, not passed on surreptitiously to Melrose 2.

6    38.    As with the egregious examples of understating revenue, the above-referenced

7    examples of overstating costs are but a few of the many instances in which Defendants have

8    improperly reduced the amount of income that should be allocated to the Melrose 2-funded films.

9    Indeed, in each and every audit Melrose 2 has performed, Melrose 2 has seen numerous examples of

10   this behavior that, to date, Defendants refuse to correct.  Not only do Defendants owe Melrose 2

11   these amounts, Defendants are also contractually required to pay interest on these amounts.  But,

12   again, Defendants have held this money and used it for their own benefit.

13   **Defendants Have Refused To Allocate Substantial Vendor Payments For Goods and Services**
**Paid For By Melrose 2**

14

15   39.    Defendants also refused to allocate, or provide any documentation of, the substantial

     cash payments and/or discounts they receive from the vendors they use in connection with the
16
     production and distribution of Melrose 2-funded films, which Paramount describes as "bonuses."
17
     Such discounts -- whatever they may be called -- should be allocated as reductions to the production
18
     and/or distribution costs of the studio's films, for example when Defendants use a common vendor
19
     for film printing or DVDs, and the Agreement requires that Defendants do so in connection with the
20
     Melrose 2-funded films.  Defendants, however, have engineered their contracts with house vendors
21
     in such a way that these discounts are dubbed "bonuses" (or something similar) and, using this
22
     misleading nomenclature, claim that such amounts belong to Defendants alone.  Not surprisingly,
23
     Defendants refused to provide any information about these amounts or the agreements through
24
     which they are received, despite explicit requests for such information and agreements by Melrose 2
25
     in connection with its audits.  This is Defendants' practice with respect to all Melrose 2-funded
26
     films.
27

28

40.     Even more egregiously, Paramount has kept for itself all of the money it received in connection with its much-touted August 2007 deal with Toshiba, even though the Agreement requires Paramount to allocate a portion of that money to the Melrose 2-financed films. Indeed, to announce the deal, Viacom, Defendants' parent company, issued a press release in which Paramount's Chief Executive Officer boasted that the box office success of two high-grossing Melrose 2-funded films, *Blades of Glory* and *Transformers*, had paved the way for Paramount to land the lucrative deal, reportedly worth $150 million.



search

VIACOM    OUR BRANDS | INVESTOR RELATIONS | CORPORATE RESPONSIBILITY | NEWS | ABOUT US | CAREERS

NEWS
YOUTUBE LITIGATION          **NEWS**

**Toolkit**          08.20.2007
🖶 Print Page
✉ E-mail Page          **Paramount and DreamWorks Animation Each Declare Exclusive Support for HD DVD**

Movies Distributed by Paramount Home Entertainment Including Paramount
Pictures, DreamWorks Animation SKG, DreamWorks Pictures, Paramount Vantage,
Nickelodeon Movies and MTV Films to be Released Exclusively in HD DVD
Exclusive Program To Begin with Release of "Blades of Glory," Followed by
"Transformers" and "Shrek the Third," Films Representing More Than $1.5
Billion in Combined Worldwide Box Office

41.     Now, despite having previously credited the success of these Melrose 2-funded films to its ability to achieve this newsworthy deal, Paramount takes the position that there is no relationship between the monies it received from Toshiba and the films Melrose 2 funded, and therefore Melrose 2 is entitled to no portion of those proceeds.

42.     Melrose 2, thus, has seen none of that money. Paramount refused Melrose 2's auditors' written requests for a copy of the Toshiba agreement and provided no documentation about the deal or where the $150 million went.

