James A. Janowitz
William L. Charron
Bryan T. Mohler
Benjamin S. Akley
Kathleen M. Prystowsky
PRYOR CASHMAN LLP
7 Times Square
New York, New York 10036
(212) 421-4100
jjanowitz@pryorcashman.com
wcharron@pryorcashman.com
bmohler@pryorcashman.com
bakley@pryorcashman.com
kprystowsky@pryorcashman.com
*Attorneys for Plaintiffs Allianz Risk Transfer AG,*
*Marathon Structured Finance Fund, LP,*
*NewStar Financial, Inc. and Munich Re Capital Markets New York, Inc.*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------- x
                                                                     :
ALLIANZ RISK TRANSFER AG,                                            :
MARATHON STRUCTURED FINANCE FUND, LP,                                :
NEWSTAR FINANCIAL, INC., and                                         :   No. 08-cv-10420 (TPG)
MUNICH RE CAPITAL MARKETS NEW YORK, INC.,                            :
                                                                     :
              Plaintiffs,                                            :
                                                                     :
       -v-                                                           :
                                                                     :
PARAMOUNT PICTURES CORPORATION,                                      :
                                                                     :
              Defendant.                                             :
                                                                     :
------------------------------------------------------------------- x

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION (A) TO PRECLUDE DEFENDANT PARAMOUNT PICTURES CORPORATION FROM USING CERTAIN REBUTTAL DAMAGES DOCUMENTS, EVIDENCE OR ANALYSIS AT TRIAL PURSUANT TO FED. R. CIV. P. 37; AND (B) TO PRECLUDE PARAMOUNT FROM RELYING IN ANY MANNER ON THE PUTATIVE EXPERT REPORT AND TESTIMONY OF PARAMOUNT'S DAMAGES REBUTTAL EXPERT, ROBERT WUNDERLICH PURSUANT TO FED. R. EVID. 702

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................................... ii

PRELIMINARY STATEMENT ...................................................................................................... 1

FACTS ............................................................................................................................................. 4

    Mechanics Of The Melrose Transaction ....................................................................... 4

    Discovery Sought By Plaintiffs Concerning All "Covered Pictures" .......................... 5

    Paramount's About-Face .................................................................................................. 7

    Paramount's Continued Refusal To Provide Discovery ................................................ 8

    Paramount's Excuses For Its Failure to Produce .......................................................... 9

    Paramount Continues to Use Documents Never Produced
    To Plaintiffs In An Attempt to Gain Strategic Advantage .......................................... 11

    Plaintiffs Have Been Unduly Prejudiced ..................................................................... 12

    All Evidence From Wunderlich Should Be Excluded ................................................. 13

ARGUMENT ................................................................................................................................. 19

I.    PARAMOUNT AND ITS DAMAGES EXPERT SHOULD BE
      PRECLUDED FROM RELYING ON THE ADDITIONAL FILMS AT TRIAL ......... 19

    A.    Paramount Failed To Provide
        Information As Required By Rule 26(a) and 26(e) ........................................ 20

    B.    Paramount's Refusal To Produce Documents Related To
        The Additional Films Is Substantially Prejudicing Plaintiffs ........................... 21

    C.    There Is No "Substantial Justification" For Paramount's
        Failure To Provide Discovery On The Additional Films ................................. 23

II.    PARAMOUNT SHOULD BE PRECLUDED FROM RELYING
      ON WUNDERLICH'S REPORT AND TESTIMONY AT TRIAL ................................... 23

CONCLUSION ............................................................................................................................... 25

## TABLE OF AUTHORITIES

**CASES**                                                                   **PAGE(s)**

*Amorgianos v. AMTRAK,*
    137 F. Supp. 2d 147 (E.D.N.Y. 2001), *aff'd,* 303 F.3d 256 (2d Cir. 2002) ................................ 25

*Daubert v. Merrell Dow Pharmaceuticals,*
    509 U.S. 579 (1993) ................................................................................................23, 24

*Dreyer v. Ryder Automobile Carrier Group, Inc.,*
    367 F. Supp. 2d 413 (W.D.N.Y. 2005) ........................................................................... 24

*EEOC v. Bloomberg, L.P.,*
    07 Civ. 8383 (LAP), 2010 U.S. Dist. LEXIS 92511 (S.D.N.Y. Aug. 31, 2010) ...................... 24

*Haas v. Del. & Hudson Ry. Co.,*
    282 Fed. Appx. 84 (2d Cir. 2008) ..............................................................................20, 21

*Kam Hing Enters. v. Wal-Mart Stores, Inc.,*
    359 Fed. Appx. 235 (2d Cir. 2010) ............................................................................22, 23

*Kumho Tire Co. v. Carmichael,*
    526 U.S. 137 (1999) ................................................................................................... 23

*Lee Valley Tools, Ltd. v. Industrial Blade Co.,*
    288 F.R.D. 254 (W.D.N.Y. 2013) .................................................................................. 22

*Parlour Enterprises v. Kirin Group, Inc.,*
    152 Cal. App. 4th 281 (4th App. Dist. 2007) .................................................................. 25

*Patterson v. Balsamico,*
    440 F.3d 104 (2d Cir. 2006) ................................................................................. 19, 20, 21

*Ritchie Risk-Linked Strategies Trading (Ir.), Ltd. v. Coventry First LLC,*
    280 F.R.D. 147 (S.D.N.Y. 2012) ............................................................................ 20, 21, 23

*Rosail v. United States,*
    227 F.R.D. 53 (E.D.N.Y. 2005) ...............................................................................19, 20

*Rowe Entm't, Inc. v. William Morris Agency, Inc.,*
    98 Civ. 8272 (RPP), 2003 U.S. Dist. LEXIS 15976 (S.D.N.Y. Sept. 15, 2003) ...................... 24

**CASES**                                                                 **PAGE(s)**

*Supply & Bldg. Co. v. Estee Lauder Int'l, Inc.*,
    95 Civ. 8136, 2001 U.S. Dist. LEXIS 20737 (S.D.N.Y. Dec. 13, 2001) ................................... 25

*Texas Instruments, Inc. v. PowerChip Semiconductor Corp.*,
    2007 U.S. Dist. LEXIS 38312 (S.D.N.Y. May 24, 2007) ....................................................... 19, 23

*United States v. Procter & Gamble Co.*,
    356 U.S. 677 (1958) ......................................................................................................... 19

**STATUTES**

Fed. R. Civ. P. 26 ........................................................................................................... *passim*
                26(a) ........................................................................... 19, 20, 21, 23
                26(a)(1)(A) ........................................................................................ 21
                26(a)(1)(A)(ii) ................................................................................... 20
                26(e) ..................................................................................... 19, 20, 23
                26(e)(1)(A) ........................................................................................ 21

