.

James A. Janowitz
William L. Charron
Bryan T. Mohler
Benjamin S. Akley
Kathleen M. Prystowsky
PRYOR CASHMAN LLP
7 Times Square
New York, New York 10036
(212) 421-4100
jjanowitz@pryorcashman.com
wcharron@pryorcashman.com
bmohler@pryorcashman.com
bakley@pryorcashman.com
kprystowsky@pryorcashman.com
*Attorneys for Plaintiffs Allianz Risk Transfer AG,*
*Marathon Structured Finance Fund, LP,*
*NewStar Financial, Inc. and Munich Re Capital Markets New York, Inc.*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------- x
                                           :

ALLIANZ RISK TRANSFER AG,
MARATHON STRUCTURED FINANCE FUND, LP,  :
NEWSTAR FINANCIAL, INC., and               :    No. 08-cv-10420 (TPG)
MUNICH RE CAPITAL MARKETS NEW YORK, INC.,  :

            Plaintiffs,                :

          -v-                       :

PARAMOUNT PICTURES CORPORATION,        :

            Defendant.                :

-------------------------------------------------------------------- x

## PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION
## TO DEFENDANT'S MOTION *IN LIMINE* NO. 1
## TO EXCLUDE THE EXPERT TESTIMONY OF RICK SANDS

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ......................................................................................... ii

PRELIMINARY STATEMENT ................................................................................... 1

ARGUMENT ................................................................................................................. 3

SANDS'S TESTIMONY IS ADMISSIBLE UNDER RULE 702 ................................. 3

    A.  Sands Is Qualified To Testify As An Expert About Foreign Pre-Sales ............................ 4

    B.  Sands's Specialized Knowledge And Testimony Will Be Helpful To The Jury ................ 8

    C.  Sands's Opinion Offers Reliable Principles And Methods ................................. 9

    D.  Sands Reliably Applies His Methodology To The Melrose Slate Of Films ...................... 17

CONCLUSION ............................................................................................................. 19

## TABLE OF AUTHORITIES

**CASES**                                                           **PAGE(s)**

*Barrera v. Brooklyn Music,*
    346 F. Supp. 2d 400 (S.D.N.Y. 2004) .................................................................... 10

*In re Blech Securities Litigation,*
    No. 94 Civ. 7696 (RWS), 2003 U.S. Dist. LEXIS 4650 (S.D.N.Y. Mar. 26, 2003) .......... 5

*Cedar Petrochemicals, Inc. v. Dongbu Hannong Chemical Co.,*
    769 F. Supp. 2d 269 (S.D.N.Y. 2011) ................................................... 10, 12, 13

*Dandong v. Pinnacle Performance Ltd.,*
    No. 10 Civ. 8086 (JMF), 2013 U.S. Dist. LEXIS 150259
    (S.D.N.Y. Oct. 17, 2013) ................................................................................ 13

*Daubert v. Merrell Dow Pharmaceuticals, Inc.,*
    509 U.S. 579 (1993) ................................................................................... 4, 11

*Hollman v. Taser International, Inc.,*
    928 F. Supp. 2d 657 (E.D.N.Y. 2013) ............................................................... 10

*Kumho Tire Co. v. Carmichael,*
    526 U.S. 137 (1999) ....................................................................................... 4, 5

*Mahoney v. J.J. Weiser & Co.,*
    No. 04 Civ. 2592 (VM), 2007 U.S. Dist. LEXIS 79460 (S.D.N.Y.  Oct. 25, 2007) .......... 4

*McCullock v. H.B. Fuller Co.,*
    61 F.3d 1038 (2d Cir. 1995) ............................................................................ 7

*In re Methyl Tertiary Butyl Ether Products Liability Litigation,*
    No. 1:00-1898, MDL 1358 (SAS), M21-88, 2008 U.S. Dist. LEXIS 37331
    (S.D.N.Y. May 7, 2008) ................................................................................. 9

*Nextec Applications, Inc. v. Brookwood Companies,*
    No. 07 Civ. 6901 (TPG), 2012 U.S. Dist. LEXIS 36941 (S.D.N.Y. Mar. 19, 2012)
    (Griesa, J.)................................................................................................ 4

*Playtex Products v. Procter & Gamble Co.,*
    No. 02 CIV 8046 (WHP), 2003 U.S. Dist. LEXIS 8913 (S.D.N.Y. May 28, 2003) ........ 11

*Reach Music Publishing, Inc. v. Warner Chappell Music, Inc.,*
    No. 09 Civ. 5580 (LTS) (GWG), 2013 U.S. Dist. LEXIS 180073
    (S.D.N.Y. Dec. 23, 2013) ............................................................................... 5

**CASES**                                                                          **PAGE(s)**

*Rivera v. Mill Hollow Corp.*,
    No. 96 Civ. 8150 (TPG), 2000 U.S. Dist. LEXIS 11886
    (S.D.N.Y. Aug. 17, 2000)(Griesa, J.) ................................................................................5

*Semerdjian v. Littell*,
    641 F. Supp. 2d 233 (S.D.N.Y. 2009) ........................................................................7, 14

