UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ALLIANZ RISK TRANSFER AG, MARATHON STRUCTURED FINANCE FUND, LP, NEWSTAR FINANCIAL, INC., and MUNICH RE CAPITAL MARKETS NEW YORK, INC., <br><br> Plaintiffs, <br><br> v. <br><br> PARAMOUNT PICTURES CORPORATION, <br><br> Defendant. | No. 1:08-CV-10420 (TPG) |

**MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTION *IN LIMINE*
TO EXCLUDE THE REPORT OF LAWRENCE ULMAN AND TO
<u>PRECLUDE ULMAN FROM TESTIFYING AT TRIAL</u>**

PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP
1285 Avenue of the Americas
New York, New York 10019-6064
Tel: (212) 373-3000

– and –

KENDALL BRILL & KLIEGER LLP
10100 Santa Monica Boulevard, Suite 1725
Los Angeles, CA 90067
Tel: (310) 556-2700

*Attorneys for Defendant*
*Paramount Pictures Corporation*

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................................................. iii

Preliminary Statement..............................................................................................................1

Background ..............................................................................................................................2

Argument .................................................................................................................................6

I.  THERE IS NO BASIS FOR EXCLUDING ULMAN'S EXPLANATION OF
    THE DIFFERENCE BETWEEN DIFFERENT TYPES OF CO-FINANCINGS ..............6

II. ULMAN SHOULD BE ALLOWED TO TESTIFY ON INDUSTRY PRACTICE
    AS TO CONTRACTUAL GUARANTEES OF FINANCING AND
    PERFORMANCE ...............................................................................................................8

Conclusion ..............................................................................................................................11

## **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Cary Oil Co.* v. *MG Ref. & Mktg., Inc.*,
   2003 WL 1878246 (S.D.N.Y. Apr. 11, 2003)..........................................................................3

*Gill* v. *Arab Bank, PLC*,
   893 F.Supp.2d 523 (E.D.N.Y.2012) ......................................................................................9

*In re Initial Pub. Offering Sec. Litig.*,
   174 F. Supp. 2d 61 (S.D.N.Y. 2001).....................................................................................7

*Media Sport & Arts s.r.l.* v. *Kinney Shoe Corp*,
   1999 WL 946354 (S.D.N.Y. Oct. 19, 1999) .........................................................................9

*Nimely* v. *City of New York*,
   414 F.3d 381 (2d Cir. 2005)..................................................................................................7

*Reach Music Pub., Inc.* v. *Warner Chappell Music, Inc.*,
   988 F. Supp. 2d 395 (S.D.N.Y. 2013) .........................................................................8, 9, 10

*In re Rezulin Products Liab. Litig.*,
   309 F. Supp. 2d 531 (S.D.N.Y. 2004)...................................................................................7

*SR Intern. Bus. Ins. Co., Ltd.* v. *World Trade Center Props., LLC*,
   467 F.3d 107 (2d Cir. 2006)..................................................................................................9

**Other Authorities**

Fed. R. Evid. 702 ...........................................................................................................................2

**Preliminary Statement**

Plaintiffs move to exclude the testimony of Lawrence Ulman, a rebuttal expert offered by Defendant Paramount Pictures Corporation ("Paramount") to point out significant mistakes made by plaintiffs' experts. Plaintiffs' arguments for exclusion misstate the content of Ulman's testimony, misstate why that testimony is important, and are without legal basis.

In his expert report and deposition, Ulman distinguished between two types of film financing: long-term relationships with strategic partners, which Ulman called "strategic co-financings" and which are also referred to as "split-rights deals," on the one hand, and "territorial pre-sales" on the other. Ulman criticized plaintiffs' experts on liability and damages for conflating the two kinds of financing.

Plaintiffs now argue that Ulman purportedly "conceded" at his deposition that the two kinds of financing "are exactly the same," and seek to exclude his testimony on that basis. [Pls. Mem. at 1 (Dkt. No. 121).] This is false, and there was no concession. Plaintiffs' argument is based on no more than excerpting out-of-context deposition testimony to manufacture a purported "concession." [Pls. Mem. at 4–7.] The Court should not countenance such tactics. Instead, Ulman explained that Paramount's relationship with certain co-financing partners, such as Lakeshore and Mutual, were strategic relationships that were far different in nature and purpose than the traditional "territorial pre-sales" model. This testimony is relevant to rebutting plaintiffs' experts, both of whom treat the two types of financing as one.

