

writer's direct:
310.272.7900 telephone
310.272.7936 facsimile
rkendall@kbkfirm.com

October 24, 2014

The Honorable Katherine B. Forrest
U.S. District Court, S.D.N.Y
Daniel Patrick Moynihan U.S. Courthouse
500 Pearl Street
New York, NY 10007

Re:   *Allianz Risk Transfer AG et al. v. Paramount Pictures Corp.*; Case  1:08-cv-10420 (TPG)

Dear Judge Forrest:

I write in response to Your Honor's invitation yesterday for the parties to submit their views on bifurcation of the liability and damage phases of this trial.  We believe such bifurcation would promote the efficient use of the Court's and the parties' time and resources.  It is especially appropriate here since, after a week of trial, plaintiffs have yet to produce any meaningful evidence in support of their claims.  Once plaintiffs rest on liability, those claims should be subject to dismissal under Rule 52(c).

The decision whether "to hold separate trials on liability and damages "'is ordinarily firmly within the discretion of the trial court.'"  *In re September 11th Litig.*, 2007 WL 1965559, at *2 (S.D.N.Y. July 5, 2007).  Under Federal Rule of Civil Procedure 42(b), "the court may order a separate trial on one or more separate issues" in order to "expedite and economize" or "[f]or convenience." Bifurcation would undoubtedly produce efficiencies here where "a verdict for [Paramount] on the issue of liability would obviate any presentation on damages." *Guidi* v. *Inter-Continental Hotels Corp.*, 2003 WL 1846864, at *2 (S.D.N.Y. April 8, 2003).  If plaintiffs do not meet their burden on liability, then there would there be no need to devote numerous trial days, and party resources, to hearing testimony from the parties' damages experts, Messrs. Fier and Wunderlich, both of whom are anticipated to be multi-day witnesses.

Bifurcation would also eliminate any need for the Court to decide numerous ancillary issues concerning damages, such as the admissibility of evidence concerning the 12 films following the Melrose Slate films.[1]  As this is a bench trial, bifurcation causes no jury inconvenience, and the parties would not be prejudiced since "the issues to be bifurcated are distinct," the witness overlap between the two issues is extremely minimal, and bifurcation would not extend the trial's duration.  *See Guidi*, 2003 WL 1846864, at *1.  Bifurcation is especially appropriate here since after three days of trial, and testimony by half of their witnesses, plaintiffs "ha[v]e yet to produce any meaningful proof" of their fraud claims.  *Mendell*, 938 F.2d at 1529.  To the contrary, the evidence to date establishes that plaintiffs simply have no claim (and that, at the conclusion of their case, the claims should be subject to dismissal under Rule 52(c)):

---

[1] There are additional legal issues requiring resolution in order to determine the amount of damages, if any, to which plaintiffs are entitled. For example, Plaintiffs have pleaded rescission as the sole remedy for their common-law fraud claim.  [TAC ¶ 115.]  However, rescission is unavailable here for a number of reasons, including that plaintiffs have not sued all of the actual parties to any agreement they seek to rescind.  [ECF No. 86 at 43-45.]  Paramount sought summary judgment on this issue, but it was, unfortunately, not addressed by Judge Griesa.

Kendall Brill & Klieger LLP    10100 Santa Monica Blvd.  Suite 1725  Los Angeles, CA 90067   telephone 310.556.2700  facsimile 310.556.2705  www.kbkfirm.com

October 24, 2014
Page 2

*First*, evidence to date has made clear that plaintiffs have expressly waived and released all of the claims that they assert here. Just as the Subscription Agreement, to which plaintiffs have all now stipulated that they are bound (Trial Tr. 479:23-480:20), waived plaintiffs' right to a jury trial, so too did plaintiffs waive and release "all claims" against Paramount "arising out of, or in connection with, the offering of the [Melrose] Securities," including whether the pictures "*will be distributed in any particular manner.*" [*Id.* ¶¶ 4(s), 4(t).] Plaintiffs' argument depends on the objectively unreasonable contention that the decision of whether to pre-sell the foreign distribution rights to a film does not concern "distribution." *See, e.g.,* Trial Tr. 575:16-18 ("Our position is 'distribute' is different from 'financing.'") However, plaintiffs 'complaint is clear that the case is about "distribution." [*E.g.,* TAC ¶ 5 ("Paramount had materially altered its production *and distribution* plans . . . .") (emphasis added).]