FIRST AMENDED COMPLAINT

**Defendants' Attempts To Deprive Melrose 2 Of The Benefits Of Its Copyright Ownership Have Been Knowing And Willful**

43.     Defendants are not ignorant of the false entries in their accounting statements and cannot claim that they have made them in good faith.  Melrose 2 began auditing Defendants' accounting statements nearly four years ago.  Beginning with its first audits, Melrose 2 found obvious, false entries in Defendants' favor and made Defendants aware of them by providing Defendants with each of its audit reports as soon as they were completed.  Rather than correct those false entries, however, Defendants failed to correct the Final Investment Price Invoices for the Melrose 2-funded films and continued to make the same false entries on subsequent Participation Statements.  And, rather than own up to those accounting improprieties, Defendants tried to hide them, largely by delaying and withholding their records while the windows of time in which Melrose 2 retained the right to bring an action against Defendants under the Agreement were closing.  Indeed, not until litigation counsel surfaced did Defendants speed up their provision of information.

44.     On October 27, 2010, Melrose 2 made timely written objections to each Final Investment Price Invoice and Participation Statement that it had received as of that date and, in the hopes of resolving these issues without litigation, entered an agreement tolling and suspending the applicable statutes of limitations for one year.  On October 21, 2011, the Defendants and Melrose 2 extended the Tolling Agreement for an additional six months.

45.     For example, through several audit reports provided between late 2008 and the first half of 2011, Melrose 2's auditors had made Defendants aware that their accounting statements overstated the production costs of the films *World Trade Center*, *Barnyard*, *Dreamgirls*, *Norbit*, *Transformers*, and *Shooter*, thereby failing to report all income properly attributable to those films.  After refusing to respond to Melrose 2's claims, Defendants finally, in November  2011, agreed that the statements were in error.  In addition, at this meeting, Defendants agreed that they improperly deducted participation payments to Defendants' affiliate MTV.

46.     Despite Defendants' professed agreement that their statements were in error, Defendants continued to issue false accounting statements -- with these very same improprieties.  Indeed, three weeks after the November 2011 meeting, Defendants had not yet paid the amounts to

1   which they agreed owing but, instead, sent Melrose 2 yet another accounting statement that

2   contained the same false accounting entries.  At no time did Defendants provide Melrose 2 with a

3   written agreement, a draft of a written agreement or even an unequivocal written statement they

4   would correct their accounting statements and pay Melrose 2 the monies owed and interest in

5   connection with these repeated accounting improprieties.  Melrose 2 filed its complaint in this action

6   on November 29, 2011.

7        47.    Only after Melrose 2 filed its complaint did Defendants adjust Melrose 2's accounting

8   statements to correct some of the most glaringly false accounting that Defendants had maintained in

9   some cases for years after Melrose 2's auditors uncovered the improper accounting.  Specifically, on

10   January 19, 2012, Defendants purported to adjust Defendants' improper deduction of payments to

11   their sister company MTV as third party participations in connection with *Nacho Libre* and

12   *Charlotte's Web* and allocate to Melrose 2-funded films money received from a pay television

13   provider in France for the distribution rights for those films.  Notably, Melrose 2's auditors had

14   made Defendants aware of these accounting improprieties two years earlier in their September 24,

15   2009 Distribution Audit report for *Barnyard*, *Jackass 2*, and *Nacho Libre*.  Defendants did nothing in

16   response.  Melrose 2's auditors made Defendants aware of these same accounting improprieties

17   again in their April 21, 2011 Distribution Audit report for *Dreamgirls*, *Charlotte's Web*, and *World*

18   *Trade Center*.  Defendants, however, continued to misrepresent the income owed to Melrose 2 on

19   each of their accounting statements and did not attempt to correct the false accounting until nearly

20   two months after Melrose 2 filed its complaint in this action.

21        48.    Similarly, in February 2011 -- three months after Melrose 2 filed its complaint --

22   Defendants purported to reconcile the overstatement of production costs for certain Melrose 2-

23   funded films.  Melrose 2's auditors had made Defendants aware of production cost overstatements in

24   their November 25, 2008, April 20, 2010, and June 23, 2011 Production Cost Audit reports.

25        49.    More recently (i.e., a few days before the filing of this amended complaint),

26   Defendants adjusted the improper deduction of participation payments to Walden Media for

27   *Charlotte's Web*.  Defendants took ten months to make this "correction."  In that time period,

28   Defendants continued to issue statements reflecting this improper accounting treatment.

1   50.   Defendants have not paid Melrose 2 the contractually required interest on any of

2   those false accounting statements, however.