Fed. R. Civ. P. 37 ........................................................................................................... *passim*
                37(c) ............................................................................................. 20, 21
                37(c)(1) ...................................................................... 3, 19, 21, 22
                37(c)(1) Notes of Advisory Committee on Rules (1993 Amendments)....................... 19

Fed. R. Evid. 702 ............................................................................................................ *passim*

Fed. R. Evid. 104(a) ............................................................................................................ 24

**TREATISE**

7-37 Moore's Federal Practice, § 37.60(1) (Matthew Bender 3d ed. 2013) ............................... 20

**REFERENCE**

Federal Judicial Center, Reference Manual on Statistics 90 (2d ed. 2000) ............................... 24

Plaintiffs Allianz Risk Transfer AG, Marathon Structured Finance Fund, LP, NewStar Financial, Inc., and Munich Re Capital Markets New York, Inc. (collectively, "Plaintiffs") respectfully submit this memorandum of law in support of their motions: (a) to preclude defendant Paramount Pictures Corporation ("Paramount") from using certain rebuttal damages documents, evidence or analysis at trial pursuant to Fed. R. Civ. P. 37; and (b) to preclude Paramount from relying on the putative expert report and testimony of Paramount's damages rebuttal expert, Robert Wunderlich ("Wunderlich") pursuant to Fed. R. Evid. 702.[1]

## PRELIMINARY STATEMENT

These combined motions to preclude in advance of trial focus on discovery gamesmanship by Paramount and its rebuttal damages expert, Robert Wunderlich.

As explained below, Paramount sought, well past the eleventh-hour of discovery, to introduce new evidence through Wunderlich that Paramount had previously refused to produce on the ground that it had "no relevance to this case." Paramount surprisingly produced parts of such evidence – although not all – in connection with its rebuttal damages expert report in an effort to make it appear, disingenuously, that Plaintiffs suffered no damages (Plaintiffs' expert has indicated damages of approximately $18 million). This aspect of Wunderlich's report is irreparably tainted, and, at a minimum, Wunderlich's report and testimony predicated on Paramount's incomplete and untimely produced discovery should be precluded under Federal Rule of Civil Procedure 37.

Moreover, Wunderlich's testimony shows that he approached his task not as a neutrally-minded and reliable expert, but as an ends-based advocate, who accepted certain critical information from Paramount on blind faith without exercising even slight diligence into whether the facts fed to him by Paramount were accurate. Wunderlich admitted that he could have asked for verifying

---

[1] Plaintiffs present their Rule 37 motion first as it has already been previewed for the Court, and, as a matter of efficiency, include the related, broader FRE 702 motion *in limine* now rather than on the eve of trial.

information and that such information should have been available to him had he asked. Wunderlich previously had another putative expert report in a different case rejected for a similar failing. His putative report in this case should similarly be precluded under Federal Rule of Evidence 702 as without reliability due to the biased manner in which Wunderlich approached his task. His testimony as a paid advocate disguised as a putative expert would prejudice Plaintiffs.

As the Court knows, Plaintiffs are investors in 25 films produced and released by Paramount (the "Melrose Slate"). Plaintiffs' Third Amended Complaint alleges that as a result of Paramount's failure to engage in foreign pre-sales with respect to those 25 films, Plaintiffs suffered damages of at least $30 million (again, Plaintiffs' damages expert opined after discovery that Plaintiffs' compensatory damages are approximately $18 million).

From the beginning of discovery in this case, and for years, Paramount had taken the position that discovery should be limited to the 25 films in which Plaintiffs actually invested. During fact discovery, Paramount stated that films produced by Paramount after the 25th film in the Melrose Slate (the "Additional Films") "have no relevance to this case."[2]

Nevertheless, Paramount, in connection with its rebuttal damages expert report by Wunderlich, has decided to rely heavily on documents and data related to the Additional Films, which it has refused to produce as irrelevant. Paramount argues that if it had presold the films in the Melrose Slate as Plaintiffs' contend it should have, it would have had the ability to invest in the Additional Films. Continuing its investment in the Additional Films would, Paramount asserts, have resulted ultimately in a loss of all of Plaintiffs' money, wiping out its damages based on the Melrose Slate.

The problem for Paramount is that Paramount, knowing full well of this possible investment dynamic, nonetheless strategically chose early on to limit the case to the Melrose Slate, not including

---

[2] Janowitz Decl. Ex. 7. All references to "Janowitz Decl." refer to the accompanying Declaration of James A. Janowitz, dated August 25, 2014.

the Additional Films. Plaintiffs, as was their right, accepted that limitation on the metes and bounds of discovery and proceeded in good faith therefrom. Discovery concerning the Additional Films was never a part of this case for years by Paramount's choice. Paramount should be barred by Rule 37 from making the damages aspect of the case about the Additional Films now.

A further problem of Paramount's making is that Paramount, having suddenly decided to rely on documents and data relating to the Additional Films, continues to refuse to produce the documents or permit discovery as to them, with one exception. In an ambush maneuver, Paramount produced and questioned Plaintiffs' damages expert on its theretofore unproduced financing agreement with investors in the Additional Films (the "Melrose 2 Agreement"). Despite prior written demand for this very document (Janowitz Decl. Ex. 15 at 4), Paramount refused to produce it until it was identified during the deposition of Philip Fier, Plaintiffs' damages expert.

Paramount has offered an assortment of excuses for its failure to produce documents, beginning with the false assertion that the documents were never identified in Plaintiffs' requests for the production of documents and ending with Paramount's argument that Plaintiffs did not pursue such requests. These meritless arguments are addressed below, but what is undisputed is that for months following the service of Paramount's expert report, Paramount continues steadfastly to refuse to produce the relevant documents.

Accordingly, Plaintiffs move for a preclusion order, pursuant to FRCP 37(c)(1), barring Paramount from offering at trial any documents or analysis concerning films released after *Mission: Impossible 3*, the 25th and final film in which Plaintiffs invested.

Plaintiffs additionally move for a preclusion order, under FRE 702, barring Paramount from offering any analysis by Wunderlich at all. The revenues and costs projections of the Additional Films relied upon heavily by Wunderlich are not supported by Wunderlich or by Paramount with any actual documentation or other discovery. Wunderlich testified that Paramount simply told him

3

what revenues and costs to ascribe for the Additional Films, and he then applied those figures allegedly reducing the damages claimed by Plaintiffs and by their expert, Mr. Fier.

Yet, it is undisputed that Paramount was sued by a subsequent investor group (Melrose 2) for having overstated the costs and understating the revenues of the Additional Films and that Paramount allegedly has acknowledged that its accounting for production costs in certain films was improper and adjusted its statements. (*Id.* Ex. 10.) That lawsuit was settled. Wunderlich testified that he never asked about the disputed costs and revenues even though he obviously could have. More importantly, for Rule 702 purposes, Wunderlich *should have* asked Paramount to verify, or at least address, the disputed costs and revenues figures somehow. Wunderlich's report is singularly lacking in reliability and it should be barred.