*Souther v. Eli Lilly & Co. (In re Zyprexa Products Liability Litigation)*,
    489 F. Supp. 2d 230 (E.D.N.Y. 2007) .........................................................................4, 7

*Stagl v. Delta Air Lines*,
    117 F.3d 76 (2d Cir. 1997) ...............................................................................................7

*Ulico Casualty Co. v. Clover Capital Management, Inc.*,
    217 F. Supp. 2d 311 (N.D.N.Y. 2002)............................................................................10

*United States v. Jakobetz*,
    955 F.2d 786 (2d Cir. 1992) .............................................................................................4

*United States v. Rubin*,
    No. 92 CR 1195, 1993 U.S. Dist. LEXIS 8299 (S.D.N.Y. June 17, 1993) ........................9


**STATUTES**

Fed. R. Evid. 702 ........................................................................................................4, 11 13

Plaintiffs Allianz Risk Transfer AG, Marathon Structured Finance Fund, LP, NewStar Financial, Inc., and Munich Re Capital Markets New York, Inc. (collectively "Plaintiffs") respectfully submit this memorandum of law in opposition to defendant Paramount Pictures Corporation's ("Paramount") motion *in limine* Number 1 to exclude the expert testimony of Rick Sands ("Sands").[1]

## PRELIMINARY STATEMENT

Foreign pre-selling of films is not done by math formulas or computer programs or matrices. It is done at markets and film festivals and personal negotiations. Nevertheless, there are certain objectively identifiable criteria that can guide the likelihood of pre-selling a given Major Studio film, such as a film produced by Paramount. Those criteria have been explained and analyzed by Plaintiffs' expert witness, Rick Sands, and Sands has reliably applied the criteria to each of Paramount's 25 films in the Melrose Slate.

Plaintiffs retained Sands because Paramount elected not even to try to pre-sell nearly all of the films in the Melrose Slate – notwithstanding Paramount's misrepresentation in in the Melrose Private Placement Memorandum ("PPM") that Paramount planned to "pursue" pre-sales of the Melrose Slate of films "opportunistically." Plaintiffs will offer Sands to present evidence to the jury about how each of the films in the Melrose Slate "could have" been pre-sold, had Paramount cared to try. (Sands is not being offered to try to divine what Paramount "should have" actually decided to pre-sell as a business matter between 2004-2006, only to explain the possibilities that were available to Paramount at the relevant time. This is to rebut Paramount's phony contention, asserted at various times and without a scintilla of preserved evidence, that it

---

[1] Paramount's memorandum of law in support of its motion *in limine* Number 1 is cited herein as "Def. Br. No. 1 at __," and the omnibus exhibits that Paramount submitted in connection with all its motions *in limine* are cited herein as "Def. Ex. __." Plaintiffs' exhibits attached to the accompanying Omnibus Declaration of James A. Janowitz are cited herein as "Ex. __."

supposedly could not have pre-sold any more films than it did.)

Paramount previously moved this Court to grant it summary judgment upon, *inter alia*, the fictional notion that the PPM's discussion of Paramount's intended "opportunistic pursuit" of pre-sales should reasonably have been understood by Plaintiffs to mean "practically none at all." This Court recently denied Paramount's summary judgment motion and ordered the parties to trial. Notably, Sands's expert report was submitted in full and relied upon by Plaintiffs in opposing Paramount's summary judgment motion, and Paramount did *not* move to preclude Plaintiffs' reliance on Sands at that time.

Now, on the eve of trial, Paramount seeks to preclude Sands because it does not want the jury to hear about the foreign pre-sale possibilities that were available to Paramount in 2004-2006. Paramount's motion to preclude is a lengthy laundry-list of misguided and meritless arguments. Its motion *in limine* should be denied.

Sands is an authoritative and highly qualified figure to opine about foreign pre-sales. He has pre-sold many hundreds of films of all sizes and characteristics for over a decade, including during the time period at issue in this case (2004-2006). Even Paramount's own damages expert, Robert Wunderlich, testified in his deposition that Sands is qualified to ascertain pre-sale levels of films in the Melrose Slate.

Sands offers a concrete methodology about how to pre-sell a Major Studio film. He grounds his analysis in objective criteria with cited authorities. Perhaps most significantly, his methodology is verified by Paramount's own foreign pre-sales rebuttal expert, William Shields ("Shields"), who, at *every point*, agreed that Sands had identified correct elements of measuring foreign pre-sale viability; Shields would simply weight the elements differently. The law is clear that it is for the jury to decide which expert has weighted the elements more correctly.

Sands's opinion is also reliably rooted in his own deep experience. This is not a case of an expert just saying "take my word for it." Sands explains at every turn why the "Key Elements" he has identified matter and how they should be ascertained. He explains that his knowledge of the elements derives most directly from his sales of hundreds of films to foreign distributors in every territory: he learned what questions the distributors ask and what film attributes they care most about for purposes of pre-sale negotiations. His identification of the Key Elements is additionally supported by industry authorities and publications – and, once again, by Paramount's own rebuttal expert. Sands also reliably applies the Key Elements to the films at issue.