Plaintiffs also seek to exclude another area of testimony by Ulman, concerning custom and practice in the motion picture industry. Based on his experience in similar negotiations and transactions, Ulman concluded that, as a matter of ordinary industry practice, investors in films who wish for specific assurances of expected performance (such as a cap on expenditure, or a requirement to use a particular type or level of co-financing) will as a matter of

course negotiate those provisions specifically in written agreements. This testimony is highly relevant to core issues in this 10b-5 case—including reasonable reliance, materiality, and the existence of an actionable misrepresentation of fact. Plaintiffs argue that this testimony should be excluded because "[m]erely saying that people can and do ask their lawyers to negotiate for things" is not the kind of specialized knowledge appropriate for expert testimony under Federal Rule of Evidence 702. [Pls. Mem. at 7.] But that is not Ulman's testimony. Rather, Ulman will testify that, under practice specific to the major motion picture industry, film financing contracts where one party wants specific assurances that a studio will continue to operate in a particular way for particular films contain specific guarantee provisions. Even though no guarantee provision was present here, plaintiffs' damages expert assumed that Paramount had committed to an implied financing guarantee. Ulman demonstrated in his expert report, and will demonstrate at trial, that this assumption of plaintiffs' expert was in error. Similar expert testimony on industry custom and practice is routinely admitted by courts, and the Court should admit Ulman's testimony here.

## Background

Ulman is a prominent, long-standing, extremely knowledgeable motion picture attorney and consultant. Prior to his retirement, he served as the co-chair of the media, entertainment, and technology group at Gibson Dunn & Crutcher, LLP. In approximately 39 years as a lawyer and consultant in the film and media industries Ulman, among other things, negotiated and documented film slate financings and film financing transactions for almost every major motion picture studio, including Universal Pictures, Warner Bros., Twentieth Century Fox, and others. [Declaration of James A. Janowitz In Support of Plaintiffs' Motion *In Limine* to Exclude the Report of Lawrence Ulman and to Preclude Ulman from Testifying at Trial ("Janowitz Declaration") Exhibit 1 at 2-4.] Ulman negotiated and documented an enormous

range of complex film investments, and has enormous expertise in film financing transactions. Plaintiffs neither do, nor could, challenge Ulman's qualifications or ability to testify as an expert on the subjects as to which he will testify at trial. There are few people with a similar level of knowledge and expertise in motion picture finance. Simply by providing this level of expertise and explanation concerning the complex world of the motion picture industry, Ulman will provide a useful service to the jury. *See Cary Oil Co.* v. *MG Ref. & Mktg., Inc.,* 2003 WL 1878246 (S.D.N.Y. Apr. 11, 2003) (admitting industry experts for purpose of explaining nature of industry to jury).

Plaintiffs' liability case, expert testimony, and theory of damages are all based on the presumption that Paramount used a film-financing technique called "territorial pre-sales." Plaintiffs' basic theory of the case is (a) that Paramount had, in the years prior to the plaintiffs' investment, engaged in "territorial pre-sales" or "international territorial sales," (b) that Paramount somehow falsely represented to the plaintiffs that it would continue these "territorial pre-sales" into the future, and (c) that plaintiffs relied on this misrepresentation to their detriment. [*See* Third Amended Complaint ("TAC") ¶ 41 ("From 1998 to 2003, Paramount distributed a significant percentage of its films internationally through the use of international territorial sales, also known as international 'pre-sales,' whereby third-party distribution companies purchased the right to distribute a film in specific foreign countries and territories in exchange for a fixed sum, or minimum guarantee.").] Plaintiffs' two experts also relied on the premise that Paramount had routinely engaged in such "territorial pre-sales" prior to plaintiffs' investment and had an ongoing duty to continue to engage in such "territorial pre-sales." Plaintiffs' liability expert, Rick Sands, analyzed (in an arbitrary and unjustifiable expert opinion, as to which Paramount has filed a separate motion *in limine*) the hypothetical question of "had

3

Paramount desired to enter into the risk-mitigation process known as foreign pre-sales, what foreign pre-sale levels would have been reasonable to expect." [*See* Omnibus Declaration of Patrick J. Somers, dated October 7, 2014, ("Somers Omnibus Declaration") Exhibit 16 at 5.] Plaintiffs' damages expert, Phillip Fier calculated damages by assuming that Paramount had used the territorial pre-sale technique in the past and would continue to use it into the future. [Somers Omnibus Declaration Ex. 17 at 9–11, 31–34.]