*Second*, the evidence has established that Paramount was not the maker of any of the statements alleged to be false. It is beyond dispute that the PPM was issued by Melrose Investors LLC. None of the contents of the PPM is attributed to Paramount; in fact, the PPM expressly states the contrary. *See* Trial Tr. 24:12-15. Under *Janus Capital Grp.* v. *First Derivative Traders*, 131 S. Ct. 2296, 2301-02 (2011), the evidence will not permit plaintiffs to sustain a federal securities claim.

Finally, and perhaps most critically, now midway through their case-in-chief, plaintiffs are nowhere near meeting their burden of proving the elements required to establish fraud under federal or state law. As the Court rightly recognized, plaintiffs' case is "based on an extremely narrow theory" that Paramount made a misrepresentation related to foreign presales. (Trial Tr. 709:13-14.)[2] Yet, among other things:

- Even if Paramount is somehow legally responsible for the PPM, Plaintiffs have not identified any false statements in the PPM regarding foreign territory sales. There are only *two* references to international pre-sales in the entirety of the PPM. *See* PX-601 at 11, 31. These references are far too general to be actionable. *See, e.g., C.D.T.S.* v. *UBS AG*, 2013 WL 6576031, at *4-5 (S.D.N.Y. Dec. 13, 2013) ("[T]outing good risk controls is the equivalent of a positive, aspirational puffery found inactionable by courts.") (Forrest, J.). None of the representations committed Paramount to any course of action with respect to territorial sales. And the statements are literally true—the evidence shows Paramount "opportunistically" entered into at least two territorial sales with respect to two films in the Melrose Slate *after* the allegedly undisclosed decision to discontinue such sales.

- The remainder of the PPM is also true. For example, immediately after referring to the "opportunistic" use of territory sales, the PPM disclosed that "[t]here can be no assurance that

---

[2] This limitation is the result of previous motion practice. In March 2010, the Court dismissed plaintiffs' first amended complaint as asserting allegations "too general" to state a claim for fraud. [ECF No. 26 at 19-20.] Plaintiffs then amended their complaint to add additional allegations focused on territorial pre-sales, [*See, e.g,* ECF No. 27 ¶¶ 41-56], and the court denied Paramount's motion to dismiss that complaint. [ECF No. 37.] Under the law of the case doctrine, in order to establish Paramount's liability for fraud, plaintiffs must prove those allegations that survived dismissal, namely, that Paramount made misrepresentations *specifically regarding territorial pre-sales. See Official Comm. of Unsecured Creditors of Color Tile, Inc.* v. *Coopers & Lybrand, LLP*, 322 F.3d 147, 167 (2d Cir.2003) ("[W]here litigants have once battled for the court's decision, they should neither be required, nor without good reason permitted, to battle for it again").

Kendall Brill & Klieger LLP

October 24, 2014
Page 3

    Paramount will implement the same techniques or achieve similar results in the future as it has in the past." (PX 601 at 31.) The PPM also disclosed that Paramount would "control all decisions . . . relating to the development and production" of the films in the Melrose Slate, as well as the decisions whether to pursue and consummate any co-financing transaction" and "will have complete authority to license, market and exploit the Covered Pictures and all rights therein, or to refrain from so doing, in accordance with such sales methodologies, policies and terms as it may, in its reasonable business judgment determine." (*Id.* at 36.) The PPM also disclosed press reports of "a desire by Viacom and Paramount management to pursue a more aggressive approach, both *fiscally* and artistically, to . . . development and production of motion pictures." (*Id.* at 92 (emphasis added).)