3   51.   On January 18, 2012, the day before Defendants finally first purported to correct

4   some of their false accounting, Defendants filed a duplicative declaratory relief complaint against

5   Melrose 2 in the United States District Court for the Southern District of New York seeking to

6   adjudicate the same issues presented in Melrose 2's action.  Defendants then dismissed that action

7   for lack of federal jurisdiction and, on February 9, 2012, filed an action in New York state court,

8   again seeking to litigate the same issues presented by Melrose 2's action.  On June 7, 2012, the New

9   York state court granted Melrose 2's motion to dismiss Defendants' New York action against

10   Melrose 2.

11   52.   To date, Defendants have not corrected other glaringly false entries on their Final

12   Investment Price Invoices and Participation Statements nor have Defendants paid Melrose 2 the

13   amounts and interest they clearly owe.  Defendants' conduct in this regard stands in stark contrast to

14   what one would expect from an equity partner and co-copyright owner acting in good faith.

15   **FIRST CAUSE OF ACTION**

16   **(Breach of Contract under New York Law)**

17   53.   Melrose 2 incorporates by reference each and every allegation set forth above as

18   though fully set forth herein.

19   54.   Melrose 2 and Defendants entered into the Agreement, which at all relevant times has

20   remained binding and enforceable.

21   55.   Melrose 2 has performed its obligations under the Agreement.

22   56.   Defendants' performance of their obligations has not been excused.

23   57.   Nonetheless, as set forth in part through the examples above, Defendants have

24   breached the Agreement by underreporting revenues, overcharging and overstating costs, failing to

25   take reasonable steps to provide information in a timely manner, self-dealing, refusing to pursue

26   their rights against affiliates to the detriment of Melrose 2, refusing to allocate substantial vendor

27   payments for goods and services paid for by Melrose 2, and refusing to provide basic information.

28

58.   Both New York and California law imply a covenant of good faith and fair dealing in all contracts.

59.   Defendants owe a duty to act in good faith toward Melrose 2.  As part of Defendants' good faith obligation, Defendants are required to allocate income fairly and accurately to each of the Melrose 2-funded films by allocating that income to each of the films based on its value.

60.   To the extent such acts are not expressly prohibited by the Agreement, Defendants breached the covenant of good faith and fair dealing implied in the Agreement by classifying certain monies received as corporate "bonuses" or corporate opportunities when, in fact, they should have been allocated to the Melrose 2-funded films.

61.   To the extent such acts are not expressly prohibited by the Agreement, Defendants also breached the covenant of good faith and fair dealing implied in the Agreement by entering agreements with related entities in a way designed to be detrimental to Melrose 2's interests.

62.   To the extent such acts are not expressly prohibited by the Agreement, Defendants also breached the covenant of good faith and fair dealing implied in the Agreement by delaying the provision of some information to Melrose 2 and refusing entirely to provide other information, thereby effectively preventing Melrose 2 from exercising its full audit rights under the Agreement.

63.   To the extent such acts are not expressly prohibited by the Agreement, Defendants also breached the covenant of good faith and fair dealing implied in the Agreement by entering or allowing Viacom to enter agreements in which third parties could exploit Melrose 2-funded films in exchange for revenue or other benefits that were not allocated to Melrose 2-funded films.

64.   To the extent such acts are not expressly prohibited by the Agreement, Defendants also breached the covenant of good faith and fair dealing implied in the Agreement by refusing to share customary budget information about derivative works in which Melrose 2 has the right to invest, thereby effectively depriving Melrose 2 of the contractual right to invest in such films.

65.   As a result of the Defendants' above-described actions, Defendants have violated the implied covenant of good faith and fair dealing contained in the Agreement.

66.   Melrose 2 has suffered, and will continue to suffer, damages in an amount as yet undetermined, as a direct result of Defendants' breaches of the Agreement.

**SECOND CAUSE OF ACTION**

**(Fraud)**

67.     Melrose 2 incorporates by reference each and every allegation set forth above as though fully set forth herein.

68.     Independent of their duties under the Agreement, Defendants' owe a duty to not make affirmative misrepresentations that Melrose 2 would justifiably rely on to its detriment.  Defendants also must not deliberately conceal the amount of income received from the exploitation of Melrose 2-funded films so that income to which Melrose 2 is entitled under the Agreement is undercounted.