## FACTS

### Mechanics Of The Melrose Transaction

Under the terms of the Melrose transaction, Plaintiffs and other investors provided Paramount with approximately $231 million to be used to finance the production of Paramount films. (Janowitz Decl. Ex. 2.) The transaction called for this capital to be invested at a rate of 18.75% of the total net production cost of each qualifying film (known as a "Covered Picture") until the funds were exhausted. (*Id.* Ex. 1 at 9-10.) The Private Placement Memorandum ("PPM") provided that the investors' 18.75% investment in a film was to be calculated based upon the "Direct Costs" incurred by Paramount to produce a picture, "less any Co-financing Amount attributable to each Covered Picture." (*Id.* Ex. 1 at 10.) Thus, the amount that the Melrose investors would invest in each film, and the total number of films to which the investors ultimately would contribute, was contingent on the cost of producing the film as well as the amount of any other "co-financing." (*Id.*)

This case concerns Paramount's failure to employ international pre-sales in the Melrose Slate as it had in past. The amount of pre-sales declined from approximately 25% of the gross production

4

budget of prior films to approximately 5% of the gross production budget of the Melrose Slate. Given the fact that the gross production budget of the 25 films in the Melrose Slate was approximately $1.7 billion, this disparity accounted for approximately $340 million in gross production cost. As set forth in the PPM and alleged in several paragraphs of the Third Amended Complaint, Paramount used the funds provided by international pre-sales to reduce the production cost of its films. Therefore, the indisputable effect of increasing the level of pre-sales, as Plaintiffs allege was required, would be to lower the production cost of the films invested in by the Plaintiffs and thereby increase the number of films to be invested in. This dynamic is a simple result of investing the same percentage rate in films of lower cost, which Paramount has referred to as a "basic component of the deal." (*Id.* Ex 3 at 1.)

## Discovery Sought By Plaintiffs Concerning All "Covered Pictures"

Because the films in which Plaintiffs invested were determined by application of their 18.75% investment rate multiplied by the net production cost of the films, there was no way, at the outset of the transaction, to determine which or how many films Plaintiffs would invest in. Therefore, all of the relevant terms pertaining to Plaintiffs' investment in the transaction documents were neutral as to the number of films that would comprise the Melrose Slate.

The term "Covered Picture," as well as all other terms employed in Plaintiffs' document requests, reference the definitions set forth in Exhibit A to the Melrose transaction's Revenue Participation Agreement ("RPA"). (*Id.* Ex. 4 at 3, Ex. 21 at 30.) Neither Plaintiffs' document requests nor the RPA contain any language limiting the term "Covered Picture" or any other relevant term to the 25 films that Plaintiffs invested in. (*Id.*) To the contrary, Plaintiffs' document requests were fully inclusive of all documents relating to all films meeting the definition of "Covered Picture," including the Additional Films in which Plaintiffs might have invested had Paramount engaged in foreign pre-sales to the same degree as it had historically. (*Id.* Ex. 4.)

5

In responding to Plaintiffs' requests for production, however, Paramount produced documents only for those 25 films that actually were in the Melrose Slate. Paramount also produced no information concerning the Melrose 2 transaction. Also, in its own First Request for Production, Paramount limited its requests to films in the "Melrose Slate," which it narrowly defined to include only "films, partially or wholly financed by Melrose Securities, that were produced, released and distributed by Paramount between April of 2004 and March of 2006." (*Id.* Ex. 5.)

It is clear from the definition of "Covered Picture" in the RPA and the PPM that Paramount chose to limit its document production with the consciousness that such production did not address the entire universe of Covered Pictures. (*Id.* Ex. 1 at 8, Ex. 21 at 30.) This consciousness is reflected in Paramount's decision in its own document requests to define the Melrose Slate narrowly, so as to exclude films that were not actually invested in by Plaintiffs. Plaintiffs, having litigated this matter for 6 years through three Motions to Dismiss and knowing that discovery, even with respect to 25 films, would entail tens of thousands of pages of documents, accepted Paramount's limitation on the scope of discovery. Even when Plaintiffs later returned to the issue of the scope of discovery, Paramount was emphatic that it would not produce documents relating to films released after *Mission: Impossible 3*, the 25th film in the Melrose Slate. The issue arose following the deposition of Paramount's CFO, Mark Badagliacca, when Plaintiffs requested an unredacted version of a Paramount document which detailed, among other things, the proceeds of international pre-sales for Paramount films released after September 1, 2002, including the films in the Melrose Slate and the Additional Films. (*Id.* Ex 6.) Paramount had previously produced a version of the document showing the pre-sales for only the first 25 films in the Melrose Slate. When Plaintiffs asked to see the information relating to the Additional Films, Paramount's counsel responded, in part, as follows:

> Paramount has redacted information about films that are neither part of the historical data set nor part of the Melrose slate of films and therefore have no relevance to this case. Further, there are substantial confidentiality concerns, both for Paramount and third parties, in disclosing financial and other sensitive

6

information about these irrelevant films.... The "relevant time period" includes only the historical data set period (1998 and 2003) and the Melrose slate period (mid-2004 through early 2006).

(*Id.* Ex. 7.)

As of the close of fact discovery, Paramount had consistently taken the position, as set forth above by Paramount's counsel, that discovery relating to films after *Mission: Impossible 3* was irrelevant and would not be provided. Plaintiffs, based upon Paramount's position, which they did not contest, commissioned their expert, Philip Fier, to conduct an analysis based solely upon the 25 films in which Plaintiffs had invested.

**Paramount's About-Face**

After receiving Plaintiffs' damage calculation, Paramount decided that the films released <u>after</u> *Mission: Impossible 3* were suddenly relevant, and that if Plaintiff had suffered damages with respect to the Melrose Slate, they would have to continue to invest the proceeds from the Melrose Slate in additional Paramount films. Based upon Paramount's calculation, by compelling Plaintiffs to continue investing in the Additional Films, Plaintiffs would conveniently have lost all their money and there would be no damage as a result of Paramount's fraud. This argument was first raised in the rebuttal report of Paramount's damages expert, Robert Wunderlich, which was served in April 2014. (*Id.* Ex. 8) The analysis was provided together with documents produced for the first time (confidentiality no longer being a concern), which purported to show the projected financial performance of 12 films released by Paramount after *Mission: Impossible 3* (the "Additional Films Ultimates".) (*Id.* Ex. 9).

Unlike the Ultimates for the 25 films in the Melrose Slate, the Additional Films Ultimates were produced without *any* accompanying documentation. Discovery with respect the Ultimates for the Melrose Slate included the production of *tens of thousands* of pages of documents which support and detail the voluminous figures in the Ultimates. These include documents supporting the various

types of co-financing transactions that were entered into which impact the amount being invested by the Plaintiffs, as well as the recoupment of that investment. The documents also include contemporaneous reports detailing the financial performance of the films in the Melrose Slate quarter by quarter. Not a single document has been produced in connection with the Additional Films Ultimates, which were relied upon by Paramount's expert.