Not all expertise is or need be scientific. Paramount's attempt to hold Sands to some non-existent scientific standard should be rejected. Sands will help the jury understand what "could have" been done with the Melrose Slate in terms of pre-sales, where Paramount saw fit not to try to pre-sell most of the Melrose Slate and not to preserve its evidence. That knowledge is specialized and not self-apparent to the jury, and it is important to this case. Paramount would prefer the jury to speculate and wonder. Paramount's motion to preclude Sands should be denied.

## ARGUMENT[2]

## SANDS'S TESTIMONY IS ADMISSIBLE UNDER RULE 702

Federal Rule of Evidence 702 provides:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

---

[2] Plaintiffs presume the Court's familiarity with the procedural and factual background of this action.

3

(d) the expert has reliably applied the principles and methods to the facts of the case.

The admissibility of expert testimony to assist the trier of fact is favored. *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 588 (1993). The proper means to address suggested shortcomings of an expert are: "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof . . . ." *Id.* at 596 (citation omitted).

Rick Sands should be permitted to testify for Plaintiffs under Rule 702.

## A. Sands Is Qualified To Testify As An Expert About Foreign Pre-Sales

There is no rigid set of factors to determine a witness's qualifications as an expert. *See, e.g., Nextec Applications, Inc. v. Brookwood Cos.*, No. 07 Civ. 6901 (TPG), 2012 U.S. Dist. LEXIS 36941, at *3 (S.D.N.Y. Mar. 19, 2012) (Griesa, J.) (citing *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999)). "It is critical that 'doubts about whether an expert's testimony will be useful should generally be resolved in favor of admissibility unless there are strong factors such as time or surprise favoring exclusions.' Any more rigorous approach would deny the jury's constitutional role." *Souther v. Eli Lilly & Co. (In re Zyprexa Prods. Liab. Litig.)*, 489 F. Supp. 2d 230, 285 (E.D.N.Y. 2007) (quoting *United States v. Jakobetz*, 955 F.2d 786, 797 (2d Cir. 1992)).

In certain fields, "experience," "training" and "specialized knowledge," not "science," will be the predominant or even sole basis to determine that a witness is qualified as an expert. Where an expert's "opinion is based on professional experience and there really is no methodology or technique supporting it . . . courts focus on the relationship between the experience and the opinion and whether the latter is rationally related to the former." *Mahoney v. J.J. Weiser & Co.*, No. 04 Civ. 2592 (VM), 2007 U.S. Dist. LEXIS 79460, at *12-14 (S.D.N.Y.

Oct. 25, 2007). *E.g.*, *In re Blech Secs. Litig.*, No. 94 Civ. 7696 (RWS), 2003 U.S. Dist. LEXIS 4650, at *56-57 (S.D.N.Y. Mar. 26, 2003); *Rivera v. Mill Hollow Corp.*, No. 96 Civ. 8150 (TPG), 2000 U.S. Dist. LEXIS 11886, at *1-2 (S.D.N.Y. Aug. 17, 2000) (Griesa, J.) (quoting *Kumho*, 526 U.S. at 150); *Reach Music Publ'g, Inc. v. Warner Chappell Music, Inc.*, No. 09 Civ. 5580 (LTS) (GWG), 2013 U.S. Dist. LEXIS 180073, at *16 (S.D.N.Y. Dec. 23, 2013); Fed. R. Evid. 702.

Sands unquestionably has the requisite experience and training to qualify him as an expert regarding the practice of foreign pre-selling of films between 2004 and 2006 (the time period at issue in this case). Sands is a former motion picture executive with 36 years of industry experience – 19 of which were in executive positions. (Ex. 1 at 1.) He worked as the Vice President of Domestic Distribution at Columbia Pictures; he was the Executive Vice President and Chief Financial Officer, and later President of International, Chairman of Worldwide Distribution and Chief Operating Officer, at Miramax Films (where he personally set the new standard for how independent studios internationally pre-sell their films – *i.e.*, by replicating the major studio model); he was the President and Chief Operating Officer at Dreamworks SKG; and he was the Chief Operating Officer at MGM Studios. (Ex. 1 at 1-4.)[3]

Sands pre-sold hundreds of films over the course of more than ten years for these film studios, including between 2004 and 2006, when Sands pre-sold films for Miramax, Dreamworks, and MGM (three of the most prominent film producers and distributors in the history of motion pictures). (Ex. 1 at 2-4; Ex. 2 at 62:21-63:11, 104:24-106:5.) Paramount's belittling of Sands as having only "limited professional experience" in foreign pre-selling is laughable: Sands testified that he "used to travel 180 days a year when [he] was head of Miramax International. To learn the territories, to get – to know the TV buyers, I used to go to

---

[3] Today Sands owns his own media and entertainment consulting company called "RS Consultants." (Ex. 1 at 4.)

the video stores, to know the theaters, to know who is releasing what, who is buying, who is selling. That's really what you have to do." (Ex. 2 at 105:9-16.) Sands internationally pre-sold films of all budgets and sizes, including big budget films that characterize releases by Major Studios. (Ex. 1 at 4; Ex. 2 at 50:15-51:11, 62:21-63:7, 75:4-81:9.)