Ulman, based on his knowledge as one of the world's foremost experts in film financing (expertise that the plaintiffs do not contest), will explain to the jury that plaintiffs' presumption that Paramount used territorial pre-sales is incorrect. Ulman will also explain that plaintiffs were also wrong to conflate the concepts of "territorial pre-sales" with another type of co-financing.[1] Rather, Ulman will explain that Paramount, with some exceptions, generally had *not* engaged in "territorial pre-sales" prior to the plaintiffs' purchase of securities.

In his expert report and deposition testimony, Ulman explained that, in a "territorial pre-sale," a studio simply sells rights to revenues from a foreign territory (e.g., France, Germany, or Latin America) in exchange for a set amount of money, a "minimum guaranteed license fee." [Janowitz Declaration Ex. 1. at 4.] This kind of financing is not generally attractive to a "major" film studio such as Paramount. [*Id.*] Smaller or independent studios (for example, Lions Gate or the Weinstein Company), find territorial pre-sales attractive because they can use the minimum guaranteed license fee as collateral for loans to fund production, and because they do not have their own international distribution networks. [Janowitz Declaration Ex. 1. at 4.] Major studios like Paramount typically do not use territorial pre-sales, since they have other sources of financing and their own international distribution

---

[1] There are, of course, numerous other fatal problems with plaintiffs' theory of the case, not directly raised by this motion.

networks. [Janowitz Declaration Ex. 1. at 5–6.] In the period prior to plaintiffs' investment, based upon Ulman's review of the record, Paramount did not significantly rely upon territorial pre-sales. [Janowitz Declaration Ex. 1. at 5.] This testimony rebuts the contrary testimony of plaintiffs' experts.

Instead of territorial pre-sales, Paramount, both before and after the plaintiffs' investment, sought to enter into long-term arrangements with various partners that Ulman calls either "strategic co-financings" or "split-rights deals." (Ulman used the terms "strategic co-financing and "split rights deals" interchangeably, and distinguished Plaintiffs' use of the term "split-rights" deals to mean territorial pre-sales.) [Janowitz Declaration Ex. 1. at 5–6.] In these "strategic co-financing" or "split-rights" arrangements, the partner was not a simple purchaser of foreign rights. [*Id.*] Rather, in strategic co-financing, an investor, typically a long-term financial partner of the studio and/or a partner with an overall producing deal with the studio that provides for payment of some overhead expenses, finances a portion of the cost of producing a film and in exchange receives distribution rights in a substantial group of or all foreign markets. [*Id.*] Examples of such a long-term partner for Paramount include Lakeshore Entertainment Group. [*Id.*] The deal is made, not to get a short-term infusion of cash to use as collateral or to handle a distribution problem, but as part of a longer-term strategic relationship between the studio and a business partner. [*Id.*] Ulman's observation about the differences between these two kinds of financing is based directly upon his industry experience and his extensive knowledge of financing arrangements at different levels of the film industry. [Janowitz Declaration Ex. 1 at 4–7.]

Ulman also explained in his expert report (and will testify at trial) how and when assurances of expected performance are negotiated in film financing transactions. Based upon

his extensive personal experience in the industry, including negotiating similar provisions, Ulman concluded that there is no industry custom or practice of providing "implied" guarantees of particular performance (such as a guarantee that a film slate would be financed in a particular way, that costs would not exceed a certain level, etc.). In Ulman's expert opinion, "assurances of expected performance" in film financing transactions are "heavily negotiated and included in the governing agreements." [*Id.* at 7.] This directly rebuts the conclusions of plaintiffs' damages expert, Phillip Fier, who concluded that even though no performance guarantee was present here, the plaintiffs were nonetheless entitled to damages based on an (allegedly) implicit guarantee by Paramount to continue financing its films in a particular way. [*Id.*]

## Argument

### I. THERE IS NO BASIS FOR EXCLUDING ULMAN'S EXPLANATION OF THE DIFFERENCE BETWEEN DIFFERENT TYPES OF CO-FINANCINGS

Plaintiffs do not contend (and could not contend) that Ulman has no expertise to testify as to film finance issues. Ulman is clearly qualified to testify to the difference between "territorial pre-sales" and "split-rights/strategic co-financing" transactions. Nor do plaintiffs contend that Ulman could not, based on his long experience within the industry, reliably distinguish between different types of film financing. Rather, plaintiffs have only one argument for excluding Ullman's testimony on this issue. Plaintiffs assert that, in deposition testimony, Ulman somehow "conceded" that territorial pre-sales and split-rights/strategic partnerships are "exactly the same" and that any difference is "merely a matter of nomenclature." There was no such concession. Ulman never renounced his expert report to any extent whatsoever. Ulman nowhere stated, or even implied, that "split-rights deals/strategic co-financings" are the same as "territorial pre-sales." To the contrary, Ulman explained that, in his opinion, Paramount's relationships with Lakeshore and Mutual were fundamentally different than traditional territorial