- Nor have Plaintiffs demonstrated that Paramount made any false statement *outside* the PPM; plaintiffs concede the TAC does not plead such oral misrepresentations. [ECF No. 141 at 3-5.] Under the terms of the Subscription Agreement, Plaintiffs warranted that they were "not relying" on any such statements "for purposes of making any investment decision or otherwise." (DX-3 ¶ 4(e)) The PPM includes similar provisions. (PX-601 at iii.) And in all events, Plaintiffs have identified no admissible evidence of a false statement *outside* the PPM.

- Plaintiffs will not meet their burden of establishing scienter. Plaintiffs have not presented evidence that Paramount intended to defraud anyone. To the contrary, Paramount *disclosed* detailed information regarding the amount of co-financing in the Melrose Slate. (*See, e.g.,* DX-181, 202) Furthermore, Paramount candidly disclosed to Merrill Lynch its supposedly secret board discussion about a strategy to "retain more foreign rights" months before the Melrose deal closed. [*See* PX-331.] This evidence refutes any allegation of scienter.

- Plaintiffs did not actually rely on any statements in the PPM regarding foreign pre-sales. As the Court recognized, if plaintiffs cannot establish "a foreign presale commitment or guarantee of some sort," they have no fraud claim. (Trial Tr. 709:22-23.) There is no evidence that three of the plaintiffs even asked about any specific type of co-financing in the Historical Data Set, and no evidence *any* plaintiff sought any guarantee or commitment regarding the level of co-financing in the Melrose Slate. Joseph Flynn of Allianz admitted as much. (Trial Tr. 590:4-10.) And Paramount does not expect, based on deposition testimony, that any credible evidence will be elicited from Mr. Hoffman or the remaining three plaintiffs on this point. (*See* Burnaman Dep. 120:6-7 ("I'm not aware that there was any guarantee involved in this transaction."); Hohmann Dep. 80:3-7 (PPM doesn't guarantee any particular level of co-financing); Springer Dep. 202:2-5 ("I understood that" he was not "being guaranteed [or] assured a particular mix [of co-financing techniques.")))

- Plaintiffs' federal securities claims turn on alleged misrepresentations not omissions. *See Affiliated Ute Citizens of Utah v. United States,* 406 U.S. 128, 153 (1972); *Starr ex rel. Estate of Sampson v. Georgeson S'holder, Inc.*, 412 F.3d 103, 109 n.5 (2d Cir. 2005) (*Affiliated Ute* presumption applies only in connection with claims involving primarily a failure to disclose). It is black-letter law that, where a plaintiff identifies allegedly false affirmative statements on a topic, it cannot invoke the presumption. *E.g., In re Lehman Bros. Sec. & ERISA Litig.*, 2013 WL 5730020, at *3 (S.D.N.Y. Oct. 22, 2013). Thus, Plaintiffs cannot prevail unless they prove reasonable reliance. And in light of the

information known to each plaintiff, any alleged reliance, even if it existed, was not reasonable.  The Melrose Slate schedule of covered pictures alerted Plaintiffs to the status of co-financing, if any, for each of the films in the slate as of the date of the schedule and in particular, showed that it was substantially lower than the Historical Data Set.  While plaintiffs claim that the schedule was "tentative," (Trial Tr. 611-8-612:7), it was unreasonable for them not to have raised any questions about this information given the purported importance of co-financing to their investment decision.

We respectfully submit that after a week of trial, it is apparent that there will be a failure of proof on liability.  At the least, given the clear potential for such an outcome, and given the obvious efficiencies that would result for both the Court and the parties, Paramount requests that the Court exercise its discretion to postpone the damages phase of the case, if any, until after a determination on liability.

                Respectfully submitted,

                Richard B. Kendall

210065.1