69.     On each of their Final Investment Price Invoices and Participation Statements, Defendants made intentionally false accountings in connection with Melrose 2-funded films, such as for film printing, DVDs and media purchases.

70.     On each of their Final Investment Price Invoices and Participation Statements, Defendants concealed the existence of volume discounts and payments they received from common vendors used in connection with Melrose 2-funded films, such as for film printing, DVDs and media purchases.

71.     During each audit performed by Melrose 2's auditors, Defendants concealed the existence of volume discounts and payments they received from common vendors used in connection with Melrose 2-funded films, such as for film printing, DVDs and media purchases.

72.     On each of the Final Investment Price Invoices for the films *World Trade Center*, *Barnyard*, *Charlotte's Web*, *Dreamgirls*, *Norbit*, *Transformers*, *Heartbreak Kid*, *Blades of Glory*, and *Shooter*, Defendants misrepresented the production costs of those Melrose 2-funded films. Specifically, as set forth in the Production Cost Audit of Paramount Pictures dated November 25, 2008, the Production Cost Audit of Paramount Pictures dated April 20, 2010, the Production Cost Audit of Paramount Pictures dated June 23, 2011, and the Production Cost Audit of Paramount Pictures dated February 9, 2012, all of which were provided to Defendants, Defendants falsely represented in their Final Investment Price Invoices that:

a.      the production cost of *World Trade Center* was at least $319,239 greater than the actual production cost for that film;

b.      the production cost of *Barnyard* was at least $397,568 greater than the actual production cost for that film;

c.      the production cost of *Transformers* was at least $654,557 greater than the actual production cost for that film;

d.      the production cost of *Heartbreak Kid* was at least $11,500 greater than the actual production cost for that film;

e.      the production cost of *Blades of Glory* was at least $100,000 greater than the actual production cost for that film;

f.      the production cost of *Shooter* was at least $663,997 greater than the actual production cost for that film;

g.      the production cost of *Norbit* was at least $1,108,882 greater than the actual production cost for that film;

h.      the production cost of *Dreamgirls* was at least $170,585 greater than the actual production cost for that film;

i.      the production cost of *Charlotte's Web* was at least $51,500 greater than the actual production cost for that film; and

73.      On each of the Participation Statements for the films *World Trade Center*, *Barnyard*, *Charlotte's Web*, *Dreamgirls*, *Jackass 2*, *Nacho Libre*, *Transformers*, *Shooter*, and *Norbit*, Defendants misrepresented the Net Receipts of those Melrose 2-funded films. Specifically, as set forth in the Distribution Audit of Paramount Pictures dated September 24, 2009, the Distribution Audit of Paramount Pictures dated April 21, 2011, and the Distribution Audit of Paramount Pictures dated December 13, 2011, all of which were provided to Defendants, Defendants falsely represented in their Participation Statements that:

a.      the Net Receipts of *Barnyard* was at least $8,408,300 less than indicated by Defendants' internal records;

b.      the Net Receipts of *Jackass 2* was at least $16,325,800 less than indicated by Defendants' internal records;

1        c.        the Net Receipts of *Nacho Libre* was at least $3,814,600 less than indicated by

2        Defendants' internal records;

3        d.        the Net Receipts of *Dreamgirls* was at least $2,472,500 less than indicated by

4        Defendants' internal records;

5        e.        the Net Receipts of *Charlotte's Web* was at least $4,119,100 less than indicated by

6        Defendants' internal records;

7        f.        the Net Receipts of *World Trade Center* was at least $4,924,600 less than indicated

8        by Defendants' internal records;

9        g.        the Net Receipts of *Transformers* was at least $42,429,900 less than indicated by

10        Defendants' internal records;

11        h.        the Net Receipts of *Shooter* was at least $1,489,300 less than indicated by

12        Defendants' internal records; and

13        i.        the Net Receipts of *Norbit* was at least $1,857,800 less than indicated by Defendants'

14        internal records.