Although Plaintiffs were aware of an investment by the Melrose 2 investor group in two of Plaintiffs' films, Wunderlich's analysis revealed that Melrose 2 had invested in every subsequent film which Wunderlich deemed relevant to his analysis. Given the evident importance of Melrose 2 to Wunderlich's analysis, Plaintiffs conducted research as to the Melrose 2 transaction and discovered that Melrose 2 had asserted fraud claims in an action against Paramount claiming that Paramount had inflated the production costs of the Melrose 2 films and had improperly excluded revenues for the purpose of diminishing Melrose 2's financial participation. (*Id.* Ex. 10.) As alleged in the Melrose 2 Complaint, Paramount acknowledged and corrected certain of the accounting complained of by Melrose 2. (*Id.* Ex. 10 at ¶ 47) It settled the litigation in 2013. Although Plaintiffs would be entitled to discovery regarding Melrose 2 films regardless of the allegations of fraud asserted by Melrose 2, the nature of the allegations illuminates the importance of the discovery that has been withheld from Plaintiffs.

## Paramount's Continued Refusal To Provide Discovery

Given the nature of Wunderlich's report, it cannot even be properly considered as a rebuttal report. Although a portion of the Wunderlich report addresses the analysis of Plaintiffs' expert, the key analysis which occupies most of the report is based upon documents and data, which were not addressed by Mr. Fier and were eliminated from consideration by Paramount. Paramount's counsel falsely asserts that it was in no position to understand the relevance of the documents relating to the Additional Films until Paramount was served with a copy of Mr. Fier's report. (*Id.* Ex. 3 at 2-4.)

However, as set forth above, the dynamic that increased pre-sales would have left more investor funds available for investment in additional films was recognized by Paramount as a "basic component of the deal" and well understood by Paramount. Paramount's counsel conceded that Paramount was aware that Plaintiffs' Complaint would result in funds being available for further investment. Plaintiffs' counsel stated as follows:

> Depending on the specifics of the Plaintiffs damages theory, which Plaintiffs flatly refused to disclose by calling Paramount's discovery efforts "ridiculous," Melrose may have been required to invest in anywhere from one additional picture to 25 or more additional pictures. Was Paramount supposed to have been clairvoyant and foresee not only that, under Plaintiffs' then-undisclosed damages theory, Melrose would have been required to invest in additional pictures, but also the number of additional pictures that would have been implicated?

(*Id.* Ex. 16 at 4.)

Thus, it is evident that Paramount understood from Plaintiffs' claims regarding international pre-sales that net production costs would be reduced, leaving funds available to be invested in more films. Paramount's counsel merely argues that Paramount was not in a position to know how many more films. But from the very start, Paramount always had Plaintiffs' pleading and claims for at least $30 million in damages. Paramount's feigned ignorance did not excuse Paramount from responding to Plaintiffs' discovery demands. Paramount fully understood the implications of Plaintiffs' claims and decided, for strategic reasons, not to produce documents or data relating to the Additional Films. Paramount evidently reconsidered its position when presented with an analysis by its expert which in its view favored the inclusion of the Additional Films.

## Paramount's Excuses For Its Failure to Produce

In the various letters exchanged between counsel, Paramount's counsel also insisted that Plaintiffs' written discovery did not seek documents pertaining to the Additional Films. However, Paramount has failed to address the fact, which was pointed out in the exchange of correspondence, that the definition of Covered Picture and all other relevant definitions contained no limitation to

the first 25 films produced. A plain reading of the definition of the term Covered Picture, makes it clear beyond dispute that any picture produced by Paramount, which met the qualifications of the Melrose transaction, was included in the definition.

As a companion to Paramount's argument that Plaintiffs never requested the discovery, Paramount argues that Plaintiffs never complained about Paramount's failure to produce, asserting: "…at no point in time did Plaintiffs contend that Paramount's document production was deficient…." (Janowitz Decl. Ex. 16.) However, Plaintiffs were entitled to accept discovery that was more limited in scope than Plaintiffs sought. This kind of agreement occurs constantly in the course of discovery. The decision to limit discovery cannot be used by one party to gain advantage over the other by depriving an adversary of the access to such discovery at a later time.

Lastly, Paramount argues that Plaintiffs refused to provide discovery on its damage calculation leaving Paramount in the dark as to the significance of the documents relating to the Additional Films. This argument is purely a red herring.

First, as Paramount concedes, it sought to question Plaintiffs' lay witnesses on the subject of complex expert testimony, which they were unable to address.

Second, as set forth above, the impact of the requirement for greater pre-sales that Plaintiffs alleged in their Complaint, resulted, on its face, in a decrease in the net production cost of the films in the Melrose Slate and an increase in the number of films for which there would be funds to invest. This is a mathematical certainty of which Paramount was fully aware. Paramount's counsel has sought to create the impression that Paramount did not understand that additional investable funds derived as a result of increased pre-sales would create the opportunity to invest in more pictures. Paramount's counsel, Philip Kelly, has cited various factors which would have been unknown to Paramount such as "the specific territories in which additional pre-sales should have been made." (Id. Ex. 16 at 3). However, this issue as well as other issues raised by Mr. Kelly is irrelevant. As Mr.

Kelly has conceded in his letter of June 20, 2014, Paramount was aware that there would be money to invest in Additional Films as a result of the additional pre-sales, which Plaintiffs alleged should have been made. (*Id.* Ex. 16 at 3-4). Thus he acknowledges that the information requested by Plaintiffs in their document requests, which addressed all "Covered Pictures," was relevant. The relevance of that information is clear beyond dispute by the use of it in the Wunderlich report.

**Paramount Continues to Use Documents Never Produced**
**To Plaintiffs In An Attempt to Gain Strategic Advantage**

Plaintiffs engaged in extensive correspondence with Paramount in order to obtain the relevant discovery concerning the Additional Films. (*Id.* Exs. 3, 6-7, 11-17). Paramount steadfastly refused.[3] Plaintiffs agreed to go forward with expert discovery in July without the discovery at issue, reserving Plaintiffs' right to seek relief from the Court as it does in this Motion. (*Id.* Ex. 17). In Mr. Janowitz's letter of June 9th to Allan Arffa, one of Paramount's lawyers, Mr. Janowitz asked specifically for the following:

> It appears, for example, that Melrose 2 invested as much as $350 million in the additional films. The terms and conditions of such investment have not been disclosed, although clearly the investment would have a significant impact on the economic results of the additional films and therefore upon Wunderlich's analysis.

(*Id.* Ex. 15 at 4). Notwithstanding Mr. Janowitz's numerous requests, Paramount refused to produce the Melrose 2 transaction documents.