Although Paramount pretends at one point not to understand the difference between "Major Studios" and "Independent Studios," Sands specifically explains the distinction in his report. (Ex. 1 at 6.) Paramount then criticizes Sands for "primarily" working for Independent Studios, but it is undisputed that Sands worked for Major Studios; indeed, MGM is specifically identified as a "major studio" at page 39 of the Melrose PPM: "The other major motion picture studios [in addition to Paramount] are generally considered to be Warner Brothers, Universal Studios, Twentieth Century Fox, Sony Pictures, Disney and MGM/UA." (Def. Ex. 1 at 39.)

Moreover, Paramount has offered a report and testimony by its own foreign pre-sales expert, William Shields, even though Shields's Major Studio experience is more limited than that of Sands. Whereas Sands handled international distribution (including pre-sales) for MGM in the mid-2000s, and handled domestic distribution for Columbia Pictures in the late 1990s, Shields "was a salesman and a branch manager" for MGM in the 1970s, selling films only domestically to theaters in Los Angeles, Salt Lake City, and Denver, and was a "branch manager" for Twentieth Century Fox also in the 1970s, selling films domestically to theaters on the east coast. (Ex. 4 at 69:19-70:22, 86:22-87:8.) That limitation did not impede Paramount from offering Shields as its foreign pre-sales expert.

Also revealingly, whereas Paramount now disingenuously questions Sands's credentials, Paramount's own film industry damages expert, Robert Wunderlich, does not. Wunderlich testified during his deposition in this case as follows:

Q:      You are not aware of any methodology by which one could divine [which of the Melrose Slate of films should have been pre-sold]?

A:      I myself am not. *But I think if you look at parties such as Mr. Sands, who actually have experience in picking films to sell and how to sell them, that perhaps someone with that type of background might be able to devise a strategy or to comment on how it might be done.* But that's not my scope of analysis.

(Ex. 5 at 223:23-224:17 (emphasis supplied).)

Regardless of this split between Paramount and its own experts as to Sands's credentials to opine upon foreign pre-selling of films, the law is clear that "[d]isputes as to the strength of [an expert's] credentials, faults in his use of differential etiology as a methodology, or lack of textual authority for his opinion, go to the weight, not the admissibility, of his testimony." *McCullock v. H.B. Fuller Co.*, 61 F.3d 1038, 1043-44 (2d Cir. 1995) ("[Defendant's] quibble with [the expert's] academic training . . . and his other alleged shortcomings . . . were properly explored on cross-examination and went to his testimony's weight and credibility – not its admissibility.") (citation omitted); *see also In re Zyprexa Prods. Liab. Litig.*, 489 F. Supp. 2d at 282 ("If the expert has educational and experiential qualifications in a general field closely related to the subject matter in question, the court will not exclude the testimony solely on the ground that the witness lacks expertise in the specialized areas that are directly pertinent.") (citing *Stagl v. Delta Air Lines*, 117 F.3d 76, 80 (2d Cir. 1997)); *Semerdjian v. Littell*, 641 F. Supp. 2d 233, 245 (S.D.N.Y. 2009) (holding that "[the expert's] two decades of experience in textbook selection, even if that experience primarily involved state-wide, rather than district or local, selection practices, constitutes a sufficient basis for him to reach the inferences he does") (citation omitted).

Paramount's argument that Sands is unqualified should be rejected.

7

**B.    Sands's Specialized Knowledge And Testimony Will Be Helpful To The Jury**

The international pre-selling of films is not a self-apparent subject matter.  This point was proved by Paramount's damages expert, Robert Wunderlich, who, as noted above, conceded that he does not "actually have experience" in foreign pre-sales and that such an area was "not [his] scope of analysis."  (Ex. 5 at 223:23-224:17.)  Sands's ability to explain why and how the Melrose Slate of films could have been pre-sold internationally will help the jury understand an otherwise opaque subject matter.

Paramount's contention that Sands's testimony will not be helpful and would be "completely irrelevant" is nonsense.  (Def. Br. No. 1 at 3, 21.)  In fact, Paramount's counsel repeatedly questioned Plaintiffs' witnesses about whether they had conducted any "study" of whether foreign pre-sale opportunities existed at the relevant time for the films in the Melrose Slate – *i.e.*, the very subject of Sands's opinion and an obviously relevant topic.  (Ex. 6 at 233:14-235:9.)

In a display of disingenuous bootstrapping, Paramount argues that because Paramount elected not to engage in foreign pre-sales for most of the films in the Melrose Slate, and elected instead to pursue "shared pot deals" and other kinds of transactions for a number of films where Paramount bargained away its foreign distribution rights, then Sands's analysis is inapt.  (Def. Br. No. 1 at 17, 22.)  This, of course, misses the point of Sands's opinion.  As Sands explained during his deposition, his opinion addresses what Paramount "could have" pre-sold the Melrose Slate of films for had Paramount chosen *not* to bargain away its foreign distribution rights.  (Ex. 2 at 139:9-141:18.)  Paramount's actual practices involving the Melrose Slate do not impact Sands's opinion one bit.