6

pre-sales. [Declaration of Patrick J. Somers in Support of Defendant's Opposition to Plaintiffs' Motion *In Limine* to Exclude the Report of Lawrence Ulman and to Preclude Ulman from Testifying at Trial ("Somers Opposition Declaration") Exhibit 1 at 35:14–18, 57:23–61:23, 87:14–88:5, 94:6–18, 97:19–24, 110:23–111:25.]   That Ulman stated that there is (unsurprisingly) some variance in terminology to describe deals does not, in any way, undermine Ulman's fundamental distinction between the two kinds of financing.  Plaintiffs' argument simply misconstrues the record.

Plaintiffs also point to a passage where Ulman testified at his deposition that split-right and territorial pre-sale financing is *similar* in a specific, limited, and narrow sense.  [Pls. Mem. at 4–6; Somers Opposition Declaration Ex. 1 at 99:6–18 (describing similarity on "limited issue").]  Ulman testified that under both the split-rights deal and the territorial pre-sale, a second party pays money for distribution rights, funds that then go to the studio.  [*Id.*]  This passage does not help plaintiffs.  Conceding the completely unremarkable point that both territorial pre-sales and split-rights deals involve payments to a studio is hardly a concession that the two types of financing are the same thing.  The passages cited by plaintiffs simply do not support plaintiffs' suggestion that Ulman "conceded" the core conclusion of his expert report.  Ulman stands by the conclusions of his expert report, and his testimony should be admitted.[2]

---

[2] No case cited by plaintiffs even remotely supports excluding the testimony.  Plaintiffs cite to the *Daubert* and *Kumho Tire Co.* cases, only for general propositions of law.  None of the other cases cited by plaintiffs are remotely on point.  *In re Rezulin Products Liab. Litig.*, 309 F. Supp. 2d 531, 542 (S.D.N.Y. 2004) (vague testimony by "ethics experts" who cited no governing standards inadmissible as unreliable and entirely subjective); *Nimely* v. *City of New York*, 414 F.3d 381, 398 (2d Cir. 2005) (testimony by expert concerning "credibility" of testimony given by police officers inadmissible); *In re Initial Pub. Offering Sec. Litig.*, 174 F. Supp. 2d 61, 66 (S.D.N.Y. 2001) (admitting expert opinion on an issue of law in the context of a motion for attorney recusal was improper).

7

## II. ULMAN SHOULD BE ALLOWED TO TESTIFY ON INDUSTRY PRACTICE AS TO CONTRACTUAL GUARANTEES OF FINANCING AND PERFORMANCE

Courts routinely allow expert testimony concerning industry custom and practice in business negotiations, when that testimony applies specialized knowledge to facts relevant to an issue before the jury. In *Reach Music Pub., Inc.* v. *Warner Chappell Music, Inc.*, 988 F. Supp. 2d 395, 405 (S.D.N.Y. 2013), for example, a court in this District allowed an experienced entertainment attorney to testify about industry custom and practice, where the issue was whether a party should, after negotiations, have had actual knowledge of a certain contractual arrangement. The expert was retained to testify concerning alleged "statements and conduct" during negotiations that were "contrary to the custom and practice in the music industry." *Id.* at 399–400. The court found that such evidence was relevant, reliable, and admissible. The testimony provided "circumstantial evidence" based on "custom and practice" in the industry. *Id.* at 403. The Court explained that the industry expert's testimony would be helpful to the jury by preventing them from reaching unwarranted conclusions about what should or should not have been done in the contractual negotiations, without the benefit of expertise as to ordinary practice. *Id.* (noting that "a juror with no knowledge of the entertainment industry might be reluctant to draw" certain inferences from the evidence; a juror, without the benefit of expert testimony, "might assume that it is normal practice in the music industry" for certain things to be done in a negotiation).