15        74.        Defendants' Final Investment Price Invoices were issued by Alan J. Bailey, then

16 Senior Vice President and Treasurer of Paramount.  Defendants issued their Final Investment Price

17 Invoices on the dates set forth below:

18        a.        for *World Trade Center* on August 1, 2007;

19        b.        for *Barnyard* on July 25, 2007;

20        c.        for *Charlotte's Web* on July 9, 2008;

21        d.        for *Dreamgirls* on December 5, 2007;

22        e.        for *Norbit* on January 29, 2008;

23        f.        for *Transformers* on July 10, 2008;

24        g.        for *Heartbreak Kid* on October 3, 2008;

25        h.        for *Blades of Glory* on April 18, 2008;

26        i.        for *Shooter* on December 8, 2008; and

27        j.        for *Jackass 2* on September 14, 2007.

28

FIRST AMENDED COMPLAINT

1    75.    Defendants' Participation Statements were issued by Carmen G. Desiderio,

2  Paramount's Senior Vice President, Contract Accounting.  Defendants issued the first Participation

3  Statements for each of the films set forth below on the dates set forth below:

4         a.    for *Failure to Launch, She's The Man, Mission Impossible 3, Nacho Libre, Barnyard,*

5         and *World Trade Center* in December 2006 for the period ending October 28, 2006;

6         b.    for *Last Kiss* in January 2007 for the period ending November 25, 2006;

7         c.    for *Jackass 2* in February 2007 for the period ending December 30, 2006;

8         d.    for *Flags of Our Fathers* in March 2007 for the period ending January 27, 2007;

9         e.    for *Charlotte's Web* and *Dreamgirls* in April 2007 for the period ending February 24,

10        2007;

11        f.    for *Freedom Writers* in May 2007 for the period ending March 31, 2007;

12        g.    for *Norbit* in June 2007 for the period ending April 28, 2007;

13        h.    for *Reno 911: Miami* and *Zodiac* in July 2007 for the period ending May 26, 2007;

14        i.    for *Shooter*, *Blades of Glory*, and *Disturbia* in August 2007 for the period ending

15        June 30, 2007;

16        j.    for *Transformers* in November 2007 for the period ending September 29, 2007;

17        k.    for *Hot Rod* and *Stardust* in December 2007 for the period ending October 27, 2007;

18        l.    for *Heartbreak Kid* in February 2008 for the period ending December 29, 2007;

19        m.    for *Things We Lost in the Fire* and *Beowulf* in March 2008 for the period ending

20        January 26, 2008;

21        n.    for *Sweeny Todd* in May 2008 for the period ending March 29, 2008;

22        o.    for *Cloverfield* and *Spiderwick Chronicles* in June 2008 for the period ending April

23        26, 2008;

24        p.    for *Transformers 2* in October 2009 for the period ending August 31, 2009; and

25        q.    for *Transformers 3* in October 2011 for the period ending August 31, 2011.

26    76.    In their accounting statements and during each of Melrose 2's audits, Defendants

27  intentionally concealed the agreements with Defendants' major vendors for film and DVDs because

28  these agreements contained or related to the above-referenced "bonuses."  Defendants concealed

1   these agreements and related payments even though Melrose 2's auditors found that Defendants'

2   distribution expense reports reflected that some rebates and volume discounts provided by such

3   vendors were allocated to Melrose 2-funded films.  Despite Melrose 2's auditors' specific requests

4   for the agreements that would allow Melrose 2's auditors to evaluate the accounting of rebates and

5   volume discounts and related payments, Defendants intentionally withheld those documents.

6       77.     Defendants' incomplete and delayed production of these secret agreements during

7   discovery in this action has confirmed that the "bonuses" concealed by Defendants are substantial

8   and apply to many Melrose 2-funded films.  During the period in which Melrose 2 was funding

9   films, Defendants hid several side agreements whereby Defendants received hundreds of millions of

10   dollars in concealed payments, or cost reductions, that Defendants did not allocate to Melrose 2.