However, during the deposition of Mr. Fier, Paramount introduced one of the Melrose 2 transaction documents it refused to produce to Plaintiffs. While questioning Mr. Fier concerning certain adjustments he made to his damage calculation (based upon information he derived from the Melrose 2 Complaint) to account for more than $10 million in unexplained third-party participation payments made by Paramount to affiliates such as MTV Networks or Nickelodeon, *id.* Ex. 18 at

---

[3] Plaintiffs first raised this issue with Paramount in May 2014, after receiving the Wunderlich Report. (*Id.* Ex. 11.) Plaintiffs and Paramount continued to debate Plaintiffs' need and entitlement to discovery concerning the Additional Films for the next several months. (*Id.* Exs. 12-17.)

118:2-17, 268:19-269:17, Paramount's counsel showed Mr. Fier a "Multi-Picture Investment Agreement" from the Melrose 2 transaction. (*Id.* Ex. 19.) Paramount then used this document in an effort to unfairly surprise Mr. Fier:

> **Q:** **Okay. If you turn to page 48 of this agreement. The definition of: "'Third Party Participation' shall mean any amount payable to any third Person (other than Investor, Studio, or any Affiliate thereof and other payments reflecting an investment in Direct Costs)." And then continues on, do you see that?**
> A:   Yes.
> **Q:** **Does that change your opinion as to whether affiliates are included or excluded in the definition of third party participation in the Melrose 1 revenue participation agreement?**
> MR. JANOWITZ:       Objection. Calls for a legal conclusion. He's also answered the question.
> THE WITNESS:       So -- sorry. What's the question?
> **Q:** **Just asked whether that changes your opinion in any way.**
> A:   No.

(*Id.* Ex. 18 at 268:19-269:17.)

Thus, Paramount, in plain violation of principles of fairness and avoidance of unfair surprise underpinning the discovery system, is seeking to affirmatively use for its advantage the very documents it has refused to produce to Plaintiffs. This conduct, together with the withholding of documents, is sanctionable under Fed. R. Civ. P. 37.

## Plaintiffs Have Been Unduly Prejudiced

Plaintiffs have received tens of thousands of pages of documents detailing and supporting the financial results of the 25 films in the Melrose Slate. This detailed discovery is essential to an analysis of Plaintiffs' damages and of Paramount's liability. Paramount now expects Plaintiffs to accept on faith the financial data with respect to an additional 12 films with a production budget of $717 million and revenues of over $2 billion. (*Id.* Ex. 9.) Included in what Paramount expects Plaintiffs to accept on faith are amounts attributed to revenues and expenses, which are the subject of detailed allegations of fraud by investors in those films. (*Id.* Ex. 10.) Even without such allegations, there are questions on the face of many of the figures that Paramount reports.

**All Evidence From Wunderlich Should Be Excluded**

Wunderlich was retained to respond to the expert report of Plaintiffs' expert, Philip Fier. Mr. Fier's report contained a damage calculation based on the 25 films in the Melrose Slate, ending with *Mission: Impossible 3*. Although Plaintiffs have had extensive discovery with respect to the documents and data pertaining to the Melrose Slate, they have had no discovery with respect to the Additional Films produced by Paramount that meet the qualifications of "Covered Pictures." Mr. Fier performed an analysis based upon Paramount's Ultimates for the Melrose Slate, which he adjusted to give effect to the international pre-sales that Plaintiffs have alleged Paramount should have conducted with respect to those pictures.

Although Wunderlich addressed Mr. Fier's analysis of the Melrose Slate, he focused particular attention on the Additional Films that Paramount released after *Mission: Impossible 3* in which Plaintiffs did not invest as a result of having expended all of their capital in the first 25 films. Wunderlich concluded that even if Plaintiffs could prove damages with respect to the Melrose Slate, they would have been compelled, by the terms of their deal, to invest in the Additional Films, as a result of which their damages with respect to the Melrose Slate would have been wiped out. Wunderlich was provided with data on the financial performance of the Additional Films, which he employed in his analysis. (*Id.* Ex. 8 at 11.)

As set forth above, Paramount should be precluded from using documents and data pertaining to the Additional Films as a sanction under FRCP 37 for its failure to make discovery regarding such films available to Plaintiffs. Independently, Wunderlich's report and testimony should be excluded in their entirety as a result of his use, without verification, of the Paramount questionable financial data regarding the Additional Films.

Wunderlich's report is unreliable as a result of his biased methodology and his failure to conduct a principled analysis. As set forth in Wunderlich's deposition testimony, cited below, Wunderlich's report should be excluded for the following reasons:

        1.    Wunderlich did not test the reliability of the data with respect to the Additional Films and did not verify the data.

**Q.    And you took the data for the next 12 films from Paramount, and you accepted the data on faith; correct?**
A.    I did not get additional documents related to those data. I used the data that I had for those films.
**Q.    And you didn't ask for any further data.**
A.    That's correct.
**Q.    And you didn't ask for anything underlying the data.**
A.    That's correct.
**Q.    And you didn't test the reliability of the data.**
A.    I didn't verify the data versus other sources. I mean, I didn't have other sources.

(*Id.* Ex. 20 at 169:17-171:7.)

        2.    Although he was able to perform some tests concerning the reliability of the films in the Melrose Slate, he did not perform such tests with respect to the Additional Films.

A.    ...And also, let me just say I do have, it occurs to me, that at least for the first set of films, I did have the ability to and did look at consistency between more than one set of ultimates. That Mr. Fier had used information as of March 2013, I think it was. And I did compare that with the information that I had. And so, striking discrepancies, there of course were some differences, but you would expect there to be some differences. But I did have the ability to look at internal consistency at least between the two sets of information that were a couple years apart.
**Q.    But only with respect to the first 25 films?**
A.    Yes.

(*Id.* Ex. 20 at 172:19-173:9.)

        3.    Wunderlich testified that he would have been unable to detect overstatements of costs in Paramount's Ultimates.

**Q. And if they had overstated costs by 15 or 20 percent, is that something that you would have noticed by looking at the data?**
A. I don't think I could, just by looking at the data, discern a difference of that extent.

(*Id.* Ex. 20 at 171:18-22.)

       4.    Wunderlich did not speak to anyone at Paramount to verify the reliability of

the data which he used.

**Q.**    **And did you ever ask to speak to anyone at Paramount who was responsible for the data?**
A.    No.
**Q.**    **Did you ever ask for any kind of information that would be a guide to the reliability of the data?**
A.    I'm not sure what you mean by that.
 Q.    **Well, did you ever talk to somebody in Paramount and say: Is this all good data? Something I can rely on? Are there any problems that should be aware of?**
A.    I did not speak to anyone from Paramount.

(*Id.* Ex. 20 at 171:23-172:10.)

       5.    Wunderlich was aware of the Melrose 2 investment in the Additional Films,

but did not ask to see documentation concerning the Melrose 2 deal, although he admits that

he could have asked for such documentation.