Paramount's further argument that it will be unduly prejudiced by Sands's testimony is

equally unavailing. Paramount fails to explain its assertion of "prejudice" other than to claim "that the hypothetical availability of pre-sales somehow suggests that Paramount defrauded plaintiffs," which Paramount says may "mislead jurors." (Def. Br. No. 1 at 21.)

While Paramount leaves it to the Court to speculate what this statement is supposed to mean, the fact is that Sands has not been offered to testify about Paramount's intentions or actions at the time, or about any ultimate legal issues. Paramount knows this: its counsel questioned Sands at a deposition and established that Sands is "certainly not opining whether or not Paramount committed fraud in this case." (Ex. 2 at 11:24-12:14.) Accordingly, Paramount's "unfair prejudice" argument is baseless and should be rejected. *See also United States v. Rubin*, No. 92 CR 1195, 1993 U.S. Dist. LEXIS 8299, at *9 (S.D.N.Y. June 17, 1993) (rejecting conclusory assertion that expert opinion would cause "unfair prejudice").

**C.    Sands's Opinion Offers Reliable Principles And Methods**

"The test for reliability is flexible, especially…where [the expert witness's] expertise is non-scientific and is based on his experience." *In re Methyl Tertiary Butyl Ether Prods. Liab. Litig.*, No. 1:00-1898, MDL 1358 (SAS), M21-88, 2008 U.S. Dist. LEXIS 37331, at *22 (S.D.N.Y. May 7, 2008).

Sands's written report explains his methodology in detail. Sands explains that, having negotiated and pre-sold hundreds of films, he has learned that there are four "Key Elements" of Major Studio films about which foreign distributors worldwide most care: (1) does the film have an "Acclaimed Director"; (2) does the film have immediately "Recognizable Acting Talent"; (3) is the film a "Big Budget" production that will include special effects, ornate sets and costumes, and diverse, on-location filming; and (4) will the film be supported by domestic distribution in the United States by a Major Studio, including the Major Studio's domestic print and advertising

9

(or "P&A") support that will help to build "buzz" or "heat" for the film. (Ex. 1 at 11-17.) *See*
*Barrera v. Brooklyn Music*, 346 F. Supp. 2d 400, 409-10 (S.D.N.Y. 2004) (accepting expert
testimony estimating a reasonable license fee for photographs where expert applied factors such
as "type of use," "circulation," and "size of the image . . . in relation to the materials in which it
is used").

Each of Sands's Key Elements is supported with footnoted citations to other recognized
industry authorities and publications, such as *Filmmaker Magazine*, *The Hollywood Economist*,
and *The Hollywood Reporter*. (Ex. 1 at 11-17.) *See Hollman v. Taser Int'l, Inc.*, 928 F. Supp. 2d
657, 670 (E.D.N.Y. 2013) ("'As a general rule, the factual basis of an expert opinion goes to the
credibility of the testimony, not the admissibility, and it is up to the opposing party to examine
the factual basis for the opinion in cross-examination.'") (citations omitted); *see also Cedar
Petrochemicals, Inc. v. Dongbu Hannong Chem. Co.*, 769 F. Supp. 2d 269, 286 (S.D.N.Y. 2011)
("[T]here is no requirement that 'an expert must back his or her opinion with published studies
that unequivocally support his or her conclusions.' . . . '[L]ack of textual support may go to the
weight, not the admissibility of the expert's testimony.'") (citations omitted); *Ulico Cas. Co. v.
Clover Capital Mgmt., Inc.*, 217 F. Supp. 2d 311, 318 (N.D.N.Y. 2002) ("Attacks relating to. . . .
lack of textual authority for the opinion all are improper criteria for advancing a motion under
702.") (citations omitted).

Paramount disingenuously suggests that Sands ignored contrary "research, studies, or
other generally accepted support for expert testimony." (Def. Br. No. 1 at 24.) Nevertheless,
Paramount fails to point to a *single* contradictory industry publication, let alone any supposedly
contradictory "research" or "studies." Nor does Paramount dispute that the authorities cited by
Sands are relevant industry sources of information.  In any event, and whatever "generally

accepted support" Paramount may have in mind (if at all), the Supreme Court established long ago that "general acceptance" is not a prerequisite to admissibility under Federal Rule of Evidence 702. *Daubert*, 509 U.S. at 597.

Perhaps more importantly, Paramount's own rebuttal expert, William Shields, *admitted* during his deposition, repeatedly, that he **"agrees"** with Sands's identification of each of these elements. (Ex. 4 at 227:20-228:9, 229:16-234:7.) Shields admitted, for example, that Sands "is generally correct, however, that actors and actresses who have been nominated for or won Academy Awards for acting generally increase pre-sale interest"; that Sands is "generally correct" that "directors are far more important to the success of a film in foreign territories than domestically"; that Sands "is generally correct that domestic distribution by a major studio may raise foreign pre-sale interest"; and that Sands is correct in stating that "Major Studios have the advantage of being able to select higher-cost films to produce that include better-known stars and accomplished directors ...[,] expensive special effects, costumes, ornate sets, and diverse shooting locations" (*i.e.*, the Key Element of being able to produce big budget films). (*Id.*). (Shields also testified to his "general" agreement about most of Sands's background discussion about the foreign pre-sales market. (*See generally* Ex. 4 at 185:21-208:17.)