In reaching these conclusions, the *Reach Music* court drew from the very long line of Southern District and Second Circuit cases permitting expert testimony on industry custom and practice, particularly when such custom and practice is relevant to understanding the terms of a business negotiation. *Id.* at 403 (citing *Media Sport & Arts s.r.l.* v. *Kinney Shoe Corp.*, 1999 WL 946354, at *3 (S.D.N.Y. Oct. 19, 1999) (admitting expert's opinion "regarding the customs

8

and practices of the sports industry, an analysis of whether the conduct of the parties in this action conformed to those customs, and whether such behavior evidences the parties' intent to be bound by contract")); *Gill* v. *Arab Bank, PLC*, 893 F.Supp.2d 523, 537 (E.D.N.Y.2012) (allowing experts to testify about custom and practices of the banking industry because such testimony "[would] be valuable to a jury likely to be unfamiliar with such topics"); *SR Intern. Bus. Ins. Co., Ltd.* v. *World Trade Center Props., LLC*, 467 F.3d 107, 133 (2d Cir. 2006) (admitting expert testimony as to custom and practice concerning "the proper interpretation of [a] construction contract" and "pre-bid conditions").

   Here, Paramount seeks to offer Ulman's testimony on industry custom and practice in the motion picture industry concerning "guarantees" for film performance. [Janowitz Declaration Ex. 1 at 6–7.] Ulman's testimony on this issue is highly relevant circumstantial evidence that should be admitted under the extensive law permitting expert testimony on industry custom and practice in business negotiations.

   Plaintiffs and their experts have interpreted the underlying documents at issue in this case—the Revenue Participation Agreement ("RPA") and Private Placement Memorandum ("PPM")—to have impliedly guaranteed to them that Paramount would continue to engage in territorial pre-sales at the same level as during the prior five years. Putting aside all the reasons why this assumption is unsupportable on the record, the assumption of a guarantee underlies most aspects of plaintiffs' theory of this 10b-5 case. It goes to misrepresentation (plaintiffs interpret the PPM and RPA as providing a guarantee) and to reliance (plaintiffs claim to have reasonably relied on the non-existent guarantee). The assumption of a guarantee is also the basis of plaintiffs' theory of damages, since plaintiffs' expert, Phillip Fier, calculated damages based on an assumption that Paramount would continue to act precisely as it had in the past concerning

9

territorial pre-sales. [*See* Somers Omnibus Declaration Ex. 17 (Plaintiffs' expert calculates damages based on assessing "whether, if Paramount had employed the *same level* of risk mitigation techniques in the Melrose Slate as it had employed historically, would the performance of Plaintiffs' investment have improved.") (emphasis added).]

Ulman's expert testimony demonstrates that plaintiffs' assumption of an implied performance guarantee is unsupported by industry custom or practice. In the world of film finance, parties who want assurances of performance, such as the use of a particular level of foreign pre-sales, ask for and negotiate such assurances. [Janowitz Declaration Ex. 1 at 6–7.] But no such specific assurance was present here, or negotiated for. [*Id.*] Without Ulman's testimony about how film finance negotiations normally work, the jury may well be misled about critical facts concerning film finance—jurors might assume that the kinds of oblique references to "risk" in the relevant documents constituted an assurance of performance. Or, a juror might assume, without benefit of further knowledge, that it was reasonable for financiers of a film to assume a guaranteed level of risk management, even with no specific written guarantee. Ulman's testimony on these issues will undoubtedly be helpful to the jury, and provide precisely the kind of expert assistance on custom and practice that courts have long deemed admissible. *Reach Music Pub*, 988 F. Supp. 2d at 405. The Court should allow Ulman to describe how, in ordinary practice, film finance negotiations actually work.

**Conclusion**

For the foregoing reasons, the Court should deny plaintiffs' motion.


Dated:   October 13, 2014
         New York, New York

                        Respectfully submitted,

                        PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

By:   s/Allan J. Arffa
     Allan J. Arffa (arffa@paulweiss.com)
     Andrew J. Ehrlich (aehrlich@paulweiss.com)
     Patrick J. Somers (psomers@paulweiss.com)
     1285 Avenue of the Americas
     New York, New York 10019
     Tel: (212) 373-3000
     Fax: (212) 757-3990

     KENDALL BRILL & KLIEGER LLP
     Richard B. Kendall (rkendall@kbkfirm.com)
     Philip M. Kelly (pkelly@kbkfirm.com)
     10100 Santa Monica Boulevard, Suite 1725
     Los Angeles, California  90067
     Tel:  (310) 556-2700
     Fax: (310) 556-2705

     *Attorneys for Defendant Paramount Pictures Corporation*