11   These agreements further show that Defendants treat such "bonuses" precisely the same as discounts

12   when it is financially advantageous to do so.

13       78.     Knowing that Melrose 2's ability to bring an action for its share of these payments

14   depended on the completion of audits during the timeframes set forth in the Agreement, Defendants

15   intentionally hid the agreements to prevent Melrose 2's auditors from completing their audits, and

16   thereby prevent Melrose 2 from seeking the proper allocation of these "bonuses" in an action against

17   Defendants.  Defendants also concealed these discounts in their statements.

18       79.     At the time Defendants intentionally issued their false Final Investment Price

19   Invoices and Participation Statements, Defendants knew them to contain false material information

20   and to omit material information.

21       80.     At the time Defendants intentionally concealed from Melrose 2 the above-referenced

22   "bonuses" and other payments from vendors, Defendants knew they were obligated to disclose them.

23       81.     Defendants knew the statements of receipts and costs on the Final Investment Price

24   Invoices and Participation Statements were material representations at the time they made them.

25       82.     Defendants knew the existence of discounts in the form of "bonuses" or other

26   payments was a material fact at the time they concealed these bonuses from Melrose 2.

27       83.     Defendants made the above-referenced misstatements and concealed the above-

28   referenced material facts with the intention to deceive and defraud Melrose 2, to deny Melrose 2 its

1  interest in the Melrose 2-funded films, and to induce Melrose 2 into forfeiting its ability to bring an

2  action to enforce its rights.

3       84.     Defendants repeatedly misrepresented and concealed these material facts by

4  falsifying their reports to Melrose 2 in order to deceive Melrose 2 as to the true amount of money

5  owed and induce Melrose 2 to accept improperly low payments, as well as by failing to disclose the

6  existence of numerous secret agreements with vendors.  Defendants had the knowledge of true

7  amounts owed and the cost reductions received from these vendors and knew Melrose 2 was relying

8  on the information Defendants supplied.

9       85.     Melrose 2 justifiably relied on and was deceived by Defendants' false representations

10  and concealments in connection with their Final Investment Price Invoices by paying to Defendants

11  the amounts set forth on those documents.

12       86.     Melrose 2 justifiably relied on and was deceived by Defendants' false representations

13  in connection with their Participation Statements because those false representations caused Melrose

14  2 to believe, until Melrose 2's audits proved them false, that the amounts on the Participation

15  Statements were the total amounts actually due to Melrose 2.

16       87.     Melrose 2 justifiably relied on the completeness of information on Defendants'

17  Participation Statements because those Participation Statements caused Melrose 2 to believe that

18  there were no additional revenues that should be included in the total amounts actually due to

19  Melrose 2.

20       88.     Melrose 2 justifiably relied on the completeness of information provided during

21  Melrose 2's audits because that information caused Melrose 2 to believe that there were no

22  additional revenues that should be included in the total amounts actually due to Melrose 2.

23       89.     Melrose 2 uses the information on the Participation Statements to attract financing,

24  including for its investments in Defendants' films.  By having Participation Statements reflecting

25  income due to Melrose 2 that was below what it should have been and preventing Melrose 2 from

26  calculating all amounts owed, Melrose 2 was improperly limited in its ability to obtain lower cost

27  debt.  Because Defendants' false Participation Statements limited Melrose 2's ability to obtain lower

28  cost debt, its cost of capital was higher than it should have been.  Melrose 2 also relies on these

1  statements to make decisions regarding whether it may be able to refinance its overall capital

2  structure with lower cost debt.

3      90.    In addition, Melrose 2 relied upon Defendants' false Participation Statements to

4  assess the overall cost of financing when deciding whether to invest in derivative works in which it

5  has the right to invest pursuant to the Agreement.

6      91.    Moreover, Defendants' false accounting subjected Melrose 2 to potential liability if

7  Melrose 2 was unable to pay its debt.

8      92.    As a direct and proximate result of Defendants' concealments, Melrose 2 has been

9  injured and has suffered damage in a sum as yet undetermined.

10     93.    Defendants' conduct toward Melrose 2 was willful, malicious, unjust, wanton,

11  oppressive, and done without provocation.