**Q.**    **Did you ask anything about additional investors in the Melrose Slate?**
A.    I don't know if I asked.  But I was aware of the Melrose II investments.
**Q.**    **You were?**
A.    That for some even in the initial 25, there were Melrose II investments.
**Q.**    **Tell me what you knew about the Melrose II investments.**
A.    I could see that as part of the co-financing some money had been put up by what had been called the Melrose II parties.
**Q.**    **Okay.  And you saw that a little bit with respect to the Melrose I Slate, because there were two films, I think?**
A.    There might have been more that two, but a handful of films.
**Q.**    **Yeah.  I think there was two films. And when you saw that, did you ask anything about Melrose II?**
A.    No.
**Q.**    **And when you got the additional information on the additional films, you saw Melrose II in all of those films, didn't you?  Or virtually all of them?**
A.    Virtually all. Yes.
**Q.**    **Did you ask anything about Melrose II then?**
A.    No.
**Q.**    **So you said that, when you were describing Melrose II before in your criticisms, you explained that you hadn't seen documentation regarding Melrose II; correct?  You hadn't seen their deal?**
A.    Yes.
**Q.**    **Right? Though you could have asked for it; correct?**

A.      I could have.  Yes.

(*Id.* Ex. 20 at 177:16-179:4.)

6.      Wunderlich was aware of claims by the Melrose 2 investors regarding

overstatement of costs and understatement of revenues, but concluded that such claims were

irrelevant to his calculation and therefore ignored such claims.

**Q.      And you were aware, are you not, that the Melrose II plaintiffs who are
also investors in those very same films, say that the costs were overstated—
I'm sorry—the costs were overstated and the revenues were understated.  You
were aware of that; right?**
A.      Well, I only saw the Complaint on Tuesday.  And I did see that Mr. Fier did a
calculation related to complaints by Melrose II people.  But that was the extent of
my knowledge.
**Q.      Well, do you feel today... And by the way, you learned of this from Mr.
Fier weeks ago.  And on this week, you saw the Complaint.  Do you feel today
that you should look into whether or not the data, the revenues and the costs
that you have used in your analysis, are wrong?**
A.      I don't think it's relevant for the analysis that I did.  I don't think it's relevant
for this litigation.  I don't see what that has to do with the allegation that Paramount
misrepresented the strategy that it was going to adopt regarding pre-sales.

(*Id.* Ex. 20 at 181:17-182:13.)

7.      Wunderlich admitted that if the data he used in his calculation was materially

flawed he would want to know that but did nothing to ascertain whether the data he used

was inaccurate.

A.      Yes.  I'm doing the rebuttal of Mr. Fier's Damages Calculation.
**Q.      And in so doing, you have produced a calculation in the alternative
universe, using the data, the costs and revenues that paramount has given you.
If that data is significantly, materially flawed, wouldn't you want to know that?**
A.      Well, I would want to know that....

(*Id.* Ex. 20 at 182:20-183:3.)

8.      Wunderlich testified that he did not inquire into the claims asserted by the

Melrose 2 investors which were incorporated in Mr. Fier's analysis, because Mr. Fier did not

present substantiation of the Melrose 2 claims.

A.      Well, I would want to know that. But also in rebutting Mr. Fier's analysis, he is not presenting a substantiation of the Melrose II claims.

(*Id.* Ex. 20 at 183:3-5.)

9.      Wunderlich conceded that information which would substantiate the Melrose 2 claims was not available in this litigation.

A.      But also in rebutting Mr. Fier's analysis, he is not presenting a substantiation of the Melrose II claims. Let me finish.
Q.      Sure.
A.      What we have are some allegations in a complaint. Without knowing specifics, I would imagine that there was a lot of back-and-forth in that litigation, and a lot of documentation of plaintiffs' view and defendant's view of the issues in that litigation.
Q.      And –
A.      If that information is available in this litigation, I haven't seen it. And I'm not aware of Mr. Fier looking at that information, or using that information, providing substantiation of the calculation that he provided, using that information to come up with the number that he comes up with in terms of a Melrose II adjustment.

(*Id.* Ex. 20 at 183:3-21.)

10.      Wunderlich testified that he believed that Plaintiffs and their expert, Phil Fier, were not provided with current financial information that was provided to him by Paramount.

Q.      But in any event, do you know that when you were doing your analysis, you were provided with more recent information than the plaintiffs were?
A.      Are you asking me did I have more recent information than Mr. Fier had at the time that he did his report?
Q.      Yes.
A.      I don't know that for a fact. I see that Mr. Fier used information from 2012. It's logical, if he had more recent, he would have used it. But of course I don't know for a fact what he had.

(*Id.* Ex. 20 at 173:21-174:7.)

11.      Wunderlich indicated that he had no intention of verifying whether the data which he received from Paramount regarding the Additional Films was accurate.

**Q.** And again, if Paramount has materially misrepresented the costs and revenues of the films, the 12 films in the data given to you, so that your analysis is now materially incorrect, you don't care?

MR. KELLY:          Misstates his testimony.

THE WITNESS:          No. I want my analysis to be correct.

BY MR. JANOWITZ:

**Q.** What are you going to do about it?

**A.** Well, at this point, sitting here today, I don't know.

**Q.** What are you going to do about it Monday?

**A.** Well, I'll include Monday in as of today. I have no specific plans to do additional analysis past today. I haven't been asked to do additional analysis past today. It's possible that I may be asked to do something. But as of today, I haven't been.

(*Id.* Ex. 20 at 185:4-20.)

        12.     Wunderlich did not know whether the data that was provided to him by

Paramount was created in the ordinary course of business or was created specifically for this

litigation.

**Q.** Do you in fact know that these documents were created in the ordinary course of business? In other words, do you know whether the ultimates that have been provided to you for analysis in this case are the same ultimates that were provided to the Melrose II plaintiffs

**A.** I haven't seen what's been provided to the Melrose II plaintiffs, so I can't say. But even if they were different, they are different agreements. And so there can be differences between the two.

**Q.** Do you know whether or not these are truly documents that have been provided in the ordinary course of business, or whether these ultimates have been provided especially for the plaintiffs in this case?

**A.** I have no reason to think that they were not prepared in the ordinary course of business. They are in the format of documents that are prepared in the ordinary course of business. And so I have no reason to think that they weren't.

(*Id.* Ex. 20 at 188:15-189:9.)

18

**ARGUMENT**[4]

## I. PARAMOUNT AND ITS DAMAGES EXPERT SHOULD BE PRECLUDED FROM RELYING ON THE ADDITIONAL FILMS AT TRIAL

In federal courts, "[o]pen discovery is the norm.  Gamesmanship with information is discouraged and surprises are abhorred." *Rofail v. United States*, 227 F.R.D. 53, 58 (E.D.N.Y. 2005). Accordingly, the Federal Rules of Civil Procedure governing discovery are premised on the principle that parties should be forthcoming with all relevant information in their possession. *See United States v. Procter & Gamble Co.*, 356 U.S. 677, 682 (1958) ("Modern instruments of discovery serve a useful purpose . . . . They together with pretrial procedures make a trial less a game of blindman's buff and more a fair contest with the basic issues and facts disclosed to the fullest practicable extent.") (citation omitted).