Shields merely testified that he would ascribe different weight or "emphasis" to Sands's Key Elements, and that he (Shields) would include a film's genre as another element to consider. (Ex. 4 at 227:20-228:9, 229:16-234:7.) The appropriate weighting of methodological factors by dueling experts is indisputably for the jury to resolve. *E.g.*, *Playtex Prods. v. Procter & Gamble Co.*, No. 02 CIV. 8046 (WHP), 2003 U.S. Dist. LEXIS 8913, at *5 (S.D.N.Y. May 28, 2003) ("criticisms targeting the methodology" of survey, and by extension expert testimony, "relate to the weight to be afforded to the survey, not its admissibility") (citations omitted).

11

Moreover, Sands explained in detail during his deposition and in his report why he disagrees with Shields's weighting of the elements, and why Shields's identification of "genre" as a Key Element is incorrect when analyzing the foreign pre-sale viability of Major Studio films, as contrasted with Independent Studio films (which is Shields's only real area of experience). (Ex. 1 at 16; Ex. 2 at 57:11-59:8, 78:6-79:15.)  As Sands explained:

> If you're selling low budget movies that don't have a named director, don't have any recognizable talent, acting talent, or low budget and don't have major studio distribution North America, this [the film's genre] is the way that you would generally review and consider [foreign pre-sale] pricing, because you don't have any of the other key elements.  *Genre becomes more important, when you don't have those elements.* . . .  It's a little bit of a different mindset and I get it, I know what Bill Shields was doing.  If you have a million to $3 million budget, generally it's not a theatrical movie in North America.  So you have to really look at selling it in different ways than selling bigger movies.

(Ex. 2 at 57:11-59:8 (emphasis supplied).)[4]  *See also Cedar*, 769 F. Supp. 2d at 287 ("'The grounds for the expert's opinion merely have to be good, they do not have to be perfect.  The judge might think that there are good grounds for an expert's conclusion even if the judge thinks that there are better grounds for some alternative conclusion . . . .'") (citations omitted).

Sands further explains what each of the Key Elements he has identified means and how each is measured by objective criteria.  These criteria are not "entirely in Mr. Sands's head," or "just made [] up" by Sands, or "hopelessly vague," or stated without a "clue as to how anyone might replicate his analysis," as Paramount cries at various points in its brief.  Again, the Key Elements are supported by industry authorities – and Paramount's rebuttal expert had no difficulty understanding them and agreeing with them – and the specific criteria that illustrate the Key Elements are not imagined or invented in Sands's own head but are based upon his actual

---

[4] Shields applies his experience in Independent Studio foreign pre-sales through a publication known as "The Going Rate," which, in a further nod to the existence of a foreign pre-selling market, publishes prevailing territorial pre-selling rates for independent films in *The Hollywood Reporter*.  (Ex. 1 at 9-10 & nn.7-8; Ex. 2 at 51:12-59:8.)

interactions with foreign distributors in pre-sale negotiations. (Ex. 1 at 8-9, 11-17; Ex. 2 at 105:21-106:19.)[5]

Sands explains that when a foreign distributor asks if a film includes an **"Acclaimed Director,"** what the distributor specifically wants to know is whether the director has: "directed a film that was invited to be part of a major intentional film festival," "directed a film that won an award in competition at a major international film festival," "directed a film that was nominated for, or won, one or more Academy Awards," and/or "directed a financially successful motion picture previously." (Ex. 1 at 12.) As Sands explains: "[t]he last credit of any film is that of the director because it is universally recognized that the director is the creative force behind a film," and the identity of the director is thus "[o]ne of the most important elements to a film's foreign audience appeal." (*Id.*) Sands's opinion in this regard is experiential, not subjective. *See Dandong v. Pinnacle Performance Ltd.*, No. 10 Civ. 8086 (JMF), 2013 U.S. Dist. LEXIS 150259, at *45 (S.D.N.Y. Oct. 17, 2013) ("Defendants also contend that the Wolson Declaration represents nothing more than Wolson's subjective opinion, unmoored from any verifiable methodology. But Wolson's opinion regarding the importance of the omitted or allegedly misleading information is based on his experience in the structured finance industry, and experts are permitted to provide such experiential testimony so long as they 'explain how

---

[5] Sands testified that he identified his "Key Elements" and the specific criteria therein first by drawing upon his own, deep experience. (Ex. 1 at 8-9, 11-17; Ex. 2 at 105:21-106:19.) After doing so, he researched secondary sources to validate and confirm his thinking, or to see if there was anything that contradicted his thinking. (*Id.*) Sands found nothing to contradict his identification of the Key Elements – which is to be expected where Paramount's rebuttal expert concurs with Sands's identification of such elements – and he cited a number of secondary sources to support his thinking. (*See generally* Ex. 1 at 7-17 & nn.1-17.) Paramount complains about this approach and suggests that Sands should have approached his task more like a book report and should have recounted any literature first and, presumably, drawn upon his experience second. That is a baseless complaint. As discussed above, Sands was absolutely entitled to rely primarily upon his own specialized knowledge, skill and training in identifying the Key Elements and the criteria therein. *E.g.*, Fed. R. Evid. 702. Paramount misrepresents the record when it claims that Sands "shockingly" formed conclusions first and then "search[ed] for data to back them up." (Def. Br. No. 1 at 1.) The only expert who acted inappropriately and purely as a hired gun to form ends-based conclusions dictated by his client is Paramount's damages expert, Robert Wunderlich, as described in Plaintiffs' prior Rule 37 motion addressed to Mr. Wunderlich's report.