12                          **THIRD CAUSE OF ACTION**

13  **(Unfair Business Practices in Violation of Cal. Bus. & Prof. Code § 17200)**

14     94.    Melrose 2 incorporates by reference each and every allegation set forth above as

15  though fully set forth herein.

16     95.    As described above, Defendants have engaged in a pattern and practice of falsely

17  reporting revenues and costs properly attributable to the production and distribution of the Melrose

18  2-funded films.  Defendants knew that Melrose 2 would rely on those reports, and indeed Melrose 2

19  relied on those reports to its detriment.  Defendants' actions in this regard were designed to defraud

20  Melrose 2 and thereby keep for themselves income that properly belongs to Melrose 2.

21     96.    Although the Agreement contained specific windows in which Melrose 2 was

22  permitted to perform audits and make objections to Defendants' statements of costs and receipts

23  related to Melrose 2-funded films, Defendants intentionally withheld and delayed providing

24  information that Melrose 2 needed to perform its audits and discover Defendants' false accounting.

25  In addition, Defendants' delays and failures to provide necessary information placed Melrose 2 at

26  risk of losing its ability to take action to enforce its rights under the Agreement.  Defendants have

27  engaged in this conduct knowingly, and continue to engage in this conduct without correcting their

28

1  false accounting statements, even though Melrose 2 has notified Defendants of those accounting

2  improprieties.

3      97.    Defendants' above-described acts and practices constitute unfair and fraudulent

4  business practices under Cal. Bus. & Prof. Code § 17200.

5      98.    The utility of Defendants' conduct, if any, is outweighed by the gravity of the

6  consequences to Melrose 2.

7      99.    Defendants' conduct is unethical, oppressive, and substantially injurious to Melrose

8  2.

9      100.   As a direct and proximate result of Defendants' unfair business acts and practices,

10  Defendants have been unjustly enriched and have obtained a monetary benefit at the expense of

11  Melrose 2.  Melrose 2 is thus entitled to restitution and injunctive relief.

12                        **FOURTH CAUSE OF ACTION**

13                           **(Declaratory Relief)**

14      101.   Melrose 2 incorporates by reference each and every allegation set forth above as

15  though fully set forth herein.

16      102.   Melrose 2 and Defendants entered into the Agreement, which at all relevant times has

17  remained binding and enforceable.

18      103.   Under the provisions of the Agreement, Melrose 2 is entitled to receive a portion of

19  the Net Receipts for Melrose 2-funded films, and Defendants must include discounts, rebates, credits

20  and third party reimbursements in the calculation of those Net Receipts to Melrose 2, by allocating

21  them as a credit to offset production costs of the Melrose 2-funded films.

22      104.   Under the provisions of the Agreement, Melrose 2 is entitled to receive a portion of

23  all revenues from the exploitation of Melrose 2-funded films whether received as a lump sum, a

24  percentage or through any other calculation.  Under the provisions of the Agreement, Defendants

25  must also fairly allocate to the Melrose 2-funded films sums received in connection with both

26  Melrose 2-funded films and non-Melrose 2-funded films.

27

28

FIRST AMENDED COMPLAINT

105.    Under the provisions of the Agreement, Melrose 2 is entitled to audit the Final Investment Price Invoices and the Participation Statements issued by Defendants for the Melrose 2-funded films.

106.    Under the provisions of the Agreement, Melrose 2 is entitled to invest in certain Derivative Works of Melrose 2-funded films and needs certain information in order to make investment decisions reasonably.

107.    Actual controversies have arisen and now exist between Melrose 2 and Defendants relating to the legal rights and duties of the respective parties under the Agreement, in that the parties are in disagreement as to whether or not:

    a.    Defendants can withhold for themselves revenue received in connection with the exploitation of a group of Defendants' films that include Melrose 2-funded films;

    b.    Defendants can exclude discounts, rebates, credits, third party reimbursements or "bonuses" from bulk duplicators of Defendants' films or house vendors used in connection with the production or distribution of those films from their calculation of the production and distribution costs charged to Melrose 2-funded films;

    c.    Defendants can withhold customary information and documentation in connection with Melrose 2's audit rights and Melrose 2's rights to invest in Derivative Works as defined in the Agreement; and

    d.    Defendants can delay in providing customary information and documentation in connection with Melrose 2's audit rights, i.e., by providing that information several months after it is requested, rather than a few days or weeks.