Rule 37 of the Federal Rules of Civil Procedure serves a vital role in fulfilling this premise. Rule 37(c)(1) provides that:

> If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless.

Fed. R. Civ. P. 37(c)(1).  Accordingly, pursuant to Rule 37(c)(1), a party may be precluded from offering evidence at trial where it failed to disclose the evidence under Rule 26 or provide responses to discovery aimed at discovering that evidence. *Id.*; *Patterson v. Balsamico*, 440 F.3d 104, 116-18 (2d Cir. 2006).  Rule 37(c)(1)'s preclusion sanction also applies where a party fails to supplement pursuant to Rule 26(e). Fed. R. Civ. P. 37(c)(1); *Texas Instruments, Inc. v. PowerChip Semiconductor Corp.*, 2007 U.S. Dist. LEXIS 38312, at *42 (S.D.N.Y. May 24, 2007).

As the Advisory Committee Notes explain, sanctions pursuant to Rule 37(c)(1) are "self-executing." Fed. R. Civ. P. 37(c)(1) Notes of Advisory Committee on Rules (1993 Amendments).

The non-disclosing party may avoid sanctions only by demonstrating the failure to disclose was "substantially justified" or "harmless." Fed. R. Civ. P. 37(c)(1); *Patterson*, 440 F.3d at 117; *Ritchie Risk-Linked Strategies Trading (Ir.), Ltd. v. Coventry First LLC*, 280 F.R.D. 147, 158-59 (S.D.N.Y. 2012).

Here, Paramount's failure to produce the documents at issue is unexplained and inexcusable. And far from being "substantially justified" or "harmless," Paramount's discovery abuses have substantially prejudiced Plaintiffs. Accordingly, preclusion is warranted.

### A. Paramount Failed To Provide Information As Required By Rule 26(a) and 26(e)

The purpose of Rule 37(c) is to provide parties with an incentive to make timely disclosures and to resist the temptation "to try to gain a tactical advantage at trial by exposing for the first time at that stage evidence that is favorable to their position." 7-37 Moore's Federal Practice, § 37.60(1) (Matthew Bender 3d ed. 2013); *see also, Haas v. Del. & Hudson Ry. Co.*, 282 Fed. Appx. 84, 86 (2d Cir. 2008); *Rofail*, 227 F.R.D. at 58.

Paramount utterly failed to make the disclosures required by Rule 26(a) and (e), choosing instead to attempt to gain a tactical advantage by cherry picking its disclosures so as to unfairly surprise Plaintiffs. While Paramount continues to claim that Plaintiffs never requested information concerning the films released subsequent to the films in the Melrose Slate, this justification for its failure to produce the documents to Plaintiffs is unavailing. Not only is this patently false, as explained above in 2011 Plaintiffs' sought detailed financial information on all "Covered Pictures" without limiting the films to those in the Melrose Slate, but Paramount in any event has violated Rule 26(a) and (e).

Rule 26(a) requires that "a party must, *without awaiting a discovery request*, provide to the other parties: ... all documents ... in its possession, custody, or control [that the party] *may use to support its claims or defenses*." Fed. R. Civ. P. 26(a)(1)(A)(ii) (emphasis supplied). Rule 26(e) imposes a duty upon the parties to supplement this disclosure "if the party learns that that in some material respect the

20

disclosure or response is incomplete or incorrect . . .." Fed. R. Civ. P. 26(e)(1)(A). As Paramount admittedly understood from Plaintiffs' Complaint (Dkt. No. 65), and as its rebuttal damages expert now concedes in his report, to rebut Plaintiffs' damages analysis Paramount necessarily must use financial data for the Additional Films. Thus, these materials fall squarely within the categories of documents that Paramount has a continuing duty to disclose "without awaiting a discovery request." Fed. R. Civ. P. 26(a)(1)(A).

By failing to comply with these disclosure rules, Paramount is subject to sanction under Rule 37(c) absent a showing by Paramount that its failure to disclose was "harmless" or was "substantially justified."

**B.     Paramount's Refusal To Produce Documents Related To The Additional Films Is Substantially Prejudicing Plaintiffs**

Paramount's continued refusal to produce documents related to the Additional Films is unduly prejudicial to Plaintiffs.

In order to avoid Rule 37(c)(1) sanctions, Paramount must demonstrate its non-disclosure is "harmless," meaning it caused no prejudice to Plaintiffs. *Ritchie Risk-Linked*, 280 F.R.D. at 159. The determination of whether a Rule 26(a) violation is harmless is entrusted to the broad discretion of the district court. *Haas*, 282 Fed. Appx. at 86; *Patterson*, 440 F.3d at 117.

Paramount's own conduct and admissions belie any claim that its failure to produce documentation for the Additional Films is harmless. Plaintiffs have been deprived of both the data and the discovery pertaining to such films, and consequently Plaintiffs are unable to analyze Wunderlich's report and to test his analysis and conclusions.

Even if additional data were to be supplied at this late stage, Plaintiffs would still be prejudiced. Fact and expert discovery have concluded and this case is scheduled for trial in two months. Yet, despite Paramount's defensive use of summary evidence concerning the Melrose 2 transaction, Paramount refuses to provide Plaintiffs the underlying documentation regarding the

21

Additional Films comparable to that produced with respect to the 25 Melrose Slate films.[5]  Thus, Plaintiffs have no way to assess, verify, or dispute this information.  The Second Circuit has found such gamesmanship sanctionable under Rule 37(c)(1).  *Kam Hing Enters. v. Wal-Mart Stores, Inc.*, 359 Fed. Appx. 235, 238 (2d Cir. 2010) ("[T]he spreadsheets were summary evidence culled from underlying data that Wal-Mart had not produced.  Given the proximity to trial, the lack of any compelling excuse for the failure to produce such documentation, and the prejudice to plaintiff that would have resulted from allowing House to testify to costs that plaintiff had no means of verifying or disputing, we conclude that the District Court acted within its discretion in granting plaintiff's motion in limine [precluding this information at trial].").

Given the close proximity to trial and the completion of fact and expert discovery, even if this information were disclosed, plaintiffs would be severely prejudiced.  Plaintiffs would need and be entitled to conduct depositions of the relevant witnesses, including not only many of the Paramount witnesses that already have been deposed, but also the investors and professionals involved in the Melrose 2 transaction.  *Lee Valley Tools, Ltd. v. Indus. Blade Co.*, 288 F.R.D. 254, 260-62 (W.D.N.Y. 2013) (reopening discovery to permit additional discovery relating to the untimely disclosures and shifting the costs of supplemental and expert reports to the non-disclosing party).