[their] experience leads to the conclusion reached and how [their] experience is reliably applied to the facts.'") (citations omitted); *Semerdjian*, 641 F. Supp. 2d at 244 (" [The expert] posits that in his experience with state academic standards and other written criteria, illustrations, especially in secondary school language arts texts, have never been the basis for selection and that he has never heard anyone advocate for one literature textbook over another on the basis of its illustrations.").

Sands also explains that when a foreign distributor asks if a film includes **"Recognizable Acting Talent,"** the distributor wants to know if the actor has:  "been part of a big box office film or films in the past," "been in a film that was invited to be part of a major international film festival," "been part of a film that won an award in competition at a major international film festival," "been nominated for or won Academy Awards," "demonstrated noteworthy acting skill in connection with multiple motion pictures that received international notoriety," and/or "is charismatic and has done well at choosing successful movie projects in the past, which has allowed the actor or actress to generate his/her own momentum and popularity."  (Ex. 1 at 13.) Sands explains that "[a] big name actor can substantially enhance the foreign pre-sale value of a movie by making the movie relatively easy to market among the foreign audience based on the actor's name and/or face recognition alone."  (*Id.*)

Sands additionally explains that, "[i]n [his] experience, there is a perceived correlation between a film's budget level and quality:  *i.e.*, the higher a film's budget, the greater the perception that the film will be of a higher production quality and, thus, more successful.  [He] learned this by selling high, low and mid-budget movies to foreign territories around the world." (Ex. 1 at 13-14.)  Notwithstanding Paramount's feigned inability to understand what a **"big budget"** film may be, (Def. Br. No. 1 at 15), Sands explains that they are films "that include

14

better-known stars and accomplished directors – who command substantially higher compensation – expensive special effects, costumes, ornate sets, and diverse shooting locations." (Ex. 1 at 6-7.)  Sands further explains, with citations to external authorities, that "[t]here is great demand for U.S. studio-made films around the world:  in or about 2005, approximately 85% of the worldwide box office was comprised of films produced by the Major Studios in the United States."  (Ex. 1 at 7 & nn.1-3.)

Finally, Sands explains that when there is **"distribution of a film in the U.S. by a Major Studio,"** "foreign buyers perceive that decision to constitute an endorsement of the film's quality and market viability by the Major Studio, which is putting its own considerable resources behind the film."  (Ex. 1 at 14.)  Sands explains, with citations to external sources, that this dynamic is a function of simple supply and demand:

> Major Studios spend tens of millions of dollars per movie to market and create awareness and what is known in the trade as "want to see" within the U.S. . . . They do this, in substantial part, by generating their own market awareness (or "heat") for a movie in advance of the movie's release through their enormous marketing and promotional efforts.  Because most of the Major Studios do not frequently engage in foreign pre-sales of their films, when a Major Studio offers one of its films for foreign pre-sale, that film generally becomes one of the most sought after and desirable films for foreign pre-sale at the international markets and film festivals.

(Ex. 1 at 14 & n.15.)

"In addition," Sands explains, "when a Major Studio offers one of its films for foreign pre-sale, the Major Studio will generally provide the foreign Buyer with access to marketing materials that the Major Studio already spent millions of dollars creating.  This means the foreign Buyer need not spend money itself to create similar marketing materials (*e.g.*, posters, theatrical trailers, dubbing tracks, television spots, electronic press kits), and thus has more money to pay a higher foreign pre-sale price."  (Ex 1 at 15-16.)  According to Sands:  "This point cannot be

over-emphasized: my years of experience in overseeing both domestic and international marketing and distribution of motion pictures allowed me to learn how domestic distribution can and does propel foreign demand." (Ex. 1 at 14-15.)

Lastly, Sands explains that "a film with fewer (or no) Key Elements (*i.e.*, a 'Non-Driver Film') can be sold at the same time and to the same foreign Buyer as a film with more Key Elements (*i.e.*, a 'Driver Film'). In this sales dynamic (a **"Tandem Sale"**), the Driver Film is sold for its full pre-sale value but the Buyer is also required to purchase the Non-Driver Film for greater value than the Buyer otherwise would have paid had the film been sold by itself." (Ex. 1 at 17.)