108.    Melrose 2 believes that the true interpretation of the Agreement requires a negative answer to each of the above-referenced disputes.

109.    Melrose 2 desires a judicial determination of its rights and duties, and, to avoid an ongoing dispute, seeks a declaration that:

    a.    Defendants cannot withhold for themselves revenue received in connection with the exploitation of a group of Defendants' films that include Melrose 2-funded films;

1    b.    Defendants cannot exclude discounts, rebates, credits, third party reimbursements or

2    "bonuses" from bulk duplicators of Defendants' films or house vendors used in connection

3    with the production or distribution of those films from their calculation of the production and

4    distribution costs charged to Melrose 2-funded films;

5    c.    Defendants cannot withhold customary information and documentation in connection

6    with Melrose 2's audit rights and Melrose 2's rights to invest in Derivative Works as defined

7    in the Agreement; and

8    d.    Defendants cannot delay in providing customary information and documentation in

9    connection with Melrose 2's audit rights, i.e., by providing that information several months

10   after it is requested, rather than a few days or weeks.

11                          **PRAYER FOR RELIEF**

12   WHEREFORE, Melrose 2 prays that judgment be entered against Defendants for:

13   e.    compensatory and actual damages;

14   f.    restitution;

15   g.    a constructive trust;

16   h.    a declaration as set forth in Paragraph 109(a)-(d) above;

17   i.    attorneys' fees and costs, as allowed by law and the Agreement, for this action and

18   Defendants' New York actions against Melrose 2 in state and federal court;

19   j.    interest on damages, as allowed by law and the Agreement;

20   k.    for punitive damages by reason of the egregious and fraudulent conduct made toward

21   Melrose 2 by Defendants;

22   l.    injunctive relief;

23   m.    such other relief as the Court deems proper, fair, equitable, and just.

24

25

26

27

28

FIRST AMENDED COMPLAINT

1

## JURY DEMAND

2
    Melrose 2 respectfully demands a trial by jury.

3
DATED:  October 4, 2012

Kirkland & Ellis LLP

4

5
By: _____

Mark Holscher

6
Attorneys for Plaintiff Melrose Investors 2 LP

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

FIRST AMENDED COMPLAINT

1

**PROOF OF SERVICE**

2        I am employed in the County of Los Angeles, State of California, over the age of eighteen

3  years, and not a party to the within action.  My business address is 333 South Hope Street, Los

4  Angeles, California 90071.

5        On October 4, 2012 I served the **FIRST AMENDED COMPLAINT FOR (1) BREACH**

6  **OF CONTRACT; (2) FRAUD; (3) UNFAIR COMPETITION; (4) DECLARATORY RELIEF**

7  on the interested parties in this action as follows:

8

9

    ☒    **(BY E-MAIL)**  By causing a copy of the document to be served by e-mail to the persons at the e-mail addresses listed below as agreed upon pursuant to the February 8, 2012 Agreement to Accept Electronic Service, Section 1 :

10

11

**Richard Kendall**
rkendall@kbkfirm.com
**Robert N. Klieger**
rklieger@kbkfirm.com
**Philip Kelly**
pkelly@kbkfirm.com
**Cassie Palmer**
cpalmer@kbkfirm.com
**Patricia Perello**
pperello@kbkfirm.com

12

13

14

15

16

of

17

Kendall Brill & Klieger
10100 Santa Monica Boulevard, Suite 1725
Los Angeles, CA 90067
Telephone:   310-272-7933
Facsimile:   310-272-7938

18

19

20

*Attorneys for Defendants*

21

22        I declare under penalty of perjury under the laws of the State of California that the foregoing

23  is true and correct.

24        Executed on October 4, 2012, at Los Angeles, California.

25

26

27                           Laura Bay

28