Accordingly, if Paramount is permitted to rebut Plaintiffs' expert damages analysis using the portion of Wunderlich's report that relies on the Additional Films, the prejudice to Plaintiffs is manifest.

---

[5] Such documentation would include not only the projected performance of the films as calculated by Paramount (known as "Ultimates"), but also the supporting financial documentation for such Ultimates; the deal documentation with respect to all forms of co-financing and risk mitigation; all the documentation concerning the Melrose 2 Slate, another film slate investment vehicle which Wunderlich acknowledges was an investor in each of the Additional Films.

**C.    There Is No "Substantial Justification" For Paramount's
        Failure To Provide Discovery On The Additional Films**

Substantial justification means "justification to a degree that could satisfy a reasonable person that parties could differ as to whether the party was required to comply with the disclosure request...." *Ritchie Risk*, 380 F.R.D. at 159.

Paramount's failure to disclose these materials is not "substantially justified" by any reasonable measure. Paramount declined *for years* to produce documents related to the Additional Films called for in Plaintiffs' document requests or in connection with its Rule 26(a) and (e) obligations. Paramount now uses some of those same documents as part of its defense, but continues to inexplicably and unjustifiably refuse to provide full discovery of the underlying information. *Kam Hing*, 359 Fed. Appx. at 238. Instead, Paramount cherry-picks documents to selectively disclose at tactical moments, sandbagging Plaintiffs. This is the very conduct that Rule 37(c)(1) is intended to prevent. *Texas Instruments, 2007 U.S. Dist. LEXIS 38312*, at *42 (imposing sanctions pursuant to Rule 37(c)(1) where non-disclosing party "stated that responsive documents existed, failed to produce such documents, created responsive documents which it gave to its experts to rely on, and then produced the newly created documents to [the opposing party] after the exchange of expert rebuttal reports.").

**II.   PARAMOUNT SHOULD BE PRECLUDED FROM RELYING
        ON WUNDERLICH'S REPORT AND TESTIMONY AT TRIAL**

Under Fed. R. Evid. 702, "[a] witness is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence..." *Id.* Expert testimony is admissible only where (1) the testimony is based on sufficient facts or data; (2) the testimony is the product of reliable principles; and (3) the witness applies the principles reliably to the facts of the case. Fed. R. Evid. 702; *see also Daubert v. Merrell Dow Pharm.*, 509 U.S. 579 (1993);

*Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999). The proponent of expert testimony has the burden of establishing that expert testimony is both relevant and reliable by a preponderance of the evidence. *Daubert*, 509 U.S. at 593 n.10 (citing to Fed R. Evid. 104(a)). To be scientifically valid, the subject of expert testimony must rest on "good grounds, based on what is known." *Daubert*, 509 U.S. at 590 (quotations omitted).

Wunderlich's failure to consider relevant data and to independently verify the data provided to him by Paramount mandates exclusion of his testimony and expert report as unreliable, because it is based on data that is not "sufficient." *See e.g.*, *EEOC v. Bloomberg, L.P.*, 07 Civ. 8383 (LAP), 2010 U.S. Dist. LEXIS 92511, at *45-46 (S.D.N.Y. Aug. 31, 2010) (excluding expert witness who did not independently verify information forming basis of testimony); *Rowe Ent'n, Inc. v. William Morris Agency, Inc.*, 98 Civ. 8272 (RPP), 2003 U.S. Dist. LEXIS 15976, at *8, 33-35 (S.D.N.Y. Sept. 15, 2003) (finding data upon which expert relied to be insufficient, because it was selected by counsel and therefore, "would, perforce, be biased"); *Dreyer v. Ryder Auto. Carrier Group, Inc.*, 367 F. Supp. 2d 413, 446-47 (W.D.N.Y. 2005) (excluding expert's opinions for failing to comply with Rule 702's requirement that data upon which a proposed expert's testimony is based be "sufficient," where opinion founded upon unverified and therefore potentially incomplete and inaccurate data). "[A]n analysis is only as good as the data upon which it rests . . .." *Rowe Ent'n, Inc.*, 2003 U.S. Dist. LEXIS 15976, at *15 (quoting Federal Judicial Center, Reference Manual on Statistics 90 (2d ed. 2000)).

Wunderlich's analysis is particularly unreliable given that, although he conceded being aware that the financial data on which he relied was challenged as materially inaccurate in a separate lawsuit that was confidentially settled, he chose not to undertake *any* independent efforts to verify the information he was provided by Paramount.

In such situations, where an expert bases his analysis on his client's "assurances rather than available records," and his "client's guarantees . . . were contradicted by other data available," the opinions should be excluded under Rule 702. *Supply & Bldg. Co. v. Estee Lauder Int'l, Inc.*, 95 Civ. 8136, 2001 U.S. Dist. LEXIS 20737, at *16 (S.D.N.Y. Dec. 13, 2001) (citations omitted); *see also Amorgianos v. AMTRAK*, 137 F. Supp. 2d 147, 175 (E.D.N.Y. 2001), *aff'd*, 303 F.3d 256 (2d Cir. 2002) (excluding expert's opinion under Rule 702 because he "based his calculation on an assumption that contradict[ed] plaintiffs' own evidence") (citation omitted).

In 2007, a California appellate court rejected most of Wunderlich's expert opinion as unreliable for these same reasons. *Parlour Enters. v. Kirin Grp., Inc.*, 152 Cal. App. 4th 281 (4th App. Dist. 2007). In *Parlour*, the court rejected Wunderlich's lost profits calculations, because they were based on projections prepared by others, who were not known to Wunderlich. Wunderlich knew only that the projections were received, as in this case, from the client or its attorney. He knew nothing of the methodology used in preparing the projections. No one testified "as to the facts underling the projections or the calculations used to prepare them." *Id.* at 289.

Here, too, Wunderlich based his analysis on Ultimates, which were a combination of actual and projected results, provided by Paramount's attorneys and willfully blinded himself to their methodology, source and reliability.

## CONCLUSION

For the foregoing reasons, and upon the papers accompanying this memorandum of law, Plaintiffs respectfully request that the Court grant Plaintiffs' motions: (a) to preclude Paramount from using certain rebuttal damages documents, evidence or analysis at trial pursuant to Fed. R. Civ. P. 37; (b) to preclude Paramount from relying at all on the putative expert report and testimony of Paramount's damages rebuttal expert, Robert Wunderlich pursuant to Fed. R. Evid. 702; and (c) that the Court award Plaintiffs such other and further relief as deemed just and proper.

Dated:  New York, New York
August 25, 2014

PRYOR CASHMAN LLP

By: _____

James A. Janowitz
William L. Charron
Bryan T. Mohler
Benjamin S. Akley
Kathleen M. Prystowsky
7 Times Square
New York, New York  10036
(212) 421-4100
*Attorneys for Plaintiffs*