Paramount contends that the "Tandem Sale" concept "has no basis in reality since Sands cites to no evidence that Paramount had ever engaged in a tandem sale for any film during the five-year period preceding the Melrose Slate": *i.e.*, the period of the Historical Data Set ("HDS") of films, which spanned 1998-2003. (Def. Br. No. 1 at 19.) In fact, Sands testified during his deposition that he had seen documents evidencing tandem sales by Paramount during that time period, but Paramount's counsel elected not to follow up. (Ex. 2 at 119:17-121:15.) Had there been follow up, Sands could have directed Paramount to the exhibits accompanying this brief, which are just two examples bookending the HDS time period and include Tandem Sale agreements by Paramount in August 1998 (for *Runaway Bride* as the Driver Film and *The Next Best Thing* as the Non-Driver Film), and in July 2003 (for *The Italian Job* as the Driver Film and *Timeline* as the Non-Driver Film). (Ex. 16.) These documents were subsequently marked as exhibits at Shields's deposition (*id.*) – it is outrageous for Paramount to act like it has never seen such evidence.

Sands's methodology is grounded, objective, and, as demonstrated by Paramount's

rebuttal expert's agreement with and validation of Sands's "Key Elements" and Paramount's past use of Tandem Sales, verifiable.

**D.**    **Sands Reliably Applies His Methodology To The Melrose Slate Of Films**

In his report, Sands faithfully and exhaustively applied the Key Elements and his experience to opine about the likely foreign pre-sale value of each of the 25 films in the Melrose Slate. (Ex. 1 at 17-35.) Sands explained to Paramount's counsel during his deposition that he arrived at reasonable pre-sale values on an "absolute basis," meaning he determined dollar ranges of potential pre-sales based upon the Key Elements, and then identified what percentage of the film's budget that pre-sale value could have constituted. (Ex. 2 at 97:8-98:22.)[6]

Paramount falsely accuses Sands of not taking into account the secondary consideration of film genre and local territorial preferences. In fact, Sands did so throughout his analysis of the Melrose Slate of films, while nonetheless also making clear that genre can only mitigate a Major Studio film's pre-sale value when Key Elements exist, not destroy that pre-sale value. (Ex. 1 at p.26 (*Coach Carter*), p.27 (*The Longest Yard* and *The Honeymooners*), p.28 (*Bad News Bears*, which could have enjoyed even greater foreign pre-sale value from Japan due to that territory's fascination with the film's subject matter of baseball), p.31 (*Get Rich or Die Tryin'*).)

Examples of actual foreign pre-selling of the films in the Melrose Slate by Paramount are sparse because Paramount elected not to pre-sell the international rights for most of the films in the Melrose Slate. Paramount reports having engaged in foreign pre-sales for the films: *Suspect Zero, Sky Captain and the World of Tomorrow, The Weather Man, Aeon Flux*, and *Mission: Impossible III*. (Ex. 1 at 21-23, 30-31, 32, 34 (citations omitted).) Sands found that the Key

---

[6] Although Sands also offered to recite a territory-by-territory analysis for Paramount's counsel during his deposition (that was not what Sands was asked to do for his report because the report only needed to identify what aggregate international pre-sales "could have" been accomplished for the Melrose Slate), Paramount's counsel ignored Sands's offer. (Ex. 2 at 75:4-25).

Elements warranted a result consistent with the level of pre-sales reported by Paramount for *Suspect Zero*, but Sands otherwise found that the Key Elements warranted considerably higher foreign pre-sale possibilities for the other films listed. (*Id.*) Paramount and its rebuttal expert are welcome to try to convince a jury otherwise.[7]

Paramount's suggestion that Sands somehow disabled Paramount from verifying the underlying data for each of the 25 films in the Melrose Slate that Sands applied is specious. Sands's report specifically cites to every website page from which he obtained his data about the directors, actors and budgets for each film: *i.e.*, www.boxofficemojo.com, which is a source of box office performance information that is relied upon by the industry. (Ex. 1 at 18-34.) Although Paramount's counsel had initially indicated some confusion during Sands's deposition about whether Sands's source information was also attached as hard copies to his report, that confusion was explicitly clarified, on the record, and Paramount's counsel noted that the absence of hard copies of each website page was "[n]ot a big deal either way." (Ex. 2 at 114:22-115:10.) It is disingenuous for Paramount to try to make a "big deal" out of the same issue now by hyperbolically – and inaccurately – complaining that "Sands did not even retain much of the data he found, such that Paramount could challenge his analysis." (Def. Br. No. 1 at 1.)

Sands's opinion is reliable and the jury deserves to hear and consider it, particularly where the jury otherwise would be left to speculate about what "could have" been given Paramount's decision not to try to pre-sell most of the films in the Melrose Slate.

---

[7] Perhaps most starkly, Paramount reported foreign pre-sales of only $3.5 million for *Mission: Impossible III*, an unquestioned blockbuster and franchise film that could have earned about $150 million. (Ex. 1 at 34.)

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court deny Paramount's motion *in limine* Number 1, and grant Plaintiffs such other and further relief as the Court deems just and proper.

Dated: New York, New York
      October 13, 2014                    PRYOR CASHMAN LLP

                                        By: _/s James A. Janowitz_____
                                            James A. Janowitz
                                            William L. Charron
                                            Bryan T. Mohler
                                            Benjamin S. Akley
                                            Kathleen M. Prystowsky
                                   7 Times Square
                                   New York, New York  10036
                                   (212) 421-4100
                                   *Attorneys for Plaintiffs*

19